## VOLUME II OF III (PAGES A0631 – A2448)

### 2013-1665, -1666, -1667

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ADJUSTACAM, LLC,

Plaintiff-Appellant,

v.

NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.,

Defendants-Cross-Appellants,

and

SAKAR INTERNATIONAL, INC.,

Defendants-Cross-Appellant,

*Appeals from the United States District Court for the Eastern District of Texas in Case No. 10-cv-329, Chief Judge Leonard Davis*

## CORRECTED NON-CONFIDENTIAL JOINT APPENDIX

Date:  December 11, 2014

John J. Edmonds
Stephen F. Schlather
Shea N. Palavan
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone:  (281) 501-3425


***Attorneys for Plaintiff-Appellant
AdjustaCam, LLC***

Kent E. Baldauf, Jr.
Daniel H. Brean
Anthony W. Brooks
THE WEBB LAW FIRM
One Gatewar Center
420 Fort Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-885

***Attorneys for Defendant-Cross-
Appellants Newegg, Inc., Newegg.com,
Inc. and Rosewill, Inc.***

Ezra Sutton
EZRA SUTTON, P.A.
900 Route 9, Suite 201
Woodbridge, NJ 07095
Telephone: (732) 634-3520

***Attorneys for Defendant-Cross-
Appellants Sakar International, Inc.***

*AdjustaCam LLC v. Newegg, Inc., et al.*

Fed. Cir. Appeal Nos. 2013-1665, -1666, -1667

## INDEX OF NON-CONFIDENTIAL JOINT APPENDIX

| DATE | ECF NO. | TITLE | BEG APP'X NO. |
|---|---|---|---|
| 08/20/2013 | 762 | FINAL JUDGMENT that the parties take nothing and that all pending motions are DENIED AS MOOT | **A0001** |
| 08/19/2013 | 761 | ORDER denying 727 Sealed Motion for Declaration of Exceptional Case; denying 748 Sealed Motion for Declaration of Exceptional Case | **A0004** |
| 06/07/2012 | 650 | ORDER overruling pltf's objections 629 and defts' objections 632 , and adopting 627 Memorandum Opinion and Order of the US Magistrate Judge as the Opinion of this Court | **A0012** |
| 04/10/2012 | 627 | MEMORANDUM OPINION AND ORDER. The Court interprets the claim language in this case in the manner set forth in this Order | **A0013** |
| | | Entire Docket Sheet from the Proceedings Below | **A0028** |
| | | U.S. Patent No. 5,855,343 | **A0164** |
| 03/31/2014 | 782 | ORDER Granting Motion to Withdraw Motion to Correct or to Amend Judgment | **A0176** |
| 09/17/2013 | 765 | NOTICE OF APPEAL - FEDERAL CIRCUIT as to 650 Order, 627 Order, 762 Judgment, by AdjustaCam LLC | **A0193** |
| 09/17/2013 | 764 | NOTICE OF APPEAL - FEDERAL | **A0195** |

| DATE | ECF NO. | TITLE | BEG APP'X NO. |
|------|---------|-------|---------------|
|  |  | CIRCUIT as to 761 Order on Sealed Motion, 762 Judgment, by Newegg, Inc., Newegg.com, Inc., Rosewill Inc. |  |
| 02/05/2013 | 749 | SEALED RESPONSE to Motion re 748 SEALED MOTION DEFENDANT SAKAR INTERNATIONAL, INC.'S OPPOSED MOTION FOR DECLARATION OF EXCEPTIONAL CASE AND AWARD OF FEES AND NONTAXABLE EXPENSES filed by AdjustaCam LLC | **A0257** |
| 01/16/2013 | 748 | SEALED MOTION DEFENDANT SAKAR INTERNATIONAL, INC.'S OPPOSED MOTION FOR DECLARATION OF EXCEPTIONAL CASE AND AWARD OF FEES AND NONTAXABLE EXPENSES by Sakar International, Inc. with attachments | **A0285** |
| 12/14/2012 | 744 | Unopposed MOTION to Dismiss claims and counterclaims involving Defendants/Counter-claimants Sakar International, Inc., Kohls Illinois, Inc., Kohls Corporation, Inc. and Kohls Department Stores, Inc. by AdjustaCam LLC | **A0319** |
| 11/07/2012 | 736 | SEALED ADDITIONAL ATTACHMENTS to Main Document | **A0340** |
| 11/07/2012 | 735 | SEALED RESPONSE to Motion re 727 SEALED MOTION For Declaration of Exceptional Case and Award of Fees and Nontaxable Expenses filed by AdjustaCam LLC | **A1190** |
| 10/11/2012 | 728 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 727 SEALED MOTION | **A1224** |

| DATE | ECF NO. | TITLE | BEG APP'X NO. |
|---|---|---|---|
| | | For Declaration of Exceptional Case and Award of Fees and Nontaxable Expenses | |
| 10/11/2012 | 727 | SEALED MOTION For Declaration of Exceptional Case and Award of Fees and Nontaxable Expenses by Newegg, Inc., Newegg.com, Inc., Rosewill Inc. | **A1776** |
| 10/03/2012 | 724 | NOTICE by AdjustaCam LLC of Supplemental Authority in support of its opposed Motion to Dismiss | **A1867** |
| 10/02/2012 | 723 | Proposed Pretrial Order (Joint) by AdjustaCam LLC | **A1873** |
| 09/30/2012 | 721 | Opposed MOTION to Dismiss Remaining Defendants Sakar and Kohl's by AdjustaCam LLC | **A1955** |
| 09/27/2012 | 719 | Unopposed MOTION to Dismiss involving Defendants/Counter-claimants Newegg Inc., Newegg.com Inc., and Rosewill, Inc. by AdjustaCam LLC | **A1986** |
| 08/27/2012 | 678 | Opposed SEALED MOTION TO DISMISS CLAIMS AND COUNTERCLAIMS INVOLVING NEWEGG AND ROSEWILL by AdjustaCam LLC | **A2136** |
| 05/17/2012 | 642 | RESPONSE to 635 Response to Non-Motion,, PLAINTIFFS REPLY TO DEFENDANTS OPPOSITION TO PLAINTIFFS OBJECTIONS TO THE MAGISTRATES ORDER ON CLAIM CONSTRUCTION by AdjustaCam LLC | **A2171** |
| 05/07/2012 | 635 | RESPONSE to 629 Appeal of Magistrate Judge Decision to District Court by Best Buy | **A2348** |

| DATE | ECF NO. | TITLE | BEG APP'X NO. |
|---|---|---|---|
| | | Co Inc, Best Buy Stores, LP, BestBuy.com, LLC, CDW, LLC, Digital Innovations, LLC, Fry's Electronics Inc, Gear Head, LLC, Hewlett-Packard Company, KOHLS CORPORATION D/B/A KOHL'S, Kohl's Illinois, Inc., Micro Electronics, Inc. DBA Micro Center, Newegg, Inc., Newegg.com, Inc., Office Depot, Inc., Rosewill Inc., Sakar International, Inc., Wal-Mart Stores, Inc. | |
| 04/24/2012 | 629 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by AdjustaCam LLC re 627 Order | **A2436** |
| 03/02/2012 | 614 | OFFICIAL TRANSCRIPT of CLAIM CONSTRUCTION HEARING held on 2/9/12 before Judge John D. Love | **A2610** |
| 01/31/2012 | 601 | REPLY to 595 Claim Construction Brief,,, filed by AdjustaCam LLC | **A2718** |
| 01/17/2012 | 595 | CLAIM CONSTRUCTION BRIEF filed by Amazon.com, Inc., Auditek Corporation, Best Buy Co Inc, Best Buy Stores, LP, BestBuy.com, LLC, CDW Corporation F/K/A CDW Computer Centers, Inc., CDW, Inc., CDW, LLC, Compusa.com, Inc., Digital Innovations, LLC, Fry's Electronics Inc, Gear Head, LLC, Hewlett-Packard Company, KOHLS CORPORATION D/B/A KOHL'S, Kohl's Illinois, Inc., Micro Electronics, Inc. DBA Micro Center, New Compusa Corporation, Newegg, Inc., Newegg.com, Inc., Office Depot, Inc., Rosewill Inc., Sakar International, Inc., Systemax, Inc. D/B/A Compusa, Target Corp., Tigerdirect, Inc., | **A2740** |

| DATE | ECF NO. | TITLE | BEG APP'X NO. |
|---|---|---|---|
|  |  | Wal-Mart Stores, Inc. |  |
| 12/19/2011 | 575 | CLAIM CONSTRUCTION BRIEF filed by AdjustaCam LLC | **A2806** |
| 07/02/2010 | 1 | COMPLAINT | **A3670** |

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by a United States District Court has been redacted. Pages noted with "THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE" contain information derived from confidential third party settlement agreements.

*Adjustacam LLC v. Amazon.com, Inc., et al.*

**Exhibit 7**

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

| # | Licensor | Licensee | Effective Date | Patent | Scope | Term | MFN | Covenant Not to Sue | Not Contesting Validity / Enforceability | Lump-Sum | Running-Royalty | Notes | Source |
|---|----------|----------|----------------|--------|-------|------|-----|--------------------|--------------------------------------------|----------|-----------------|-------|--------|
| 1 | Par Technologies, Inc. | Philips Electronics North America Corporation & Koninklijke Philips Electronics N.V. | 10/22/2001 | 5,855,343 | Non-exclusive right to make, have made, use, offer to sell, sell and/or import Licensed Products in the U.S. | Until expiration of '343 Patent or until every claim of patent is held invalid or unenforceable | Yes | No | No | ▮ | | | ADJCAM-SETTLE000001 - 15 |
| 2 | Par Technologies, Inc. | | 12/31/2001 | 5,855,343 | Worldwide, non-exclusive license to make, have made, use, lease, sell, offer to sell, import, export, distribute, and otherwise dispose of Licensed Products sold by | Until 3/7/2017 | No | Yes | No | | | | ADJCAM-SETTLE000001 - 15 |
| 3 | Par Technologies, Inc. / WIYN Investments, Inc. / GlobalMedia Group, LLC | | 7/25/2002 | 5,855,343 | Worldwide, non-exclusive right and license (1) to make, have made, use, lease, sell, offer to sell, import, export, distribute, have distributed, and otherwise dispose of USB webcams utilizing the Kritter Design (2) to use and modify the Kritter Design for ▮ design and development purposes in creating the USB Cameras hereunder | Perpetual license for life of '343 Patent | No | No | No | | | | |
| 4 | GlobalMedia Group, LLC | Acacia Patent Acquisition LLC ("APAC") | 2/22/2010 | 5,855,343 | Worldwide, exclusive right and license under Patents to make, have made, use, import, offer or sell products or services covered by the Patents, including the exclusive right to grant sublicense  GlobalMedia grants APAC the exclusive right to enforce the Existing Agreements.  APAC grants back to GlobalMedia a limited, non-transferable, royalty-free, personal right and license under the Patents to make, use, offer to sell Licensor's products/services. | Until the later of (a) the expiration date of the Patents or (b) the conclusion of APAC's licensing and enforcement of the Patents | No | No | No | N/A | APAC shall pay equal to (a) 50% of Net Proceeds up to $30M; (b) if Net Proceeds $30M - $50M, APAC shall pay Licensor 55% and keep 45%; (c) If Net Proceeds exceed $50M, APAC shall pay Licensor 60% and keep 40%.  "Net Proceeds" Total Recoveries less APAC costs. | | GLOBALMEDIA 000052 - 64 |
| 5 | AdjustaCam | Trippe Manufacturing Company | 9/21/2010 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell methods, apparatuses and systems covered by the claims of the Licensed Patents | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ▮ | | | ADJCAM-SETTLE000060 - 69 |
| 6 | AdjustaCam | Intcomex, Inc. & Klip Extreme, LLC & Software Brokers of America, Inc. | 11/22/2010 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell methods, apparatuses and systems covered by the claims of the Licensed Patents | Until expiration of the last surviving Licensed Patent | No | Yes | Yes | | | | ADJCAM-SETTLE000038 - 48 |
| 7 | AdjustaCam | Jasco Products Company LLC | 12/28/2010 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ▮ | N/A | | ADJCAM-SETTLE000016 - 26 |

Expert Report of Walt Bratic
June 25, 2012

| # | Licensor | Licensee | Effective Date | Patent | Scope | Term | MFN | Convenant Not to Sue | Not Contesting Validity / Enforceability | Lump-Sum | Running-Royalty | Notes | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | AdjustaCam | Phoebe Micro, Inc. | 3/17/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ■ | ■ | ■ | ADJCAM-SETTLE000049 -59 |
| 9 | AdjustaCam | jWin Electronics Corp. | 3/23/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ■ | ■ | | ADJCAM-SETTLE000027 -37 |
| 10 | AdjustaCam | KYE International Corporation, KYE Systems America Corporation, and KYE Systems Corporation | 3/24/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until the expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ■ | N/A | | "Settlement and Patent License Agreement between Adjustacam and KYE, March 24, 2011" |
| 11 | AdjustaCam | Trust International B.V. | 6/3/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ■ | ■ | | ADJCAM-SETTLE000106 -116 |
| 12 | AdjustaCam | **Chicony Global Inc.** | 6/28/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000097 -105 |
| 13 | AdjustaCam | RadioShack Corporation | 8/8/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000117 -126 |
| 14 | AdjustaCam | Baltic Latvian Universal Electronics, LLC | 8/11/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000127 -139 |
| 15 | AdjustaCam | Overstock.com, Inc. | 9/12/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration of the last-to-expire Licensed Patent | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000191 -201 |
| 16 | AdjustaCam | Dell Inc. | 11/3/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until expiration or final determination of invalidity of the last surviving Licensed Patent | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000153 -163 |
| 17 | AdjustaCam | MACE GROUP, Inc and MACALLY PERIPHERALS, INC. d/b/a MACALLY U.S.A. | 11/11/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000176 -190 |
| 18 | AdjustaCam | Creative Technology, Ltd. & Creative Labs, Inc. | 11/18/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ■ | N/A | Settlement includes claims to Licensed Products sold by Best Buy/Rocketfish and Licensee's other customers | ADJCAM-SETTLE000142 -152 |
| 19 | AdjustaCam | J&R Electronics Inc. | 12/30/2011 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until latest date of the expiration of the Licensed Patents | No | Yes | Yes | ■ | N/A | | ADJCAM-SETTLE000164 -175 |

| # | Licensor | Licensee | Effective Date | Patent | Scope | Term | MFN | Convenant Not to Sue | Not Contesting Validity / Enforceability | Lump-Sum | Running-Royalty | Notes | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | AdjustaCam | CompUSA.com, New CompUSA Corporation, Systemax, Inc., and Tiger Direct, Inc. | 3/15/2012 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ▇▇▇ | N/A | | ADJCAM-SETTLE000202 - 212 |
| 21 | AdjustaCam | Amazon.com, Inc. | 3/22/2012 | 5,855,343 | Licensor grants Licensee, its Affiliates and Third Parties to the extent of their Licensed Third-Party Activity, a worldwide, non-exclusive, non-transferable, fully paid-up license to the Licensed Patents | From the Effective Date until the last expiration date of any Licensed Patent | No | Yes | Yes | ▇▇▇ | N/A | | ADJCAM-SETTLE000200 - 222 |
| 22 | AdjustaCam | Auditek Corporation | 5/10/2012 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ▇▇▇▇▇▇▇▇▇ | ▇▇▇▇▇ | | "Settlement and Patent License Agreement between Adjustacam and Auditek Corporation, May 10, 2012" |
| 23 | AdjustaCam | Digital Innovations, LLC | 5/31/2012 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Effective date until 3/7/2017 | No | Yes | Yes | ▇▇▇ | N/A | | ADJCAM-SETTLE000202 - 213 |
| 24 | AdjustaCam | CDW Corporation f/k/a CDW Computer Centers, Inc. and CDW, Inc. | 6/22/2012 | 5,855,343 | Worldwide, non-exclusive, non-transferable, fully paid-up license to make, have made, use, import, offer to sell and sell the Licensed Products | Until the last to expire of the Licensed Patents, plus six years | No | Yes | No | ▇▇▇ | N/A | | "Settlement and Patent License Agreement between Adjustacam and CDW Corporation, July 22, 2012" |

Highly Confidential – Attorneys' Eyes Only Material

Expert Report of Walt Bratic
June 25, 2012

**A0633**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

ADJUSTACAM, LLC          :
                         :
                         :
                         :
VS.                      : CASE NO. 6:10-CV-329-LED
                         :
AMAZON.COM, INC.,        :
ET AL                    :


*****************************************

ORAL DEPOSITION OF

WALTER BRATIC

AUGUST 28, 2012

*****************************************

     ORAL DEPOSITION of WALTER BRATIC, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered cause
on Tuesday, the 28th day of August, 2012, from
9:10 a.m. to 3:59 p.m., before Lesia J.P. Wagner, CSR
in and for the State of Texas, recorded by machine
shorthand, at the offices of Collins Edmonds &
Pogorzelski, 1616 S. Voss Road, Suite 125, Houston,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto; the deposition shall be read and signed before
any notary public.

"CONFIDENTIAL"

|   |   |
|---|---|
| | 1 |
| 09:10:38 | 2 |
| 09:10:42 | 3 |
| 09:10:42 | 4 |
| 09:10:42 | 5 |
| 09:10:42 | 6 |
| 09:10:54 | 7 |
| 09:10:54 | 8 |
| 09:10:58 | 9 |
| 09:11:01 | 10 |
| 09:11:02 | 11 |
| 09:11:05 | 12 |
| 09:11:06 | 13 |
| 09:11:07 | 14 |
| 09:11:08 | 15 |
| 09:11:10 | 16 |
| 09:11:12 | 17 |
| 09:11:14 | 18 |
| 09:11:15 | 19 |
| 09:11:16 | 20 |
| 09:11:18 | 21 |
| 09:11:23 | 22 |
| 09:11:24 | 23 |
| 09:11:27 | 24 |
| 09:11:31 | 25 |

1    (Marked was Exhibit No. 1.)

2         THE REPORTER:  The time is 9:10 a.m.,

3    and we're on the record.

4              WALTER BRATIC,

5    after being first duly sworn, testified as follows:

6              EXAMINATION

7    BY MR. HERBERHOLZ:

8    Q.   Good morning, Mr. Bratic.  My name is Dana

9    Herberholz.  I represent Newegg Inc. and Rosewill Inc.

10   in this matter.

11        Can you state your name for the record,

12   please?

13   A.   Walter Bratic.

14   Q.   What's the spelling of that?

15   A.   B-r-a-t-i-c.

16   Q.   Thank you.

17        I'm going to hand you what's been marked

18   as Exhibit No. 1.

19   A.   Okay.

20   Q.   It's a notice of deposition that's been

21   served.  Have you seen a copy of this, Mr. Bratic?

22   A.   Yes.

23   Q.   And you'll see here at the -- toward the

24   bottom of the notice on Page 1, we ask that you bring

25   invoices for your work relative to the lawsuit.  Do you

09:44:28  1      Q.   What specifically do you recall about that

09:44:31  2    interview?

09:44:32  3      A.   Well, everything I discussed with

09:44:33  4    Mr. Barthelemy is cited in my report, so I'll just

09:44:36  5    refer you to the footnotes where I talk about that.

09:44:48  6               If you'll go to Page 14.

09:44:50  7      Q.   Uh-huh.

09:44:52  8      A.   If you'll look at Footnote 61, 62, and 63,

09:45:02  9    which are referenced in Paragraph 33 --

09:45:04 10      Q.   Uh-huh.

09:45:04 11      A.   -- that's the subject matter of my discussion

09:45:07 12    with Mr. Barthelemy.  I believe that's the extent of

09:45:16 13    it.

09:45:27 14               Now, go to Footnote 211, which is on

09:45:31 15    Page 33, Paragraph 75.  And that's it.

09:45:59 16      Q.   Okay.  So aside from Footnote 61 to 63,

09:46:04 17    Footnote 211, are you aware of any other --

09:46:12 18      A.   Subject matter?

09:46:13 19      Q.   Yes, thank you -- any other areas of subject

09:46:15 20    matter that you discussed with Mr. Barthelemy that

09:46:18 21    aren't listed here in your report?

09:46:20 22      A.   No.

09:46:20 23      Q.   Let's take a look at Footnote 61 briefly.

09:46:24 24      A.   Okay.  All right.

09:46:29 25      Q.   Is it fair to say that you and

Case: 13-1665   Document: 97-2   Page: 14   Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

37

09:46:32   1    Mr. Barthelemy, during your interview, discussed what

09:46:34   2    GlobalMedia and PAR Technologies would have considered

09:46:41   3    in a hypothetical negotiation for rights to the '343

09:46:45   4    patent?

09:46:45   5          A.   Yes.

09:46:45   6          Q.   And you understand that Mr. Barthelemy was a

09:46:51   7    representative of PAR Technologies at the time of PAR's

09:46:55   8    license with Philips.  Is that correct?

09:46:57   9          A.   Well, I don't know what his capacity was, but

09:47:00   10   he certainly told me that he was involved in PAR's

09:47:02   11   negotiations with Philips and ▮▮▮▮▮▮

09:47:04   12         Q.   Okay.

09:47:05   13         A.   The first two licenses that were executed for

09:47:09   14   the '343 patent.

09:47:09   15         Q.   Did he tell you what his specific role in

09:47:12   16   those negotiations was?

09:47:12   17         A.   No, other than he was very involved in them,

09:47:14   18   and so that would have set the predicate for all

09:47:19   19   subsequent licensing that took that licensing model.

09:47:26   20         Q.   Do you recall speaking with Mr. Barthelemy

09:47:27   21   about a minimum per-unit royalty of $1.25?

09:47:34   22         A.   Yes.

09:47:34   23         Q.   What did you specifically discuss with

09:47:36   24   Mr. Barthelemy in that regard?

09:47:39   25         A.   Well, the minimum royalty of -- let me look.

| | |
|---|---|
| 09:48:13 | 1 |
| 09:48:16 | 2 |
| 09:48:18 | 3 |
| 09:48:22 | 4 |
| 09:48:26 | 5 |
| 09:48:28 | 6 |
| 09:48:30 | 7 |
| 09:48:33 | 8 |
| 09:48:36 | 9 |
| 09:48:39 | 10 |
| 09:48:42 | 11 |
| 09:48:47 | 12 |
| 09:48:52 | 13 |
| 09:48:56 | 14 |
| 09:48:58 | 15 |
| 09:49:02 | 16 |
| 09:49:04 | 17 |
| 09:49:07 | 18 |
| 09:49:13 | 19 |
| 09:49:13 | 20 |
| 09:49:15 | 21 |
| 09:49:18 | 22 |
| 09:49:25 | 23 |
| 09:49:27 | 24 |
| 09:49:29 | 25 |

1  I'm sorry.  Would you repeat your question?

2       Q.   Yeah.  I asked:  What specifically did you

3  discuss with Mr. Barthelemy in that regard; that is, in

4  regard to a minimum per-unit royalty of $1.25?

5       A.   Well, they were looking -- he explained to me

6  the situation with respect to the Philips license,

7  where they granted Philips the "most favored nations"

8  clause for any subsequent licenses.  And so they -- in

9  recognition of that, his understanding was, based on

10  their negotiation with Philips, that Philips was not --

11  did not have high volumes nor did they expect to have

12  high volumes in sales of webcams, but their target was

13  to get around $1.25 effective royalty per unit.

14       Q.   Okay.  And you're saying that was their

15  target, was to get around $1.25 effective royalty per

16  unit.  Are you referring to PAR Technologies?

17       A.   Well, PAR, and then subsequently that would

18  have been GlobalMedia's mindset, was to seek a royalty

19  in the $1.25 to $1.50 frame.

20       Q.   So Mr. Barthelemy, during your interview,

21  told you that it was both PAR's desire and the desire

22  of GlobalMedia to seek a minimum per-unit royalty of

23  $1.25 for the '343 patent?  Is that right?

24       A.   No, that's not what I said.  That the target

25  was in the range of $1.25 to $1.50 per unit.

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

39

```
09:49:33  1         Q.   Okay.  And that applies to both PAR
09:49:36  2    Technologies and GlobalMedia?
09:49:37  3         A.   Yes.
09:49:38  4         Q.   Okay.  Did you discuss any of the accused
09:49:42  5    products in this matter with Mr. Barthelemy?
09:49:44  6         A.   No.
09:49:44  7         Q.   Did you discuss the expert reports of any
09:49:52  8    other expert in this matter with Mr. Barthelemy?
09:49:53  9         A.   No.
09:49:54 10         Q.   Did Mr. Barthelemy explain to you why --
09:50:04 11    well, first of all, did Mr. Barthelemy explain to you
09:50:06 12    that there was an established royalty of $1.25 per unit
09:50:10 13    or minimum -- established royalty of a minimum of $1.25
09:50:21 14    per unit at the time you spoke with him?
09:50:21 15         A.   Well, I don't know that he used the word
09:50:22 16    "established royalty," but he clearly made it clear
09:50:24 17    that that was the goal, was the $1.25 to $1.50 per
09:50:29 18    unit.  But they recognized that with the Philips "most
09:50:31 19    favored nation" clause and then the license of the
09:50:34 20    subsequent that they executed with ████████ who was
09:50:37 21    the volume leader in the industry, that they were
09:50:39 22    targeting $1.25 to $1.50 per unit.
09:50:39 23         Q.   Did Mr. --
09:50:43 24         A.   And that was consistent with what they had
09:50:45 25    observed with other licenses.
```

"CONFIDENTIAL"

| | | |
|---|---|---|
| 09:50:46 | 1 | Q.   Did Mr. Barthelemy explain why GlobalMedia |
| 09:50:50 | 2 | and PAR were targeting a per-unit royalty of $1.25 to |
| 09:50:54 | 3 | $1.50? |
| 09:50:56 | 4 | A.   Well, because that's what they felt was the |
| 09:50:57 | 5 | value of the technology associated with the webcam |
| 09:51:01 | 6 | clip, the patent clip. |
| 09:51:02 | 7 | Q.   Okay.  So Mr. -- okay.  Did he -- did |
| 09:51:05 | 8 | Mr. Barthelemy explain what his basis for that is; in |
| 09:51:09 | 9 | other words, what his basis was for the statement that |
| 09:51:11 | 10 | the webcam clip was worth between $1.25 and $1.50? |
| 09:51:16 | 11 | A.   I don't recall specifics of that. |
| 09:51:23 | 12 | Q.   Do you know if Mr. Barthelemy has a financial |
| 09:51:26 | 13 | interest in the outcome of this litigation? |
| 09:51:27 | 14 | A.   I do not. |
| 09:51:31 | 15 | Q.   It says here that you spoke with Mr. Wong as |
| 09:51:37 | 16 | well, correct? |
| 09:51:39 | 17 | A.   Yes. |
| 09:51:39 | 18 | Q.   Okay.  Was that a telephonic interview? |
| 09:51:42 | 19 | A.   It was. |
| 09:51:43 | 20 | Q.   Just one interview? |
| 09:51:45 | 21 | A.   There were at least two. |
| 09:51:48 | 22 | Q.   Okay.  Do you recall when those took place? |
| 09:51:49 | 23 | A.   Well, the first one was during the process of |
| 09:51:54 | 24 | preparing my report, so it would have certainly been |
| 09:51:59 | 25 | prior to June 25, 2012. |

"CONFIDENTIAL"

| | | |
|---|---|---|
| 09:52:01 | 1 | Q.   Okay.  When was the second one? |
| 09:52:02 | 2 | A.   The second one was yesterday. |
| 09:52:05 | 3 | Q.   When you were preparing your report, did you |
| 09:52:20 | 4 | ask to speak with Mr. Wong? |
| 09:52:21 | 5 | A.   I did. |
| 09:52:22 | 6 | Q.   What was the reason for that? |
| 09:52:23 | 7 | A.   Well, because Mr. Wong, when Acacia had |
| 09:52:31 | 8 | acquired -- Acacia and AdjustaCam acquired the rights |
| 09:52:32 | 9 | to the '343 patent, then AdjustaCam had negotiated |
| 09:52:36 | 10 | several licenses, and I wanted to understand the |
| 09:52:39 | 11 | context of what information was made and known and |
| 09:52:41 | 12 | understood between the parties to those negotiations on |
| 09:52:45 | 13 | behalf of AdjustaCam and on behalf of the licensees. |
| 09:52:50 | 14 | Q.   So you felt you needed to speak with Mr. Wong |
| 09:52:53 | 15 | to understand the basis of AdjustaCam's license |
| 09:52:58 | 16 | agreements in this case? |
| 09:52:59 | 17 | A.   Well, I needed to get some information -- |
| 09:53:02 | 18 | there were 14 licenses, for example, prior to issuance |
| 09:53:06 | 19 | of my report, 14 licenses that were lump-sum, which did |
| 09:53:15 | 20 | not call for anyone in the world to read. |
| 09:53:15 | 21 | THE REPORTER:  I'm sorry.  "Which did |
| 09:53:15 | 22 | not call"? |
| 09:53:16 | 23 | THE WITNESS:  That's fine.  I'm sorry. |
| 09:53:17 | 24 | I've got a cold.  I apologize.  Let me |
| 09:53:19 | 25 | know where you trailed off -- okay.  Let's start over. |

"CONFIDENTIAL"

|           |    |                                                                     |
|-----------|----|---------------------------------------------------------------------|
| 09:53:28  | 1  | A.    Prior to the issuance of my report, I noted                   |
| 09:53:31  | 2  | that there were 14 licenses that were issued, executed,             |
| 09:53:35  | 3  | involving the '343 patent, that involved lump-sum                   |
| 09:53:38  | 4  | amounts, with no ongoing running royalty obligations.               |
| 09:53:42  | 5  | So one of the things I wanted to know from -- ask                   |
| 09:53:46  | 6  | Mr. Wong about was what was it about those licenses                  |
| 09:53:49  | 7  | that characterized them as lump-sum payments and what               |
| 09:53:53  | 8  | was the underlying understanding about the sales                    |
| 09:53:56  | 9  | associated with the infringing or licensed product.                 |
| 09:54:00  | 10 | And based on my understanding, as I said                            |
| 09:54:03  | 11 | in my report, the target was in the range of $1.25 to               |
| 09:54:08  | 12 | $1.50 per unit, based on the representations made by                 |
| 09:54:11  | 13 | those perspective licensees about the volumes of                    |
| 09:54:15  | 14 | accused webcams that they were selling and that they                |
| 09:54:19  | 15 | were likely to sell.  And that was part of my                       |
| 09:54:23  | 16 | discussion with Mr. Wong.                                           |
| 09:54:26  | 17 | Q.    (By Mr. Herberholz) So you mentioned the 14                   |
| 09:54:28  | 18 | lump-sum licenses?                                                  |
| 09:54:30  | 19 | A.    That's right.                                                 |
| 09:54:30  | 20 | Q.    Any other reason you felt it was necessary to                |
| 09:54:33  | 21 | speak with Mr. Wong in preparing your opinions in this             |
| 09:54:36  | 22 | case?                                                              |
| 09:54:36  | 23 | A.    Well, yes.  I wanted to understand also about                |
| 09:54:39  | 24 | the licenses with respect to the six other licenses he            |
| 09:54:43  | 25 | executed -- that were executed, that involved an                   |

"CONFIDENTIAL"

| | |
|---|---|
| 09:54:45 | 1 |
| 09:54:51 | 2 |
| 09:54:59 | 3 |
| 09:55:24 | 4 |
| 09:55:28 | 5 |
| 09:55:36 | 6 |
| 09:55:38 | 7 |
| 09:55:43 | 8 |
| 09:55:46 | 9 |
| 09:55:48 | 10 |
| 09:55:52 | 11 |
| 09:56:01 | 12 |
| 09:56:03 | 13 |
| 09:56:04 | 14 |
| 09:56:05 | 15 |
| 09:56:09 | 16 |
| 09:56:12 | 17 |
| 09:56:15 | 18 |
| 09:56:17 | 19 |
| 09:56:18 | 20 |
| 09:56:19 | 21 |
| 09:56:19 | 22 |
| 09:56:22 | 23 |
| 09:56:22 | 24 |
| 09:56:28 | 25 |

up-front payment with a running royalty option.

Q.   Any other reasons?

A.   Let me look.

One of the other things I do recall is that Mr. Wong was very -- Mr. Wong and AdjustaCam were very aware of the fact that they could not claim royalties before July 2, 2010.  So that was -- went into the equation and the calculation of the imputed royalty rates for the lump sums and even for the licenses involving the up- -- lump-sum payment with the running royalty option.

MR. SUTTON:  Can I ask the witness to just speak up a bit?

MR. EDMONDS:  I'm going to turn up the volume.  He's got a cold, so, I'll just ask him to do the best he can.

MR. SUTTON:  Thank you.

Q.   (By Mr. Herberholz) Mr. Bratic, we've talked about the --

A.   I'm not done.

Q.   Oh, I'm sorry.  Continue.

A.   You asked me an open-ended question, so let me finish, please.

Q.   Please do.

A.   We also discussed a little about the -- we

"CONFIDENTIAL"

Case: 13-1665   Document: 97-2   Page: 21   Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

44

```
09:56:30   1    discussed the Chicony license and how Chicony

09:56:34   2    approached AdjustaCam, seeking a license.

09:57:41   3              We discussed, and I've also mentioned to

09:57:43   4    you already, that ███████ they understood, was going

09:57:54   5    to be -- was the volume leader in terms of all the

09:57:54   6    licensees in respect to their sales.

09:58:21   7              I'm trying not to be, you know, redundant

09:58:24   8    here.

09:58:44   9              As to the 14 lump-sum payments, those

09:58:52  10    licensees provided AdjustaCam with past sales information

09:58:56  11    which was configured into their calculations to get to

09:59:01  12    their imputed royalty rate of $1.25 to $1.50 per unit.

09:59:14  13         Q.   Where in your report are you reading from?

09:59:15  14         A.   Right now I'm reading from Paragraph 70.

09:59:29  15              And that -- that's the general

09:59:50  16    recollection of the general subject matter of the

09:59:54  17    discussions with Mr. Wong, except for the call

09:59:59  18    yesterday.

09:59:59  19         Q.   Okay.  What was the nature of your call with

10:00:04  20    Mr. Wong yesterday?

10:00:05  21         A.   Well, since my report had been filed, both my

10:00:08  22    reports had been filed, I received two additional

10:00:12  23    licenses that were executed, one with Gear Head and one

10:00:14  24    with HP.  So my discussions with Mr. Wong were based on

10:00:21  25    those two licenses, and he advised me that those two
```

"CONFIDENTIAL"

Case: 13-1665    Document: 97-2    Page: 22    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

45

| | | |
|---|---|---|
| 10:00:25 | 1 | licenses were negotiated much like all the other |
| 10:00:28 | 2 | licenses regarding the past volumes from July 2nd, 2010 |
| 10:00:37 | 3 | through the license date, and what the understandings |
| 10:00:40 | 4 | and representations were made to AdjustaCam regarding |
| 10:00:45 | 5 | future sales of licensed products. |
| 10:00:51 | 6 | Q.  So in your call yesterday -- I just want to |
| 10:00:54 | 7 | make sure I understand this -- Mr. Wong advised you |
| 10:00:56 | 8 | that the HP and Gear Head settlements were negotiated |
| 10:01:01 | 9 | like the other settlements in this case? |
| 10:01:02 | 10 | A.  That's correct. |
| 10:01:03 | 11 | Q.  And specifically, those settlements were |
| 10:01:07 | 12 | negotiated with past volumes of sales in mind, as well |
| 10:01:12 | 13 | as representations regarding future sales.  Is that |
| 10:01:15 | 14 | right? |
| 10:01:15 | 15 | A.  Yes.  But past sales that were licensable. |
| 10:01:25 | 16 | Q.  What makes a past sale licensable? |
| 10:01:28 | 17 | A.  Well, because of the marking -- the fact that |
| 10:01:31 | 18 | ████ and Philips never marked their products, it |
| 10:01:35 | 19 | was my understanding that AdjustaCam recognized that it |
| 10:01:39 | 20 | could not seek royalties from any licensee prior to |
| 10:01:44 | 21 | filing suit. |
| 10:01:44 | 22 | Q.  So when you say "past sales that were |
| 10:01:47 | 23 | licensable," you're referring to sales after the |
| 10:01:50 | 24 | complaint was filed in this matter? |
| 10:01:51 | 25 | A.  Yes.  And what I meant by "past sales that |

"CONFIDENTIAL"

A0667

10:01:54  1    were licensable," meaning those sales that were from

10:01:57  2    today, going back to July 2, 2010, when the complaint

10:02:03  3    was filed.

10:02:03  4        Q.   You understand the term "noninfringing

10:02:06  5    alternatives," don't you?

10:02:07  6        A.   I do.

10:02:08  7        Q.   Did you at any time discuss with Mr. Wong

10:02:11  8    noninfringing alternatives?

10:02:12  9        A.   Not with Mr. Wong, no.

10:02:14  10       Q.   So aside from discussing the Gear Head and HP

10:02:19  11   settlement agreements with Mr. Wong yesterday, did you

10:02:21  12   and Mr. Wong discuss anything else?

10:02:23  13       A.   No.

10:02:23  14       Q.   How long was your call with Mr. Wong

10:02:27  15   yesterday?

10:02:27  16       A.   Five minutes.

10:02:28  17       Q.   How long was your first call with Mr. Wong?

10:02:30  18       A.   About 45 minutes to an hour.

10:02:32  19       Q.   So I want to go back to your first interview

10:02:35  20   with Mr. Wong.

10:02:36  21       A.   All right.

10:02:36  22       Q.   You referenced 14 licenses that were

10:02:41  23   lump-sum, and then you referenced another six licenses

10:02:43  24   that involved an up-front payment and a running royalty

10:02:48  25   option.  Is that right?

"CONFIDENTIAL"

Case: 13-1665    Document: 97-2    Page: 24    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

47

| | | |
|---|---|---|
| 10:02:49 | 1 | A.   Correct. |
| 10:02:49 | 2 | Q.   Okay.  So 20 licenses, you discussed with |
| 10:02:52 | 3 | Mr. Wong during your first interview.  Is that right? |
| 10:02:54 | 4 | A.   No, that's not true.  We also discussed the |
| 10:02:57 | 5 | Philips and ███████ license, which is referenced in my |
| 10:03:01 | 6 | report. |
| 10:03:01 | 7 | Q.   Okay.  But the -- |
| 10:03:01 | 8 | A.   The bottom line is there were 22 licenses |
| 10:03:03 | 9 | that were executed before my report was filed.  I |
| 10:03:05 | 10 | discussed all 22 with Mr. Wong. |
| 10:03:06 | 11 | Q.   Now, 20 of those licenses involved |
| 10:03:09 | 12 | AdjustaCam, correct? |
| 10:03:09 | 13 | A.   Correct. |
| 10:03:10 | 14 | Q.   Now, why was it that you felt you needed to |
| 10:03:13 | 15 | speak with Mr. Wong about licenses that involved |
| 10:03:17 | 16 | AdjustaCam? |
| 10:03:18 | 17 | A.   I don't understand the question. |
| 10:03:18 | 18 | Q.   My question is:  AdjustaCam is the party to |
| 10:03:20 | 19 | this lawsuit? |
| 10:03:21 | 20 | A.   Right. |
| 10:03:21 | 21 | Q.   They're the plaintiff, right? |
| 10:03:22 | 22 | A.   Right. |
| 10:03:23 | 23 | Q.   Did you ever request to speak with a |
| 10:03:27 | 24 | representative of AdjustaCam to discuss those licenses, |
| 10:03:30 | 25 | those 20 licenses? |

**"CONFIDENTIAL"**

**A0669**

| | | |
|---|---|---|
| 10:03:31 | 1 | A.   No, because Mr. Wong was the party that |
| 10:03:33 | 2 | negotiated those licenses. |
| 10:03:35 | 3 | Q.   Okay.  That was on behalf of Acacia? |
| 10:03:38 | 4 | A.   On behalf of AdjustaCam and Acacia. |
| 10:03:41 | 5 | Q.   Okay. |
| 10:03:41 | 6 | A.   That's why I spoke with him.  He was the |
| 10:03:43 | 7 | party representative in those negotiations. |
| 10:03:48 | 8 | Q.   And that was for all 20 of the AdjustaCam |
| 10:03:52 | 9 | settlement agreements? |
| 10:03:54 | 10 | A.   Yes, as well as the two new ones that we |
| 10:03:58 | 11 | discussed, Gear Head and HP. |
| 10:04:03 | 12 | We've been going about an hour.  I'd like |
| 10:04:04 | 13 | to -- |
| 10:04:04 | 14 | Q.   Do you want to take a break? |
| 10:04:06 | 15 | A.   Yes. |
| 10:04:06 | 16 | MR. HERBERHOLZ:  Yeah, let's take a |
| 10:04:21 | 17 | break.  That's fine. |
| 10:04:21 | 18 | (Recess taken from 10:04 a.m. to 10:12 a.m.) |
| 10:13:03 | 19 | MR. HERBERHOLZ:  Okay.  We're back on |
| 10:13:04 | 20 | the record. |
| 10:13:05 | 21 | Q.   (By Mr. Herberholz) Mr. Bratic, do you |
| 10:13:06 | 22 | understand you're still under oath? |
| 10:13:07 | 23 | A.   I do. |
| 10:13:08 | 24 | Q.   Okay.  Before we took our morning break, we |
| 10:13:10 | 25 | were talking about a couple of interviews that you had |

| | | |
|---|---|---|
| 10:13:11 | 1 | with Mr. Wong. |
| 10:13:12 | 2 | A.    Yes. |
| 10:13:15 | 3 | Q.    And I want to go back to the first interview |
| 10:13:17 | 4 | that you had with Mr. Wong. |
| 10:13:21 | 5 | A.    Okay. |
| 10:13:21 | 6 | Q.    I believe you testified that you and |
| 10:13:23 | 7 | Mr. Wong, during that interview, discussed the Chicony |
| 10:13:26 | 8 | license.  Is that right? |
| 10:13:27 | 9 | A.    Yes. |
| 10:13:28 | 10 | Q.    What specifically did you discuss with |
| 10:13:38 | 11 | Mr. Wong in that regard? |
| 10:14:22 | 12 | A.    Well, let me look.  Well, if you look at |
| 10:14:23 | 13 | Footnote 124, Mr. Wong stated that Chicony approached |
| 10:14:28 | 14 | AdjustaCam for a license.  And just to be clear, |
| 10:14:31 | 15 | Mr. Wong was AdjustaCam's agent, if you will, for |
| 10:14:35 | 16 | licensing these -- the '343 patent to various parties |
| 10:14:42 | 17 | on behalf of AdjustaCam. |
| 10:14:43 | 18 | So he advised me that Chicony approached |
| 10:14:46 | 19 | him and Chicony did not tell him who their licensee -- |
| 10:14:52 | 20 | who their customers were -- who its customers were |
| 10:14:57 | 21 | until they had already agreed upon the amount of |
| 10:15:02 | 22 | license, based on estimates Chicony provided.  And |
| 10:15:05 | 23 | Chicony also advised them that Chicony was a foreign |
| 10:15:08 | 24 | entity, that they didn't directly ship product into the |
| 10:15:12 | 25 | United States, and so they weren't a direct -- they |

| | | |
|---|---|---|
| 10:15:13 | 1 | were not subject to, you know, a claim of infringement. |
| 10:15:18 | 2 | Q.   Okay.  And that's -- that's set forth in your |
| 10:15:21 | 3 | report, isn't it? |
| 10:15:21 | 4 | A.   I'm sorry? |
| 10:15:23 | 5 | Q.   That conversation you just described, those |
| 10:15:25 | 6 | details are set forth in your report? |
| 10:15:27 | 7 | A.   Yes. |
| 10:15:29 | 8 | Q.   And what were you referring to -- |
| 10:15:30 | 9 | A.   I was referring to Footnote 124. |
| 10:15:33 | 10 | Q.   Do you recall speaking with Mr. Wong about |
| 10:15:36 | 11 | any other issues related to Chicony, other than those |
| 10:15:39 | 12 | that you just described and those that are in Footnote |
| 10:15:39 | 13 | 124? |
| 10:15:39 | 14 | A.   That's my general recollection. |
| 10:15:41 | 15 | Q.   You weren't involved in negotiating the |
| 10:15:43 | 16 | license between AdjustaCam and Chicony, were you? |
| 10:15:45 | 17 | A.   I was not. |
| 10:15:46 | 18 | Q.   Did Mr. Wong represent to you that the |
| 10:15:49 | 19 | license between Chicony and AdjustaCam was consistent |
| 10:15:53 | 20 | with an established royalty of -- established per-unit |
| 10:15:57 | 21 | royalty between $1.25 and $1.50? |
| 10:15:59 | 22 | A.   Based on the representations made by Chicony |
| 10:16:03 | 23 | at the time, yes. |
| 10:16:03 | 24 | Q.   Okay.  Do you believe that's accurate? |
| 10:16:05 | 25 | A.   Well, I have no way to validate because I |

Case: 13-1665    Document: 97-2    Page: 28    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

51

| | | |
|---|---|---|
| 10:16:08 | 1 | don't know what the specific information Chicony |
| 10:16:10 | 2 | provided at the time. |
| 10:16:10 | 3 | Q.   So, for example, you don't know the total |
| 10:16:12 | 4 | volume of accused products that were a part of the |
| 10:16:17 | 5 | Chicony agreement? |
| 10:16:19 | 6 | A.   Well, you mean after or at the time of the |
| 10:16:21 | 7 | negotiation? |
| 10:16:22 | 8 | Q.   At the time of the negotiation. |
| 10:16:23 | 9 | A.   No, I don't. |
| 10:16:25 | 10 | Q.   Okay.  Similarly, you don't know how many |
| 10:16:29 | 11 | products after the negotiation were covered by the |
| 10:16:32 | 12 | Chicony license, do you? |
| 10:16:33 | 13 | A.   No. |
| 10:16:34 | 14 | Q.   You also testified that when you spoke with |
| 10:16:40 | 15 | Mr. Wong, he informed you that ██████ was the -- he |
| 10:16:44 | 16 | used the words "volume leader"? |
| 10:16:46 | 17 | A.   Yes. |
| 10:16:46 | 18 | Q.   In terms of sales? |
| 10:16:48 | 19 | A.   Correct. |
| 10:16:48 | 20 | Q.   Did he give you a particular time frame in |
| 10:16:48 | 21 | which he believed that ██████ was the volume leader |
| 10:16:52 | 22 | in sales? |
| 10:16:52 | 23 | A.   No, it wasn't specific to a time frame.  It |
| 10:16:55 | 24 | was just an overall statement. |
| 10:16:57 | 25 | And if you look at my initial report, you |

Case: 13-1665    Document: 97-2    Page: 29    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

52

| | | |
|---|---|---|
| 10:16:59 | 1 | look at the total volumes of all units sold by |
| 10:17:01 | 2 | defendants and you compare them to the most recent |
| 10:17:04 | 3 | royalty reports for -- that GlobalMedia produced in |
| 10:17:10 | 4 | this case, GlobalMedia has generated -- ████████ has |
| 10:17:15 | 5 | paid royalties on over 2 million units, 2.2, 2.3 million |
| 10:17:22 | 6 | units.  And that's far in excess of total sales of all |
| 10:17:26 | 7 | other defendants, even ignoring the issue of exhaustion |
| 10:17:30 | 8 | between my first and second report. |
| 10:17:33 | 9 | Q.   Okay.  So when you're saying that -- is it |
| 10:17:35 | 10 | your understanding that ████████ is a volume leader in |
| 10:17:37 | 11 | sales? |
| 10:17:37 | 12 | A.   Yes. |
| 10:17:38 | 13 | Q.   And that's sales of webcam clips? |
| 10:17:40 | 14 | A.   Correct.  Webcams with clips. |
| 10:17:42 | 15 | Q.   Webcams with clips.  Okay. |
| 10:17:44 | 16 | And you're referring to some documents |
| 10:17:48 | 17 | produced by GlobalMedia, and I want to make sure I |
| 10:17:51 | 18 | understand this.  You're aware that -- it's your |
| 10:17:54 | 19 | understanding that ████████ has paid ongoing |
| 10:17:57 | 20 | royalties -- |
| 10:17:58 | 21 | A.   Yes. |
| 10:17:58 | 22 | Q.   -- to AdjustaCam? |
| 10:18:00 | 23 | A.   That's correct.  I've seen the most recent |
| 10:18:02 | 24 | royalty reports through March 31, 2012. |
| 10:18:05 | 25 | Q.   And were those royalty reports identified in |

Case: 13-1665    Document: 97-2    Page: 30    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

53

10:18:08  1    your reports?

10:18:08  2        A.   No, because they weren't produced until after

10:18:10  3    my report was filed.

10:18:13  4        Q.   Okay.  Did those royalty reports -- let me

10:18:16  5    back up.

10:18:17  6             You served a supplemental expert report

10:18:20  7    in this case, right?

10:18:22  8        A.   My supplemental report was three days after

10:18:24  9    my original report.

10:18:25  10       Q.   Right.  You didn't reference the particular

10:18:27  11   royalty reports in your supplemental report, did you?

10:18:31  12       A.   No.  Because I didn't have them at the time.

10:18:32  13       Q.   When did you receive those reports?

10:18:34  14       A.   I received -- what's today?  Today's Tuesday.

10:18:38  15   I received them Saturday, I believe.

10:18:40  16       Q.   Have you given those to AdjustaCam's counsel?

10:18:43  17       A.   They were provided to me by AdjustaCam's

10:18:45  18   counsel.

10:18:46  19       Q.   Do you know whether those were produced in

10:18:48  20   this litigation?

10:18:48  21       A.   You'd have to ask counsel that.

10:18:50  22       Q.   And I'm sorry, I'm just trying to catch up

10:18:58  23   here.  Those royalty reports, you believe indicate that

10:19:02  24   ███████ has paid -- did you say in excess of $2 million?

10:19:05  25       A.   No, those -- the royalty payments are -- and

Case: 13-1665    Document: 97-2    Page: 31    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

54

| | | |
|---|---|---|
| 10:19:10 | 1 | there are gaps.  There's some time periods -- it's not a |
| 10:19:12 | 2 | complete set.  There's some missing time periods. |
| 10:19:15 | 3 | But you can tell from the information that |
| 10:19:18 | 4 | approximately there's been about 2.2 to 2.3 million |
| 10:19:21 | 5 | units sold to date, through March of 2012, under the |
| 10:19:25 | 6 | license -- let me clarify that.  I apologize, because |
| 10:19:31 | 7 | I'm on some medication, so let me just try and clarify. |
| 10:19:35 | 8 | What I'm trying to explain to you is that |
| 10:19:37 | 9 | in the GlobalMedia royalty reports, ▇▇▇▇▇ reported |
| 10:19:41 | 10 | to GlobalMedia sales under the '343 patent license in |
| 10:19:48 | 11 | excess of 2 million units through March 2012.  And I |
| 10:19:53 | 12 | can say "in excess of 2 million units" because there |
| 10:19:56 | 13 | are some data gaps in some of the quarterly reports. |
| 10:20:07 | 14 | But I also know when the volume conversion went from |
| 10:20:07 | 15 | $1.25 to a dollar per unit per the license agreement. |
| 10:20:08 | 16 | And if you'll look here, for example -- |
| 10:20:12 | 17 | let me find it for you.  Yes.  If you look in Paragraph |
| 10:20:22 | 18 | 42, for example -- |
| 10:20:25 | 19 | Q.    Okay. |
| 10:20:28 | 20 | A.    Second bullet. |
| 10:20:30 | 21 | Q.    Uh-huh. |
| 10:20:30 | 22 | A.    When aggregate royalties are between 2 |
| 10:20:33 | 23 | million and $4 million, it's a dollar per unit.  So I |
| 10:20:38 | 24 | had noticed in the cumulative royalty reports that at |
| 10:20:41 | 25 | some point the royalties dropped to a dollar.  That's |

"CONFIDENTIAL"

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

55

| | | |
|---|---|---|
| 10:20:44 | 1 | why I knew that at that point, they had sold over -- |
| 10:20:47 | 2 | they had sold over 2 million units.  And then I added |
| 10:20:50 | 3 | on the additional units beyond that point, so that got |
| 10:20:53 | 4 | me to about 2.2, 2.3 million units. |
| 10:20:57 | 5 | Q.   Okay.  So it's your understanding that |
| 10:21:01 | 6 | through -- is it through March of 2012, ▇▇▇▇ had |
| 10:21:05 | 7 | sold about 2.2 to 2.3 million units? |
| 10:21:08 | 8 | A.   Yes, through March 31, 2012.  Licensed units. |
| 10:21:13 | 9 | Q.   And that's based on quarterly reports that |
| 10:21:17 | 10 | you said you received -- |
| 10:21:18 | 11 | A.   Yes. |
| 10:21:18 | 12 | Q.   -- from GlobalMedia? |
| 10:21:20 | 13 | A.   Royalty reports from ▇▇▇▇ to GlobalMedia. |
| 10:21:30 | 14 | Q.   Is it your understanding that ▇▇▇▇ is |
| 10:21:35 | 15 | still today the volume leader as far as sales with |
| 10:21:39 | 16 | webcams with clips? |
| 10:21:40 | 17 | A.   Webcams with clips?  That, I don't know.  I |
| 10:21:44 | 18 | don't have the information to say that.  But certainly |
| 10:21:45 | 19 | with respect to the defendants in this case, all the |
| 10:21:47 | 20 | licensees in this case, the answer would be "yes." |
| 10:21:51 | 21 | Q.   In your report, you also indicated -- sorry. |
| 10:22:15 | 22 | By "report," I'm referring to your first report, dated |
| 10:22:18 | 23 | June 25, 2012.  You indicated there that you spoke with |
| 10:22:20 | 24 | Dr. Muskivitch, who's AdjustaCam's technical expert. |
| 10:22:24 | 25 | A.   I did. |

"CONFIDENTIAL"

10:39:30 1    technical opinions about interpreting the '343 patent.

10:39:33 2        Q.   Well, let's take a look at -- let's go to

10:39:37 3    Paragraph 7 --

10:39:38 4        A.   All right.

10:39:38 5        Q.   -- of your opening report.

10:39:39 6        A.   Okay.

10:39:40 7        Q.   Before we get into the details of

10:39:44 8    Paragraph 7, are the opinions that you've offered in

10:39:46 9    this matter those captured in your June 25 report and

10:39:51 10   your June 28 report, collectively?

10:39:53 11       A.   Well, my affirmative opinions are.  And, of

10:39:56 12   course, they've been now supplemented with the

10:39:59 13   Gear Head and the HP license.

10:40:01 14       Q.   Okay.  So aside from the Gear Head and HP

10:40:05 15   license, is there any additional -- have you formed any

10:40:10 16   additional opinions outside of those set forth in

10:40:12 17   Exhibit 3 and Exhibit 4?

10:40:13 18       A.   Yes.

10:40:14 19       Q.   And what are those?

10:40:14 20       A.   Well, I've read Dr. Sullivan's report, and

10:40:17 21   I've read his deposition, and I disagree with a number

10:40:20 22   of his comments and assertions.

10:40:21 23       Q.   Okay.  Have you formed any additional

10:40:25 24   opinions about what a reasonable royalty would be for

10:40:30 25   this particular matter, aside from those that are set

| | | |
|---|---|---|
| 10:40:33 | 1 | forth in Exhibits 3 and 4? |
| 10:40:34 | 2 | A.    No.  My opinions are unchanged regarding what |
| 10:40:37 | 3 | a reasonable royalty would be. |
| 10:40:38 | 4 | Q.    Okay.  And those opinions regarding a |
| 10:40:41 | 5 | reasonable royalty are set forth in Exhibits 3 and 4, |
| 10:40:44 | 6 | which are both of your reports in this matter? |
| 10:40:46 | 7 | A.    That's correct. |
| 10:40:46 | 8 | Q.    So turning to Paragraph 7 in your first |
| 10:40:51 | 9 | report -- |
| 10:40:51 | 10 | A.    Okay. |
| 10:40:52 | 11 | Q.    I'm looking at Page 5. |
| 10:40:58 | 12 | A.    All right.  Yes, I'm on Page 5. |
| 10:41:01 | 13 | Q.    It's the first full sentence of Paragraph 7 |
| 10:41:04 | 14 | that appears on Page 5, beginning with the word |
| 10:41:07 | 15 | "Additionally."  Do you see where I'm at? |
| 10:41:10 | 16 | A.    Yes. |
| 10:41:10 | 17 | Q.    It says:  "Additionally, a reasonable royalty |
| 10:41:14 | 18 | rate of $1.25 represents the contribution of the |
| 10:41:18 | 19 | Accused Feature to the overall device and is not |
| 10:41:21 | 20 | dependent on the sales price of the Accused Product." |
| 10:41:33 | 21 | Do you see that? |
| 10:41:33 | 22 | A.    Yes. |
| 10:41:33 | 23 | Q.    I notice that the term "Accused Feature" is |
| 10:41:33 | 24 | in caps.  Do you see that? |
| 10:41:33 | 25 | A.    Right. |

10:41:33  1          Q.    What is your understanding of what the

10:41:34  2    accused feature is in this case?

10:41:34  3          A.    It's the webcam clip.

10:41:36  4          Q.    Okay.  It's not the webcam itself, right?

10:41:39  5          A.    No.  But the webcam is not sold separate and

10:41:44  6    apart -- as far as the external webcam, which is not

10:41:48  7    sold separate and apart from the webcam clip.

10:41:51  8          Q.    Is it your understanding that that's true for

10:41:53  9    the accused products?

10:41:55  10         A.    Yes.

10:41:55  11         Q.    Okay.

10:41:56  12         A.    Some of them are sold in packs of two, but

10:41:59  13   the least divisible unit is the webcam, the portable

10:42:03  14   webcam, which is an external webcam we're talking

10:42:07  15   about.

10:42:07  16         Q.    Putting the accused products aside, I mean,

10:42:08  17   it's possible that other companies sell a webcam

10:42:11  18   separate and apart from a clip, isn't it?

10:42:13  19                MR. EDMONDS:  Objection, form.

10:42:14  20         A.    Oh, you mean maybe as a replacement part or

10:42:17  21   something like that?  That's possible.  But the -- all

10:42:20  22   of the accused products here that were sold, as I

10:42:22  23   understand it, based on production by the defendants in

10:42:25  24   this case, were complete webcams, external webcams,

10:42:30  25   which had a webcam clip attached to it.

"CONFIDENTIAL"

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:42:32 | 1  | Q.   (By Mr. Herberholz) I see.                           |
| 10:42:33 | 2  | A.   As an integrated unit.                               |
| 10:42:35 | 3  | Q.   Is it your understanding that the webcam             |
| 10:42:37 | 4  | clips of the accused products can actually be removed     |
| 10:42:40 | 5  | from the webcam itself?                                   |
| 10:42:42 | 6  | A.   I don't know.  I've not done that.                   |
| 10:42:44 | 7  | Q.   So turning again to the sentence here that we        |
| 10:42:50 | 8  | just read out of Paragraph 7, my question to you is:      |
| 10:42:56 | 9  | What is the basis for the statement that $1.25            |
| 10:42:59 | 10 | represents the contribution of the accused feature to     |
| 10:43:02 | 11 | the overall device?                                       |
| 10:43:04 | 12 | A.   Well, if you look at the totality of the             |
| 10:43:08 | 13 | circumstances and if you look at, for example -- I'm      |
| 10:43:34 | 14 | going to give you an example.  Go to Paragraph 80.        |
| 10:43:44 | 15 | Q.   (Complies.)  Okay.                                   |
| 10:43:45 | 16 | A.   Now, Paragraph 80 is the gross margins              |
| 10:43:50 | 17 | reported by the various defendants, with the exception    |
| 10:43:57 | 18 | of one or two, now all licensees of AdjustaCam for the    |
| 10:44:02 | 19 | '343 patent.  Some of them are manufacturers and         |
| 10:44:03 | 20 | distributors, what are called suppliers, and the other    |
| 10:44:07 | 21 | ones are resellers.                                       |
| 10:44:08 | 22 | And there's a difference in royalty               |
| 10:44:11 | 23 | rate -- of a profit margin between both the               |
| 10:44:14 | 24 | manufacturer and then the resale.  Generally speaking,    |
| 10:44:18 | 25 | the manufacturers tend to have higher margins than does   |

"CONFIDENTIAL"

| | | |
|---|---|---|
| 10:44:23 | 1 | the reseller because, of course, the reseller has to |
| 10:44:25 | 2 | now pay the manufacturer an extra profit for the |
| 10:44:28 | 3 | distribution. |
| 10:44:29 | 4 | And yet, despite the fact that the -- |
| 10:44:32 | 5 | there's a difference in margins, generally, between |
| 10:44:34 | 6 | manufacturers and resellers, they both have agreed to |
| 10:44:38 | 7 | pay an imputed royalty, an effective royalty rate, in |
| 10:44:42 | 8 | the order of $1.25, $1.50, recognizing what the value |
| 10:44:47 | 9 | contribution is of the patented technology to the |
| 10:44:49 | 10 | accused product. |
| 10:44:49 | 11 | Q.   Okay.  But the -- while you're there -- |
| 10:44:51 | 12 | A.   Yes. |
| 10:44:52 | 13 | Q.   -- the profit margin -- there's a table |
| 10:44:54 | 14 | here -- |
| 10:44:55 | 15 | A.   Yes. |
| 10:44:55 | 16 | Q.   -- on Page 36 that lists the profit margins |
| 10:44:58 | 17 | of a number of defendants in this case, right? |
| 10:44:59 | 18 | A.   Yes. |
| 10:45:00 | 19 | Q.   You didn't specifically rely on those profit |
| 10:45:04 | 20 | margins, though, in formulating your opinion that |
| 10:45:07 | 21 | AdjustaCam is entitled to a per-unit royalty of between |
| 10:45:10 | 22 | $1.25 and $1.50, did you? |
| 10:45:13 | 23 | A.   Sure, I did.  That's part of my analysis. |
| 10:45:13 | 24 | Q.   How so? |
| 10:45:14 | 25 | A.   Well, because I recognize that as a result on |

| | | |
|---|---|---|
| 10:45:16 | 1 | the Georgia-Pacific Factor 15, after paying a royalty, |
| 10:45:20 | 2 | these licensees could still make a profit, which is |
| 10:45:24 | 3 | what's called for in the Georgia-Pacific Factor 15. |
| 10:45:27 | 4 | Q.   But each of these defendants here has a |
| 10:45:29 | 5 | different profit margin, right? |
| 10:45:30 | 6 | A.   That's correct. |
| 10:45:31 | 7 | Q.   But you're saying -- |
| 10:45:32 | 8 | A.   But what I'm saying is -- I didn't mean to |
| 10:45:34 | 9 | interrupt you.  But to conclude what you're asking me |
| 10:45:37 | 10 | is, this, to me, is very telling.  The fact that you |
| 10:45:40 | 11 | have resellers and suppliers in the chain of commerce, |
| 10:45:45 | 12 | in the food chain, that have different levels of |
| 10:45:47 | 13 | profitability depending on where they are in the food |
| 10:45:50 | 14 | chain, nonetheless, they both recognize that they're |
| 10:45:53 | 15 | willing to pay $1.25 to $1.50 as an imputed royalty for |
| 10:45:58 | 16 | the -344 license to the '343 patent, tells me that |
| 10:46:03 | 17 | that's the intrinsic value associated with the patented |
| 10:46:08 | 18 | technology in the accused products. |
| 10:46:09 | 19 | Q.   Okay. |
| 10:46:10 | 20 | A.   Irrespective of where the licensee is in the |
| 10:46:14 | 21 | chain of commerce. |
| 10:46:16 | 22 | Q.   Okay.  So is there any other reason that the |
| 10:46:20 | 23 | list of profit margins here for these defendants |
| 10:46:24 | 24 | informs your opinions as to what a reasonable royalty |
| 10:46:26 | 25 | is in this matter, aside from what you just described? |

"CONFIDENTIAL"

| | | |
|---|---|---|
| 10:46:27 | 1 | A. Well, I just also told you that after paying |
| 10:46:30 | 2 | an effective royalty of $1.25, for example, these |
| 10:46:35 | 3 | licensees could still generate a profit. |
| 10:46:37 | 4 | Q. Okay. I understand that. But aside from |
| 10:46:38 | 5 | that, is there any other reason that these profit |
| 10:46:41 | 6 | margins listed here on this table on Page 36 inform |
| 10:46:45 | 7 | your opinion about a reasonable royalty? |
| 10:46:46 | 8 | A. We've already discussed the other aspect of |
| 10:46:49 | 9 | that. |
| 10:46:49 | 10 | Q. Okay. So we've discussed -- |
| 10:46:51 | 11 | A. Both aspects. |
| 10:46:51 | 12 | Q. -- both aspects. All aspects. |
| 10:46:52 | 13 | A. Yes. |
| 10:46:53 | 14 | Q. Okay. So taking Newegg's profit margin, |
| 10:46:56 | 15 | which is 32 percent, you didn't rely on that 32 percent |
| 10:47:01 | 16 | in making any specific calculations to arrive at a |
| 10:47:04 | 17 | per-unit royalty of $1.25 to $1.50, did you? |
| 10:47:17 | 18 | A. I'm not sure what your question is. |
| 10:47:17 | 19 | Q. Yeah. I'm thinking about a formula, for |
| 10:47:17 | 20 | example. You didn't take a 32 percent profit margin |
| 10:47:17 | 21 | and plug it into a formula to arrive at your conclusion |
| 10:47:19 | 22 | about a reasonable royalty in this case, right? |
| 10:47:21 | 23 | A. No. |
| 10:47:21 | 24 | Q. Okay. |
| 10:47:22 | 25 | A. No. But what I'm just telling you is I |

10:47:25 1    consider the fact that all these licensees, irrespective

10:47:28 2    of where they were in the distribution chain, they

10:47:31 3    recognized that the intrinsic value associated with the

10:47:34 4    patented feature was in the area of $1.25 to $1.50 per

10:47:38 5    unit.

10:47:38 6        Q.   And I understand that.  I'm just asking if

10:47:40 7    there's a specific equation, for example, that you used

10:47:43 8    to arrive at your conclusion of a reasonable royalty

10:47:46 9    rate that involved the profit margin as a variable.

10:47:50 10       A.   Well, the profit margin was used as -- for

10:47:54 11   illustrative purposes and as a benchmark to show that

10:47:58 12   these products are profitable.

10:47:59 13       Q.   Okay.

10:48:00 14       A.   And to show that after paying a royalty of

10:48:03 15   $1.25, $1.50 per unit, for example, the licensee would

10:48:07 16   still generate a profit.

10:48:08 17       Q.   Sure.  But it wasn't used in an equation,

10:48:10 18   right, the profit margin?

10:48:10 19       A.   No, it wasn't used in a specific equation

10:48:13 20   because it wasn't necessary.

10:48:15 21       Q.   Okay.  So it's your opinion that the

10:48:28 22   reasonable royalty in this case is not dependent on the

10:48:31 23   sales price of the accused products.  Is that right?

10:48:34 24       A.   I'm sorry?

10:48:35 25       Q.   Is it your opinion that the reasonable

**"CONFIDENTIAL"**

**A0696**

10:48:37   1    royalty that you've formulated for this case is not

10:48:40   2    dependent on the sales price of the accused products?

10:48:42   3         A.    That's correct.

10:48:43   4         Q.    Okay.   And what's the -- what's the basis for

10:48:45   5    that opinion?

10:48:46   6         A.    The discussion -- the discussion we've just

10:48:48   7    had, that so many licensees in the industry have all

10:48:53   8    taken license with the imputed royalty rate in the

10:48:54   9    range of $1.25 to $1.50, irrespective of where they are

10:48:58   10   in the stream of commerce, is a strong indication to me

10:49:02   11   that they've all recognized that that's the intrinsic

10:49:05   12   value of the patented feature.

10:49:06   13        Q.    So it's because other companies have paid

10:49:09   14   between $1.25 and $1.50 per unit to license the

10:49:11   15   technology.   Is that right?

10:49:13   16              MR. EDMONDS:   Objection, form.

10:49:14   17        A.    It's because so many companies, during the

10:49:17   18   entire course of the licensing history of the '343

10:49:21   19   patent, have all agreed to pay imputed royalties or

10:49:23   20   effective royalty rates in the range -- with a few

10:49:27   21   exceptions -- but generally speaking, within the range

10:49:28   22   of $1.25 to $1.50.

10:49:30   23        Q.    (By Mr. Herberholz) Any other reason?

10:49:32   24        A.    Well, to me -- well, that, in light of the

10:49:35   25   differing profit margins that resellers compared to

10:49:39  1    suppliers have, is an indication to me that they've all

10:49:42  2    recognized the intrinsic value of the patented feature

10:49:45  3    is in that range of $1.25 to $1.50, as opposed to being

10:49:50  4    tied somehow to the sale price of the overall accused

10:49:53  5    product, which is the webcam with a clip.

10:49:57  6         Q.   Okay.  So your opinions concerning a

10:50:01  7    reasonable royalty in this case are not based on the

10:50:03  8    sales price of the accused products, right?

10:50:05  9         A.   Yeah.  My opinion is not tied to the price

10:50:07 10    of -- sales price of accused webcam.

10:50:09 11         Q.   Okay.  And that's because, A, other

10:50:14 12    companies, you believe, have paid between $1.25 and

10:50:18 13    $1.50 per unit to license the technology; and, B,

10:50:22 14    because of the various profit margins that are set

10:50:25 15    forth on Page 36 of your report?

10:50:27 16              MR. EDMONDS:   Objection, form.

10:50:27 17         A.   And, C, no single licensee has paid a running

10:50:31 18    royalty based on the sale price of an accused product.

10:50:38 19    They've all been based on the per-unit royalty.

10:50:41 20         Q.   (By Mr. Herberholz) Okay.  So aside from A,

10:50:44 21    B, and C that we've just discussed, are there any other

10:50:47 22    reasons that you believe -- any other reasons why the

10:50:54 23    reasonable royalty in this case is not dependent on the

10:50:56 24    sales price of the accused products?

10:50:59 25         A.   Those are the primary reasons, as I recall.

"CONFIDENTIAL"

A0698

10:51:01  1      Q.   Can you think of any other reasons as you sit
10:51:04  2   here today?
10:51:04  3      A.   I'd have to give it some more thought or just
10:51:07  4   go back through my report again.
10:51:08  5      Q.   Okay.
10:51:09  6      A.   But those are the primary reasons as I see
10:51:11  7   it.
10:51:11  8      Q.   Now, your reasons concerning a reasonable
10:51:14  9   royalty in this case are not based on the manufacturing
10:51:17  10  cost of the clip itself of the accused products.  Is
10:51:19  11  that right?
10:51:19  12     A.   No.  That's correct.
10:51:20  13     Q.   Okay.  Why didn't you take that into account
10:51:23  14  as part of your analysis?
10:51:24  15     A.   Because it's not relevant.
10:51:26  16     Q.   Why is that not relevant?
10:51:27  17     A.   Because I've looked at what the licensing
10:51:29  18  history of these products are and I've looked at the
10:51:32  19  fact that licensees have uniformly agreed to pay in the
10:51:36  20  range of $1.25 to $1.50 per unit.
10:51:38  21     Q.   Okay.
10:51:39  22     A.   So that tells me that that's -- that is a
10:51:41  23  good benchmark, for me, as to what the intrinsic value
10:51:46  24  of -- in the form of a license of the patented
10:51:50  25  technology is.

"CONFIDENTIAL"

10:51:50  1        Q.    Okay.   And you've reviewed 24 settlement

10:51:54  2    agreements in this case, right?

10:51:55  3        A.    24 license and settlement agreements.

10:51:57  4        Q.    And of those 24 license and settlement

10:51:59  5    agreements, it's your opinion that each licensee agreed

10:52:04  6    to pay somewhere between $1.25 and $1.50 per unit?   Is

10:52:08  7    that right?

10:52:08  8        A.    Most of them.   More recently, for example, as

10:52:11  9    I recall, the Gear Head license, where there was a

10:52:14  10   discount off the Gear Head license because of

10:52:24  11   AdjustaCam's interest in reducing the number of parties

10:52:24  12   going to trial.

10:52:24  13            So as I recall, AdjustaCam granted

10:52:24  14   Gear Head an additional discount.

10:52:25  15       Q.    Okay.   So aside from those 24 Settlement and

10:52:32  16   License Agreements that we've talked about, is there

10:52:35  17   any other reason why you believe that it was not --

10:52:38  18   that it wasn't necessary to take into account the cost

10:52:40  19   of the clip in forming your opinions as to a reasonable

10:52:43  20   royalty?

10:52:44  21       A.    Well, cost doesn't necessarily have to do

10:52:46  22   anything -- it has to do with value.   It's the question

10:52:51  23   of what is the benefit to those who practice the

10:52:55  24   patent.   One of the key Georgia-Pacific factors here is

10:52:57  25   Factor -- Georgia-Pacific Factor 12, for example.

| | | |
|---|---|---|
| 10:52:58 | 1 | Q.   Okay. |
| 10:52:58 | 2 | A.   11 and 12.  What is the benefit to those who |
| 10:53:02 | 3 | have practiced, not what is the cost of the benefit. |
| 10:53:05 | 4 | Q.   That's a fair point, and we'll get to the |
| 10:53:07 | 5 | value in a second. |
| 10:53:08 | 6 | But just to be clear, you didn't consider |
| 10:53:09 | 7 | the actual cost to manufacture the clip of any accused |
| 10:53:13 | 8 | products, right? |
| 10:53:13 | 9 | A.   I didn't believe it to be relevant. |
| 10:53:15 | 10 | Q.   So you didn't consider it? |
| 10:53:16 | 11 | A.   I didn't consider it. |
| 10:53:16 | 12 | Q.   Okay. |
| 10:53:18 | 13 | A.   I considered it, but I determined it not to |
| 10:53:19 | 14 | be relevant. |
| 10:53:19 | 15 | Q.   So the cost of the clip, in other words, of |
| 10:53:21 | 16 | the accused products is not part of your opinions as to |
| 10:53:23 | 17 | a reasonable royalty in this case? |
| 10:53:24 | 18 | A.   Correct.  It does not bear on the |
| 10:53:27 | 19 | determination of a reasonable royalty. |
| 10:53:28 | 20 | Q.   Let's talk about value, as you pointed out. |
| 10:53:32 | 21 | It's your opinion that -- first of all, is it your |
| 10:53:35 | 22 | opinion that the value of the clip of each of the |
| 10:53:38 | 23 | accused products is somewhere between $1.25 and $1.50? |
| 10:53:42 | 24 | A.   Well, in my opinion, it's no less than $1.25 |
| 10:53:46 | 25 | per unit. |

Case: 13-1665    Document: 97-2    Page: 46    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

95

| | | |
|---|---|---|
| 11:09:41 | 1 | based on what was known and represented as the actual |
| 11:09:44 | 2 | sales. |
| 11:09:45 | 3 | Q.    Okay.  So aside from ████████ are you aware |
| 11:09:49 | 4 | of any other entity paying actual royalties to -- to |
| 11:09:55 | 5 | AdjustaCam or any former owner of the '343 patent? |
| 11:09:58 | 6 | A.    Well, almost all the other licensees paid an |
| 11:10:01 | 7 | effective actual royalty rate in the range of $1.25 to |
| 11:10:04 | 8 | $1.50, based on the volumes that they represented to |
| 11:10:07 | 9 | AdjustaCam. |
| 11:10:09 | 10 | Q.    Were those volumes of past sales, or did |
| 11:10:11 | 11 | those include estimates of future sales? |
| 11:10:13 | 12 | A.    No, they included a combination of both, |
| 11:10:17 | 13 | licensable past sales and their representations about |
| 11:10:20 | 14 | what they were going to sell in the future, if anything. |
| 11:10:23 | 15 | Many of them were getting out of the business, and that |
| 11:10:25 | 16 | was the representation they made. |
| 11:10:25 | 17 | Q.    So do all of the 24 licensees of the '343 |
| 11:10:34 | 18 | patent -- did each of those licensees make |
| 11:10:35 | 19 | representations about future sales? |
| 11:10:38 | 20 | A.    My understanding is a number of them made |
| 11:10:41 | 21 | representations regarding future sales or lack thereof. |
| 11:10:46 | 22 | For example, Philips made representations to |
| 11:10:49 | 23 | Mr. Barthelemy that it was getting out of the market of |
| 11:10:52 | 24 | selling webcams, and it turns out to be true because |
| 11:10:56 | 25 | I've seen the royalty reports that Philips paid in to |

Case: 13-1665    Document: 97-2    Page: 47    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

161

01:57:17    1      A.    Yeah, after the fact.    But the point is

01:57:20    2    AdjustaCam did not know that there were ████ HP

01:57:25    3    units that were going to be -- that were going to be

01:57:27    4    subject to a license.    AdjustaCam didn't have any

01:57:30    5    information regarding that.

01:57:32    6            The limited information AdjustaCam had

01:57:35    7    enabled AdjustaCam to make a determination that their

01:57:37    8    imputed royalty rate they were getting was $1.05 per

01:57:42    9    unit.

01:57:42   10      Q.    So shouldn't it be the actual mathematical

01:57:45   11    implied royalty rate that matters and not AdjustaCam's

01:57:49   12    expectation?

01:57:50   13      A.    No.    Because that was after the fact.    At the

01:57:53   14    time of the negotiations involving Chicony, certain

01:57:57   15    representations were made to AdjustaCam regarding

01:58:01   16    Chicony's customers.    Chicony didn't necessarily have

01:58:04   17    access to its three customer-specific U.S. information,

01:58:10   18    so there were some estimates provided.    But that's what

01:58:13   19    the imputed royalty was based on.

01:58:16   20      Q.    So are you saying that the imputed royalty

01:58:19   21    for those licensed HP products that we discussed, the

01:58:24   22    ████ units, the imputed royalty is not 41 cents per

01:58:27   23    unit?

01:58:27   24      A.    No.    The imputed royalty that AdjustaCam

01:58:30   25    understood it was getting was not 41 cents.

"CONFIDENTIAL"

02:45:51  1      accused product.

02:45:54  2           Q.   So I'm going to ask you a hypothetical, then,

02:45:57  3      based on your answer.

02:45:58  4                If an infringing webcam is sold by a

02:46:01  5      vendor to a retailer for $52 for the webcam, wherein

02:46:08  6      the camera component is $50 and the gripping component

02:46:12  7      is $2, in that hypothetical, what is the reasonable

02:46:16  8      royalty in that case?

02:46:17  9                MR. EDMONDS:  Objection, form.

02:46:18  10          A.   What is the $50 based on and what is the $2

02:46:24  11     based on in your hypothetical?

02:46:25  12          Q.   (By Mr. Sutton) As I said, the camera

02:46:27  13     component is $50 --

02:46:28  14          A.   But are you talking about cost or price?

02:46:30  15     Because you're selling -- you're saying that the

02:46:31  16     wholesaler is selling it for $52.

02:46:35  17          Q.   Right.  In my hypothetical, I said that the

02:46:39  18     infringing webcam is being sold by a vendor to a

02:46:43  19     retailer --

02:46:44  20          A.   Yes.

02:46:44  21          Q.   -- meaning at a wholesale price --

02:46:46  22          A.   Yes.

02:46:47  23          Q.   -- of $52 --

02:46:48  24          A.   Yes.

02:46:49  25          Q.   -- wherein the camera component is $50, as

```
02:46:53   1   part of the wholesale price, and the gripping component

02:46:57   2   is $2, as part of the wholesale price.

02:47:00   3                  What is, in your opinion, the reasonable

02:47:03   4   royalty in that hypothetical?

02:47:04   5        A.   It's $1.25 per unit.

02:47:09   6        Q.   And if I -- and how does that -- how do you

02:47:12   7   apply your intrinsic value statement to that?

02:47:15   8        A.   Because as I've discussed all day today,

02:47:18   9   throughout all of these licensees that have taken

02:47:21  10   licenses over a period of ten years, and recognizing

02:47:23  11   that pricing of the accused products has changed over

02:47:28  12   time, the royalty -- imputed royalty rates or implied

02:47:31  13   royalty rates are still in the range of $1.25 to $1.50

02:47:36  14   per unit ten years out.

02:47:37  15        Q.   So your royalty rate has no relationship to

02:47:41  16   the percentage of the item?

02:47:42  17        A.   My royalty rate --

02:47:43  18                  MR. EDMONDS:   Objection, form.

02:47:44  19        A.   -- I've already established, is not tied to

02:47:47  20   the sale price of the item.

02:47:49  21        Q.   (By Mr. Sutton) And also it's not based on --

02:47:51  22        A.   And I might add --

02:47:54  23        Q.   And is it also correct to say that your

02:47:57  24   amount of $1.25 per unit has no relationship to -- as a

02:48:04  25   percentage of the sale price of the item?
```

"CONFIDENTIAL"

Case: 13-1665   Document: 97-2   Page: 50   Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

235

| | | |
|---|---|---|
| 03:44:54 | 1 | all of the lump-sum settlements? |
| 03:44:56 | 2 | A.   Correct.  With the exception of Chicony and |
| 03:44:59 | 3 | with the exception of Gear Head, that we just |
| 03:45:05 | 4 | discussed. |
| 03:45:24 | 5 | Q.   Did you ever check the records of -- from all |
| 03:45:29 | 6 | of these settled cases as to what they disclosed with |
| 03:45:32 | 7 | their sales? |
| 03:45:33 | 8 | A.   Only what's been produced in this litigation. |
| 03:45:37 | 9 | Q.   Oh, so you have reviewed that? |
| 03:45:39 | 10 | A.   Well, whatever has been produced in this |
| 03:45:41 | 11 | litigation. |
| 03:45:41 | 12 | Q.   So if any of these settled parties have |
| 03:45:44 | 13 | produced their sales information, you would have |
| 03:45:48 | 14 | reviewed that? |
| 03:45:48 | 15 | A.   Yes. |
| 03:45:48 | 16 | Q.   And did you -- did you check to see whether |
| 03:45:55 | 17 | the disclosures by the settled parties of the |
| 03:45:58 | 18 | quantities they sold -- did you check to see if that |
| 03:46:00 | 19 | matched up with $1.25 or $1.50 per unit? |
| 03:46:05 | 20 | A.   No, I did not.  I don't recall which parties |
| 03:46:08 | 21 | provided any subsequent information, other than |
| 03:46:11 | 22 | ███████  and Philips, I know, produced royalty |
| 03:46:13 | 23 | reports -- or generated royalty statements. |
| 03:46:21 | 24 | Q.   So let me ask you a hypothetical question. |
| 03:46:23 | 25 | If a majority of these settlements -- if |

"CONFIDENTIAL"

Case: 13-1665   Document: 97-2   Page: 51   Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

236

03:46:24  1    it turns out that they disclosed that the units that

03:46:27  2    they sold was much more than would have amounted to

03:46:33  3    $1.25 per unit, how would that affect your analysis

03:46:38  4    here of what a reasonable royalty is?

03:46:39  5        A.   Well, it wouldn't affect my analysis because

03:46:41  6    the target had always been in the range of $1.25 to

03:46:45  7    $1.50, based on the Philips and ██████ licenses.

03:46:50  8              And what it means is if, in your

03:46:52  9    hypothetical, if it turns out that some of these

03:46:54 10    licensees sold more products than they made

03:46:56 11    representations to AdjustaCam, then if AdjustaCam had

03:47:00 12    actually known what the actual numbers were, then

03:47:03 13    AdjustaCam would have renegotiated those agreements to

03:47:06 14    reflect the $1.25 to $1.50 per unit as an effective

03:47:11 15    royalty to change the lump-sum payment upward.

03:47:14 16        Q.   Well, actually that was not my hypothetical.

03:47:17 17              My hypothetical was that if in the

03:47:20 18    disclosures that you have from the various settled

03:47:24 19    parties, if it turns out that they sold 150,000 units

03:47:29 20    or something like that instead of -- let's say with

03:47:32 21    RadioShack, if they disclosed they sold over 100,000

03:47:36 22    units -- and you're making an assumption that it would

03:47:38 23    have been somewhere in the range of 53,000 to

03:47:43 24    64,000 units -- if that turns out to be the case after

03:47:45 25    reviewing their discovery disclosures of their sales,

"CONFIDENTIAL"

Case: 13-1665    Document: 97-2    Page: 52    Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

237

| | | |
|---|---|---|
| 03:47:49 | 1 | how would that impact on your analysis? |
| 03:47:51 | 2 | A.    It doesn't. |
| 03:47:52 | 3 | Q.    Why? |
| 03:47:52 | 4 | A.    Because it's what AdjustaCam's expectations |
| 03:47:56 | 5 | were and what their understanding was at the time they |
| 03:47:58 | 6 | executed the licenses.  That's what they based their |
| 03:48:02 | 7 | calculations on.  That's what they based their lump-sum |
| 03:48:05 | 8 | agreements on.  If it turns out -- |
| 03:48:05 | 9 | Q.    If there's just one -- |
| 03:48:07 | 10 | A.    -- after the fact -- let me finish, please. |
| 03:48:08 | 11 | If it turns out after the fact that the |
| 03:48:10 | 12 | volumes were different than were represented, that's |
| 03:48:12 | 13 | just a fact of either imprecise information or the fact |
| 03:48:17 | 14 | that the representations were inaccurate or they were |
| 03:48:21 | 15 | just estimates for which subsequent information |
| 03:48:24 | 16 | revealed that more sales occurred than anticipated. |
| 03:48:27 | 17 | But the fact is the goal and objective of |
| 03:48:30 | 18 | AdjustaCam, in terms of the representations made to |
| 03:48:33 | 19 | them in executing these lump-sum agreements, were to |
| 03:48:36 | 20 | get an effective royalty rate in the range of $1.25 to |
| 03:48:41 | 21 | $1.50 per unit. |
| 03:48:43 | 22 | Q.    What -- |
| 03:48:44 | 23 | A.    And that's consistent with the ▮▮▮▮▮ |
| 03:48:47 | 24 | license agreement, because ▮▮▮▮▮ volumes were |
| 03:48:49 | 25 | $1.25 per unit all the way up until they hit 2 million |

"CONFIDENTIAL"

A0788

Case: 13-1665   Document: 97-2   Page: 53   Filed: 12/11/2014
THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

238

| | | |
|---|---|---|
| 03:48:53 | 1 | units in sales. |
| 03:48:54 | 2 | So ███████ had been paying $1.25 per |
| 03:48:57 | 3 | unit on an ongoing running royalty basis for most of |
| 03:49:03 | 4 | the 10-, 11-year period they've been paying royalties. |
| 03:49:05 | 5 | Q.   Okay.  Based on your answers, would it be |
| 03:49:08 | 6 | correct to say that the main factor that you relied on |
| 03:49:14 | 7 | in determining the reasonable royalty rate of $1.25 per |
| 03:49:20 | 8 | unit is based almost solely on what the settlements |
| 03:49:38 | 9 | were in this case? |
| 03:49:38 | 10 | A.   I don't understand your question. |
| 03:49:38 | 11 | MR. SUTTON:  Maybe the reporter can read |
| 03:49:38 | 12 | it back. |
| 03:49:57 | 13 | (The requested portion was read.) |
| 03:49:57 | 14 | A.   No.  That's not true.  I base my royalty of |
| 03:50:05 | 15 | $1.25 based on all the analysis I did in my report and |
| 03:50:09 | 16 | considering all the Georgia-Pacific factors. |
| 03:50:11 | 17 | Q.   (By Mr. Sutton) And the settlements was only |
| 03:50:14 | 18 | one of those factors? |
| 03:50:15 | 19 | A.   That's correct. |
| 03:50:15 | 20 | Q.   What are -- without going into a lot of |
| 03:50:18 | 21 | detail, what are some of the other factors that you |
| 03:50:21 | 22 | think were prominent in making your analysis? |
| 03:50:24 | 23 | MR. EDMONDS:  Objection, form. |
| 03:50:25 | 24 | A.   All the discussions I made in my report about |
| 03:50:27 | 25 | the degree of novelty and -- the degree of novelty, for |

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

239

| | | |
|---|---|---|
| 03:50:33 | 1 | example, about the patented technology that was |
| 03:50:36 | 2 | discussed by Dr. Muskivitch and the benefits of the |
| 03:50:39 | 3 | technology as discussed by -- of the patented |
| 03:50:42 | 4 | technology discussed by Dr. Muskivitch; the fact that |
| 03:50:45 | 5 | these parties, both the suppliers and resellers, |
| 03:50:48 | 6 | enjoyed high margins; and despite the fact that there |
| 03:50:52 | 7 | were differences, generally, between profit margins of |
| 03:50:54 | 8 | suppliers and resellers, they still all agreed to |
| 03:50:57 | 9 | effective royalty rates in the range of $1.25 or so per |
| 03:51:02 | 10 | unit. |
| 03:51:04 | 11 | And the ███████ license has been ongoing |
| 03:51:07 | 12 | for 11 years now, and ███████ has continued to pay |
| 03:51:10 | 13 | under that license agreement -- indicates that there is |
| 03:51:13 | 14 | ongoing demand for the patented product. |
| 03:51:15 | 15 | That's just examples of -- I'm just |
| 03:51:21 | 16 | summarizing for you from all the myriad factors I've |
| 03:51:24 | 17 | discussed in the Georgia-Pacific analysis of my initial |
| 03:51:28 | 18 | report. |
| 03:51:28 | 19 | Q.   (By Mr. Sutton) All right. |
| 03:51:29 | 20 | MR. SUTTON:  Thank you for your answers |
| 03:51:31 | 21 | and time. |
| 03:51:31 | 22 | And I just want to make one statement to |
| 03:51:37 | 23 | John.  I pulled out the -- just for your information, |
| 03:51:45 | 24 | John, I pulled out the complaint for the '644 case. |
| 03:51:51 | 25 | And I'll refer you to Paragraph 17 of the '644 |

Clayton Haynes
Designated Highly Confidential Attorneys Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

ADJUSTACAM, LLC,                        )
                                        )
            Plaintiff,                  )
                                        ) CIVIL ACTION
vs.                                     ) NO.
                                        ) 6:10-CV-329-LED
AMAZON.COM, INC., ET AL,                )
                                        )
            Defendants.                 )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

CLAYTON HAYNES

(DESIGNATED HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY)

August 30th, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

            ANSWERS AND DEPOSITION of CLAYTON HAYNES,

taken at the instance of the Defendants, on the 30th

day of August AD 2012 in the above styled and numbered

cause at the offices of United American Reporting

Services, Inc., 1201 Elm Street, Suite 5220 in Dallas,

Dallas County, Texas, before David B. Jackson, RDR, a

Certified Shorthand Reporter in and for the State of

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record.

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

Clayton Haynes
Designated Highly Confidential Attorneys Eyes Only

Page 72

```
 1   Mr. Wong in preparation for your deposition today?

 2       A.    Correct.

 3       Q.    And during that preparation did you and

 4   Mr. Wong discuss the target royalty of $1.25 to $1.50

 5   per unit?

 6       A.    Yes, that was -- that was one of the topics

 7   that -- that -- that we did cover, you know, in -- in

 8   conjunction with confirming that statements made, you

 9   know, by Steve Wong to Bratic and referenced in

10   Bratic's report, you know, confirming that those

11   statement were true and accurate as outlined in

12   Bratic's report.

13       Q.    Did Mr. Wong explain to you the basis for the

14   target of $1.25 to $1.50 per unit royalty?

15       A.    It -- in connection with my preparation, it's

16   my understanding that that is based on the precedent

17   set by the ████████ and Phillips license agreements

18   executed by PAR Technologies.

19       Q.    Okay.  So Mr. Wong informed you that the

20   target royalty of $1.25 to $1.50 per unit is based on

21   precedence set by the PAR Technologies license and the

22   ████████ license; is that right?

23       A.    The -- it's my understanding that that was one

24   of the factors considered.

25       Q.    Okay.
```

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE
Clayton Haynes
Designated Highly Confidential Attorneys Eyes Only

Page 73

1      A.    Based upon the ███████ agreement and the

2   Phillips agreement executed by PAR Technologies.

3      Q.    ███████ and Phillips, I'm sorry.

4      A.    Yes.

5      Q.    Aside from the ███████ and Phillips

6   agreements did Mr. Wong explain any other bases for the

7   target royalty of $1.25 to $1.50 per unit?

8      A.    Again, he -- he -- you know, we -- we

9   discussed the statements, you know, made by Steve Wong

10  to Bratic as referenced in his report and confirmed

11  that those statements were indeed true and accurate as

12  referenced by Bratic in -- in that expert report.

13     Q.    Now, AdjustaCam was not a party to the

14  ███████ or Phillips agreements, true?

15     A.    That is my understanding.

16     Q.    All right.  So putting those two agreements

17  aside, you were preparing for this deposition speaking

18  with Mr. Wong concerning the target royalty of $1.25 to

19  $1.50 per unit, did he explain to you whether any of

20  the settlement agreements that AdjustaCam has entered

21  into in this case have any -- provide a basis to

22  support that target, that target royalty range?

23          MR. EDMONDS:  Objection, scope.

24     A.    Yeah, you know, again, the -- you know, the --

25  you know, to the extent that Steve Wong made certain

Page 74

1    statements to Bratic that Bratic referenced in his

2    report, we -- you know, in connection with my

3    preparation, I confirmed that those statements were

4    true -- true and accurate.  And there may be some

5    statements in there that speak to, you know, additional

6    considerations.

7        Q.    And in there, you mean in Mr. Bratic's report?

8        A.    In Mr. Bratic's report, yes.  And perhaps, you

9    know, discussed in Mr. Bratic's deposition as well.

10       Q.    Did you and Mr. Wong, in preparation of this

11   deposition, discuss any of the settlement agreements to

12   which AdjustaCam is a party?

13       A.    Well, we -- you know, in connection with

14   confirming that the statements were true and correct,

15   you know, we -- we -- we certainly, you know, touched

16   upon the topic of licensing and the licensing that --

17   that had been done, which obviously would encompass the

18   license agreements that were executed.

19       Q.    In preparation of your deposition when you

20   spoke with Mr. Wong, did either you or Mr. Wong make

21   specific mention to any of the AdjustaCam settlement

22   agreements by name?

23              MR. EDMONDS:  Objection, scope.

24       A.    Sitting here today, I -- I don't recall

25   specifically if any specific agreement was -- was

# Unexamined Utility Model Application Publication H2-19997

| | |
|---|---|
| (19) Japan Patent Office (JP) | (11) Japanese Unexamined Utility Model Application Publication Number |

## (12) **Japanese Unexamined Utility Model Publication** (U)

### H2-19997

| (51) Int. Cl.$^5$ | Identification codes | JPO file numbers | (43) Publication date: February 9, 1990 |
|---|---|---|---|
| F 16 M 13/02 | T | 7312-3G | |
| G 03 B 17/56 | B | 7811-2H | |

Request for examination: Requested  Number of claims: 3 (Total of   pages)

| (54) Title of the device | LIGHTWEIGHT AND CONVENIENT CAMERA MOUNTING DEVICE |
|---|---|

(21) Utility Model Application S63-94014

(22) Application date: July 18, 1988

| (72) Inventor | Kunio IKI | 6-7-801 Irifune, Urayasu-shi, Chiba-ken |
|---|---|---|
| (71) Applicant | Kunio IKI | 6-7-801 Irifune, Urayasu-shi, Chiba-ken |

Specification

1. Title of the Device

   LIGHTWEIGHT AND CONVENIENT CAMERA MOUNTING DEVICE

2. Scope of the Utility Model Registration Claim

   1. A structure in which a camera fixed part (2) and arms (3) and (4) can be freely rotated around a central shaft (1) is employed.

   2. A structure in which the camera fixed part (2) and the arms (3) and (4) can be fixed by turning a fastening screw (5) is employed.

      In order to supplement the fixing function, elastic rings (7) and (8) are inserted and star-shaped notches are made at the points of contact between the rings and the camera fixed part (2) and the arms (3) and (4).

   3. In order to increase the mounting stability, a rubber ring (12) and a rubber cord

[half seals:
Kunio Iki]

Unexamined Utility Model Application Publication H2-19997

(1)     1216

A0907

**Unexamined Utility Model Application Publication H2-19997**

belt (13) are attached to prevent slippage.

A lightweight and convenient camera mounting device configured as described above.

3. Detailed Description of the Device

The present device is a lightweight and small camera mounting device which enables a camera to be easily set at different positions under various different conditions.

Conventional devices include tripods and the like, but these are difficult to carry around because they are large and heavy. The expansion and contraction of the legs and the operation of the screws is troublesome. A flat surface of a specific width is required as a location for mounting the tripod. Tripods are therefore inconvenient in that the locations at which they can be mounted are limited.

[half seal:
Kunio Iki]

The present device was invented in order to eliminate such inconveniences.

The device will be described with reference to the drawings. This camera mounting device has the following characteristics, as shown in FIGS. 1, 2, 3, and 4.

1. A structure in which a camera fixed part (2) and arms (3) and (4) can be freely rotated around a central shaft (1) is employed.

A0908

2. A structure in which the camera fixed part (2) and the arms (3) and (4) can be fixed by turning a fastening screw (5) is employed.

   In order to supplement the fixing function, elastic rings (7) and (8) are inserted and star-shaped notches are made at the points of contact between the rings and the camera fixed part (2) and the arms (3) and (4).

3. In order to increase the mounting stability, a rubber ring (12) and a rubber cord belt (13) are attached to prevent slippage.

[half seal: Kunio Iki]   This is the basic structure of the present device.

   In order to maintain the fixing function in [2], a hard ring (6) and elastic rings (7) and (8) are inserted, and these are fixed by making notches (0.5 mm) in the star-shaped regions of the rotating parts shown by (2), (3), and (4) in FIGS. 6 and 7. The elastic rings (7) and (8) and the tightening by the fastening screw (5) provide a structure

A0909

**Unexamined Utility Model Application Publication H2-19997**

with a supplementary function for preventing slippage.

The nonslip rubber ring (12) attached to the arms (3) and (4) is for increasing the stability when mounting the camera mounting device. The rubber cord belt (13) is formed so that its length can be expanded and contracted. Clasps are also attached to both ends so that it can be easily set.

[half seal:
Kunio Iki]

The rubber cord belt (13) is used to stabilize the camera mounting device when mounting the device on a tree, a pillar, or the like, but it is also useful for winding around the camera mounting device so that it is more compact when carrying it around.

The present device has the structure described above, so it can be described as follows with reference to the drawings.

A   Having the size shown in FIGS. 1-4, is small and lightweight.

B   As shown in FIGS. 9 and 1, the device can be made small and compact when it is carried around, so it can be placed in a pocket or a purse for easy portability.

A0910

C   As illustrated in FIG. 9 and FIGS. 2-11, the camera can be simply and easily mounted in various locations such as on a desk or a table, the back of a chair indoors or in a park, a guard rail, a wall, a fence, a deck, or on the ground.

D   The operation is simple, and the device can be fixed by simply moving the arms (3) and (4) around the central shaft (1) to an appropriate angle and tightening the fastening screw (5).

E   When mounting on a chair, a tree, or the like, stability can be ensured by fastening the device with the rubber cord belt (13) when particularly necessary.

[half seal:
Kunio Iki]

There are also various other methods of using this camera mounting device, but 2-3 examples will be illustrated here.

The present camera mounting device is easy to carry around and to mount, as described above, and it can be mounted in different places under various conditions.

This device is convenient in that it can be brought on a honeymoon, a family

(5)    1220

**Unexamined Utility Model Application Publication H2-19997**

vacation, or the like, and pictures can be taken in various locations in the preferred poses by using the device in combination with a self-timer or the like.

(We would like to call this camera mounting device by the pet name "Camera Setter Honeymoon.")

4. Brief Description of the Drawings

FIG. 1 is an oblique view of the present device.

[half seal: Kunio Iki]

FIG. 2 is a front view of the present device.

FIG. 3 is a top view of the present device.

FIG. 4 is a side view of the present device.

FIG. 5 shows the states in which the camera fixed part (2) and the arms (3) and (4) of the present device are set to various angles around the central shaft (1).

FIGS. 6, 7, and 8-1 show each section of the present device.

FIG. 8-2 shows a plan view and a side view of the [*rub*]ber cord belt (13) of the present device.

FIG. 9-1 is a drawing showing the present camera mounting device in the compact state.

A0912

FIG. 9-2 is an oblique view of an example in which a camera is mounted in a flat location with the present camera mounting device.

FIG. 10 shows drawings in which a camera is mounted to the back of a chair with the present camera mounting device. FIG. 10-1 is a view from the front; FIG. 10-2 is a view from the side; and FIG. 10-3 is a view from the side at a slight distance.

FIG. 11 shows drawings in which a camera is mounted to a tree, a pillar, or the like with the present camera mounting device. FIG. 11-1 is a view from the top; FIG. 11-2 is a view from the side; and FIG. 11-3 is a view from a slight distance.

[half seal: Kunio Iki]

The numbers in these drawings are respectively associated with the following names.

(1) central shaft

(2) camera fixed part

(3) arm (large)

(4) arm (small)

(5) fastening screw

(6) hard ring

(7)    1222

A0913

**Unexamined Utility Model Application Publication H2-19997**

 (7) elastic ring (small)

 (8) elastic ring (large)

 (9) camera attachment shaft

 (10) camera attachment screw (free)

 (11) camera attachment screw (fixed)

 (12) nonslip rubber ring

 (13) rubber cord belt

[half seal:
Kunio Iki]

Utility Model Registration Applicant    Kunio IKI

(8)    1223

A0914

Drawings

FIG. 1

[seals:
Kunio Iki]



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

## Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 2

[seals:
Kunio Iki]



1225

Utility Model Registration Applicant　　Kunio Iᴋɪ

Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 3

[seals:
Kunio Iki]



1226

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

A0918

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 4

[seals:
Kunio Iki]



1237

Utility Model Registration Applicant    Kunio Iki

Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 5

[seals:
Kunio Iki]



1228

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

A0920

Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 6

[seals:
Kunio Iki]



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

A0921

Drawings

FIG. 7

[seal:
Kunio Iki]



1230

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 8



FIG. 2

13

[seal:
Kunio Iki]

FIG. 1



8

6

7

5

1231

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 9



[seal:
Kunio Iki]

FIG. 2

FIG. 1



1232

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

A0924

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 10

FIG. 3



[seals:
Kunio Iki]

FIG. 2



FIG. 1



1233

Utility Model Registration Applicant    Kunio Iᴋɪ

Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 11

FIG. 3



[seals:
Kunio Iki]

FIG. 1

FIG. 2



1234

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJUSTACAM LLC v. AMAZON.COM, INC., ET AL.

NO. 6:10-cv-329-LED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

**EXPERT REPORT OF JOHN C. MUSKIVITCH REGARDING INFRINGEMENT OF U.S. PATENT NO. 5,855,343**

Dated: June 25, 2012

Respectfully submitted,

JOHN C. MUSKIVITCH

A0994



1

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MV000001

**INTRODUCTION.**

In this litigation, Plaintiff AdjustaCam LLC ("AdjustaCam") has asserted that the Defendants, namely: BEST BUY CO., INC. D/B/A BEST BUY D/B/A ROCKETFISH, BEST BUY STORES, LP, and BESTBUY.COM, LLC ("BEST BUY"); FRY'S ELECTRONICS, INC. ("FRY'S"); GEAR HEAD, LLC ("GEAR HEAD"); HEWLETT-PACKARD COMPANY ("HP"); KOHL'S CORPORATION D/B/A KOHL'S and KOHL'S ILLINOIS, INC. ("KOHL'S"); MICRO ELECTRONICS, INC. D/B/A MICRO CENTER ("MICRO CENTER"); NEWEGG, INC., NEWEGG.COM, INC. and ROSEWILL INC. (collectively "NEWEGG"); OFFICE DEPOT, INC. ("OFFICE DEPOT"); SAKAR INTERNATIONAL, INC. ("SAKAR"), and WAL-MART STORES, INC. ("WAL-MART");

have infringed United States Patent No. 5,855,343 (the "343 patent") relative to the Infringing Products listed at Exhibit A.

In this report, I refer to, and analyze, claims 1, 7 and 19 of the '343 patent as the "Asserted Claims." I have been asked by AdjustaCam to provide my expert opinion (hereinafter "opinion") on the subject of whether the Infringing Products infringe the Asserted Claims.

In my opinion, the Infringing Products infringe the Asserted Claims for the reasons stated in this Report.

**QUALIFICATIONS.**

My Curriculum Vitae ("CV") is Exhibit B to this report. Among my other qualifications noted therein, I have developed and presented undergraduate and graduate level university courses related to design and development of useful and competitive products. Portions of the subject material in these courses relates to creating a focused engineering product design and

2

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
NW000002

development process that has a practical awareness and appreciation of the role of patents in invention and innovation. Topics included: discussion of a best practices approach to documenting an invention; an overview of the sections of a patent; using the United States Patent and Trademark Office website; and how to integrate basic patent concepts with engineering principles to develop/invent a device of their choosing as a final project.

**LEVEL OF ORDINARY SKILL IN THE ART.**

Among other things, I have reviewed the '343 patent, the prior art cited on the face of the patent, and its file history. The art of the '343 patent involves apparatuses that provide structural support and that have moving parts. This art relates specifically to camera stands and/or camera clips. In my opinion, one of ordinary skill in the art would have a civil, structural or mechanical engineering degree.

**COMPENSATION.**

AdjustaCam pays $450 per hour for my work plus reimbursement of expenses. My compensation is neither based on nor contingent on the outcome of this case.

**DOCUMENTS AND MATERIALS REVIEWED.**

Aside from any documents listed in this report, including the infringement charts, a list of the documents and materials referenced and/or considered in forming my opinions is attached to this report as Exhibit C. I have also inspected each of the Infringing Products. The materials that I am relying upon are of a type reasonably relied upon by experts in the technology of the '343 patent in forming opinions.

**LEGAL PRINCIPLES.**

**DIRECT INFRINGEMENT.**[1]

---

[1] I am aware that Sections 271(b) and (c) relate to induced and contributory infringement of patents, but given the

3

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY<br>NIV000003

I have been informed by counsel for AdjustaCam that, pursuant to 35 U.S.C. § 271(a), direct infringement occurs when one makes, uses, sells, offers for sale or imports an apparatus (the Asserted Claims are all apparatus claims) meeting all the limitations of a claim. As stated in this statute, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefore, infringes the patent."

## OVERVIEW OF THE '343 PATENT.

United States Patent Application No. 08/814,168 was filed on March 7, 1997. The '343 patent issued on November 18, 2008. The named inventor is David E. Krekelberg. The '343 patent has been assigned to GlobalMedia Group LLC. GlobalMedia Group LLC has exclusively licensed the '343 patent to AdjustaCam LLC, which is the plaintiff in this case. The title of the '343 patent is "CAMERA CLIP."

As stated by the Court in its April 10, 2012 Memorandum Opinion and Order:

> The '343 patent, entitled "Camera Clip," is directed at a clip for supporting a portable webcam. See '343 patent at ABSTRACT. The claimed apparatus is specifically directed to a structure supporting a webcam both on a flat surface, like a tabletop, and on an edge of a housing, like a laptop computer screen. Id. at 1:4–9. The camera clip is also intended to protect the camera lens when the clip is not used as support. Id. Figures 2 and 4 of the patent illustrate the two different configurations of the camera clip, i.e., on a flat surface (Fig. 2) and on an inclined object (Fig. 4):

A0997

---

clear direct infringement by each Defendant, it is not necessary for me to analyze such indirect infringement.

4

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MV000004



Claim 1 of the '343 patent generally covers an apparatus for supporting a camera (i.e., a camera clip) on any generally horizontal, substantially planar surface (for example, a table or desk) and on an object (for example, a laptop computer), comprising a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation (for example, the vertical axis), relative to said hinge member; a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said surface, and said support frame having a second disposition attached to the object, the camera being maintained adjacent the edge of the object said second disposition.

5

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MV060005

Claim 7 covers the apparatus of claim 1 wherein the object is the display screen of a laptop computer.

In general, claim 19 is similar to claim 1 (with certain differences discussed in more detail below), with the primary difference being that the support frame is hingedly attached and the object is specified as the display screen of a laptop computer.

FIG. 1 is a view of a preferred embodiment of the camera clip invention. FIG. 1 shows generally a camera apparatus 10 has a camera 12 and a camera clip 14. Camera clip 14 is further comprised of a hinge member 16 and a support frame 18. Hinge member 16 is rotatably attached to camera 12, where camera 12 rotates over a first axis 26 relative to hinge member 16. Support frame 18 is hingedly attached to hinge member 16 to engagingly support hinge member 16 on an object 30. Hinge member 16 rotates over a second axis 32 relative to support frame 18. First axis 26 is perpendicular to second axis 32. Second axis 32 is substantially parallel to a first surface 36 when hinge member 16 is engagingly supported on object 30. Support frame 18 has a first portion consisting of first support element 38 and a second portion consisting of a first front support element 40 and a second front support element 42.

FIG. 2 is a side view showing a first mode of a preferred embodiment of the claimed invention. Rear support element 38, first front support element 40 and second front support element 42 support camera 12 in the first position 44, on the first surface 36, when rear support element 38, first front support element 40 and second front support element 42 are engaging first surface 36 and first surface 36 is substantially level. In the first position 44, camera 12 may be pivoted upon support frame 18 from a position 46 to a position 48. In the preferred embodiment, rear support element 38, first front support element 40 and second front support element 42 support the camera in first position 44 on first surface 36.

A0999

6

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MVU00006

FIG. 4 is a side view showing a second mode of the preferred embodiment of the claimed invention. Second position 52 corresponds to first surface 54 being inclined from the substantially level position. In FIG. 4, object 58 has a second surface 60, wherein edge 56 is between first surface 54 and second surface 60. Camera 12 is maintained adjacent edge 56 in second position 52 when the uppermost portion of object 58 is edge 56. Rear support element 38 engages first surface 54, and first front support element 40 and second front support element 42 engage edge 56 and second surface 60. Rear support element 38, first front support element 40 and second front support element 42 support camera 12 in second position 52 on the first surface 54 adjacent edge 56.

In a preferred embodiment, object 58 may be a display screen for a laptop computer when support frame 18 is in second position 52, where second surface 60 is the front of the display screen and first surface 54 is the back of the display screen.

FIG. 4 shows a preferred embodiment with hinge member 16 comprised of a body 74 having a proximal end 76 and a distal end 78. A pivot element 80 at proximal end 76 of body 74 rotatably attaches camera 12 to body 74 so the camera may rotate about first axis 26 relative to body 74. A hinge element 82 at distal end 78 of body 74 hingedly attaches body 74 to support frame 18 so body 74 rotates about second axis 32 relative to support frame 18.

FIGS. 5-7 show various perspectives of a third mode of the preferred embodiment of the claimed invention.

**OVERVIEW OF THE PROSECUTION HISTORY OF THE '343 PATENT.**

As noted above, U.S. Patent Application No. 08/814,168 was filed on March 7, 1997.

On February 6, 1998, the Patent Examiner issued a first office action which rejected original claims 1-26 on various Section 112 grounds.

7

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY MV000007

On June 8, 1998, the Applicant submitted an amendment which mostly clarified antecedent basis and structure and to remove any ambiguity regarding combination/sub-combination issues.

On July 7, 1998 the Applicant and the Examiner had an interview in which the Applicant "agreed to amend the claims to overcome possible 112 problems and pass the case to issue." Pursuant to that agreement, on July 18, 1998 the Examiner issued an Examiner's Amendment making certain relatively minor changes to the claims.

On July 18, 1998, the Examiner also issued a notice of allowability for original claims 1, 2, 4-6, 8, 11-14, 16- 21, and 25-29, which have since be renumbered to claims 1-21.

**CLAIM CONSTRUCTION.**

The Court has construed and/or has resolved the parties' disputes relative to certain claim terms in its April 10, 2012 Memorandum Opinion and Order. My analysis and opinions for this case are compliant with the Court's ruling in this regard.

The Court has construed "hinge member" to be "a structural element that joins to another for construction." In so ruling, the Court rejected the Defendants' proposed construction, which was the following: "a structural element that may be joined to another so as to form a hinge joint and is capable of rotating on that hinge joint."

The Court has construed "rotatably attached / adapted to be rotatably attached / adapted to rotatably attach" as follows: "No construction necessary, sufficiently defined in the claims; subject to the Court's resolution of the scope of the claims." In so ruling, the Court rejected the Defendants' proposed construction, which was the following: "Connected such that the connected object is capable of being adjusted to different configurations via motion over one axis of rotation." The Court further ruled that, "[w]hile the Court has not explicitly construed

A1001

8

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MM000008

the 'rotatably attached' terms, the Court has resolved the parties' dispute regarding the proper scope of the claims, i.e., 'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation." In so holding, the Court rejected Defendants' proposed construction, which was "a physically distinct structural element whose different dispositions enable support of said hinge member."

The Court has construed "support frame" as follows: "No construction necessary, sufficiently defined in the claims; subject to the Court's resolution of the scope of the claims." In so holding, the Court rejected the defendants' proposed construction, which was, "A physically distinct structural element whose different dispositions enable support of said hinge member." Further, the Court ruled as follows:

> The claims are not limited to the extent that "the different dispositions enable support' of the hinge member. Support frame is an easily understood term and its function and structure are defined in the claims. While the support frame must allow for two structural arrangements as described in the claims, the ability to support the hinge member is not directly linked to the two structural arrangements.

The Court has construed "disposition" to be "a configuration or arrangement of the support frame." In so holding, the Court rejected Defendants' proposed construction, which was "configuration of the support frame enabling support of the hinge member, accomplished through rotation about the second axis." Further, the Court ruled as follows:

> Defendants appear to contend that these "dispositions" may only be functionally accomplished through rotational motion of the support frame about the second axis. DEF.'S RESP. at 12. On the contrary, the claims describe the hinge member, not the support frame, as rotating about the second axis. See, e.g., '343 patent at 6:60–61 ("[S]aid hinge member rotating about a second axis of rotation."). Further, the first clause of Defendants' proposed construction is merely a second bite at the same argument they advanced in construing "support frame." The claims, however, do not require the specific dispositions of the support frame to enable support of the hinge member.

9

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MMV000009

For those terms/phrases not ruled upon by the Court, in my analysis I have given them their customary meaning as understood by one of ordinary skill in the art at the time of the invention. I have been informed by counsel for AdjustCam that in the present case, the inventor has not yet been deposed. For purposes of this Report, I will assume that the claimed invention was made sometime in the year preceding the filing of the patent application on March 7, 1997. For purposes of this analysis, it would not matter whether the invention was made on March 7, 1996, on March 7, 1997, or sometime in between.

**OPINIONS ON INFRINGEMENT.**

In my opinion, each of the Infringing Products meets each element of each of the Asserted Claims. My technical analysis relative to the Infringing Products correlating to each and every element of the Asserted Claims is at Exhibit D.

**BEST BUY.**

BEST BUY resells Infringing Products at stores and from its website. BEST BUY has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by BEST BUY were offered for sale prior to being sold. In my opinion, BEST BUY directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**FRY'S.**

Fry's re-sells Infringing Products at stores and from its website. FRY'S has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by FRY'S were offered for sale prior to being sold. In my opinion, FRY'S directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

10

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
INV060010

**GEAR HEAD.**

GEAR HEAD has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by GEAR HEAD were offered for sale prior to being sold. In my opinion, GEAR HEAD directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**HP.**

HP has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by HP were offered for sale prior to being sold. In my opinion, HP directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**KOHL'S.**

KOHL'S has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by KOHL'S were offered for sale prior to being sold. In my opinion, KOHL'S directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**MICRO CENTER.**

MICRO CENTER has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by MICRO CENTER were offered for sale prior to being sold. In my opinion, MICRO CENTER directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**NEWEGG.**

NEWEGG has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by NEWEGG were offered for sale prior

11

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY<sub></sub>00011

to being sold. In my opinion, NEWEGG directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**OFFICE DEPOT.**

OFFICE DEPOT has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by OFFICE DEPOT were offered for sale prior to being sold. In my opinion, OFFICE DEPOT directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**SAKAR.**

SAKAR has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by SAKAR were offered for sale prior to being sold. In my opinion, SAKAR directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**WAL-MART.**

WAL-MART has provided sales information for its Infringing products, which is noted on Exhibit C. Clearly all of the Infringing Webcams sold by WAL-MART were offered for sale prior to being sold. In my opinion, WAL-MART directly infringes the Asserted Claims when it sells and offers for sale the Infringing Products noted above.

**SUMMARY OF THE CLAIMED INVENTION.**

The invention of claims 1, 7 and 19 is a highly versatile and configurable camera clip which is ideal for webcams used in conjunction with laptop computers[2] and flat panel displays attached to desktop computers.

---

[2] At the time of the invention, the technology for having webcams internal to laptops either did not exist, or, if it did exist somewhere, it would not have been practical or cost effective to commercialize it.

12

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY₀₀₀₁₂

The invention of claim 1 focuses on a versatile, configurable camera clip which may optionally be configured to sit on a generally horizontal, substantially planar surface (for example, a table or desk) or an object (for example, a laptop computer or a flat panel display) having a first surface (for example, the back of a display screen), a second surface (for example, the front of a display screen), and an edge the first surface and the second surface upon which one may perch a webcam. For example, one might want to put a webcam atop the laptop in order to film the person using the computer, or on the table to film someone (or something) else, observe an event, or to capture a different angle, distance or field of view.

In order to obtain this highly desirable versatility and configurability, the invention of claim 1 has a hinge member adapted to be rotatably attached to the camera, and the camera rotates about a single axis of rotation relative to the hinge member. This allows the camera to take pictures or videos at different angles without moving the laptop or the support frame, or adjusting the viewing angle of the display.

In addition, the invention of claim 1 has a support frame rotatably attached to the hinge member and configured to support the hinge member on the surface (for example, the table) and the object (for example, a laptop computer). Here again, the versatility of being able to place the webcam on a table or atop a laptop or flat panel computer display (monitor) is highly desirable. Further, the hinge member rotates about a second axis of rotation relative to the support frame, with the first axis of rotation being generally perpendicular to said second axis of rotation (and the second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object). This allows for more versatility in angling the camera (again without moving the laptop, display or the table) and it allows for the camera clip

13

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MWM000013

to fit securely on the laptop screen or computer display, which important to the stability of the webcam.

In addition, the support claim of claim 1 has a first disposition positioned on the generally horizontal, substantially planar surface, and a second disposition attached to the object when the first surface and said second surface are inclined from a generally horizontal orientation, with the camera being maintained adjacent the edge in said second disposition of said support frame. As noted above, these physical characteristics of the camera clip allows for versatility in that the webcam can be set upon a table (or desk), perched on a laptop screen or flat panel computer display.    Since the camera is maintained adjacent to the edge, it gets a desirable and unobstructed view, for example, of the person using a laptop computer. Although claim 1 does not expressly refer to a laptop, a laptop screen is something upon which it is ideal to perch webcam when the screen is inclined from horizontal.

The claimed invention of claim 7 is the apparatus of claim 1 wherein the object is the display screen of a laptop computer. As noted above, the invention is ideal for webcams which may be used with laptop computers, including in terms of versatility, configurability and portability.

The claimed invention of claim 19 is a camera clip for supporting a camera on a laptop computer.    Here the laptop computer has a display screen which can be inclined from a generally horizontal position, and the uppermost portion of the display screen defines an edge upon which one may perch the camera clip and webcam.

In order to obtain its highly desirable versatility and configurability, the invention of claim 19 also has a hinge member adapted to be rotatably attached to the camera, and the camera rotates about a single axis of rotation relative to the hinge member. This allows the

A1007

14

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY0014

camera to take pictures or videos at different angles without moving the laptop, changing the angle of the display screen or the support frame.

In addition, the invention of claim 1 has a support frame hingedly attached to the hinge member to engagingly support the hinge member on the display screen. The hinged attachment limitation of claim 19 is narrower than the rotatable attachment of claim 1 (because rotatable attachments can comprise more than hinged attachments), but a hinged attachment here is still ideal for webcams and laptops. Here again, the versatility of being able to place the webcam on a laptop and maneuver it in various directions is highly desirable.

In addition, the hinge member rotated over a second axis of rotation relative to the support frame, with the camera being maintained adjacent the edge, and rotation of the support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to the edge. This highly desirable configurability allows for versatile and unobstructed angles of view for the webcam, as well as stability of the camera clip and webcam.

### BENEFITS AND ADVANTAGES OF THE CLAIMED INVENTION.

I've been asked to opine upon the utility and advantages of the patented invention over the prior art, and the benefits to those who use the patented invention.

As stated in the '343 patent:

> With portable cameras, it is desirable to have an apparatus which can support the camera in any number of desired configurations. The apparatus must easily accommodate repositioning the camera to new orientations during use, and must be easily transportable. This is especially true when using the camera with a portable computer, such as a laptop computer. . .
> In the past, camera support apparatus were not easily transportable. Often times these apparatus utilized designs which incorporated a tripod approach, or which used one or more telescoping arms to support the camera. These designs attempted to support the camera during use, and then collapse to a smaller size to facilitate storage or transportation. While these designs were transportable, often

15

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY WM000015

times even the collapsed size of the prior art camera support apparatus could not be easily accommodated by a laptop computer bag. These prior art apparatus also did not provide means to protect the camera during transport, and if constructed of hard, exposed materials, tended to damage the cameras.

Another problem with prior art camera support apparatus was that they could not easily accommodate the variety of applications desired for portable cameras. These applications ranged from supporting the camera on the surface of a desk or table to supporting the camera on the upright display screen of a laptop computer. With the prior art, often times more than one camera support apparatus was necessary in order to support the desired range of applications. This unfortunately adversely impacted portability of the camera.

Thus, a desire was created within the industry for a small, easily transportable camera support apparatus for supporting the camera on both horizontal surfaces, such as the surface of a desk or table, and vertical surfaces, such as the display screen of a laptop computer, and to protect the camera during storage and transport.

At the time the patent application was filed and even today, claimed invention is highly advantageous over the prior art due to its versatility, configurability, stability and portability. Without repeating what is stated above in describing the claimed invention, it is especially beneficial for webcams, laptops and flat panel display monitors. In some circumstances it is advantageous to place a webcam on a surface such as a table or desk. In other circumstances it is advantageous to place a webcam atop a laptop computer. Since laptop computers are portable, it was, and still is, desirable for webcams to be portable, compact and unobtrusive too. Further, it is highly desirable that webcams be configurable for different angles and views, and that they have a secure, stable perch. The claimed invention described above provided for all of these benefits and advantages.

In many regards, the claimed invention has revolutionized personal and business communication through the ability to attach and configure a webcam for use social network and video conferencing applications. The use of webcams with laptops has evolved into many of today's laptops having a less configurable webcam integrated into their display component. While less configurable webcams have been integrated into some laptop displays, highly

16

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY00016

configurable standalone webcams are preferred for flat panel displays used with desktop computers. This is demonstrated by many flat panel displays available for purchase offer stand-alone webcams as one of the recommended accessories.

I have not yet seen the report of the Defendants' expert addressing the issue of validity, but I have been informed by counsel for AdjustaCam that certain Defendants have alleged that the closest prior art is one or more of the following: (1) Unexamined Utility Model Application Publication H2-19997 to Irifune ("Irifune"); (2) U.S. Patent No. 5,880,783 to Ma ("Ma"); and (3) U.S. Design Patent No. 383,475 to Yamauchi ("Yamauchi").

The claimed invention is advantageous over Irifune because the Irifune apparatus does not have a hinge member adapted to be rotatably attached to a camera as set forth in claims 1, 7 and 19. Rather, Irifune discloses that a camera can be screwed onto a mounting device using a camera attachment shaft 9 and camera attachment screws 10 and 11. The purpose of the camera attachment shaft and screws is to attach the camera to the camera fixed part 2. Once the camera is attached to the camera fixed part 2, the camera cannot rotate about a first axis relative to the hinge member.

Further, with the Irifune apparatus, a partially threaded camera is not rotatably attached to the hinge member. FIG. 2 of Irifune shows a camera fixed part 2 that is unthreaded, and a camera attachment shaft 9 that is also partially unthreaded at the location where it would be disposed within an opening of the camera fixed part. Thus, the camera attachment shaft 9 can freely pass through the opening of the camera fixed part 2. Thus, camera fixed part merely has a hole that allows the camera attachment shaft 9 to cleanly pass through and be screwed into a camera. Thus, Irifune merely disclose a hole that allows a camera attachment shaft 9 to pass there through and provide for secure tightening of the camera to be in contact with the camera

17

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
ADJ-060017

fixed part 2 so that it is in a tight, stable, fixed position when fully screwed to the camera attachment shaft. The purpose of the camera attachment shaft 2 is to tightly secure the camera to the camera fixed part so that it does not rotate.

Further, the Irifune apparatus is essentially incompatible with laptop computers. The Irifune apparatus is large and clunky, uses a rubber cord belt to stabilize the apparatus, and its large front legs would cover a large part of a laptop screen in an undesirably prominent manner. Further, laptop computers were well known by the July 18, 1988 filing date of the Irifune application. *See,* for example, http://www.life123.com/technology/computer-hardware/laptop/laptop-computer-history.shtml and http://en.wikipedia.org/wiki/History_of_laptops. For example, IBM came out with the IBM PC Convertible in 1986, Toshiba came out with the T1100 in 1985, and Toshiba came out with the T1000 and T1200 in 1987. Yet, despite the fact that laptops were well known, Irifune makes no mention of being used with a laptop computer. For example, at p. 5, Irifune states that "the camera can be simply and easily mounted in various locations such as on a desk or a table, the back of a chair indoors or in a park, a guard rail, a wall, a fence, a deck, or on the ground."

The camera of Ma is an impractical design, it looks unstable, and it is doubtful that it was ever commercialized or put into widespread production. The claimed invention is advantageous over Ma because Ma does not disclose an apparatus for supporting a camera. Rather, Ma discloses camera assembly that includes camera components which are rotatable with respect to one another. Further, Ma does not disclose a "hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member..." as required by claims 1, 7 and 19. Rather, Ma's tubular shaft 21 rotatably couples adjustment block 2 to circuit box 3. In Ma, the

18

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY
MW000018

camera is not rotating about tubular shaft 21. Instead, two camera components (adjustment block 2 and circuit box 3) are rotatable with respect to one another by tubular shaft 21. Likewise, tubular revolving shaft 11 rotatably couples two camera components (adjustment block 2 and photographic lens assembly 1) to one another. Thus, the respective tubular revolving shafts 11 and 21 merely provide for rotatable attachment of respective camera components within the CCD camera. They are not part of an apparatus for supporting a camera let alone rotating the camera.      Further, circuit box 3 is a sub-component of the camera and thus is not a support frame. Thus, Ma does not disclose "a support frame rotatably attached to said hinge member."Furthermore, Ma discloses two hinge members 11 and 21, which is contrary to the single hinge member recited in claims 1, 7 and 19 which is adapted to be rotatably attached to the camera. Moreover, claims 1, 7 and 19 recite that the respective axes of rotation of the hinge member relative to the camera and the support are perpendicular, something which Ma lacks.

Yamauchi is far afield from the patented invention. First, Yamauchi discloses a camera, not a camera clip nor an apparatus for supporting a camera. The entire Yamauchi apparatus, except for the front bipod, is a video camera. Second, Yamauchi does not disclose a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member. With respect to Yamauchi, the hinge member merely connects two halves of the camera. Third, Yamauchi does not disclose a support frame rotatably attached or hingedly attached to the hinge member with the hinge member rotating about a second axis of rotation relative to the support frame. Even if the bottom half of Yamauchi's camera was erroneously deemed to constitute a support frame for the top half of the camera, Yamauchi discloses only a hinge member rotating about a

19

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY MV000019

A1012

single axis of rotation.

In view of the above-described desirability, benefits and advantages of the claimed invention, it is my opinion that patented feature, as described above, at least substantially creates the value of the component parts of the infringing products.

**MICROCENTER LICENSES.**

I have reviewed the licenses produced by MicroCenter (i.e, Exhibits 5 -9 of the MicroCenter deposition) and a reasonable amount of the patents listed therein. Three of the licenses are with MacroVision, one with MPEG LA, and one is with Tessera. The MacroVision licenses generally relate to technology and devices for video transmissions and adaptive control, devices and circuitry for the Higher Definition Specification video output waveforms for copy protection and DVD manufacturing which includes the copy protection technology. The MPEG LA license generally relates to the use of MPEG-2 Essential Patents for video data compression and data transport. The Tessera license generally relates to patented semiconductor integrated circuit ("IC") packaging technology. None of the MicroCenter licenses involve technology comparable to the patented invention as described above.

**EXHIBITS.**

Exhibits to this report are as follows:

Exhibit A: Chart of infringing products

Exhibit B: Curriculum Vitae of John C. Muskivitch

Exhibit C: List of documents reviewed/considered in preparation of this report

Exhibit D: Chart of asserted claims of '343 as asserted against the Infringing Products

A1013

20

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY 000020

EXHIBIT D (HERCULES CLASSIC)
INFRINGEMENT CHART FOR THE HERCULES CLASSIC

| 1(p) | Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | As noted in the photos below, the HERCULES CLASSIC is an apparatus (i.e., a camera clip) for supporting a camera, namely a webcam.<br><br>As noted in the photos below, the camera supported by the HERCULES CLASSIC has a lens.<br><br>The HERCULES CLASSIC is an apparatus for supporting a camera on a generally horizontal, substantially planar surface, for example, a table top or desk top.  For example:<br><br><br><br>The HERCULES CLASSIC is an apparatus for supporting a camera on an object, for example the display screen of a laptop or notebook (collectively "laptop") computer, having a first surface and a second surface and an edge intersecting the first surface and the second surface. For example, with a laptop computer, the first surface is the back of the display screen, the second surface is the front of the display screen, and an edge intersects those surfaces. |
| 1(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The HERCULES CLASSIC comprises a hinge member (noted with a green arrow) adapted to be rotatably attached to the camera. |

MV000049

A1042

<table>
<tr><td></td><td></td><td><br>When the hinge member is so attached the camera rotates about a first axis of rotation (noted with a blue circular arrow) relative to the hinge member. The axis of rotation is a single axis of rotation which is defined by a vector from the center of the connector through the central axis of the camera.</td></tr>
<tr><td>1(b)</td><td>b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object,</td><td>The HERCULES CLASSIC comprises a support frame (noted with a red arrow) which is configured to support, and which does support, the hinge member on the surface (see above re surface) and the object (see above re object).

The support frame of the HERCULES CLASSIC is rotatably attached to the hinge member. The hinge member rotates about a second axis of rotation (noted with a yellow arrow), relative to the support frame. This axis of rotation is defined by the axis of the hinge connection to the support frame. Thus, it is a single axis of rotation.

The first axis of rotation (noted with a blue arrow) is at least generally perpendicular to the second axis of rotation (noted with a yellow arrow).  ).  In particular, the camera always rotates around a vector defined from the center of the connector through the central axis of the camera.

For example:</td></tr>
</table>

MV000050

**A1043**

| | | |
|---|---|---|
| | | <br><br>As noted in the photo above, the second axis of rotation (noted with a yellow arrow) is at least substantially parallel to the first surface (see above re first surface) when the hinge member (see above re hinge member) is supported on the object (see above re object). |
| 1(c) | said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and | The support frame (see above re support frame) of the HERCULES CLASSIC has a first disposition when positioned on the generally horizontal, substantially planar surface (see above re generally horizontal, substantially planar surface).<br><br>For example, see the above photos at the preamble and elements (a) and (b) of claim 1. |
| 1(d) | said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | The support frame (see above re support frame) of the HERCULES CLASSIC has a second disposition when attached to the object (see above re object) when the first surface (see above re first surface) of the object (see above re object) and the second surface of the object (see above re second surface) are inclined from a generally horizontal orientation, for example when a laptop computer's display screen is opened.<br><br>For example:<br><br><br><br>As noted in the photo above, in this second disposition the camera is maintained adjacent the edge (see above re edge) of |

3

| | | the object (see above re object). |
|---|---|---|
| 7(p) | Apparatus according to claim 1 | The HERCULES CLASSIC is an apparatus according to claim 1. See above re claim 1. |
| 7(a) | wherein the object is a display screen for a laptop computer, | As noted above at the preamble of claim 1 and at element d of claim 1, the HERCULES CLASSIC is an apparatus for supporting a camera on a display screen for a laptop computer.<br><br>For example:<br><br> |
| 7(b) | and the second surface is the front of the display screen | As noted above at the preamble of claim 1 and at element d of claim 1, the HERCULES CLASSIC is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the second surface (noted with a dark purple arrow) is the front of the display screen.<br><br>For example:<br><br> |
| 7(c) | and the first surface is the back of the display screen. | As noted above at the preamble of claim 1 and at claim 1, element (d) (and in the photo at claim 7, element (a)), the HERCULES CLASSIC is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the first surface (noted with a light purple arrow) is the back of the display screen. |

4

A1045

MV000052

| | |  |
|---|---|---|
| 19(p) | A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | As noted above at the preamble of claim 1 and at claim 1, element (d), the HERCULES CLASSIC is a camera clip for supporting a camera on a laptop computer having a display screen which can be inclined from a generally horizontal position (i.e., when opened) with the uppermost portion of the display screen defining an edge.<br><br>For example:<br><br> |
| 19(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | See 1(a) above. |
| 19(b) | b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, | The HERCULES CLASSIC comprises a support frame (see above re support frame) which engages and supports the hinge member (see above re hinge member) on the display screen.<br><br>For example: |

A1046

5

As depicted in the graphic above, the support frame (see above re support frame) is hingedly attached to the hinge member (see above re hinge member).

| 19(c) | said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, | The HERCULES CLASSIC comprises the hinge member (see above re hinge member) rotating over a second axis of rotation (see above re second axis of rotation), as noted with a yellow arrow, relative to the support frame (see above re support frame).<br><br>For example:<br><br><br><br>As exemplified by the photo above, the HERCULES CLASSIC comprises the camera being maintained adjacent the edge (see above re edge) of the laptop computer. |
| --- | --- | --- |
| 19(d) | rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | As exemplified by the photo above below, the HERCULES CLASSIC comprises the support frame (see above re support frame) being supported on the display screen, and its movement constrained by a front lip on the hinge member, and thus rotation of the support frame is prevented along an axis which is at least substantially horizontal. |

6

MV000054



As noted in the above photo, this at least substantially horizontal axis is at least substantially parallel to the second axis (see above re second axis) and the second axis is at least substantially parallel to the edge.

A1048

7

**A1048**

EXHIBIT D (KODAK S101)
INFRINGEMENT CHART FOR THE KODAK S101

| 1(p) | Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | As noted in the photos below, the KODAK S101 is an apparatus (i.e., a camera clip) for supporting a camera, namely a webcam.<br><br>As noted in the photos below, the camera supported by the KODAK S101 has a lens.<br><br>The KODAK S101 is an apparatus for supporting a camera on a generally horizontal, substantially planar surface, for example, a table top or desk top.  For example:<br><br><br><br>The KODAK S101 is an apparatus for supporting a camera on an object, for example the display screen of a laptop or notebook (collectively "laptop") computer, having a first surface and a second surface and an edge intersecting the first surface and the second surface. For example, with a laptop computer, the first surface is the back of the display screen, the second surface is the front of the display screen, and an edge intersects those surfaces. |
| 1(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The KODAK S101 comprises a hinge member (noted with a green arrow) adapted to be rotatably attached to the camera. |

MV000139

A1132

| | | |
|---|---|---|
| | | <br>When the hinge member is so attached the camera rotates about a first axis of rotation (noted with a blue circular arrow) relative to the hinge member. The axis of rotation is a single axis of rotation which is defined by a vector from the center of the connector through the central axis of the camera. |
| 1(b) | b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The KODAK S101 comprises a support frame (noted with a red arrow) which is configured to support, and which does support, the hinge member on the surface (see above re surface) and the object (see above re object).<br><br><br><br>The support frame of the KODAK S101 is rotatably attached to the hinge member. The hinge member rotates about a second axis of rotation (noted with a yellow arrow), relative to the support frame. This axis of rotation is defined by the axis of the hinge connection to the support frame. Thus, it is a single axis of rotation.<br><br>The first axis of rotation (noted with a blue arrow) is at least generally perpendicular to the second axis of rotation (noted with a yellow arrow). In particular, the camera always rotates around a vector defined from the center of the connector through the central axis of the camera.<br><br>For example: |

2

MV000140

**A1133**

As noted in the photo above, the second axis of rotation (noted with a yellow arrow) is at least substantially parallel to the first surface (see above re first surface) when the hinge member (see above re hinge member) is supported on the object (see above re object).

| 1(c) | said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and | The support frame (see above re support frame) of the KODAK S101 has a first disposition when positioned on the generally horizontal, substantially planar surface (see above re generally horizontal, substantially planar surface).<br><br>For example, see the above photos at the preamble and elements (a) and (b) of claim 1. |
|---|---|---|
| 1(d) | said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | The support frame (see above re support frame) of the KODAK S101 has a second disposition when attached to the object (see above re object) when the first surface (see above re first surface) of the object (see above re object) and the second surface of the object (see above re second surface) are inclined from a generally horizontal orientation, for example when a laptop computer's display screen is opened.<br><br>For example:<br><br><br><br>As noted in the photo above, in this second disposition the |

3

| | | camera is maintained adjacent the edge (see above re edge) of the object (see above re object). |
|---|---|---|
| 7(p) | Apparatus according to claim 1 | The KODAK S101 is an apparatus according to claim 1. See above re claim 1. |
| 7(a) | wherein the object is a display screen for a laptop computer, | As noted above at the preamble of claim 1 and at element d of claim 1, the KODAK S101 is an apparatus for supporting a camera on a display screen for a laptop computer.<br><br>For example:<br><br> |
| 7(b) | and the second surface is the front of the display screen | As noted above at the preamble of claim 1 and at element d of claim 1, the KODAK S101 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the second surface (noted with a dark purple arrow) is the front of the display screen.<br><br>For example:<br><br> |
| 7(c) | and the first surface is the back of the display screen. | As noted above at the preamble of claim 1 and at claim 1, element (d) (and in the photo at claim 7, element (a)), the KODAK S101 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the first surface |

4

**A1135**

| | | |
|---|---|---|
| | | (noted with a light purple arrow) is the back of the display screen.<br> |
| 19(p) | A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | As noted above at the preamble of claim 1 and at claim 1, element (d), the KODAK S101 is a camera clip for supporting a camera on a laptop computer having a display screen which can be inclined from a generally horizontal position (i.e., when opened) with the uppermost portion of the display screen defining an edge.<br><br>For example:<br> |
| 19(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | See 1(a) above. |
| 19(b) | b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, | The KODAK S101 comprises a support frame (see above re support frame) which engages and supports the hinge member (see above re hinge member) on the display screen.<br><br>For example: |

5

A1136

MV000143

| | | |
|---|---|---|
| | | <br><br>As depicted in the graphic above, the support frame (see above re support frame) is hingedly attached to the hinge member (see above re hinge member). |
| 19(c) | said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, | The KODAK S101 comprises the hinge member (see above re hinge member) rotating over a second axis of rotation (see above re second axis of rotation), as noted with a yellow arrow, relative to the support frame (see above re support frame).<br><br>For example:<br><br><br><br>As exemplified by the photo above, the KODAK S101 comprises the camera being maintained adjacent the edge (see above re edge) of the laptop computer. |
| 19(d) | rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | As exemplified by the photo above below, the KODAK S101 comprises the support frame (see above re support frame) being supported on the display screen, and its movement constrained by a front lip on the hinge member, and thus rotation of the support frame is prevented along an axis which is at least substantially horizontal. |

6

MV000144



As noted in the above photo, this at least substantially horizontal axis is at least substantially parallel to the second axis (see above re second axis) and the second axis is at least substantially parallel to the edge.

7

MV000145

EXHIBIT D (KODAK T130)
INFRINGEMENT CHART FOR THE KODAK T130

| 1(p) | Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | As noted in the photos below, the KODAK T130 is an apparatus (i.e., a camera clip) for supporting a camera, namely a webcam.<br><br>As noted in the photos below, the camera supported by the KODAK T130 has a lens.<br><br>The KODAK T130 is an apparatus for supporting a camera on a generally horizontal, substantially planar surface, for example, a table top or desk top. For example:<br><br><br><br>The KODAK T130 is an apparatus for supporting a camera on an object, for example the display screen of a laptop or notebook (collectively "laptop") computer, having a first surface and a second surface and an edge intersecting the first surface and the second surface. For example, with a laptop computer, the first surface is the back of the display screen, the second surface is the front of the display screen, and an edge intersects those surfaces. |
| 1(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The KODAK T130 comprises a hinge member (noted with a green arrow) adapted to be rotatably attached to the camera.<br><br> |

MV000146

**A1139**

| | | When the hinge member is so attached the camera rotates about a first axis of rotation (noted with a blue circular arrow) relative to the hinge member.  The axis of rotation is a single axis of rotation which is defined by a vector from the center of the connector through the central axis of the camera. |
|---|---|---|
| 1(b) | b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The KODAK T130 comprises a support frame (noted with a red arrow) which is configured to support, and which does support, the hinge member on the surface (see above re surface) and the object (see above re object).<br><br><br><br>The support frame of the KODAK T130 is rotatably attached to the hinge member. The hinge member rotates about a second axis of rotation (noted with a yellow arrow), relative to the support frame.  This axis of rotation is defined by the axis of the hinge connection to the support frame.  Thus, it is a single axis of rotation.<br><br>The first axis of rotation (noted with a blue arrow) is at least generally perpendicular to the second axis of rotation (noted with a yellow arrow In particular, the camera always rotates around a vector defined from the center of the connector through the central axis of the camera.<br><br>For example: |

2

MV000147

| | | |
|---|---|---|
| | | As noted in the photo above, the second axis of rotation (noted with a yellow arrow) is at least substantially parallel to the first surface (see above re first surface) when the hinge member (see above re hinge member) is supported on the object (see above re object). |
| 1(c) | said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and | The support frame (see above re support frame) of the KODAK T130 has a first disposition when positioned on the generally horizontal, substantially planar surface (see above re generally horizontal, substantially planar surface).<br><br>For example, see the above photos at the preamble and elements (a) and (b) of claim 1. |
| 1(d) | said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | The support frame (see above re support frame) of the KODAK T130 has a second disposition when attached to the object (see above re object) when the first surface (see above re first surface) of the object (see above re object) and the second surface of the object (see above re second surface) are inclined from a generally horizontal orientation, for example when a laptop computer's display screen is opened.<br><br>For example:<br><br>As noted in the photo above, in this second disposition the |

3

MV000148

A1141

| | | |
|---|---|---|
| | | camera is maintained adjacent the edge (see above re edge) of the object (see above re object). |
| 7(p) | Apparatus according to claim 1 | The KODAK T130 is an apparatus according to claim 1. See above re claim 1. |
| 7(a) | wherein the object is a display screen for a laptop computer, | As noted above at the preamble of claim 1 and at element d of claim 1, the KODAK T130 is an apparatus for supporting a camera on a display screen for a laptop computer.<br><br>For example:<br> |
| 7(b) | and the second surface is the front of the display screen | As noted above at the preamble of claim 1 and at element d of claim 1, the KODAK T130 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the second surface (noted with a dark purple arrow) is the front of the display screen.<br><br>For example:<br> |
| 7(c) | and the first surface is the back of the display screen. | As noted above at the preamble of claim 1 and at claim 1, element (d) (and in the photo at claim 7, element (a)), the KODAK T130 is an apparatus for supporting a camera on a |

MV000149

A1143

| | | |
|---|---|---|
| | | display screen for a laptop computer, wherein the first surface (noted with a light purple arrow) is the back of the display screen.<br><br> |
| 19(p) | A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | As noted above at the preamble of claim 1 and at claim 1, element (d), the KODAK T130 is a camera clip for supporting a camera on a laptop computer having a display screen which can be inclined from a generally horizontal position (i.e., when opened) with the uppermost portion of the display screen defining an edge.<br><br>For example:<br><br> |
| 19(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | See 1(a) above. |
| 19(b) | b. a support frame hingedly attached to said hinge member to engagingly support said | The KODAK T130 comprises a support frame (see above re support frame) which engages and supports the hinge member (see above re hinge member) on the display screen. |

5

| | hinge member on the display screen, | For example:<br><br><br><br>As depicted in the graphic above, the support frame (see above re support frame) is hingedly attached to the hinge member (see above re hinge member). |
|---|---|---|
| 19(c) | said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, | The KODAK T130 comprises the hinge member (see above re hinge member) rotating over a second axis of rotation (see above re second axis of rotation), as noted with a yellow arrow, relative to the support frame (see above re support frame).<br><br>For example:<br><br><br><br>As exemplified by the photo above, the KODAK T130 comprises the camera being maintained adjacent the edge (see above re edge) of the laptop computer. |
| 19(d) | rotation of said support frame being prevented along an axis substantially parallel to said | As exemplified by the photo above below, the KODAK T130 comprises the support frame (see above re support frame) being supported on the display screen, and its movement constrained |

6

| second axis where said second axis is substantially parallel to said edge. | by a front lip on the hinge member, and thus rotation of the support frame is prevented along an axis which is at least substantially horizontal.  As noted in the above photo, this at least substantially horizontal axis is at least substantially parallel to the second axis (see above re second axis) and the second axis is at least substantially parallel to the edge. |

EXHIBIT D (ROSEWILL RCM-8163)
INFRINGEMENT CHART FOR THE ROSEWILL RCM-8163

| 1(p) | Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | As noted in the photos below, the ROSEWILL RCM-8163 is an apparatus (i.e., a camera clip) for supporting a camera, namely a webcam.<br><br>As noted in the photos below, the camera supported by the ROSEWILL RCM-8163 has a lens.<br><br>The ROSEWILL RCM-8163 is an apparatus for supporting a camera on a generally horizontal, substantially planar surface, for example, a table top or desk top. For example:<br><br><br><br>The ROSEWILL RCM-8163 is an apparatus for supporting a camera on an object, for example the display screen of a laptop or notebook (collectively "laptop") computer, having a first surface and a second surface and an edge intersecting the first surface and the second surface. For example, with a laptop computer, the first surface is the back of the display screen, the second surface is the front of the display screen, and an edge intersects those surfaces. |
| 1(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The ROSEWILL RCM-8163 comprises a hinge member (noted with a green arrow) adapted to be rotatably attached to the camera.<br><br><br><br>When the hinge member is so attached the camera rotates about |

MV000167

| | | |
|---|---|---|
| | | a first axis of rotation (noted with a blue circular arrow) relative to the hinge member. The axis of rotation is a single axis of rotation which is defined by a vector from the center of the connector through the central axis of the camera. |
| 1(b) | b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The ROSEWILL RCM-8163 comprises a support frame (noted with a red arrow) which is configured to support, and which does support, the hinge member on the surface (see above re surface) and the object (see above re object).<br><br><br><br>The support frame of the ROSEWILL RCM-8163 is rotatably attached to the hinge member. The hinge member rotates about a second axis of rotation (noted with a yellow arrow), relative to the support frame. This axis of rotation is by the axis of the hinge connection to the support frame.  Thus, it is a single axis of rotation.<br><br>The first axis of rotation (noted with a blue arrow) is at least generally perpendicular to the second axis of rotation (noted with a yellow arrow In particular, the camera always rotates around a vector defined from the center of the connector through the central axis of the camera.<br><br>For example:<br><br><br><br>As noted in the photo above, the second axis of rotation (noted with a yellow arrow) is at least substantially parallel to the first surface (see above re first surface) when the hinge member (see above re hinge member) is supported on the object (see above re object). |
| 1(c) | said support frame having a first disposition positioned on | The support frame (see above re support frame) of the ROSEWILL RCM-8163 has a first disposition when positioned |

2

A1161

| | said generally horizontal, substantially planar surface, and | on the generally horizontal, substantially planar surface (see above re generally horizontal, substantially planar surface).<br><br>For example, see the above photos at the preamble and elements (a) and (b) of claim 1. |
|---|---|---|
| 1(d) | said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | The support frame (see above re support frame) of the ROSEWILL RCM-8163 has a second disposition when attached to the object (see above re object) when the first surface (see above re first surface) of the object (see above re object) and the second surface of the object (see above re second surface) are inclined from a generally horizontal orientation, for example when a laptop computer's display screen is opened.<br><br>For example:<br><br><br><br>As noted in the photo above, in this second disposition the camera is maintained adjacent the edge (see above re edge) of the object (see above re object). |
| 7(p) | Apparatus according to claim 1 | The ROSEWILL RCM-8163 is an apparatus according to claim 1. See above re claim 1. |
| 7(a) | wherein the object is a display screen for a laptop computer, | As noted above at the preamble of claim 1 and at element d of claim 1, the ROSEWILL RCM-8163 is an apparatus for supporting a camera on a display screen for a laptop computer.<br><br>For example: |

3

MV000169

A1162

| | | |
|---|---|---|
| | |  |
| 7(b) | and the second surface is the front of the display screen | As noted above at the preamble of claim 1 and at element d of claim 1, the ROSEWILL RCM-8163 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the second surface (noted with a dark purple arrow) is the front of the display screen.<br><br>For example:<br><br> |
| 7(c) | and the first surface is the back of the display screen. | As noted above at the preamble of claim 1 and at claim 1, element (d) (and in the photo at claim 7, element (a)), the ROSEWILL RCM-8163 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the first surface (noted with a light purple arrow) is the back of the display screen. |

MV000170

A1163

| | | |
|---|---|---|
| | |  |
| 19(p) | A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | As noted above at the preamble of claim 1 and at claim 1, element (d), the ROSEWILL RCM-8163 is a camera clip for supporting a camera on a laptop computer having a display screen which can be inclined from a generally horizontal position (i.e., when opened) with the uppermost portion of the display screen defining an edge.<br><br>For example:<br><br> |
| 19(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | See 1(a) above. |
| 19(b) | b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display | The ROSEWILL RCM-8163 comprises a support frame (see above re support frame) which engages and supports the hinge member (see above re hinge member) on the display screen. |

5

A1164

MV000171

**A1164**

| | screen, | For example: <br><br> As depicted in the graphic above, the support frame (see above re support frame) is hingedly attached to the hinge member (see above re hinge member). |
|---|---|---|
| 19(c) | said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, | The ROSEWILL RCM-8163 comprises the hinge member (see above re hinge member) rotating over a second axis of rotation (see above re second axis of rotation), as noted with a yellow arrow, relative to the support frame (see above re support frame). <br><br> For example: <br><br>  <br><br> As exemplified by the photo above, the ROSEWILL RCM-8163 comprises the camera being maintained adjacent the edge (see above re edge) of the laptop computer. |

MV000172

| 19(d) | rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | As exemplified by the photo above below, the ROSEWILL RCM-8163 comprises the support frame (see above re support frame) being supported on the display screen, and its movement constrained by a front lip on the hinge member, and thus rotation of the support frame is prevented along an axis which is at least substantially horizontal.<br><br><br><br>As noted in the above photo, this at least substantially horizontal axis is at least substantially parallel to the second axis (see above re second axis) and the second axis is at least substantially parallel to the edge. |

A1166

7

RYAN M. SULLIVAN, PH.D.  Attorneys Eyes Only
ADJUSTACAM vs. AMAZON.COM

August 13, 2012
1

```
 1              UNITED STATES DISTRICT COURT

 2      FOR THE EASTERN DISTRICT OF TEXAS, TYLER DIVISION

 3

 4   ADJUSTACAM, LLC,

 5              Plaintiff,

 6      vs.                        Case No.: 6:10-cv-329-LED

 7   AMAZON.COM, INC.,

 8              Defendant.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9

10      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY -

11          SUBJECT TO PROTECTIVE ORDER

12                DEPOSITION OF

13          RYAN M. SULLIVAN, PH.D.

14

15                August 13, 2012

16                 9:01 a.m.

17

18            12730 High Bluff Drive
                   Suite 300
19            San Diego, California

20

21          Jill B. Darland, CSR No. 6140

22

23

24

25
```

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1  | you could point that out for me.
2  | BY MR. EDMONDS:
3  |      Q.   With all due respect, you're being evasive.
4  |           MR. HERBERHOLZ:  Counsel, let's not do that.
5  | BY MR. EDMONDS:
6  |      Q.   I don't think you've quantified the trend.
7  | Could you point the jury to where in your point you've
8  | quantified the trend?
9  |           MR. HERBERHOLZ:  Object to the form of the
10 | question.
11 |      A.   Paragraph 49 of my report explains that the
12 | marketplace for webcams trended away from external
13 | webcams in favor of embedded webcams by the mid-2000s.
14 | Recent estimates, for example, indicate that more than
15 | 70 percent of laptops have embedded webcams.  There is
16 | significant and substantial information demonstrating the
17 | role of external versus embedded webcams and the role
18 | that plays within the marketplace.
19 |           For example, I also explained that the webcam
20 | business is substantially impacted by the embedding of
21 | webcams in laptops.  "Everybody has a webcam in their
22 | laptops," as noted by Logitech in its discussion with
23 | Morgan Stanley.
24 |           In addition, a Logitech representative stated
25 | that, "Consumer webcams, the tethered webcam, the one



1  that you put on your PC and you plug into the USB port,

2  that is a declining business.  That will not -- right now

3  I don't think it's reasonable to assume it will grow

4  again."

5         So the point is this trend is declining over

6  time.  Exactly when it began, as I indicated earlier, is

7  not material as it's clear that by the time of the

8  hypothetical negotiations, the trend was in decline.  And

9  that is what is important for the determination of the

10  reasonable royalty is recognizing that this trend was

11  declining.  Determining an exact or precise estimate of

12  that decline is not necessary.  Rather, it's the fact of

13  the decline and the fact of the direction of the trend

14  that helps to inform upon the reasonable royalty.

15  BY MR. EDMONDS:

16      Q.  You made a statement that everybody has a webcam

17  in his laptop.

18         MR. HERBERHOLZ:  Objection.  Form.

19  BY MR. EDMONDS:

20      Q.  Is that correct?

21         MR. HERBERHOLZ:  Same objection.

22      A.  I do not know.  Your statement was unclear to

23  me.  Perhaps you could try it again.

24  BY MR. EDMONDS:

25      Q.  Well, you said just a minute ago that everybody



1    analysis reveals that there is no such discernible

2    relationship.  And that is another factor as to why the

3    settlement agreements are not informative for determining

4    a reasonable royalty.

5    BY MR. EDMONDS:

6         Q.   Does your analysis factor in when a later

7    defendant's sales numbers would decrease because they

8    were selling webcams that were -- had been licensed via

9    the settlement of an earlier licensed defendant?

10        A.   I'm not sure I follow the question.  Could you

11   try that again?

12        Q.   You understand that all the defendants didn't

13   settle on the same day.  Correct?

14        A.   That is my understanding.

15        Q.   And you understand that when some settled, if

16   they are a supplier to another defendant, then that

17   supplier would get the benefit of that license, and these

18   webcams would now be excluded from what's royalty-bearing

19   or what's actionable.  Correct?

20             MR. HERBERHOLZ:  Object to the form.

21        A.   Generally speaking, my understanding is that a

22   given product can only be accused once for the

23   determination of a royalty.

24   BY MR. EDMONDS:

25        Q.   Okay.  Has your analysis factored in when a



1    later-settling defendant now has lower unit numbers by

2    virtue of an earlier-settling defendant having gotten a

3    license for those webcams?

4        A.   So in terms of Attachment 12, I have not

5    endeavored to reduce the sales volumes for overlapping

6    sales as I believe you are suggesting.  Rather, I have

7    undertaken this analysis as something that Mr. Bratic has

8    not attempted, to determine whether there's any

9    relationship between the settlement amounts and the sales

10   data.  And as I demonstrate, there is no such

11   relationship.

12       Q.   Would you agree that during a royalty

13   negotiation with these various defendants, that they

14   would not be required to pay royalties on webcams that

15   had already been licensed via a settlement of an

16   earlier-settling defendant?

17       MR. HERBERHOLZ:  Object to form.

18       A.   I would hope that would be the case, yet it's

19   not clear to me that that has been the case.

20   BY MR. EDMONDS:

21       Q.   Assuming they're rational, they would not pay

22   royalties on licensed webcams.  Correct?

23       A.   I'm not sure how to answer that one.  I don't

24   follow the question.

25       Q.   What don't you understand about it?



1    Q.    Which ones would be excluded?

2    A.    That is demonstrated in Attachment 12.

3    Q.    How did you calculate the 1,017,766 units for

4  Creative?  No.  Excuse me.  That's Chicony.

5          Okay.  Yeah.  Let's take -- with Creative, how

6  did you get to your 8,083 webcams?

7    A.    That is based upon the data in Attachment 11,

8  adjusted for the pre-agreement time period of July 2nd,

9  2010, to November 18, 2011.

10   Q.    So the numbers on Attachment 11 for Creative,

11 which of those numbers are relevant to your analysis?

12   A.    Well, I've considered all of the sales data, yet

13 with respect to the calculation of pre-agreement units as

14 listed on Attachment 12, that is based upon the sales in

15 2010 and 2011.

16   Q.    All right.  Let's take Chicony.  So for Chicony,

17 how did you get to the 1,017,266 pre-agreement units?

18   A.    Well, that is based upon the sales data for

19 Chicony, and it is calibrated to the time period of

20 January 1, 2006, up through June 28, 2011.

21   Q.    Why did you start at 2006?

22   A.    That is based upon the beginning of the sales

23 data for Chicony.

24   Q.    Well, if Chicony and AdjustaCam were both aware

25 when they negotiated the Chicony license that Chicony was



1    not required to pay royalties for webcams because of

2    marking, would that affect your analysis?

3         A.   No, not in any material way.

4         Q.   Why not?

5         A.   Well, I have approached this both from a

6    pre-agreement perspective as well as a post-agreement

7    perspective, as well as a perspective that includes both

8    of those.  And really, any way you cut it, there's not

9    any sort of a relationship that can be discerned between

10   unit sales and settlement amounts.

11        Q.   If Chicony and AdjustaCam were both aware that

12   Chicony was not required to pay royalties on webcams

13   because of lack of marking, would that affect your

14   implied royalty rate for Chicony?

15        A.   The rate -- the implied rate for pre-agreement

16   units would be different if one were to reduce the number

17   of units.  That's just simply a matter of simple math.

18   Yet the calculation of the implied rate for

19   post-agreement would not change based upon the

20   assumptions that you're providing.

21        Q.   Well, with Chicony, what are you basing your

22   post-agreement sales on?

23        A.   Post-agreement units are calculated based on

24   average annual unit sales applied to the applicable time

25   range.



1      Q.   And where -- how did you decide that those

2   were -- Chicony didn't supply that information.  Correct?

3      A.   I'm not sure what you're asking.  Which

4   information?

5      Q.   Once Chicony settled with AdjustaCam, they

6   didn't supply any additional sales information.  Correct?

7           MR. HERBERHOLZ:  Object to form.

8      A.   I did not follow that.

9   BY MR. EDMONDS:

10     Q.   Once Chicony settled with AdjustaCam, they did

11  not provide any further sales information.  Correct?

12          MR. HERBERHOLZ:  Object to the form.

13     A.   I'm not aware of any additional information

14  supplied by Chicony subsequent to their settlement

15  agreement.

16  BY MR. EDMONDS:

17     Q.   Do you have any understanding of what Chicony

18  told AdjustaCam that their past sales had been?

19     A.   There is information on past sales that I have

20  provided in my report, for example, at Attachment 11.

21          MR. HERBERHOLZ:  Counsel, is now a good time to

22  break for lunch?

23          MR. EDMONDS:  Yeah.  Let's just finish this

24  Chicony issue, and then we'll break.  That's fine.

25



1    BY MR. EDMONDS:

2        Q.   Okay.  Your cite for the Chicony sales numbers

3    is the Bratic report; is that correct?

4        A.   Yes.

5        Q.   Are you aware of what Chicony told AdjustaCam

6    its sales numbers were when they negotiated the license?

7            MR. HERBERHOLZ:  Object to form.

8        A.   I did not participate in that negotiation.  So I

9    cannot say, as I did not personally hear any

10   conversations.

11   BY MR. EDMONDS:

12       Q.   Okay.  And if Chicony gave AdjustaCam lower

13   sales numbers than actuals, would that affect the implied

14   royalty rate of that license?

15       A.   Mathematically, if you want to put in different

16   sales numbers, it will change the implied rate.  It's a

17   basic mathematical formula, so it's all based on the

18   inputs.

19           MR. EDMONDS:  Okay.  Let's take our lunch break.

20   What time should we recommence?

21           MR. HERBERHOLZ:  Let's come back at 2:00.  Does

22   an hour work?

23           MR. EDMONDS:  That's fine.

24                        *    *    *

25                   (LUNCHEON RECESS)



1                           *    *    *

2    BY MR. EDMONDS:

3        Q.   All right.  So let's take a look at your report

4    again, please, and specifically on Attachment 12 where

5    you go into post-agreement implied rates.

6        A.   Okay.

7        Q.   All right.  So with respect to Dell, you

8    calculated post-agreement sales based upon average

9    monthly unit sales from 2010 to 2011.  Correct?

10       A.   As applied to the applicable time range, yes.

11       Q.   Yet you made no assumptions about the

12   declining sales.  Correct?

13       A.   The post-agreement units for Dell are not based

14   upon an assumption of decline.

15       Q.   In fact, none of Dell, Digital Innovations, KYE,

16   Mace Group, Overstock, Systemax, are -- have any

17   assumptions of declining sales.  Correct?

18            MR. HERBERHOLZ:  Object to the form.

19       A.   Which ones are you referring to?  Dell

20   through --

21   BY MR. EDMONDS:

22       Q.   Yeah.  Sources G through L, Dell through

23   Systemax.

24       A.   Okay.  L, Systemax, is set to zero based on a

25   declining sales trend, whereas the others within that



```
1   range are based upon actual unit sales applied to the
2   applicable time range.  And that can embed a degree of
3   decline within the data, yet there's not a separate
4   declining time trend that has been imposed for the
5   post-agreement units.
6       Q.   What's the degree of decline you're referring
7   to?
8       A.   With regards to Systemax or the others?
9       Q.   Any of them.  You projected linearly, didn't
10  you?
11      A.   It is a linear projection, yes.
12      Q.   Why didn't you use the same time period for all
13  of them?
14      A.   Generally speaking, because the agreements were
15  entered into at different points in time.
16      Q.   Why do some span two years and others span one?
17      A.   I'm not sure I follow the question.
18      Q.   Well --
19      A.   In other words, I don't know which span you're
20  referring to.
21      Q.   Okay.  Well, for example, CDW, you looked at
22  2011 sales.  Correct?  For CDW, you used their 2011 sales
23  numbers to project post-agreement sales.  Correct?
24      A.   I do utilize 2011 sales for CDW in estimating
25  post-agreement sales.
```



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| ADJUSTACAM LLC | |
| v. | NO. 6:10-cv-329-LED |
| AMAZON.COM, INC.;  ET AL. | JURY |

**PLAINTIFF'S RESPONSE TO NEWEGG/ROSEWILL'S MOTION FOR DECLARATION OF
EXCEPTIONAL CASE
AND REQUEST FOR ORAL HEARING**

*FILED UNDER SEAL*

Plaintiff AdjustaCam, LLC ("AdjustaCam") submits this response to the above-styled motion filed by Newegg Inc., Newegg.com Inc. and Rosewill, Inc. (collectively "NewEgg/Rosewill"):

## I.    Introduction.

Plaintiff voluntarily dismissed NewEgg/Rosewill from this case for strategic reasons—to streamline the case to focus on larger defendant Sakar.  NewEgg/Rosewill now seeks to take advantage of AdjustaCam's good faith efforts, and to distort its good fortune into an unwarranted exceptional case finding.  In essence, NewEgg/Rosewill alleges that it should have been dismissed earlier, apparently in April, when the Court issued its *Markman* Order, instead of in August. NewEgg's arguments and allegations lack both factual and legal support.  NewEgg has not shown that its arguments are factually correct, or that this is an exceptional case, and it certainly has not met its burden of providing an exceptional case by clear and convincing evidence.

## II.    Factual background.

### A.    The '343 patent.

The patent-in-suit is U.S. Patent No. 5,855,343 (the "'343 patent"). <u>Exhibit 2</u>.  The two previously asserted independent claims, nos. 1 and 19, each cover an apparatus comprising a hinge member rotatably attached to a camera, and a support frame rotatably (claim 1) or hingedly (claim 19) attached to the hinge member, the support frame having a first disposition on a surface and a second disposition on an inclined object. *Id.*

### B.    The Court's *Markman* Order.

NewEgg's Motion appears to focus on the "rotatably attached" element in claims 1 and 19. On April 10, 2012, the Court issued a Memorandum Opinion and Order (Doc. No. 627 & <u>Exhibit 3</u>).  In its *Markman* Order, the Court rejected both sides proposed construction of "rotatably attached," and found that, "[w]hile the Court has not explicitly construed the 'rotatably attached' terms, the Court has resolved the parties' dispute regarding the proper scope of the claims, i.e., 'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation." *Id.* at 10.

1

ATTORNEY'S EYES ONLY

Due to the Court's construction of "rotatably attached," AdjustaCam dropped sixteen (16) webcams from the suit because the rotatable attachment between the hinge member and camera was not limited to a single axis of rotation.[1] Exhibit 1.

### C.     The dismissal of NewEgg/Rosewill was for strategic reasons unrelated to the merits.

NewEgg is a reseller of electronics including webcams. *See* www.newegg.com.  Rosewill is a wholly owned subsidiary of NewEgg that manufactures, *inter alia*, a house brand of webcams sold by NewEgg which are labeled as Rosewill webcams.  AdjustaCam originally accused NewEgg of infringement relative to various webcams sold by NewEgg which were manufactured by Auditek, Creative, Digital Innovations, Gearhead, Hercules, HP, iMicro, Lifeworks, jWin, Pixxo and Rosewill. Exhibit 1.  However, during the course of the lawsuit, most of NewEgg's suppliers reached settlements with AdjustaCam which licensed the sale of their webcams by NewEgg. *Id.*[2]  Finally, on August 10, 2012, AdjustaCam settled with NewEgg's supplier GearHead, and on August 17th, AdjustaCam settled with NewEgg's supplier HP. *Id.*

With the HP and GearHead licenses, AdjustaCam's claims against almost all of remaining retailers in the case became essentially *de minimis*,[3] and the only significant remaining defendants were Sakar and its primary distributor Kohl's. *Id.*  Sakar/Kohl's were also unique among the remaining defendants in that they failed to designate a damages expert, and thus had no expert to rebut AdjustaCam's damages expert, Mr. Walt Bratic. *Id.* Therefore, in view of the HP and GearHead settlements, and in an effort to streamline this case by winnowing out *de minimis* infringers,[4] and to focus on Sakar/Kohl's (who lacked a damages

---

[1] The dropped webcams were the HP 3100, Gearhead WC 740, Gearhead WC 745, Gearhead WC 750, Gearhead WC 740I, Gearhead WC 1100, Gearhead WC 1200, Gearhead WC 1300, Gearhead WC 1400, Gearhead WC 1500, Gearhead WCF 2600, Gearhead WCF 2750, Gearhead WC 4750 and Gearhead WC 8301. Exhibit 1 (Edmonds Declaration).

[2] As of July 2012, AdjustaCam had settled with Auditek, Creative, Digital Innovations, iMicro, Lifeworks and jWin.

[3] At that point, AdjustaCam's damage number against NewEgg/Rosewill was $17,736.

[4] In making its decision to dismiss de minimis infringers, AdjustaCam was mindful that this Court would not likely be pleased if its valuable trial time was spent by parties fighting over relatively de minimis damages.

2

ATTORNEY'S EYES ONLY

expert), AdjustaCam voluntarily dismissed its claims against the remaining retailers who had sold HP and/or GearHead webcams, namely Best Buy, Fry's, MicroCenter, Office Depot and Walmart.  *Id.*[5]

Despite its newfound indignance at not being sooner dismissed from the case, NewEgg/Rosewill initially refused to be dismissed.  *Id.*  Thus, AdjustaCam was required to take the unusual measure of filing an *opposed* motion to dismiss NewEgg/Rosewill pursuant to *Super Sack Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995), accompanied by a covenant not to sue.  Doc. No. 687.

On August 30, 2012, while AdjustaCam's opposed motion to dismiss was pending and at the culmination of reexamination proceedings involving the '343 patent, the USPTO issued a Final Office Action rejecting the Asserted Claims as being unpatentable but allowing additional new and amended claims. Exhibit 4.  On September 20, 2012, in response to that Final Office Action, AdjustaCam canceled the Asserted Claims of the '343 patent, Exhibit 5, so that a certificate of reexamination could issue concerning the multiple new and amended claims deemed allowable. Exhibit 1.  In view of the foregoing, NewEgg/Rosewill finally relented and agreed to be dismissed on September 27, 2012. *See* Unopposed Motion to Dismiss at Doc. No. 719.

> **D.**    **AdjustaCam's infringement claims against NewEgg/Rosewill were never baseless. NewEgg/Rosewill's non-infringement argument lacks merit.**

As noted above, in an effort to streamline this case by winnowing out *de minimis* infringers, AdjustaCam dismissed NewEgg/Rosewill (and several other retailers) in view of manufacturer settlements culminating in the HP and GearHead settlements to focus on Sakar/Kohl's (who lacked a damages expert). NewEgg/Rosewill's allegation that they were dismissed because AdjustaCam's infringement case lacked merit is baseless. Apparently NewEgg/Rosewill contend that two allegedly "representative" webcams have "ball and socket" joints, which they allege lack a rotatable attachment limited to a single axis between the hinge member and the camera and that, as such, AdjustaCam should have dismissed them in April (when the Court issued its *Markman* Order) instead of September.

---

[5] The dismissals of Best Buy, Fry's, MicroCenter, Office Depot and Walmart are at Doc Nos. 668, 670, 666, 667 and 669, respectively.

3

ATTORNEY'S EYES ONLY

In the first instance, NewEgg/Rosewill's newfound indignance over non-infringement is inconsistent with its conduct during this litigation. First, NewEgg/Rosewill did not articulate this non-infringement theory in its response to AdjustaCam's interrogatory requesting the basis for its contention of non-infringement. Exhibit 6, pp. 7-8. Second, NewEgg/Rosewill's counsel committed clear misconduct, and hid the ball, by refusing to allow NewEgg and Rosewill's Rule 30(b)(6) designees to testify as to the basis of their non-infringement contentions. Exhibit 7, pp. 7-8 & 46-47 & Exhibit 8, pp. 38-40. Third, if the issue of infringement had been so cut and dried after the Court issued its *Markman* Order in April 2012, NewEgg/Rosewill presumably would have promptly raised the issue with either AdjustaCam or the Court (for example, via a letter brief or motion). However, they did not.

Irrespective of the foregoing, NewEgg/Rosewill's motion alleging non-infringement by the allegedly "representative" RCM 8163 and Hercules Classic webcams lacks factual or technical merit. The only non-infringement argument raised by NewEgg/Rosewill is the limitation in the two independent Asserted Claims (claims 1 and 19) that the "hinge member" is "adapted to be rotatably attached" to the camera. As noted above, in its *Markman* Order, the Court construed "rotatably attached" as "rotating over a single axis." As AdjustaCam's technical expert Dr. Muskivitch has explained in detail, AdjustaCam's infringement positions are entirely consistent with the Court's construction. Exhibit 9, pp. 143-45, 149-54, 154-55, 158-59, 287-88 & 327-29. *See also* Exhibit 10 (Muskivitch CV).

What NewEgg/Rosewill allege is a ball and socket joint is actually a modified ball and socket joint. *Id.* at pp. 71. It is a modified ball and socket joint because there is a channel that restricts movement, as noted by the following red arrows:




4

ATTORNEY'S EYES ONLY

Exhibit 1 & Exhibit 9, p. pp. 143-45, 94-95, 151-52, 154-55 & 159. This restricted movement results in two functionally independent joints which have ranges of movement independent of each other. *Id.*, pp. 94-95, 143-45, 149-50, 287-88 & 327-29. One of these joints – the one which allows the camera to pan left and right relative to its base – meets the claim limitation of the hinge member being rotatably attached to the camera in a single axis of rotation. *Id.* at pp. 69-70, 91, 97-98, 143, 149-50, 151-52, 287-88 & 327-29.

Not only is AdjustaCam's infringement position entirely consistent with the Court's *Markman* Order and properly supported by AdjustaCam's technical expert, but it is also consistent with the preferred embodiment of the '343 patent. As can be seen, the preferred embodiment webcam has essentially the same configurability and range of movement as either the Rosewill or the Hercules webcams:

  

*Fig. 4*

NewEgg/Rosewill's allegation that the allegedly representative Rosewill RCM 1863 and Hercules Classic webcams do not meet the "rotatably attached" element (as construed by the Court) lacks merit. AdjustaCam's infringement position (1) is correct from a technical perspective; (2) follows the Court's construction; (3) is properly supported by reasoned analysis from AdjustaCam's technical expert; and (4) accords with the preferred embodiment.

**E.    AdjustaCam has not "extorted nuisance value settlements" during this case.**

NewEgg Rosewill's allegation that AdjustaCam has "extorted nuisance value settlements" is baseless hyperbole and speculation. The amounts of AdjustaCam's settlements with the various

5

ATTORNEY'S EYES ONLY

defendants are directly related to its target royalty of $1.25 - $1.50 per webcam. This royalty rate was established many years before this suit and before AdjustaCam even obtained rights in the '343 patent.

AdjustaCam's damages expert Mr. Bratic issued an extensive, well-reasoned report opining that the reasonable royalty for infringement of the '343 patent is $1.25 - $1.50 per webcam. Exhibit 11; *See* Exhibit 12 (Bratic CV); Exhibit 13 (Bratic depo). As discussed in the Bratic damages report, on October 22, 2001, AdjustaCam's predecessor PAR Technologies entered into a Settlement and License Agreement with Philips. Exhibit 11 at pp. 15-16. This agreement called for running royalties on webcam sales as follows: 0 – 20,000 units: $1.00 / unit; 20,001 - 40,000: $2.00 / unit; 40,001 - 60,000: $6.00 / unit; and more than 60,000: $8.00 / unit. *Id.* at p. 16. Using the unit ranges of 0 - 20,000 ($1.00 / unit) and 20,001 - 40,000 ($2.00 / unit) as a conservative baseline, PAR was expected to receive an average royalty payment of approximately $1.50 per licensed product. *Id.* at p. 17.

Further, as detailed in the Bratic damages report, on December 31, 2001, PAR entered into a Settlement and License Agreement with ███████ involving rights to the '343 Patent. *Id.* That agreement called for running royalties of $1.25 per webcam for total aggregate royalties up to $2 million. *Id.* In fact, to date ███████ has paid post-suit running royalties on over 2.2 million units, Exhibit 13, p. 52, which is far from "nuisance value."

In its licensing program for this litigation, AdjustaCam used this $1.25 - $1.50 per webcam royalty rate as a baseline for licensing the various defendants. Exhibit 11, pp. 18-32; Exhibit 13, pp. 36-40 & 44; & Exhibit 14 (AdjustaCam Rule 30(b)(6) depo), pp. 4, 67-68 & 72-74. Specifically, AdjustaCam entered into six (6) settlement and license agreements for rights to the '343 Patent that included both a lump-sum payment relating to a certain number of units of webcams and also a running royalty rate for sales of webcams that exceed the units sold that were covered by the lump-sum payment. Exhibit 11, p. 18. The implied royalty rate related to the lump-sum payments was approximately $1.50 per unit for five license agreements and $1.25 per unit for one license agreement. *Id.* The running royalty rates for sales of units

6

ATTORNEY'S EYES ONLY

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

exceeding the volume included in the lump-sum payments for each of the six (6) licenses were $1.50 per unit. *Id.*

Further, AdjustaCam entered into 14 settlement and license agreements for rights to the '343 Patent that included only a paid up, lump-sum payment. *Id.* at p. 22. For these licenses AdjustaCam also considered, and negotiated using the benchmark of, the same $1.25 to $1.50 per unit royalty rates its predecessor had obtained from the Philips and ████████ licenses discussed above. *Id.*

AdjustaCam's use of the $1.25 - $1.50 benchmark for its licensing negotiations with the various defendants was explained in detail in the deposition of AdjustaCam's Rule 30(b)(6) designee and by AdjustaCam's damages expert Mr. Bratic.  Exhibit 11, pp. 18-32. & Exhibit 14, pp. 4, 67-68 & 72-74. Further, Mr. Bratic's report explains in detail how the sums paid to AdjustaCam in settlement tie directly to this $1.25 - $1.50 benchmark.  Exhibit 11, pp. 18-32.  The amounts of settlement agreements with AdjustaCam are tied to the value of the patented technology, not to any "nuisance value."

NewEgg's Motion relies upon its own damages expert's opinions without laying any predicate for those opinions being well founded or reliable. In fact, they are deeply flawed.  For example, Dr. Sullivan's purported "imputed royalty" calculations (1) improperly include sales volumes for webcam sales for which no royalties were recoverable due to the lack of pre-suit marking, *see* Exhibit 22, pp. 114-115 & Exhibit 13, p. 45; (2) improperly fail to account for the fact that some defendants' infringing sales numbers declined via the doctrine of exhaustion once companies upstream of them took licenses, Ex. 22, pp. 104-05; (3) improperly include sales numbers which were not provided to AdjustaCam when the licenses were negotiated,  *see id.* at p. 117 & Ex. 13, p. 50; and (4) improperly include assumptions of linear sales into the future, Ex. 22, at pp. 118-19, despite the fact that Dr. Sullivan also opines that webcam sales are in a decline. *Id.* at pp. 34-35.

**F.    NewEgg's complaints about its settlement negotiations with AdjustaCam, aside from violating the mediation privilege, are naïve and misguided.**

ATTORNEY'S EYES ONLY

In the first instance, NewEgg's purported recitation of what occurred at mediation violates the mediation privilege and this Court's Local Rules. *See* Local Rules Appendix H, Court–Annexed Mediation Plan at VII. As this Court has Ordered, "[a]ll proceedings of the mediation, including statements made by a party, attorney, or other participant, are privileged and confidential in all respects. . . Mediation proceedings may not be reported, recorded, placed in evidence, made known to the trial court." NewEgg's inclusion of statements made during mediation are an inexcusable violation of this well-established rule, and they should be properly disregarded.

Irrespective of the foregoing, NewEgg's recitation of what occurred at mediation is naïve and misguided. In the first instance, NewEgg admits it disclosed infringing sales of approximately 20,000 units for approximately a year's worth of sales since suit had been filed. Applying AdjustaCam's $1.50 royalty target to those units results in royalties of $30,000 for past infringement. For its opening settlement number AdjustaCam naturally increased that number – to $75,000 – to account for both past and expected future infringement for the life of the '343 patent. Exhibit 1. NewEgg's apparent belief that settlements, which necessarily would include a license going forward, should only include compensation for past infringement is naïve and unrealistic. Further, NewEgg's apparent belief that an opening settlement offer must be a litigants bottom line number is also naïve and unrealistic.

Further, NewEgg's allegation that "Plaintiff refused to explain the basis for demanding nearly three times its "target" per-unit' is a falsehood. At the mediation, AdjustaCam explained that its settlement number was based upon a $1.50 per webcam metric, and that it took into account past infringement as well as some future infringement. *Id.*

Paradoxically, NewEgg next complains that AdjustaCam reduced its settlement offer to $65,000 in March 2012. What NewEgg neglects to mention is that AdjustaCam and NewEgg did not have any direct communications about settlement during March 2012. *Id.* All communications were conducted using Mr. Jim Knowles as an intermediary in furtherance of his role as mediator. *Id.* Again, NewEgg's recitation of what occurred during the mediation process violates the mediation privilege and this Court's Local Rules.

8

ATTORNEY'S EYES ONLY

*See* Local Rules Appendix H, Court–Annexed Mediation Plan at VII. Further, NewEgg's allegation that AdjustaCam "refus[ed] to provide an explanation as to how that figure was calculated" is yet another falsehood. *Id.* First, NewEgg and AdjustaCam did not have any communications at all, so no explanation was refused. *Id.* Second, AdjustaCam did explain to the Mr. Knowles, who was well aware of AdjustaCam's $1.25 per webcam metric, that its settlement number for NewEgg was based upon past infringement and estimated future infringement. *Id.*

NewEgg next complains that AdjustaCam made a $51,543 settlement offer on July 11, 2012. Here, NewEgg again misleads the Court by alleging that AdjustaCam "refus[ed] to provide an explanation as to how that figure was calculated." The truth is that the $51,543 settlement offer was communicated to NewEgg via email, and that neither Mr. Zarian nor anyone else representing NewEgg asked for an explanation. *Id.* Had NewEgg bothered to ask for an explanation of how AdjustaCam arrived at that number, it would have been informed that AdjustaCam took its expert's damage figure of $17,928 based upon two years of past infringement,[6] and then extrapolated a royalty number for future infringement based upon 3.75 more years of infringement (i.e., $33,615) through the term of the '343 patent, for a total of $51,543.

There has been nothing improper about AdjustaCam's settlement negotiations with NewEgg. NewEgg's apparent belief that settlements, which necessarily would include a license going forward, should only include compensation for past infringement is naïve and unrealistic.

## III. Legal Standards.

Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." Once it is determined that the party seeking fees is a prevailing party, determining whether to award attorneys' fees under 35 U.S.C. § 285 is a two-step process. *Highmark, Inc. v. Allcare Health Management Systems, Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012). First, a prevailing party must establish by clear and convincing evidence that the case is "exceptional." *Id.* "It is established law under

---

[6] NewEgg's infringing sales numbers had decreased from before due to manufacturer settlements.

9

ATTORNEY'S EYES ONLY

section 285 that absent misconduct in the course of the litigation or in securing the patent, sanctions may be imposed against the patentee only if two separate criteria are satisfied: (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless. *Id.* The requirement that the litigation be objectively baseless "does not depend on the state of mind of the [party] at the time the action was commenced, but rather requires an objective assessment of the merits." *Id*. at 1308-09. "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Id.* at 1309. This is known as the subjective prong of the inquiry. *Id.* This same objective/subjective standard applies for both patentees asserting claims of infringement and alleged infringers defending against claims of infringement. *Id.* With respect to the subjective prong, "there is a presumption that an assertion of infringement of a duly granted patent is made in good faith." *Id.*

Even if a case is deemed exceptional, a court must determine whether an award of attorneys' fees is appropriate and, if so, the amount of the award. *Id.* "[T]he amount of the attorney fees [awarded] depends on the extent to which the case is exceptional." *Id.*

## IV. Argument.

### A. NewEgg's reliance upon the Eon-Net case is misplaced, because that case has no meaningful similarities to this one.

NewEgg's reliance upon the *Eon-Net* case is misplaced. *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011). In *Eon-Net*, the Federal Circuit affirmed a District Court's exceptional case finding based upon the totality of (1) Eon-Net destroying relevant documents from a prior lawsuit prior to filing suit; (2) Eon–Net failing to engage in the claim construction process in good faith; (3) Eon-Net displaying a "lack of regard for the judicial system" and a "cavalier attitude" towards the "patent litigation process as a whole," as evidenced by an interrogatory response which "snidely stated" that "the skill in the art required is that sufficient to converse meaningfully with [Eon-Net's president] Mitchell Medina," and statements by Mr. Median at his deposition that it was "an inconvenience and a bother"; (4) because the written description of the patent-in-suit repeatedly defined the invention as a system for processing

ATTORNEY'S EYES ONLY

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

information that originates from hard copy documents, which the Defendant Fisher did not do; and (5) Eon-Net had had filed over 100 lawsuits, with each complaint being followed by a "demand for a quick settlement…using a license fee schedule based on the defendant's annual sales: $25,000 for sales less than $3,000,000; $50,000 for sales between $3,000,000 and $20,000,000; and $75,000 for sales between $20,000,000 and $100,000,000." *Eon-Net* is an extreme case. None of these facts, or anything close to them, are present in this case.

NewEgg alleges that this case is exceptional because "Plaintiff settled with dozens of defendants for substantially less than the costs to defend against Plaintiff's baseless infringement allegations." This allegation is baseless because, as explained above (and further below) AdjustaCam's settlement numbers were tied to a pre-established unit royalty of $1.25 - $1.50 per infringing device, and the size of its settlements were directly related to the amount of infringement by each defendant, not to any cost of litigation considerations. This allegation is also meritless because AdjustaCam's settlements were not premised upon "baseless infringement claims."

**B.    AdjustaCam did not extract nuisance settlements from any defendants. AdjustaCam's settlements were directly related to each Defendants' number of infringing units and an established royalty.**

As explained in Section II.E above and in further detail in the expert report of AdjustaCam's damages expert, Mr. Bratic, AdjustaCam's settlements in this case followed the $1.25 - $1.50 per webcam royalty which had been established years prior with the Philips and ███ licenses. AdjustaCam's settlements with the various defendant are directly linked to their sales volumes and to this $1.25 - $1.50 per unit royalty.

There has been no "extortion" of "nuisance value settlements." This case is far different from *Eon-Net*, in which that defendant would file complaints followed by a "demand for a quick settlement …using a license fee schedule based on the defendant's annual sales: $25,000 for sales less than $3,000,000; $50,000 for sales between $3,000,000 and $20,000,000; and $75,000 for sales between $20,000,000 and $100,000,000."

ATTORNEY'S EYES ONLY

NewEgg also complains that Mr. Bratic "admitted that his opinion was not influenced by the cost or sales price of the accused products or the cost of the patented feature (a clip) of the accused products on the grounds that the cost of the patented feature is 'not relevant.'" However, NewEgg/Rosewill fails to explain why the manufacturing cost of an infringing product should be considered in the reasonable royalty analysis. Mr. Bratic was entirely correct in deeming manufacturing costs irrelevant to the reasonable royalty determination. Further, Mr. Bratic's determination of the appropriate reasonable royalty relied substantially on an established royalty rate and the number of infringing units sold.

In one line, NewEgg/Rosewill makes the bold and baseless assertion that Mr. Bratic's expert opinions in this case "clearly do[] not meet the requirements of Rule 702 of the Federal Rules of Evidence." To the contrary, Mr. Bratic's Report contains a detailed and reasoned analysis of the facts and the *Georgia-Pacific* factors. Further, Mr. Bratic's report properly takes into account the best measure of the value of the patented technology -- what prior licensees paid as a unit royalty for similar infringing products. When, as here, "the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 589 F.3d 1246, 2009 WL 4911950, at *14 (Fed. Cir. Dec.22, 2009). Sometimes – as NewEgg has mistakenly done – litigants "conflate the question of whether the methodology involved is proper with whether the expert's conclusions are proper." *Anascape, Ltd. v. Microsoft Corp.*, 2008 WL 7180757, *2 (E.D. Tex. April 28, 2008). The role of the court under *Daubert* is to "ensure that a theory or technique ... can be (and has been) tested," [citation omitted], "not to evaluate the correctness of facts underlying one expert's testimony." *Anascape, Ltd.*, 2008 WL 7180757, *2. When defendants attack the "data relied on" by an expert, rather than the "methodology he relied upon to reach his results," this "goes to the weight to be given to, rather than the admissibility of, the expert's testimony." *Id. See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1221 (Fed.Cir.2006) (an attack on the underlying data of an expert's report goes to its weight rather than admissibility). Further, factual disputes concerning the data

12

ATTORNEY'S EYES ONLY

underlying an expert's opinions are not grounds for exclusion under *Daubert. Anascape, Ltd.*, 2008 WL 7180757, *2. *See State Contracting & Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057, 1072 (Fed.Cir.2003). In short, NewEgg's allegations of litigation misconduct are built on a house of cards that relies upon baseless allegations that AdjustaCam's damages expert's opinions should somehow be ignored. NewEgg also alleges in a footnote that AdjustaCam's damage expert Mr. Bratic violated *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), because he did not argue that "the webcam clip was the basis of consumer demand for the accused products." To the contrary, Mr. Bratic opined that "a reasonable royalty rate of $1.25 represents the contribution of the Accused Feature to the overall device." Exhibit 9, p. 5. Further, Mr. Bratic was relying upon prior licenses for the exact *same* technology. When an expert is relying upon prior licenses with unit royalties for the exact same technology for a running royalty, there is no need to conduct any further apportionment. The running royalty has already accomplished that.

## C.    AdjustaCam's infringement claims were not brought in bad faith nor were they objectively baseless.

NewEgg/Rosewill's motion alleging non-infringement by the allegedly "representative" RCM 8163 and Hercules Classic webcams lacks factual or technical merit. The only non-infringement argument raised by NewEgg/Rosewill is the limitation in the two independent Asserted Claims(claims 1 and 19) that the "hinge member" is "adapted to be rotatably attached" to the camera. However, as explained in detail in Section II.E above, AdjustaCam's technical expert Dr. Muskivitch's infringement positions are entirely consistent with the Court's construction of "rotatably attached."

In sum, what NewEgg/Rosewill allege is a ball and socket joint is actually a constrained ball and socket joint because there is a channel that restricts movement. Exhibit 9, p. pp. 143-45,  94-95, 151-52, 154-55 & 159. This restricted movement results in two functionally independent joints which have ranges of movement independent of each other. *Id.*, pp. 94-95, 143-45, 149-50, 287-88 & 327-29. As stated by Dr. Muskivitch, there are "two distinct joints," and "[i]t's a separate motion; it's a separate functional

13

ATTORNEY'S EYES ONLY

joint." *Id.* at pp. 96 & 150.  One of these independent joints – the one which allows the camera to pan left and right relative to its base – meets the claim limitation of the hinge member being rotatably attached to the camera in a single axis of rotation. *Id.*  at pp. 69-70, 91, 97-98, 143, 149-50, 151-52, 287-88 & 327-29.

NewEgg/Rosewill's allegation that the allegedly representative Rosewill RCM 1863 and Hercules Classic webcams do not meet the "rotatably attached" element as construed by the Court is also baseless.  AdjustaCam's infringement position (1) is correct from a technical perspective; (2) follows the Court's construction; (3) is properly supported by AdjustaCam's technical expert; and (4) accords with the preferred embodiment.

**D.    There has been no litigation misconduct by AdjustaCam.**

Rehashing its non-infringement argument, NewEgg/Rosewill argues that AdjustaCam should have dismissed its claims in April due to the Court's Construction of "rotatably attached" instead of dismissing them in August for strategic reasons.  However, as established above, AdjustaCam's infringement position is well founded and meritorious.  Thus, NewEgg's allegations of "misconduct" due to not being earlier dismissed are baseless.

**E.    AdjustaCam did not serve a "new" infringement report at the deposition of its technical expert.**

Apparently in an effort to throw mud and distract from the merits, NewEgg alleges that AdjustaCam served a "new" infringement report at the deposition of its technical expert.  This allegation is unfounded and misleading.  During his deposition, AdjustaCam's technical expert Dr. Muskivitch realized that Exhibit D of his report was not the final version of Exhibit D to his final report.  Exhibit 9, pp.  12-16.  Neither AdjustaCam nor Dr. Muskivitch were aware that an early version of Exhibit D had inadvertently been served until that point in time.  In order to remedy the situation, Dr. Muskivich provided the correct version of Exhibit D and counsel for NewEgg/Rosewill was given every opportunity to review it and to question Dr. Muskivitch about it.

ATTORNEY'S EYES ONLY

No "new" infringement report was ever generated. Rather, the correct version of Exhibit D to the Muskivitch report was substituted for the incorrect earlier version that had inadvertently been served due to a version control mistake. An honest mistake in which versions of an Exhibit are confused does not constitute generating a "new" report nor does it constitute litigation misconduct. The parties were in the process of meeting and conferring over this issue when the case was dismissed, so it never required court action.

**F.    AdjustaCam's validity arguments were not baseless. In fact, they were meritorious.**

The claims of the '343 patent duly issued from the USPTO and they are presumed valid by law. NewEgg complains that AdjustaCam worked to protect its intellectual property rights by traversing rejections during reexamination proceedings for the '343 patent. However, AdjustaCam had every right to traverse the USPTO's rejections, including because the USPTO's reasoning was flawed. Here, NewEgg/Rosewill appears to focus upon their contention that the alleged Irifune publication (which NewEgg has never proven up as a publication) meets the "rotatably attached" limitation in claims 1 and 19.

However, Irifune does not meet the "rotatably attached" limitation in the Asserted Claims for the reason's set forth in the Report of AdjustaCam's technical expert Dr. Muskivitch. <u>Exhibit 15</u>. *See* <u>Exhibit 16</u> (Irifune). This is illustrated by Fig. 2 of Irifune and by the illustration of screw (9) as follows:



As stated in Dr. Muskivitch's report, a camera partially threaded onto camera attachment shaft 9 is not "rotatably attached because:

ATTORNEY'S EYES ONLY

… camera attachment shaft 9 can freely pass through the opening of the camera fixed part 2. Thus, camera fixed part merely has a hole that allows the camera attachment shaft 9 to cleanly pass through and be screwed into a camera. Thus, Irifune merely disclose a hole that allows a camera attachment shaft 9 to pass there through and provide for secure tightening of the camera to be in contact with the camera fixed part 2 so that it is in a tight, stable, fixed position when fully screwed to the camera attachment shaft.

Exhibit 15, pp. 18-19. Further, the Muskivitch report describes how Irifune fails to disclose how a camera fully screwed down is "rotatably attached," including as follows:

. . . Irifune discloses that a camera can be screwed onto a mounting device using a camera attachment shaft 9 and camera attachment screws 10 and 11. The purpose of the camera attachment shaft and screws is to attach the camera to the camera fixed part 2. Once the camera is attached to the camera fixed part 2, the camera cannot rotate about a first axis relative to the hinge member. . . the purpose of the camera attachment shaft 2 is to tightly secure the camera to the camera fixed part so that it does not rotate. . . Thus, for the camera to be rotatable, it must be un-tightened and thus unattached and unstable.

Exhibit 15, pp. 18-20. To summarize, Irifuni lacks a "rotatable attachment" because the camera either has to be screwed tightly down, in which case it is not rotatable, or it has to be loosely appended via an unthreaded hole, in which case it is not attached. As set forth in detail in the Muskivitch Report, AdjustaCam had ample basis, in fact meritorious basis, to contend that Irifune was not invalidating.

Although the USPTO issued final rejections based upon Irifuni in September 2012, the USPTO took many months to reach a final decision, it is not perfect, and those final rejections were erroneous. Nonetheless, since the appellate process is lengthy and expensive, AdjustaCam made the strategic decision to cancel the asserted claims in order to expedite the issuance of a reexamination certificate containing new and amended claims, all of which were deemed patentable over Irifune. *See* Exhibits 13 (Office Action Response) and 16 (Issue Notice).

Moreover, AdjustaCam had already filed a motion to dismiss NewEgg/Rosewill before the final rejection by the USPTO as a result of the GearHead and HP licenses, and AdjustaCam renewed that motion once the asserted claims had been canceled. If anything, the voluntary dismissal of NewEgg/Rosewill shows a lack of bad faith and a lack of litigation misconduct.

ATTORNEY'S EYES ONLY

NewEgg alleges that AdjustaCam's distinctions of Irifuni were "objectively baseless" because "if the camera disclosed in the '343 Patent was "permanently fixed to," or had to be "fully tightened down to" the hinge member, then the camera could not rotate about the first axis of rotation as the Asserted Claims and specification require." NewEgg is both mistaken and confused.  NewEgg is mistaken because a permanently attached camera can rotate about a first axis of rotation.   In fact, the USPTO has acknowledged this.  In particular, as a result of the reexamination proceedings instituted by Defendants, the USPTO has allowed multiple new claims, including independent claims 20 and 44, both of which comprise: "a hinge member adapted to be rotatably and permanently attached to the camera, said camera, when the hinge member is so permanently attached, rotating, about a first axis of rotation, relative to said hinge member . . ."  Exhibit 5, pp. 5 & 8-10 & Exhibit 4, p. 12.  As stated by the USPTO,

> Claim 22 requires "a hinge member adapted to be rotatably and permanently attached to the camera". Similarly, claim 40 requires "a hinge member adapted to be permanently rotatably attached to the camera" and claim 41 requires "a hinge member adapted to be permanently rotatably joined to the camera". This type of connection is not shown by the cited art.

Exhibit 4, p. 12.  In the second part of its argument – which asserts that if a camera was "fully tightened down" to the hinge member, then the "camera could not rotate about the first axis of rotation as the Asserted Claims and specification require" – NewEgg is confused as this is one of the reasons that Irifuni does not meet the "rotatably attached" limitation.  Apparently, in its confusion, NewEgg agrees with AdjustaCam's position distinguishing Irifune.

Finally NewEgg argues that "the arguments advanced by Plaintiff and its expert contradicted Plaintiff's proposed construction of 'rotatably attached' in this very litigation because an object 'permanently fixed' to another object is not 'capable of being rotated.'"  Here again, as noted above, the USPTO has agreed with AdjustaCam that being permanently attached is not inconsistent with being rotatably attached.

## G. AdjustaCam did not maintain any "frivolous" arguments against the Ma Patent. In fact, the USPTO has agreed with AdjustaCam's arguments.

ATTORNEY'S EYES ONLY

NewEgg's allegations regarding Ma are mistaken. As set forth in detail the report of AdjustaCam's

technical expert Dr. Muskivitch, Ma is not anticipatory because:

> Ma discloses a camera with moveable parts. On a horizontal surface, the camera is supported on circuit box 3. On a laptop display screen, the camera is supported with a combination of circuit box 3 and sliding hook plate 31. As noted in Ma's title and throughout the patent, the invention described in Ma is a "camera." For example, claim 1 of Ma is directed to "[a] digital camera for a computer comprising: a photographic lens assembly . . . an adjustment block . . . steering element[s] . . . [and] "a circuit box." … Contrary to the assertions in the Klopp Report, the camera of Ma cannot be rotated relative to the hinge member, because the camera of MA is the combination of photographic lens assembly (1), adjustment block (2), circuit box (3), tubular revolving shaft (11) and tubular revolving shaft (21). In the illustration below, the various parts of the camera are noted in red:



Exhibit 15, pp. 28-30. *See* Exhibit 17 (Ma). Not only is AdjustaCam's assessment of Ma correct, but the

USPTO agrees with it. During reexamination proceedings, the USPTO initially rejected the Asserted

Claims as being anticipated by Ma. Exhibit 18, p.10. However, AdjustaCam made the same arguments

noted above, Exhibit 19, pp. 27-28. Acknowledging the merit of AdjustaCam's arguments, the USPTO

dropped Ma as an anticipatory reference, and wrote that "The rejections that relied on Ma in the prior

Office action have been overcome." Exhibit 20, p. 16. Moreover, NewEgg/Rosewill's apparent belief that

every dispute of point it advocates (including when disputed by experts applying reasoned analysis),

constitutes a "frivolous" argument is unfounded.

### H.    AdjustaCam did not "fabricate" a per-unit royalty to "justify nuisance value settlements."

As set forth in detail in Section II.E, AdjustaCam's target royalty of $1.25 - $1.50 per webcam was

established years prior to this lawsuit in the Phillips and ██████ Licenses. AdjustaCam did not

"fabricate" anything. Its damages expert Mr. Bratic performed a detailed, reasoned and well founded

analysis. The running royalties in those licenses set the precedent that AdjustaCam used throughout this

18

ATTORNEY'S EYES ONLY

case. In fact, twenty settling defendants agreed with AdjustaCam's royalty metric and paid lump sums according to that established royalty rate. Here again, NewEgg/Rosewill has not shown that the methodology employed by AdjustaCam's damages expert is unsound. NewEgg/Rosewill's criticisms involve a battle of the experts, and they go, if anything, to the weight that a jury would be entitled to give to Mr. Bratic's opinions. Again, NewEgg/Roswell's apparent belief that every point of disagreement, including among experts applying reasoned analysis, constitutes something "fabricated" is unfounded.

**I.    NewEgg/Rosewill has not met its burden of showing this is an exceptional case, and it is not entitled to any award of fees.**

AdjustaCam does not dispute that NewEgg is the "prevailing party" since it was voluntarily dismissed, nor does AdjustaCam dispute the amount of NewEgg's taxable costs claimed in Doc No. 726. There is nothing exceptional about this case. AdjustaCam initially sought to dismiss NewEgg/Rosewill – over NewEgg/Rosewill's objection – for strategic reasons based in large part on a dimished royalty base due to settlements with other defendants. Ultimately, the USPTO rejected the asserted claims after lengthy reexamination proceedings, and although AdjustaCam disagrees with the USPTO's conclusions, it has decided to move on by accepting a reexamination certificate with new and amended claims deemed patentable over the prior art by the USPTO. NewEgg/Rosewill has not shown, much less shown by clear and convincing evidence, that AdjustaCam's claims were frivolous or that there has been any litigation misconduct. For the most part, NewEgg/Rosewill is simply narcissistic and naïve in arguing that disputed points, based upon the reasoned and sound analysis of experts, are "frivolous" solely because NewEgg/Rosewill disagrees with them. Moreover, at best, NewEgg/Rosewill's motion argues that AdjustaCam should have dismissed NewEgg/Rosewill in April 2012 instead of August 2012. Moreover, at best, NewEgg/Rosewill's motion argues that AdjustaCam should have dismissed NewEgg/Rosewill in April 2012 instead of August 2012.

Even if NewEgg/Rosewill's arguments had factual merit, which they do not, its claim for *all* fees expended over the lengthy course of this case is unfounded. Further, NewEgg/Rosewill incurred

ATTORNEY'S EYES ONLY

approximately $160,761.50 of its $286,102.53 in attorney's fees post-Markman.  *See* NewEgg/Rosewill

Motion; Zarian Declaration.  However, if the infringement issues with the "rotatably attached" element

were as cut and dry as NewEgg/Rosewill has represented, NewEgg/Rosewill could have and should have

sought summary judgment immediately following receipt of the Court's Markman Order.  Rather,

NewEgg/Rosewill chose to continue this litigation, incurring more attorney's fees (56% of the total) in the

five months post-Markman than it did in the almost two years prior. The reality is that these issues are not

as NewEgg/Rosewill has represented and, in addition to be incorrect as to the facts, NewEgg/Rosewill has

cited nothing more than a dispute between competing experts – a situation common to each and every

patent case.  Nothing NewEgg/Rosewill has shown supports a finding that this case is  exceptional.

Finally, NewEgg/Rosewill's claim for reimbursement of expert expenses constitutes a gross and

unfounded overreach.  A court has inherent authority "to impose sanctions in the form of reasonable expert

fees in excess of what is provided for by statute." *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d

1381, 1391 (Fed.Cir.2008). However, use of this inherent authority is reserved for cases where the district

court makes a "finding of fraud or bad faith whereby the 'very temple of justice has been defiled.' "

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed.Cir.1994).  NewEgg/Rosewill has

not even argued this very high standard because it has not been met.  Further, all of NewEgg/Rosewill's

expert fees were incurred post-Markman.  Again, if the infringement issues with the "rotatably attached"

element were as cut and dry as NewEgg/Rosewill has led the Court to believe, then it begs the question of

why NewEgg/Rosewill paid so much for experts when the case against it was allegedly frivolous and could

have been disposed of summarily by summary judgment at an earlier stage

## V.    Conclusion and Request for Oral Hearing.

For at least the foregoing reasons, NewEgg/Rosewill has failed to meet its burden of proving this is

an exceptional case, or proving any entitlement to fees, and NewEgg's Motion should be denied.  Finally,

AdjustaCam requests an oral hearing so that the Court may be fully informed of these issues, including

how NewEgg/Rosewill have failed to carry their burden of showing this to be an exceptional case.

ATTORNEY'S EYES ONLY

November 7, 2012

Respectfully submitted,

By: /s/ *John J. Edmonds*
John J. Edmonds – LEAD COUNSEL
Texas State Bar No. 789758
Michael J. Collins
Texas Bar No. 4614510
Stephen F. Schlather
Texas Bar No. 24007993
COLLINS,   EDMONDS,   POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 S. Voss Rd., Suite 125
Houston, Texas 77057
Telephone: (713) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
mcollins@cepiplaw.com
sschlather@cepiplaw.com

Andrew W. Spangler
Texas Bar No. 24041960
Spangler & Fussell P.C.
208 N. Green Street, Suite 300
Longview, Texas 75601
(903) 753-9300
(903) 553-0403 (fax)
spangler@spanglerlawpc.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC

21

ATTORNEY'S EYES ONLY

## CERTIFICATE OF AUTHORITY TO FILE UNDER SEAL

I hereby certify that authority to file this document under seal is found in the protective order governing this case.

November 7, 2012                                    /s/ *John J. Edmonds*_____
                                                            John J. Edmonds

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

November 7, 2012                                    /s/ *John J. Edmonds*_____
                                                            John J. Edmonds

ATTORNEY'S EYES ONLY

A1212

settlement agreement, which covered 82,670 units for an implied royalty of $.80/unit. (Bratic Depo. at 137:18-138:2.) Hewlett-Packard paid $25,000, which according to the number of units sold as stated in Mr. Bratic's report, covered 8,829 units for an implied royalty of $2.83/unit. (Bratic Depo. at 137:18-138:2; 184:12-185:1; Supplemental Report of Walt Bratic, Exhs. 4, 4.1.)

11.    Attached hereto as <u>Exhibit 7</u> are true and accurate excerpts of the transcript of the deposition of John Muskivitch (*sans exhibits*), taken on August 24, 2012.

12.    Attached hereto as <u>Exhibit 8</u> are true and accurate excerpts of the transcript of the deposition of Walter Bratic (*sans exhibits*), taken on August 28, 2012.

13.    Attached hereto as <u>Exhibit 9</u> are true and accurate excerpts of the transcript of the 30(b)(6) deposition of AdjustaCam LLC by Clayton Haynes (*sans exhibits*), taken on August 30, 2012.

## B.    CASE MANAGEMENT AND SETTLEMENT DIALOGUE

14.    On February 7, 2011, the Court held an initial status conference. A true and correct transcript of the proceedings is attached as <u>Exhibit 10.</u>

15.    Attached hereto as <u>Exhibit 11</u> is a true and accurate copy of Newegg and Rosewill's sales data for the accused products, produced to AdjustaCam pursuant to the Court's order following status conference on February 7, 2011. (*See* Minute Entry Re Status Conference [Dkt. 386]).

16.    On November 9, 2011, I represented Newegg Inc., Newegg.com Inc., and Rosewill Inc. at mediation in Dallas, Texas before mediator Jim Knowles. Other defendants (particularly the "supplier defendants") attended and participated in the mediation. Lee Cheng, Chief Legal Officer of Newegg also attended the mediation. At the mediation, Plaintiff demanded $75,000 from Newegg and Rosewill. Plaintiff provided no calculations or bases in support of its demand.

3

17.     On March 16, 2012, Plaintiff agreed to reduce its settlement demand to Newegg from $75,000 to $65,000.

18.     On July 11, 2012, Plaintiff's counsel emailed Newegg's counsel with a settlement demand to Newegg in the amount of $51,543.  Plaintiff provided no calculations or bases in support of its demand.     A true and correct copy this email is attached hereto as Exhibit 12.

## C.     THE '343 PATENT, PRIOR ART, AND DOCUMENTS FILED DURING REEXAMINATION

19.     Attached hereto as Exhibit 13 is a true and accurate copy of 5,855,343 (the '343 Patent).

20.     Attached hereto as Exhibit 14 is a true and correct copy of Japanese Utility Model Publication No. H2-19997 to Irifune, with certificate of translation.

21.     Attached hereto as Exhibit 15 is a true and correct copy of U.S. Patent No. 5,880,783 to Ma.

22.     Attached hereto as Exhibit 16 is a true and accurate copy of the USPTO's Non-Final Action dated August 12, 2011.

23.     Attached hereto as Exhibit 17 is a true and accurate copy of the patentee's February 10, 2012 Remarks/Arguments in response to the USPTO's Office Action dated August 12, 2011.

24.     Attached hereto as Exhibit 18 is a true and accurate copy of the USPTO's Non-Final Office Action dated March 8, 2012.

25.     Attached hereto as Exhibit 19 is a true and accurate copy of the patentee's July 20, 2012 Remarks/Arguments in response to the USPTO's Office Action dated March 8, 2012.

26.     Attached hereto as Exhibit 20 is a true and accurate copy of the USPTO's Final Rejection dated August 30, 2012.

4

55.     Attached hereto as <u>Exhibit 28</u> are true and accurate copies of invoices from Defendants' of non-infringement expert, John Hamilton.  Defendants have paid the invoiced amounts.

56.     Attached hereto as <u>Exhibit 29</u> are true and accurate copies of invoices from Defendants' damages expert, Ryan Sullivan, Ph.D.  Defendants have paid the invoiced amounts.

57.     Attached hereto as <u>Exhibit 30</u> are true accurate copies of invoices from Defendants' invalidity expert, Richard Klopp, Ph.D.  Defendants have paid the invoiced amounts.

58.     As more particularly set forth in Exhibits 28, 29, and 30, Defendants incurred expert witness fees in the amount of $68,183.93 during the period June 2012 through September 2012.

**E.     CONCLUSION**

59.     Based upon my experience and knowledge, under the circumstances, in my opinion, the total sum of $286,102.52 in attorney's fees, in addition to $68,183.93 in expert witness fees, is a reasonable amount for Defendants to have incurred in litigating this action from July 2010 through September 2012.  In my opinion, this sum is reasonable given the experience, specialty and competence of the attorneys and paralegals involved, and the nature of the legal, procedural and factual issues at issue in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of October, 2012, at Boise, Idaho.


*/s/ John N. Zarian*
John N. Zarian


16

period. It is my understanding that damages for each of the Defendants can only begin on July 2, 2010, as this is the date upon which the Defendants were first notified of the '343 Patent. Based upon a damage period of July 2, 2010 through June 25, 2012, I have calculated the royalty base by Defendant as follows:[267]



### 6.6    Reasonable Royalty Conclusion

109.    It is my opinion that damages for infringement in this matter are appropriately measured by a reasonable royalty rate applied to a royalty base comprised of the total U.S. unit sales of the Accused Products as calculated above. As a result of applying a royalty rate of $1.25 to U.S. sales of Accused Products, I calculated reasonable royalty damages owed to AdjustaCam for each of the Defendants as follows:[268]

---

[267] See Exhibit 4.
[268] See Exhibit 4.

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE



110.    The royalty damages above are not additive as the Defendants involve both suppliers and resellers and therefore include an overlap in sales among the Defendants.   In an effort to eliminate any duplication, I have eliminated overlapping sales in my royalty base at the retail level due to the exhaustion principle.   The following table provides a breakdown of royalty damages by Defendant, eliminating any overlapping sales:[269]

---

[269] See Exhibit 4.1.

ADJUSTACAM LLC v. AMAZON.COM, INC., ET AL.

NO. 6:10-cv-329-LED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

**EXPERT REPORT OF JOHN C. MUSKIVITCH REGARDING INFRINGEMENT OF
U.S. PATENT NO. 5,855,343**

Dated:  June 25, 2012

Respectfully submitted,

JOHN C. MUSKIVITCH

1

HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT D (ROSEWILL RCM-8163)
INFRINGEMENT CHART FOR THE ROSEWILL RCM-8163

| 1(p) | Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | As noted in the photos below, the ROSEWILL RCM-8163 is an apparatus (i.e., a camera clip) for supporting a camera, namely a webcam. <br><br> As noted in the photos below, the camera supported by the ROSEWILL RCM-8163 has a lens. <br><br> The ROSEWILL RCM-8163 is an apparatus for supporting a camera on a generally horizontal, substantially planar surface, for example, a table top or desk top.  For example: <br><br>  <br><br> The ROSEWILL RCM-8163 is an apparatus for supporting a camera on an object, for example the display screen of a laptop or notebook (collectively "laptop") computer, having a first surface and a second surface and an edge intersecting the first surface and the second surface. For example, with a laptop computer, the first surface is the back of the display screen, the second surface is the front of the display screen, and an edge intersects those surfaces. |
|------|-----|-----|
| 1(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The ROSEWILL RCM-8163 comprises a hinge member (noted with a green arrow) adapted to be rotatably attached to the camera. <br><br>  <br><br> When the hinge member is so attached the camera rotates about |

| | | |
|---|---|---|
| |  | a first axis of rotation (noted with a blue circular arrow) relative to the hinge member. The axis of rotation is a single axis of rotation which is perpendicular to the trunk of the hinge member. |
| 1(b) | b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The ROSEWILL RCM-8163 comprises a support frame (noted with a red arrow) which is configured to support, and which does support, the hinge member on the surface (see above re surface) and the object (see above re object).<br><br><br><br>The support frame of the ROSEWILL RCM-8163 is rotatably attached to the hinge member. The hinge member rotates about a second axis of rotation (noted with a yellow arrow), relative to the support frame. This axis of rotation is defined by a channel in the support frame. Thus, it is a single axis of rotation.<br><br>The first axis of rotation (noted with a blue arrow) is at least generally perpendicular to the second axis of rotation (noted with a yellow arrow). In particular, the camera always rotates perpendicular to the trunk of the hinge member. For example:<br><br><br><br>As noted in the photo above, the second axis of rotation (noted with a yellow arrow) is at least substantially parallel to the first surface (see above re first surface) when the hinge member (see above re hinge member) is supported on the object (see above re object). |
| 1(c) | said support frame having a | The support frame (see above re support frame) of the |

| | first disposition positioned on said generally horizontal, substantially planar surface, and | ROSEWILL RCM-8163 has a first disposition when positioned on the generally horizontal, substantially planar surface (see above re generally horizontal, substantially planar surface).<br><br>For example, see the above photos at the preamble and elements (a) and (b) of claim 1. |
|---|---|---|
| 1(d) | said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | The support frame (see above re support frame) of the ROSEWILL RCM-8163 has a second disposition when attached to the object (see above re object) when the first surface (see above re first surface) of the object (see above re object) and the second surface of the object (see above re second surface) are inclined from a generally horizontal orientation, for example when a laptop computer's display screen is opened.<br><br>For example:<br><br><br><br>As noted in the photo above, in this second disposition the camera is maintained adjacent the edge (see above re edge) of the object (see above re object). |
| 7(p) | Apparatus according to claim 1 | The ROSEWILL RCM-8163 is an apparatus according to claim 1. See above re claim 1. |
| 7(a) | wherein the object is a display screen for a laptop computer, | As noted above at the preamble of claim 1 and at element d of claim 1, the ROSEWILL RCM-8163 is an apparatus for supporting a camera on a display screen for a laptop computer.<br><br>For example: |

3

| 7(b) | and the second surface is the front of the display screen | As noted above at the preamble of claim 1 and at element d of claim 1, the ROSEWILL RCM-8163 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the second surface (noted with a dark purple arrow) is the front of the display screen.<br><br>For example:<br><br> |
| 7(c) | and the first surface is the back of the display screen. | As noted above at the preamble of claim 1 and at claim 1, element (d) (and in the photo at claim 7, element (a)), the ROSEWILL RCM-8163 is an apparatus for supporting a camera on a display screen for a laptop computer, wherein the first surface (noted with a light purple arrow) is the back of the display screen. |

4

| | | |
|---|---|---|
| | |  |
| 19(p) | A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | As noted above at the preamble of claim 1 and at claim 1, element (d), the ROSEWILL RCM-8163 is a camera clip for supporting a camera on a laptop computer having a display screen which can be inclined from a generally horizontal position (i.e., when opened) with the uppermost portion of the display screen defining an edge.<br><br>For example:<br><br> |
| 19(a) | a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | See 1(a) above. |
| 19(b) | b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display | The ROSEWILL RCM-8163 comprises a support frame (see above re support frame) which engages and supports the hinge member (see above re hinge member) on the display screen. |

5

**A1258**

| | screen, | For example: |
|---|---|---|
| | |  As depicted in the graphic above, the support frame (see above re support frame) is hingedly attached to the hinge member (see above re hinge member), wherein the range of motion is defined by a channel in the support frame. |
| 19(c) | said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, | The ROSEWILL RCM-8163 comprises the hinge member (see above re hinge member) rotating over a second axis of rotation (see above re second axis of rotation), as noted with a yellow arrow, relative to the support frame (see above re support frame). This axis of rotation is defined by channel in the support frame.<br><br>For example:<br><br><br><br>As exemplified by the photo above, the ROSEWILL RCM-8163 comprises the camera being maintained adjacent the edge |

6

| | | (see above re edge) of the laptop computer. |
|---|---|---|
| 19(d) | rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | As exemplified by the photo above below, the ROSEWILL RCM-8163 comprises the support frame (see above re support frame) being supported on the display screen, and its movement constrained by a front lip, and thus rotation of the support frame is prevented along an axis which is at least substantially horizontal.  As noted in the above photo, this at least substantially horizontal axis is at least substantially parallel to the second axis (see above re second axis) and the second axis is at least substantially parallel to the edge. |

7

HIGHLY CONFIDENTIAL

(2). Thus, by all indications, camera attachment shaft (9) freely passes through camera fixed part (2).

When a camera is mounted on the Irifune device, it would be screwed onto camera attachment shaft (9) and tightened against camera fixed part (2) using camera attachment screws (10) and (11). See elsewhere herein for further observations/opinions applicable to Irifune.

At paragraph 39, the Klopp Report states that Irifune "describes a device that can be rotatably attached to a camera . . ." I disagree that Irifune discloses the "rotatably attached" element.[2] First, the plain and ordinary meaning, to one of ordinary skill in the art at the time of the invention, of "attached" is to be permanently fixed, joined, connected, or bound. *See e.g.*, Merriam-Webster Dictionary, or Oxford Dictionary. A partially threaded camera is not permanently fixed, joined, connected, or bound to the hinge member. In addition, a partially threaded camera is unstable, which is counter to the intended support to be provided by the Irifune device. With Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment shaft (9) and camera attachment screws (10) and (11).

Further, even assuming for the sake of argument that with Irifune the camera is attached, it is not "rotatably attached." As stated in my prior report:

> . . . Irifune discloses that a camera can be screwed onto a mounting device using a camera attachment shaft 9 and camera attachment screws 10 and 11. The purpose of the camera attachment shaft and screws is to attach the camera to the camera fixed part 2. Once the camera is attached to the camera fixed part 2, the camera cannot rotate about a first axis relative to the hinge member.
>
> Further, with the Irifune apparatus, a partially threaded camera is not rotatably attached to the hinge member. FIG. 2 of Irifune shows a camera fixed part 2 that is unthreaded, and a camera attachment shaft 9 that is also partially unthreaded at the location where it would be disposed within an opening of the camera fixed part. Thus, the camera attachment shaft 9 can freely pass through the opening of

---

[2] The specific language found in claims 1, 7, 8 and 19 is a "hinge member adapted to be rotatably attached to the camera . . ."

18

**Attachment 7**
**Terms of '343 Patent Settlement Agreements**

| Licensor | Licensee | Date | Expiration | Payment | | Non-Exclusive | Barred from Assisting in Contesting Liability | Source |
|---|---|---|---|---|---|---|---|---|
| | | | | Lump-Sum | Running | | | |
| PAR Technologies | Philips Electronics, et al. | 10/22/2001 | 3/7/2017 | [redacted] | [redacted] | Yes | n/a | GLOBALMEDIA000035–049 |
| PAR Technologies | [redacted] | 12/31/2001 | 12/31/2011 | [redacted] | [redacted] | Yes | n/a | GLOBALMEDIA000013–034 |
| AdjustaCam | Trippe Manufacturing | 9/21/2010 | 3/7/2017 | [redacted] | [redacted] | Yes | Yes | ADJCAM-SETTLE000060–69 |
| AdjustaCam | Intcomex, et al. | 11/22/2010 | 3/7/2017 | [redacted] | [redacted] | Yes | Yes | ADJCAM-SETTLE000038–048 |
| AdjustaCam | Jasco | 12/28/2010 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000016–026 |
| AdjustaCam | Phoebe Micro | 3/17/2011 | 3/7/2017 | [redacted] | [redacted] | Yes | Yes | ADJCAM-SETTLE000049–059 |
| AdjustaCam | jWIN | 3/23/2011 | 3/7/2017 | [redacted] | [redacted] | Yes | Yes | ADJCAM-SETTLE000027–037 |
| AdjustaCam | KYE, et al. | 3/24/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000244–254 |
| AdjustaCam | Trust International | 6/3/2011 | 3/7/2017 | [redacted] | [redacted] | Yes | Yes | ADJCAM000106–116 |
| AdjustaCam | Chicony | 6/28/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM000097–0105 |
| AdjustaCam | RadioShack | 8/8/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM000117–126 |
| AdjustaCam | Baltic Latvian | 8/11/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM000127–139 |
| AdjustaCam | Overstock | 9/12/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000191–0201 |
| AdjustaCam | Dell | 11/2/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000153–163 |
| AdjustaCam | Mace Group, et al. | 11/11/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000176–190 |
| AdjustaCam | Creative, et al. | 11/18/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000142–152 |
| AdjustaCam | J&R | 12/30/2011 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000164–175 |
| AdjustaCam | Systemax, et al. | 3/15/2012 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000202–212 |
| AdjustaCam | Amazon | 3/22/2012 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000213–222 |
| AdjustaCam | Auditek | 5/10/2012 | 3/7/2017 | [redacted] | [redacted] | Yes | Yes | ADJCAM-SETTLE000214–222 |
| AdjustaCam | Digital Innovations | 5/31/2012 | 3/7/2017 | [redacted] | n/a | Yes | Yes | ADJCAM-SETTLE000202–213 |
| AdjustaCam | CDW, et al. | 6/22/2012 | 3/7/2023 | [redacted] | n/a | Yes | Yes | CDW Agreement, 6/22/2012 |

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

**Attachment 12**

Implied Royalty Rates

| Licensee | Source | Settlement Amount | Data Period | | Pre-Agreement | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Start | End | Start | End | Units | Implied Rate |
| Amazon | [A] | | 9/7/2007 | 5/23/2011 | 7/2/2010 | 3/22/2012 | | |
| Auditek | [B] | | 7/14/2010 | 9/13/2011 | 7/2/2010 | 5/10/2012 | | |
| Baltic Latvian | [C] | | 1/1/2009 | 6/30/2010 | 1/1/2009 | 8/11/2011 | | |
| CDW, et al. | [D] | | 1/29/2007 | 12/4/2011 | 7/2/2010 | 6/22/2012 | | |
| Chicony | [E] | | 1/1/2006 | 12/31/2012 | 1/1/2006 | 6/28/2011 | | |
| Creative, et al. | [F] | | 1/1/2004 | 12/31/2011 | 7/2/2010 | 11/18/2011 | | |
| Dell | [G] | | 1/1/2007 | 5/1/2011 | 7/2/2010 | 11/2/2011 | | |
| Digital Innovations | [H] | | 7/2010 | 4/2012 | 7/2/2010 | 5/31/2012 | | |
| KYE, et al. | [I] | | 1/1/2008 | 12/31/2010 | 1/1/2008 | 3/24/2011 | | |
| Mace Group, et al. | [J] | | 1/1/2008 | 7/31/2011 | 7/2/2010 | 11/11/2011 | | |
| Overstock | [K] | | 7/2/2010 | 4/13/2011 | 7/2/2010 | 9/12/2011 | | |
| Systemax, et al. | [L] | | 2/22/2008 | 4/5/2011 | 7/2/2010 | 3/15/2012 | | |
| Trust International | [M] | | 9/1/2007 | 3/31/2009 | 9/1/2007 | 6/3/2011 | | |
| Minimum | | | | | | | | |
| Maximum | | | | | | | | |

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

| Licensee | Source | Post-Agreement | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Start | End | Units | Implied Rate | Start | End | Units | Implied Rate |
| Amazon | [A] | 3/22/2012 | 3/7/2017 | - | n/a | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Auditek | [B] | 5/10/2012 | 3/7/2017 | - | n/a | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Baltic Latvian | [C] | 8/11/2011 | 3/7/2017 | - | n/a | 1/1/2009 | 3/7/2017 | [REDACTED] | [REDACTED] |
| CDW, et al. | [D] | 6/22/2012 | 3/7/2017 | [REDACTED] | [REDACTED] | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Chicony | [E] | 6/28/2012 | 3/7/2017 | [REDACTED] | [REDACTED] | 1/1/2006 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Creative, et al. | [F] | 11/18/2011 | 3/7/2017 | - | n/a | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Dell | [G] | 11/2/2011 | 3/7/2017 | [REDACTED] | [REDACTED] | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Digital Innovations | [H] | 5/31/2012 | 3/7/2017 | [REDACTED] | [REDACTED] | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| KYE, et al. | [I] | 3/24/2011 | 3/7/2017 | [REDACTED] | [REDACTED] | 1/1/2008 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Mace Group, et al. | [J] | 11/11/2011 | 3/7/2017 | [REDACTED] | [REDACTED] | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Overstock | [K] | 9/12/2011 | 3/7/2017 | [REDACTED] | [REDACTED] | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Systemax, et al. | [L] | 3/15/2012 | 3/7/2017 | - | n/a | 7/2/2010 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Trust International | [M] | 6/3/2011 | 3/7/2017 | - | n/a | 9/1/2007 | 3/7/2017 | [REDACTED] | [REDACTED] |
| Minimum | | | | | [REDACTED] | | | | [REDACTED] |
| Maximum | | | | | [REDACTED] | | | | [REDACTED] |

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

*Notes and sources:*

Sullivan Attachments 7, 11.

Bratic Report, 6/25/2012, at ¶¶37–66.

Unit data come from sources identified in Sullivan Attachment 11.

"Pre-Agreement Units" are calculated as the sum of reported units for "Licensee" in the specified time period.

"Implied Rate" = ("Settlement Amount" / "Units").

The "Pre-Agreement" period begins as of the date of earliest available "Licensee" data for agreements entered into prior to 8/17/2011 and 7/2/2010 otherwise.

*See* Plaintiff's Response to the Motions (DKT Nos. 473, 376, and 483) for Partial Summary Judgment Regarding Pre-Suit Damages Pursuant to Section 287(A) Filed by Certain Defendants, 8/17/2011.

The "Pre-Agreement" period ends as of the date of the settlement agreement.

The "Post-Agreement" period extends to the expiration of the patent.

[A] Post-agreement units are set to zero based on declining sales trend.

[B] Post-agreement units are set to zero based on the cessation of sales by Auditek.*See* Email from Jeff Lee to John Edmonds, 9/13/2011 (ADJCAM000502–03).

[C] Post-agreement units are set to zero based on declining sales trend.

[D] Post-agreement units are calculated based on annual 2011 unit sales applied to the applicable time range.

[E] Post-agreement units are calculated based on average annual unit sales applied to the applicable time range.

[F] Post-agreement units are set to zero based on declining sales trend.

[G] Post-agreement units are calculated based on average monthly unit sales from 2010 – 2011 applied to the applicable time range.

[H] Post-agreement units are calculated based on average monthly unit sales from 2011 – 2012 applied to the applicable time range.

[I] Post-agreement units are calculated based on annual 2010 unit sales applied to the applicable time range.

[J] Post-agreement units are calculated based on average annual unit sales applied to the applicable time range.

[K] Post-agreement units are calculated based on average annual unit sales from 7/2/2010 – 4/13/2011 applied to the applicable time range.

[L] Post-agreement units are set to zero based on declining sales trend.

[M] Post-agreement units are set to zero based on cessation of sales in the U.S. after March 2009.

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

1     Q.   What specifically do you recall about that

2     interview?

3     A.   Well, everything I discussed with

4     Mr. Barthelemy is cited in my report, so I'll just

5     refer you to the footnotes where I talk about that.

6               If you'll go to Page 14.

7     Q.   Uh-huh.

8     A.   If you'll look at Footnote 61, 62, and 63,

9     which are referenced in Paragraph 33 --

10     Q.   Uh-huh.

11     A.   -- that's the subject matter of my discussion

12     with Mr. Barthelemy.  I believe that's the extent of

13     it.

14               Now, go to Footnote 211, which is on

15     Page 33, Paragraph 75.  And that's it.

16     Q.   Okay.  So aside from Footnote 61 to 63,

17     Footnote 211, are you aware of any other --

18     A.   Subject matter?

19     Q.   Yes, thank you -- any other areas of subject

20     matter that you discussed with Mr. Barthelemy that

21     aren't listed here in your report?

22     A.   No.

23     Q.   Let's take a look at Footnote 61 briefly.

24     A.   Okay.  All right.

25     Q.   Is it fair to say that you and

Electronically signed by Lesia Wagner (501-206-347-7161)                    a24a3702-8128-4c23-8f62-53d84b4a9f47

Page 37

```
1    Mr. Barthelemy, during your interview, discussed what
2    GlobalMedia and PAR Technologies would have considered
3    in a hypothetical negotiation for rights to the '343
4    patent?
5         A.   Yes.
6         Q.   And you understand that Mr. Barthelemy was a
7    representative of PAR Technologies at the time of PAR's
8    license with Philips.  Is that correct?
9         A.   Well, I don't know what his capacity was, but
10   he certainly told me that he was involved in PAR's
11   negotiations with Philips and ███████████
12        Q.   Okay.
13        A.   The first two licenses that were executed for
14   the '343 patent.
15        Q.   Did he tell you what his specific role in
16   those negotiations was?
17        A.   No, other than he was very involved in them,
18   and so that would have set the predicate for all
19   subsequent licensing that took that licensing model.
20        Q.   Do you recall speaking with Mr. Barthelemy
21   about a minimum per-unit royalty of $1.25?
22        A.   Yes.
23        Q.   What did you specifically discuss with
24   Mr. Barthelemy in that regard?
25        A.   Well, the minimum royalty of -- let me look.
```

"CONFIDENTIAL"

1    I'm sorry.  Would you repeat your question?

2         Q.   Yeah.  I asked:  What specifically did you

3    discuss with Mr. Barthelemy in that regard; that is, in

4    regard to a minimum per-unit royalty of $1.25?

5         A.   Well, they were looking -- he explained to me

6    the situation with respect to the Philips license,

7    where they granted Philips the "most favored nations"

8    clause for any subsequent licenses.  And so they -- in

9    recognition of that, his understanding was, based on

10   their negotiation with Philips, that Philips was not --

11   did not have high volumes nor did they expect to have

12   high volumes in sales of webcams, but their target was

13   to get around $1.25 effective royalty per unit.

14        Q.   Okay.  And you're saying that was their

15   target, was to get around $1.25 effective royalty per

16   unit.  Are you referring to PAR Technologies?

17        A.   Well, PAR, and then subsequently that would

18   have been GlobalMedia's mindset, was to seek a royalty

19   in the $1.25 to $1.50 frame.

20        Q.   So Mr. Barthelemy, during your interview,

21   told you that it was both PAR's desire and the desire

22   of GlobalMedia to seek a minimum per-unit royalty of

23   $1.25 for the '343 patent?  Is that right?

24        A.   No, that's not what I said.  That the target

25   was in the range of $1.25 to $1.50 per unit.

"CONFIDENTIAL"

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

Page 39

1    Q.    Okay.  And that applies to both PAR

2    Technologies and GlobalMedia?

3    A.    Yes.

4    Q.    Okay.  Did you discuss any of the accused

5    products in this matter with Mr. Barthelemy?

6    A.    No.

7    Q.    Did you discuss the expert reports of any

8    other expert in this matter with Mr. Barthelemy?

9    A.    No.

10    Q.    Did Mr. Barthelemy explain to you why --

11    well, first of all, did Mr. Barthelemy explain to you

12    that there was an established royalty of $1.25 per unit

13    or minimum -- established royalty of a minimum of $1.25

14    per unit at the time you spoke with him?

15    A.    Well, I don't know that he used the word

16    "established royalty," but he clearly made it clear

17    that that was the goal, was the $1.25 to $1.50 per

18    unit.  But they recognized that with the Philips "most

19    favored nation" clause and then the license of the

20    subsequent that they executed with ██████ who was

21    the volume leader in the industry, that they were

22    targeting $1.25 to $1.50 per unit.

23    Q.    Did Mr. --

24    A.    And that was consistent with what they had

25    observed with other licenses.

Electronically signed by Lesia Wagner (501-206-347-7161)    a24a3702-8128-4c23-8f62-53d84b4a9f47

1    consider the fact that all these licensees, irrespective

2    of where they were in the distribution chain, they

3    recognized that the intrinsic value associated with the

4    patented feature was in the area of $1.25 to $1.50 per

5    unit.

6         Q.   And I understand that.  I'm just asking if

7    there's a specific equation, for example, that you used

8    to arrive at your conclusion of a reasonable royalty

9    rate that involved the profit margin as a variable.

10        A.   Well, the profit margin was used as -- for

11   illustrative purposes and as a benchmark to show that

12   these products are profitable.

13        Q.   Okay.

14        A.   And to show that after paying a royalty of

15   $1.25, $1.50 per unit, for example, the licensee would

16   still generate a profit.

17        Q.   Sure.  But it wasn't used in an equation,

18   right, the profit margin?

19        A.   No, it wasn't used in a specific equation

20   because it wasn't necessary.

21        Q.   Okay.  So it's your opinion that the

22   reasonable royalty in this case is not dependent on the

23   sales price of the accused products.  Is that right?

24        A.   I'm sorry?

25        Q.   Is it your opinion that the reasonable

"CONFIDENTIAL"

1   royalty that you've formulated for this case is not

2   dependent on the sales price of the accused products?

3        A.   That's correct.

4        Q.   Okay.  And what's the -- what's the basis for

5   that opinion?

6        A.   The discussion -- the discussion we've just

7   had, that so many licensees in the industry have all

8   taken license with the imputed royalty rate in the

9   range of $1.25 to $1.50, irrespective of where they are

10  in the stream of commerce, is a strong indication to me

11  that they've all recognized that that's the intrinsic

12  value of the patented feature.

13       Q.   So it's because other companies have paid

14  between $1.25 and $1.50 per unit to license the

15  technology.  Is that right?

16            MR. EDMONDS:   Objection, form.

17       A.   It's because so many companies, during the

18  entire course of the licensing history of the '343

19  patent, have all agreed to pay imputed royalties or

20  effective royalty rates in the range -- with a few

21  exceptions -- but generally speaking, within the range

22  of $1.25 to $1.50.

23       Q.   (By Mr. Herberholz) Any other reason?

24       A.   Well, to me -- well, that, in light of the

25  differing profit margins that resellers compared to

1        Q.   Can you think of any other reasons as you sit

2    here today?

3        A.   I'd have to give it some more thought or just

4    go back through my report again.

5        Q.   Okay.

6        A.   But those are the primary reasons as I see

7    it.

8        Q.   Now, your reasons concerning a reasonable

9    royalty in this case are not based on the manufacturing

10   cost of the clip itself of the accused products.  Is

11   that right?

12       A.   No.  That's correct.

13       Q.   Okay.  Why didn't you take that into account

14   as part of your analysis?

15       A.   Because it's not relevant.

16       Q.   Why is that not relevant?

17       A.   Because I've looked at what the licensing

18   history of these products are and I've looked at the

19   fact that licensees have uniformly agreed to pay in the

20   range of $1.25 to $1.50 per unit.

21       Q.   Okay.

22       A.   So that tells me that that's -- that is a

23   good benchmark, for me, as to what the intrinsic value

24   of -- in the form of a license of the patented

25   technology is.

"CONFIDENTIAL"

1     Q.    Okay.

2     A.    11 and 12.  What is the benefit to those who

3 have practiced, not what is the cost of the benefit.

4     Q.    That's a fair point, and we'll get to the

5 value in a second.

6                But just to be clear, you didn't consider

7 the actual cost to manufacture the clip of any accused

8 products, right?

9     A.    I didn't believe it to be relevant.

10    Q.    So you didn't consider it?

11    A.    I didn't consider it.

12    Q.    Okay.

13    A.    I considered it, but I determined it not to

14 be relevant.

15    Q.    So the cost of the clip, in other words, of

16 the accused products is not part of your opinions as to

17 a reasonable royalty in this case?

18    A.    Correct.  It does not bear on the

19 determination of a reasonable royalty.

20    Q.    Let's talk about value, as you pointed out.

21 It's your opinion that -- first of all, is it your

22 opinion that the value of the clip of each of the

23 accused products is somewhere between $1.25 and $1.50?

24    A.    Well, in my opinion, it's no less than $1.25

25 per unit.

1    others did not involve -- they either involved lump

2    sums, which -- because of the representations that they

3    were getting out of the business or had gotten out of

4    the business of selling these particular type of

5    webcams, or they didn't exercise their option.

6         Q.   Okay.  In fact, you mentioned the lump-sum

7    agreements.  16 of the settlement agreements that

8    involved AdjustaCam involved lump-sum payments.  Is

9    that right?

10        A.   Lump sums with no royalty option.

11        Q.   Right.

12        A.   No running royalty option.  That's correct.

13        Q.   And then there's six agreements involving

14   AdjustaCam that involve a lump sum plus a running

15   royalty option.  Is that right?

16        A.   Correct.

17        Q.   Okay.

18        A.   Which, by the way, is another indication

19   of -- when you asked what bases I had for -- that's --

20   of the six licenses that had the running royalty option,

21   all of them were tied to a running royalty per unit;

22   they were not tied -- those options were not tied to

23   the sale price of a webcam.

24        Q.   Okay.  So for those six agreements that have

25   the running royalty option plus a lump sum --

1      A.   Yes.

2      Q.   -- are you aware of whether any of those

3   licensees had actually paid a running royalty beyond

4   the lump sum?

5      A.   I am not.  My understanding is they have not.

6      Q.   Okay.  Do you understand that any of those

7   six licensees met their, for lack of a better term,

8   minimum number of sales -- I should say maximum number

9   of sales, before they had to pay their running royalty?

10   Do you follow me?

11      A.   My understanding is they did, based on the

12   $1.25 to $1.50 royalty rate range.

13      Q.   Okay.  But you're not aware of any of the six

14   licensees paying any royalties beyond the lump-sum

15   payments already made, correct?

16      A.   You've asked me that question, and my answer

17   is I'm not aware of that.

18      Q.   Okay.  Let's take a look at Paragraph 36 in

19   your report.

20      A.   Okay.

21      Q.   I'm looking at the second to last full

22   sentence in that paragraph, beginning with "In some

23   circumstances."  Do you see where I'm at?

24      A.   Uh-huh.

25      Q.   And you say here:  "In some circumstances,

Electronically signed by Lesia Wagner (501-206-347-7161)                    a24a3702-8128-4c23-8f62-53d84b4a9f47

Page 229

1          Based on my discussions with Mr. Wong at

2     AdjustaCam, that was my understanding, is that the 14

3     lump-sum settlements were based on negotiations

4     targeting a royalty of $1.25 to $1.50 per unit.

5          Q.   Would I be correct in saying that to the

6     extent that these settlements that you're looking at --

7     to the extent that they included a future license that

8     was considered paid up, would I be correct in saying

9     that there's no way that Mr. Wong or anybody would have

10    known what the future sales would be?  Correct?

11         A.   That's not true.

12         Q.   Why not?

13         A.   Well, because if somebody came to Mr. Wong

14    and AdjustaCam and told them, "Here's what our sales

15    have been.  Here's what our sales have been to date.

16    And by the way, we're getting out of the market and

17    we're phasing out," then you can get a pretty good

18    handle on what future sales would be, particularly if

19    they're tapering off.

20         Q.   Well, all right.  So if that's the -- if

21    you're saying that's what the negotiations may have

22    been, that the future sales are tapering off, then the

23    bulk -- would it be -- would it be fair to say that the

24    bulk of the lump-sum payment was for past sales?

25         A.   Past licensable sales.

"CONFIDENTIAL"

1    sales in these lump-sum settlements for which there was

2    no running royalty option were based on what AdjustaCam

3    understood were the licensable sales going back to July

4    2, 2010 through whenever the defendant or particular

5    licensee told them that they were getting out of the

6    market.

7        Q.   Okay.  I don't know if you misspoke, but let

8    me just clarify something.  I think you said that

9    Mr. Wong told you that the settlement amount -- or

10   actually, you read from the statement there that

11   Mr. Wong told you that it was for -- I think you said

12   future sales.

13       A.   Yeah.  Well, it was total sales, past and

14   future.

15       Q.   Oh, is that what you said?

16       A.   Yes.

17       Q.   I'm sorry.  I must have misheard you.  Okay.

18            So Mr. Wong told you that the settlement

19   was based on a quantity for the past and the future

20   sales?

21       A.   Correct.  In other words, they -- most of

22   these licensees who were paying lump-sum amounts were

23   not going to be selling licensed products in the future

24   and were phasing out.  So they provided -- in their

25   discussions, they worked off of estimated numbers in

"CONFIDENTIAL"

THE MATERIAL OMITTED DISCLOSES MATERIAL DEEMED CONFIDENTIAL UNDER LICENSE

1    order to bracket the amount of the lump-sum payment,

2    based on AdjustaCam's target of $1.25 to $1.50 per

3    unit.

4         Q.   So again -- I'm being a little bit

5    repetitive, but going back to RadioShack, where they

6    paid ████, and using the yardstick of $1.25, it's

7    your understanding that RadioShack would have sold,

8    from July 2010 to the time the agreement was signed,

9    approximately ████ units?

10        A.   Well, no.  It's -- what I'm saying is

11   somewhere in that -- in the discussions between

12   RadioShack and AdjustaCam, it was AdjustaCam's

13   understanding that the total licensed units were going

14   to be somewhere in the range of ████████

15   licensed units, total.

16        Q.   I'm sorry.  You're saying --

17             MR. SUTTON:  Maybe I can have the

18   reporter repeat that answer.

19             (The requested portion was read.)

20        Q.   (By Mr. Sutton) So you changed -- you added

21   that number ████, based on a yardstick of $1.50 as

22   well?

23        A.   Correct.

24        Q.   And what you just said with regard to the

25   RadioShack agreement, you believe that's applicable to

"CONFIDENTIAL"

1    all of the lump-sum settlements?

2        A.    Correct.  With the exception of Chicony and

3    with the exception of Gear Head, that we just

4    discussed.

5        Q.    Did you ever check the records of -- from all

6    of these settled cases as to what they disclosed with

7    their sales?

8        A.    Only what's been produced in this litigation.

9        Q.    Oh, so you have reviewed that?

10        A.    Well, whatever has been produced in this

11    litigation.

12        Q.    So if any of these settled parties have

13    produced their sales information, you would have

14    reviewed that?

15        A.    Yes.

16        Q.    And did you -- did you check to see whether

17    the disclosures by the settled parties of the

18    quantities they sold -- did you check to see if that

19    matched up with $1.25 or $1.50 per unit?

20        A.    No, I did not.  I don't recall which parties

21    provided any subsequent information, other than

22    LogiTech and Philips, I know, produced royalty

23    reports -- or generated royalty statements.

24        Q.    So let me ask you a hypothetical question.

25              If a majority of these settlements -- if

Page 236

1    it turns out that they disclosed that the units that

2    they sold was much more than would have amounted to

3    $1.25 per unit, how would that affect your analysis

4    here of what a reasonable royalty is?

5        A.    Well, it wouldn't affect my analysis because

6    the target had always been in the range of $1.25 to

7    $1.50, based on the Philips and LogiTech licenses.

8                And what it means is if, in your

9    hypothetical, if it turns out that some of these

10   licensees sold more products than they made

11   representations to AdjustaCam, then if AdjustaCam had

12   actually known what the actual numbers were, then

13   AdjustaCam would have renegotiated those agreements to

14   reflect the $1.25 to $1.50 per unit as an effective

15   royalty to change the lump-sum payment upward.

16       Q.    Well, actually that was not my hypothetical.

17               My hypothetical was that if in the

18   disclosures that you have from the various settled

19   parties, if it turns out that they sold 150,000 units

20   or something like that instead of -- let's say with

21   RadioShack, if they disclosed they sold over 100,000

22   units -- and you're making an assumption that it would

23   have been somewhere in the range of 53,000 to

24   64,000 units -- if that turns out to be the case after

25   reviewing their discovery disclosures of their sales,

"CONFIDENTIAL"

1    that information, in 2012 is 14,189 units.

2        Q.    Okay.  And as of the date of your

3    supplemental report, it is your opinion that AdjustaCam

4    is entitled to no less than $1.25 per unit --

5        A.    Yes.

6        Q.    -- for those units?

7        A.    Yes.

8        Q.    And that works out to a total of $17,736.  Is

9    that right?

10       A.    That's right.

11       Q.    Do you believe that a per-unit royalty for

12   Newegg of $3 or more than $3 would be reasonable?

13       A.    No.  In a hypothetical negotiation, which is

14   what I've done, setting aside real-world negotiations,

15   I believe an appropriate hypothetically negotiated

16   royalty under Georgia-Pacific would yield $1.25 per

17   unit.

18       Q.    And at any time in this matter, have you

19   formed any opinions that AdjustaCam is entitled to more

20   than $3 per unit for Newegg sales of the accused

21   products?

22       A.    No, I have not.

23       Q.    Have you heard of a company called Irez

24   Corporation?  It's I-r-e-z, one word.

25       A.    I-r-e-z?  I don't recall that name.

Page 69

1    Q.    He's an employee, he's not an officer?

2    A.    Correct.  That's my understanding.

3    Q.    What's his title at ARG?

4    A.    I believe his title is vice president of

5    licensing.

6    Q.    So we've looked at a number of settlement

7    agreements involving AdjustaCam here today.  I don't

8    think we need to go through each and every one of them,

9    but is your testimony -- would your testimony with

10   respect to the AdjustaCam settlement agreements that we

11   haven't looked at be similar to what you've just

12   described with Exhibit Numbers 9 and 10 concerning the

13   number of units that -- that are subject to each of

14   those agreements?

15            MR. EDMONDS:  Objection, form.

16   Objection, scope.

17   A.    Yes, in general I believe the testimony with

18   respect to each of the agreements would be similar.

19   Q.    (BY MR. HEBERHOLZ)  Okay.  So in order to

20   determine the number of units that were subject to any

21   of the AdjustaCam settlement agreements we've looked at

22   today, you're saying you would need to look at the

23   books and records of AdjustaCam?

24            MR. EDMONDS:  Objection, form.

25   Objection, scope.

Clayton Haynes
Designated Highly Confidential Attorneys Eyes Only

Page 70

1       A.    I -- I don't believe that was my testimony.   I

2  believe it was that -- that, you know, Steve Wong, in

3  connection with outside counsel, were involved in the

4  negotiations.   And that I believe that Bratic may have

5  dealt with each one of the license agreements in his

6  expert report as well as his deposition.   And there may

7  be some information in that report with respect to --

8  to the units associated with each of the agreements.

9       Q.    (BY MR. HEBERHOLZ)  So aside from what's in

10  Mr. Bratic's report and Mr. Bratic's deposition, and

11  aside from Mr. Wong's negotiations with the AdjustaCam

12  licensees, are you aware of any other sources that one

13  could consult to determine the number of units that are

14  subject to any of the license agreements we've looked

15  at today?

16            MR. EDMONDS:  Objection, scope.

17       A.    I guess I would ask, is the question, I guess,

18  sources at AdjustaCam's disposal or that AdjustaCam has

19  access to?

20       Q.    (BY MR. HEBERHOLZ)  Yes.

21       A.    Not to my knowledge.

22       Q.    You said you spoke with Mr. Wong in

23  preparation for today's deposition?

24       A.    Yes.

25       Q.    Did Mr. Wong -- did you and Mr. Wong discuss

EXHIBIT 11

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

| Newegg Item Number | Decription | Qty Purchased | | |
|---|---|---|---|---|
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | 50 | | |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | -5 | | |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | 696 | | |
| 26-158-048 | Creative Live! Cam Video IM Pro Webcam | 24 | | |
| 26-158-062 | Creative Live! Cam Video IM Pro Webcam | 99 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 2,304 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 1,005 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 2,852 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 24 | | |
| 26-609-034 | Jwin JC-AM300 Multipurpose Webcam | 80 | | |
| 26-609-035 | Jwin JC-AM400 Webcam | 300 | | |
| 26-664-001 | Pixxo AW-I1130 Webcam | 3,116 | | |
| 26-664-003 | Pixxo AW-M2130 Webcam | 978 | | |
| 26-664-014 | Pixxo AW-U1131 Webcam | 333 | | |
| 26-782-042 | ihome MyLife Webcam | -1 | | |
| 26-782-053 | ihome MyHome/YourHome Webcam | -1 | | |
| | | | | |
| Include VF warehouse | | | | |
| Newegg Item Number | | Qty Purchased | | |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | 696 | | |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | 50 | | |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | -5 | | |
| 26-158-048 | Creative Live! Cam Video IM Pro Webcam | 24 | | |
| 26-158-062 | Creative Live! Cam Video IM Pro Webcam | 99 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 1,005 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 2,884 | | |
| 26-193-044 | Rosewill RCM-8163 Webcam | 3,456 | | |
| 26-193-045 | RCM-3201V | 3,186 | | |
| 26-193-045 | RCM-3201V | 5,988 | | |
| 26-313-001 | Minoru 3.0.1. World's First 3D | -1 | | |
| 26-609-034 | Jwin JC-AM300 Multipurpose Webcam | 79 | | |
| 26-609-035 | Jwin JC-AM400 Webcam | 280 | | |
| 26-664-001 | Pixxo AW-I1130 Webcam | 3,056 | | |
| 26-664-003 | Pixxo AW-M2130 Webcam | 928 | | |
| 26-664-014 | Pixxo AW-U1131 Webcam | 302 | | |
| 26-782-042 | ihome MyLife Webcam | -1 | | |
| 26-782-053 | ihome MyHome/YourHome Webcam | -1 | | |
| | | | | |
| Include VF warehouse | | | | |
| Newegg Item Number | | | Sold Qty | Revenue* |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | | 1,056 | |
| 26-158-048 | Creative Live! Cam Video IM Pro Webcam | | 76 | |
| 26-158-062 | Creative Live! Cam Video IM Pro Webcam | | 100 | |
| 26-168-052 | Micro Innovations Basic Webcam with LED | | 35 | |
| 26-193-044 | Rosewill RCM-8163 Webcam | | 7,319 | $20,082.12 |
| 26-313-001 | Minoru 3.0.1. World's First 3D | | 2 | |
| 26-609-034 | Jwin JC-AM300 Multipurpose Webcam | | 66 | |
| 26-609-035 | Jwin JC-AM400 Webcam | | 280 | |
| 26-664-001 | Pixxo AW-I1130 Webcam | | 3,078 | |
| 26-664-003 | Pixxo AW-M2130 Webcam | | 942 | |
| 26-664-014 | Pixxo AW-U1131 Webcam | | 290 | |
| 26-700-029 | HP Premium Autofocus Webcam | | 142 | |
| 26-782-042 | ihome MyLife Webcam | | 2 | |
| 26-782-053 | ihome MyHome/YourHome Webcam | | 14 | |
| 26-782-054 | ihome MyLife MyHome/YourHome Webcam | | 7 | |
| 26-193-045 | RCM-3201V | | 7,342 | $43,677.69 |
| | | | | |
| Notes: | Negative purchase numbers likely result from returns made on Virtual Fulfillment ("VF") items. | | | |
| | VF may occur when another source fulfills the order on behalf of Newegg. | | | |
| | *Revenue is calculated from Sales price minus Purchase cost | | | |

NEWE_ADJU 000001

A1362

HIGHLY CONFIDENTIAL - RESTRICTED
OUTSIDE COUNSEL EYES ONLY

| Newegg Warehouse* | Description | | | | | |
|---|---|---|---|---|---|---|
| Item# | | Purchased Qty | Purchase Cost | Invoice Qty | Invoice Amount | Revenue |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | 741 | 26943.64 | 753 | 27277.47 | 333.83 |
| 26-158-048 | Creative Live! Cam Video IM Pro Webcam | 24 | 903.6 | 24 | 1031.76 | 128.16 |
| 26-158-062 | Creative Live! Cam Video IM Pro Webcam | 99 | 3711.51 | 100 | 4227 | 515.49 |
| 26-609-034 | Jwin JC-AM300 Multipurpose Webcam | 79 | 1060.18 | 80 | 1567.2 | 507.02 |
| 26-609-035 | Jwin JC-AM400 Webcam | 280 | 4590 | 280 | 6200.8 | 1610.80 |
| 26-664-001 | Pixxo AW-I1130 Webcam | 3056 | 20970.5 | 3093 | 38678.86 | 17708.36 |
| 26-664-003 | Pixxo AW-M2130 Webcam | 928 | 4940 | 949 | 10246.53 | 5306.53 |
| 26-664-014 | Pixxo AW-U1131 Webcam | 302 | 3213 | 312 | 5329.92 | 2116.92 |
| 26-782-042 | iHome MyLife Webcam | -1 | -19.95 | 0 | 0 | 19.95 |
| 26-782-053 | iHome MyHome/YourHome Webcam | -1 | -52.63 | 0 | 0 | 52.63 |

*Items sold from Newegg Inc. warehouse. Negative numbers indicate Virtual Fulfillment sales.

| Virtual Fulfillment† | | | | | | |
|---|---|---|---|---|---|---|
| Item# | | PO Qty | Average Cost | Invoice Qty | Invoice Amount | Revenue |
| 26-158-029 | Creative Live! Cam Video IM Pro Webcam | 325 | 9745.13 | 325 | 13455.42 | 3710.29 |
| 26-158-048 | Creative Live! Cam Video IM Pro Webcam | 52 | 1991.6 | 52 | 2317.48 | 325.88 |
| 26-158-062 | Creative Live! Cam Video IM Pro Webcam | 0 | | 0 | 0 | 0.00 |
| 26-193-044 | Rosewill RCM-8163 Webcam | 0 | | 0 | 0 | 0.00 |
| 26-609-034 | Jwin JC-AM300 Multipurpose Webcam | 0 | | 0 | 0 | 0.00 |
| 26-609-035 | Jwin JC-AM400 Webcam | 0 | | 0 | 0 | 0.00 |
| 26-664-001 | Pixxo AW-I1130 Webcam | 0 | | 0 | 0 | 0.00 |
| 26-664-003 | Pixxo AW-M2130 Webcam | 0 | | 0 | 0 | 0.00 |
| 26-664-014 | Pixxo AW-U1131 Webcam | 0 | | 0 | 0 | 0.00 |
| 26-782-042 | iHome MyLife Webcam | 2 | 13.63 | 2 | 63.98 | 50.35 |
| 26-782-053 | iHome MyHome/YourHome Webcam | 16 | 46.94 | 16 | 1039.84 | 992.90 |

†Items sold through Newegg website fulfilled by other merchants.

1 - of - 1

NEWE_ADJU 000002



| | |
|---|---|
| **From:** | John Edmonds |
| **To:** | Dana M. Herberholz; Cathy Pontak; John N. Zarian |
| **Subject:** | AdjustaCam / Newegg / Rosewill - Rule 408 communication |
| **Date:** | Wednesday, July 11, 2012 10:38:25 AM |

CONFIDENTIAL SETTLEMENT COMMUNICATION / SUBJECT TO FRE 408

Counsel,

AdjustaCam hereby offers to settle its lawsuit against NewEgg/Rosewill for $51,543.00, subject of course to agreement on miscellaneous terms. AdjustaCam's prior settlements have standard terms that are good go-by. If you'd like us to send you a draft settlement agreement, please let us know.

This offer expires at the end of next week. If you have any questions, or would like to discuss the foregoing, please let us know.

John Edmonds



COLLINS EDMONDS POGORZELSKI
SCHLATHER & TOWER, PLLC
1616 S. Voss Road., Suite 125
Houston, Texas 77057
713.364.5291
jedmonds@cepiplaw.com

**Houston, TX**          **Longview, TX**          **Santa Ana, CA**

TransPerfect Legal Solutions
Certificate of Translation-Affidavit of Accuracy


I, Brian Toth, the undersigned, being duly sworn, depose and state:


1.    I carefully translated the Patent Publication No. H2 – 19997 (publication date February 9, 1990) document from Japanese to English in September of 2010.  I am qualified to translate from the Japanese language into the English language by virtue of being thoroughly conversant and schooled in these languages.


2.    To the best of my knowledge and ability, the attached translation of the Patent Publication No. H2 - 19997 document,  is a true and accurate rendition from Japanese to English, and nothing has been added thereto or omitted therefrom.




Signature

Date   7/25/13

Signature, Notary Public

Notary Public
State of Washington
MICHAEL A GONZALEZ
MY COMMISSION EXPIRES
August 13, 2015

Stamp, Notary Public


**ADJDEFPA000093**

## Unexamined Utility Model Application Publication H2-19997

(19) Japan Patent Office (JP)

(11) Japanese Unexamined Utility Model Application Publication Number

(12) **Japanese Unexamined Utility Model Publication** (U)

**H2-19997**

| (51) Int. Cl.⁵ | Identification codes | JPO file numbers | (43) Publication date: February 9, 1990 |
|---|---|---|---|
| F 16 M 13/02 | T | 7312-3G | |
| G 03 B 17/56 | B | 7811-2H | |

Request for examination: Requested  Number of claims: 3 (Total of  pages)

| (54) Title of the device | LIGHTWEIGHT AND CONVENIENT CAMERA MOUNTING DEVICE |
|---|---|

(21) Utility Model Application S63-94014

(22) Application date: July 18, 1988

| (72) Inventor | Kunio Iᴋɪ | 6-7-801 Irifune, Urayasu-shi, Chiba-ken |
|---|---|---|
| (71) Applicant | Kunio Iᴋɪ | 6-7-801 Irifune, Urayasu-shi, Chiba-ken |

ADJDEFPA000045

ADJDEFPA000093.1

Specification

1. Title of the Device

   LIGHTWEIGHT AND CONVENIENT CAMERA MOUNTING DEVICE

2. Scope of the Utility Model Registration Claim

   1. A structure in which a camera fixed part (2) and arms (3) and (4) can be freely rotated around a central shaft (1) is employed.

   2. A structure in which the camera fixed part (2) and the arms (3) and (4) can be fixed by turning a fastening screw (5) is employed.

      In order to supplement the fixing function, elastic rings (7) and (8) are inserted and star-shaped notches are made at the points of contact between the rings and the camera fixed part (2) and the arms (3) and (4).

   3. In order to increase the mounting stability, a rubber ring (12) and a rubber cord

[half seals: Kunio Iki]

Unexamined Utility Model Application Publication H2-19997

(1)       1216

ADJDEFPA000046

ADJDEFPA000093.2

## Unexamined Utility Model Application Publication H2-19997

belt (13) are attached to prevent slippage.

A lightweight and convenient camera mounting device configured as described above.

3. Detailed Description of the Device

The present device is a lightweight and small camera mounting device which enables a camera to be easily set at different positions under various different conditions.

Conventional devices include tripods and the like, but these are difficult to carry around because they are large and heavy. The expansion and contraction of the legs and the operation of the screws is troublesome.  A flat surface of a specific width is required as a location for mounting the tripod. Tripods are therefore inconvenient in that the locations at which they can be mounted are limited.

[half seal:
Kunio Iki]

The present device was invented in order to eliminate such inconveniences.

The device will be described with reference to the drawings. This camera mounting device has the following characteristics, as shown in FIGS. 1, 2, 3, and 4.

1. A structure in which a camera fixed part (2) and arms (3) and (4) can be freely rotated around a central shaft (1) is employed.

(2)    1217

ADJDEFPA000047

ADJDEFPA000093.3

2.  A structure in which the camera fixed part (2) and the arms (3) and (4) can be fixed by turning a fastening screw (5) is employed.

In order to supplement the fixing function, elastic rings (7) and (8) are inserted and star-shaped notches are made at the points of contact between the rings and the camera fixed part (2) and the arms (3) and (4).

3.  In order to increase the mounting stability, a rubber ring (12) and a rubber cord belt (13) are attached to prevent slippage.

[half seal: Kunio Iki]

This is the basic structure of the present device.

In order to maintain the fixing function in [2], a hard ring (6) and elastic rings (7) and (8) are inserted, and these are fixed by making notches (0.5 mm) in the star-shaped regions of the rotating parts shown by (2), (3), and (4) in FIGS. 6 and 7. The elastic rings (7) and (8) and the tightening by the fastening screw (5) provide a structure

(3)     1218

ADJDEFPA000048

ADJDEFPA000093.4

## Unexamined Utility Model Application Publication H2-19997

with a supplementary function for preventing slippage.

The nonslip rubber ring (12) attached to the arms (3) and (4) is for increasing the stability when mounting the camera mounting device. The rubber cord belt (13) is formed so that its length can be expanded and contracted. Clasps are also attached to both ends so that it can be easily set.

[half seal: Kunio Iki]

The rubber cord belt (13) is used to stabilize the camera mounting device when mounting the device on a tree, a pillar, or the like, but it is also useful for winding around the camera mounting device so that it is more compact when carrying it around.

The present device has the structure described above, so it can be described as follows with reference to the drawings.

A   Having the size shown in FIGS. 1-4, is small and lightweight.

B   As shown in FIGS. 9 and 1, the device can be made small and compact when it is carried around, so it can be placed in a pocket or a purse for easy portability.

(4)      1219

ADJDEFPA000049

ADJDEFPA000093.5

A1381

C   As illustrated in FIG. 9 and FIGS. 2-11, the camera can be simply and easily mounted in various locations such as on a desk or a table, the back of a chair indoors or in a park, a guard rail, a wall, a fence, a deck, or on the ground.

D   The operation is simple, and the device can be fixed by simply moving the arms (3) and (4) around the central shaft (1) to an appropriate angle and tightening the fastening screw (5).

E   When mounting on a chair, a tree, or the like, stability can be ensured by fastening the device with the rubber cord belt (13) when particularly necessary.

[half seal:
Kunio Iki]

There are also various other methods of using this camera mounting device, but 2-3 examples will be illustrated here.

The present camera mounting device is easy to carry around and to mount, as described above, and it can be mounted in different places under various conditions.

This device is convenient in that it can be brought on a honeymoon, a family

(5)     1220

ADJDEFPA000050

ADJDEFPA000093.6

A1382

**Unexamined Utility Model Application Publication H2-19997**

vacation, or the like, and pictures can be taken in various locations in the preferred poses by using the device in combination with a self-timer or the like.

(We would like to call this camera mounting device by the pet name "Camera Setter Honeymoon.")

4. Brief Description of the Drawings

FIG. 1 is an oblique view of the present device.

FIG. 2 is a front view of the present device.

[half seal: Kunio Iki]

FIG. 3 is a top view of the present device.

FIG. 4 is a side view of the present device.

FIG. 5 shows the states in which the camera fixed part (2) and the arms (3) and (4) of the present device are set to various angles around the central shaft (1).

FIGS. 6, 7, and 8-1 show each section of the present device.

FIG. 8-2 shows a plan view and a side view of the [*rub*]ber cord belt (13) of the present device.

FIG. 9-1 is a drawing showing the present camera mounting device in the compact state.

ADJDEFPA000051

ADJDEFPA000093.7

A1383

FIG. 9-2 is an oblique view of an example in which a camera is mounted in a flat location with the present camera mounting device.

FIG. 10 shows drawings in which a camera is mounted to the back of a chair with the present camera mounting device. FIG. 10-1 is a view from the front; FIG. 10-2 is a view from the side; and FIG. 10-3 is a view from the side at a slight distance.

FIG. 11 shows drawings in which a camera is mounted to a tree, a pillar, or the like with the present camera mounting device. FIG. 11-1 is a view from the top; FIG. 11-2 is a view from the side; and FIG. 11-3 is a view from a slight distance.

[half seal:
Kunio Iki]

The numbers in these drawings are respectively associated with the following names.

(1) central shaft

(2) camera fixed part

(3) arm (large)

(4) arm (small)

(5) fastening screw

(6) hard ring

ADJDEFPA000052

ADJDEFPA000093.8

**Unexamined Utility Model Application Publication H2-19997**

(7) elastic ring (small)

(8) elastic ring (large)

(9) camera attachment shaft

(10) camera attachment screw (free)

(11) camera attachment screw (fixed)

(12) nonslip rubber ring

(13) rubber cord belt

[half seal:
Kunio Iki]

Utility Model Registration Applicant    Kunio IKI

(8)      1223

ADJDEFPA000053

ADJDEFPA000093.9

A1385

Drawings

FIG. 1

[seals:
Kunio Iki]



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997
ADJDEFPA000055

ADJDEFPA000093.10

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 2



[seals: Kunio Iki]

Utility Model Registration Applicant   Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000056

**ADJDEFPA000093.11**

A1387

Drawings

FIG. 3

[seals:
Kunio Iki]



Utility Model Registration Applicant    Kunio Iki

Unexamined Utility Model Application Publication H2-19997
ADJDEFPA000057

ADJDEFPA000093.12

A1388

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 4



[seals:
Kunio Iki]

Utility Model Registration Applicant    Kunio Iki

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000058

ADJDEFPA000093.13

Drawings

FIG. 5

[seals:
Kunio Iki]



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997
ADJDEFPA000059

ADJDEFPA000093.14

A1390

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 6

[seals:
Kunio Iki]



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000060

ADJDEFPA000093.15

Drawings

FIG. 7

[seal:
Kunio Iki]



1230

Utility Model Registration Applicant    Kunio Iki

Unexamined Utility Model Application Publication H2-19997
ADJDEFPA000061

ADJDEFPA000093.16

## Unexamined Utility Model Application Publication H2-19997

Drawings

FIG. 8



[seal:
Kunio Iki]



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000062

**ADJDEFPA000093.17**

Drawings

FIG. 9

FIG. 2

[seal:
Kunio Iki]



FIG. 1



Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000063

**ADJDEFPA000093.18**

A1394

**Unexamined Utility Model Application Publication H2-19997**

Drawings

FIG. 10

[seals:
Kunio Iki]



FIG. 3

FIG. 2

FIG. 1

1233

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000064

ADJDEFPA000093.19

A1395

Drawings

FIG. 11



FIG. 3

[seals:
Kunio Iki]



FIG. 1

FIG. 2

1 2 3 4

Utility Model Registration Applicant    Kunio IKI

Unexamined Utility Model Application Publication H2-19997

ADJDEFPA000065

ADJDEFPA000093.20

A1396

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/011,366 | 12/06/2010 | 5855343 | 20145.0001.EP343 | 7040 |

90/011,316

7590     08/12/2011

| EXAMINER |
|---|
|  |

HIMANSHU AMIN, LLC
127 Public Square
57th Floor
Cleveland, OH  44114

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 08/12/2011

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

A1425

Application/Control Number: 90/011,366 and
90/011,316                                                          Page 4
Art Unit: 3993

### *Summary of the Proceeding to Date*

In reexamination 90/011,366, a Third Party Requester requested reexamination

of claims 1,2,5-8,10,14-17 and 19 of U.S. Patent No. 5,855,343 (hereinafter "the '343

patent") based upon the following proposed rejections:

A. Claims 1, 2, 5, 6, 8, 10 and 14-17 are anticipated by Irifune (JP-H2-19997) under
35USC 102(b).
B. Claims 1, 7, 8 and 19 are anticipated by Ma (US Patent No. 5,880,783) under 35
USC 102(e).
C. Claims 7 and 19 are rendered obvious by Irifune in view of Ma under 35 USC 103(a).

An order granting reexamination based on above substantial new questions of

patentability affecting claims 1,2,5-8,10,14-17 and 19 of the '343 patent was mailed on

December 21, 2010 (reexamination 90/011,366).

In reexamination 90/011,316 another Third Party Requester requested

reexamination of claims 1,10 and 19 of U.S. Patent No. 5,855,343 (hereinafter "the '343

patent) based upon the following proposed rejections:

A. Claims 1, 10 and 19 are anticipated by Ma (US Patent No. 5,880,783) under 35 USC
102(e).

B. Claims 1, 10 and 19 are obvious over Yamauchi (US Patent No. Des. 383,475) under
35 USC 103(a).

C. Claims 1, 10 and 19 are obvious over Yamauchi in view of Ma under 35 USC 103(a).

D. Claims 1, 10 and 19 are obvious over Yamauchi in view of Wakabayashi (US Patent
No. 5,808,672) under 35 USC 103(a).

E. Claims 1, 10 and 19 are obvious over Yamauchi in view of Ohmura (US Patent No.
4,493,542) under 35 USC 103(a).

Application/Control Number: 90/011,366 and
90/011,316                                                                    Page 5
Art Unit: 3993

F. Claims 1 and 10 are anticipated by Dovey (US Patent No. 4,526,308) under 35 USC
103(a).

An order granting reexamination based on above substantial new questions of

patentability affecting claims 1,10 and 19 of the '343 patent was mailed on March 23,

2011. The March 23, 2011 order did not find a SNQ for proposed rejection A

regarding claims 1 and 19 (as this would be a duplicate of the '366 reexam) or

proposed rejection B (as Yamauchi is seen as the technical equivalent of McAll,

which was relied upon during the original prosecution) See both the December 21,

2010 and the March 23, 2011 orders.

Reexamination was not requested or ordered for claims 3,4,9,11,12,13,18,20 and 21

of the '343 patent. Accordingly, these claims will not be examined in this merged

proceeding.

The patent owner did not file a statement under 37 CFR 1.530 for either

reexamination.


**Grounds of Rejection**
The following grounds of rejection are set forth:

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

A1432

Application/Control Number: 90/011,366 and
90/011,316                                                                                    Page 6
Art Unit: 3993

(b) the invention was patented or described in a printed publication in this or a foreign country or in
public use or on sale in this country, more than one year prior to the date of application for patent in
the United States.

(e) the invention was described in (1) an application for patent, published under section 122(b), by
another filed in the United States before the invention by the applicant for patent or (2) a patent
granted on an application for patent by another filed in the United States before the invention by the
applicant for patent, except that an international application filed under the treaty defined in section
351(a) shall have the effects for purposes of this subsection of an application filed in the United States
only if the international application designated the United States and was published under Article 21(2)
of such treaty in the English language.

Claims 1,2,5,6,8,10,14-17 and 19 are rejected under 35 U.S.C. 102(b) as being
anticipated by Irifune.

Irifune discloses a camera support apparatus which is shown supporting a
camera on a horizontal planar surface in figure 9-2 and on an object having first and
second surfaces having an edge intersecting the first and second surfaces in figure 10-
2. Irifune shows a hinge (around shaft 1) which is rotatably attached to the camera
using threaded camera attachment shaft 9. Although Irifune does not explicitly state
that the camera can rotate about the threaded post, such rotation is seen as inherent to
such a connection, as the post is designed to rotate to fasten the camera and the
camera can be securely fastened in any position using shaft 9 as an axis while the
camera rests on the camera fixed part 2. The large arm 3 and small arm 4 are seen as
a support frame which is rotatably attached to the hinge member and which, as shown
in figures 9-2 and 10-2, can support the camera on either a horizontal surface or
supported adjacent the edge between two inclined surfaces. The central shaft 1,
around which the large arm, small arm and camera fixed part rotate is perpendicular to

the camera attachment shaft 9, around which the camera can be rotated for proper

positioning.

In regard to claim 2, arms 3 and 4 are seen as the first and second portion of the

support frame. Figure 9-2 shows the arms in a first disposition with the distal

extremities of the arms engaging a generally horizontal planar surface. Figure 10

shows the arms engaging opposing outer surfaces to maintain the camera at an edge

between the two surfaces.

In regard to claim 5, Irifune shows nonslip rubber rings 12 attached to arms 3 and

4, so that the arms engage a generally horizontal surface at four locations and

unwanted rotation of the frame is avoided.

In regard to claim 6, figures 10-1 and 10-2 show the large leg contacting the

surface further away from the edge than the short leg contacts the opposite surface.

In regard to claim 8, the camera attachment shaft 9, which provides a pivoting

support for the camera is above the central portion of shaft 1, and is thus seen as being

located in a proximal end of the body. Irifune states that the structure is "(a) structure in

which a camera fixed part (2) and arms (3) and (4) can be freely rotated about a central

shaft (1)". This is seen as the body (camera fixed part 2) being able to rotate about the

second axis (shaft 1) relative to the support frame (arms 3 and 4).

In regard to claim 10, the camera supported by the Irifune device in figure 9-2 is

shown to have both a housing and a lens and the camera is shown supported on a

generally horizontal substantially planar surface. Figure 10 also shows the camera

housing and lens, but in this instance it is supported on an edge intersecting a first

surface and a second surface. The camera fixed part 2 is adapted to be rotatably

attached to the camera using shaft 9. While a pivotable connection between the

camera and the camera fixed part is not explicitly recited, "adapted to be rotatably

attached to the camera" is functional language, and the threaded shaft 9 is clearly

capable of mounting the camera in various orientations relative to the long sides of the

camera fixed part. Due to this potential movement, shaft 9 is seen as the first axis.

Arms 3 and 4 are seen as the support frame, as each arm is rotatably attached to shaft

1 (which also pivotably supports camera fixed part 2). Because of this arrangement,

shaft 1 forms the second axis of rotation relative to the support frame, with the first and

second axes being perpendicular and the second axis substantially parallel to the first

surface when the hinge member is supported on the object. As shown in figures 9 and

10, the arms can support the camera on either a planar surface or by contacting

opposite surfaces of an object by changing the disposition of the arms relative to the

second axis. As non-slip rings 12 are the parts of the frame which contact the surface,

the device of Irifune is seen to have two rear support elements and two front support

elements (the non-slip rings on each arm). When in the second disposition (with the

arms contacting opposite surfaces of an object) the non-slip rings associated with large

arm contact one surface, while the non-slip rings associated with the small arm contact

the opposite surface which will prevent the frame from rotating.

In regard to claims 14 and 15, figure 9 shows the front and rear support elements

(non-slip rubber rings 12) contacting the planar horizontal surface at a total of four

locations, with the non-slip surfaces preventing rotation of the support frame.

In regard to claim 16, Irifune uses a small arm (3) and a large arm (4). Irifune does not specify which is the front arm, and in fact has figures showing both the small arm in front (fig 11) and the large arm in front (fig 10). This is seen as evidence that Irifune shows an embodiment with the rear support element further away from the edge than the front support element. This is further seen as evidence of Irifune showing multiple camera positions relative to the first axis.

In regard to claim 17, the camera attachment shaft 9, which provides a pivoting support for the camera is above the central portion of shaft 1, and is thus seen as being located in a proximal end of the body. Irifune states that the structure is "(a) structure in which a camera fixed part (2) and arms (3) and (4) can be freely rotated about a central shaft (1)". This is seen as the body (camera fixed part 2) being able to rotate about the second axis (shaft 1) relative to the support frame (arms 3 and 4).

Claim 19 is seen as claiming the same structure as claim 1, with the claiming of the specific use, "for supporting a camera on a laptop camera". This is seen as intended use, which does not impart any structural elements to the claim. Irifune discloses that the disclosed camera support is designed for use in a variety of positions, including fastened to opposite surfaces of generally vertical opposing surfaces (as shown in figure 10 and described on page 7, "the back of a chair,… a guard rail, a wall, a fence". As claim 19 is an apparatus claim, and "for supporting a camera on a laptop computer", is functional language which the structure of Irifune is capable of performing, claim 19 is seen as anticipated by Irifune.

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Office Action dated August 12, 2011

      a.    *a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member* [emphasis added]; and

      b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

Contrary assertions in the Office Action, Irifune does not disclose or suggest *a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member* [emphasis added]. Rather, Irifune teaches that a camera can be screwed onto a mounting device using a camera attachment shaft (9) and camera attachment screws (10), (11). The purpose of the camera attachment shaft and the attachment screws is to attach the camera to the camera fixed part (2). Once the camera is attached to the camera fixed part (2), the camera, when the hinged member is so attached, cannot rotate about a first axis relative to the hinge member as in Patent Owner's claimed subject matter.

During the Examiner Interview, the Examiners indicated that they considered a partially threaded camera of Irifune to still be considered "attached" to the hinge member. Patent Owner's representative respectfully disagrees, and submits that the plain and ordinary meaning of the term "attached" is to be permanently fixed, joined, connected, or bound. *See e.g.*, Merriam-Webster Dictionary[1], Oxford English Dictionary[2], or Webster's New Universal

---

[1] "attached." *Merriam-Webster.com*. Merriam-Webster, 2011.

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Office Action dated August 12, 2011

Unabridged Dictionary[3]. A partially threaded camera is not joined, connected or bound to the hinge member. Rather, at best, provided the camera has been threaded sufficiently it can be suspended or hung as a result of the threads. The camera is not attached to the hinge member until fully screwed or threaded to the hinge member. However, at such point, the camera of Irifune is no longer rotatable relative to the hinge member. The foregoing distinction is supported by the Declaration of Expert John Vronay submitted herewith.

Furthermore, Irifune fails to disclose *a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member;* and *a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame*...[emphasis added]. The Office Action fails to clearly identify the alleged hinge member of Irifune. The Office Action states that the hinge is around shaft 1 but does not identify which element around shaft 1 is the alleged hinge that is adapted to be rotatably attached to the camera. Notwithstanding this lack of specificity, it is readily apparent that Irifune does not disclose any member, much less a hinge member, that is respectively attached to the camera as well as a support frame let alone such hinge member being respectively rotatably attached to both the camera and the support frame. Moreover, claim 1 further recites that the respective axes of rotation of the hinge member relative to the camera and the support are perpendicular - this feature is also clearly not disclosed by Irifune.

Claims 2, 5, 6, and 8 respectively depend from independent claim 1, and are not anticipated by Irifune for at least the same reasons noted above regarding claim 1.

In addition, claim 8 recites ... wherein the hinge member includes a body having a proximal and a distal end, *a pivot element at said proximal end of said body adapted to*

---

Web. 10 October 2011.

[2] "attached." Dictionary.oed.com. Oxford English Dictionary Online. 2nd ed. 1989.
Web. 10 October 2011.

[3] "attached." Webster's New Universal Unabridged Dictionary, 2nd ed, 1983.

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/011,316 | 12/30/2010 | 5855343 | 76958.00001 | 5680 |

7590    03/08/2012

HIMANSHU AMIN, LLC
127 Public Square
57th Floor
Cleveland, OH  44114

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 03/08/2012

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

A1460

Application/Control Number: 90/011,316 & 90/011,366          Page 4
Art Unit: 3993

   In reexamination 90/011,366, a Third Party Requester requested reexamination

of claims 1,2,5-8,10,14-17 and 19 of U.S. Patent No. 5,855,343 (hereinafter "the '343

patent") based upon the following proposed rejections:

A. Claims 1, 2, 5, 6, 8, 10 and 14-17 are anticipated by Irifune (JP-H2-19997) under
35USC 102(b).

B. Claims 1, 7, 8 and 19 are anticipated by Ma (US Patent No. 5,880,783) under 35
USC 102(e).

C. Claims 7 and 19 are rendered obvious by Irifune in view of Ma under 35 USC 103(a).


   An order granting reexamination based on above substantial new questions of

patentability affecting claims 1,2,5-8,10,14-17 and 19 of the '343 patent was mailed on

December 21, 2010 (reexamination 90/011,366).

   In reexamination 90/011,316 another Third Party Requester requested

reexamination of claims 1,10 and 19 of U.S. Patent No. 5,855,343 (hereinafter "the '343

patent) based upon the following proposed rejections:

A. Claims 1, 10 and 19 are anticipated by Ma (US Patent No. 5,880,783) under 35 USC
102(e).

B. Claims 1, 10 and 19 are obvious over Yamauchi (US Patent No. Des. 383,475) under
35 USC 103(a).

C. Claims 1, 10 and 19 are obvious over Yamauchi in view of Ma under 35 USC 103(a).

D. Claims 1, 10 and 19 are obvious over Yamauchi in view of Wakabayashi (US Patent
No. 5,808,672) under 35 USC 103(a).

E. Claims 1, 10 and 19 are obvious over Yamauchi in view of Ohmura (US Patent No.
4,493,542) under 35 USC 103(a).

F. Claims 1 and 10 are anticipated by Dovey (US Patent No. 4,526,308) under 35 USC
103(a).

Application/Control Number: 90/011,316 & 90/011,366                    Page 8
Art Unit: 3993

this dimension, across either the front of rear surface.  No support is in the specification

for the first support extending across this entire dimension, the "length of the edge".

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claims 22-30,32 and 34-39 are rejected under 35 U.S.C. 112, second paragraph,

as being indefinite for failing to particularly point out and distinctly claim the subject

matter which applicant regards as the invention.

Line 4 of claim 22 calls for the hinge member "adapted to be rotatably and fixedly

attached to the camera".  Dictionary.com defines fixed as "fastened, attached or placed

so as to be firm and not readily movable; firmly implanted; stationary; rigid."  By this

definition pieces that are "fixedly attached" will not be able to rotate.  The terms

rotatably and fixedly are seen to contradict each other.  Claim 32 also contains the

"rotatably and fixedly" language and claims 22-30 and 34-39 depend from claim 22, so

they are unclear due to this apparent contradiction.

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in
public use or on sale in this country, more than one year prior to the date of application for patent in
the United States.

Application/Control Number: 90/011,316 & 90/011,366                    Page 9
Art Unit: 3993

> (e) the invention was described in (1) an application for patent, published under section 122(b), by
> another filed in the United States before the invention by the applicant for patent or (2) a patent
> granted on an application for patent by another filed in the United States before the invention by the
> applicant for patent, except that an international application filed under the treaty defined in section
> 351(a) shall have the effects for purposes of this subsection of an application filed in the United States
> only if the international application designated the United States and was published under Article 21(2)
> of such treaty in the English language.

Claims 1,2,5,6,8,10,14-17,19,40,41 and 42 are rejected under 35 U.S.C. 102(b)
as being anticipated by Irifune.

Irifune discloses a camera support apparatus which is shown supporting a
camera on a horizontal planar surface in figure 9-2 and on an object having first and
second surfaces having an edge intersecting the first and second surfaces in figure 10-
2. Irifune shows a hinge (around shaft 1) which is rotatably attached to the camera
using threaded camera attachment shaft 9. Although Irifune does not explicitly state
that the camera can rotate about the threaded post, such rotation is seen as inherent to
such a connection, as the post is designed to rotate to fasten the camera and the
camera can be securely fastened in any position using shaft 9 as an axis while the
camera rests on the camera fixed part 2. The large arm 3 and small arm 4 are seen as
a support frame which is rotatably attached to the hinge member and which, as shown
in figures 9-2 and 10-2, can support the camera on either a horizontal surface or
supported adjacent the edge between two inclined surfaces. The central shaft 1,
around which the large arm, small arm and camera fixed part rotate is perpendicular to
the camera attachment shaft 9, around which the camera can be rotated for proper
positioning.

Application/Control Number: 90/011,316 & 90/011,366          Page 10
Art Unit: 3993

In regard to claim 2, arms 3 and 4 are seen as the first and second portion of the support frame. Figure 9-2 shows the arms in a first disposition with the distal extremities of the arms engaging a generally horizontal planar surface. Figure 10 shows the arms engaging opposing outer surfaces to maintain the camera at an edge between the two surfaces.

In regard to claim 5, Irifune shows nonslip rubber rings 12 attached to arms 3 and 4, so that the arms engage a generally horizontal surface at four locations and unwanted rotation of the frame is avoided.

In regard to claim 6, figures 10-1 and 10-2 show the large leg contacting the surface further away from the edge than the short leg contacts the opposite surface.

In regard to claim 8, the camera attachment shaft 9, which provides a pivoting support for the camera is above the central portion of shaft 1, and is thus seen as being located in a proximal end of the body. Irifune states that the structure is "(a) structure in which a camera fixed part (2) and arms (3) and (4) can be freely rotated about a central shaft (1)". This is seen as the body (camera fixed part 2) being able to rotate about the second axis (shaft 1) relative to the support frame (arms 3 and 4).

In regard to claim 10, the camera supported by the Irifune device in figure 9-2 is shown to have both a housing and a lens and the camera is shown supported on a generally horizontal substantially planar surface. Figure 10 also shows the camera housing and lens, but in this instance it is supported on an edge intersecting a first surface and a second surface. The camera fixed part 2 is adapted to be rotatably attached to the camera using shaft 9. While a pivotable connection between the

camera and the camera fixed part is not explicitly recited, "adapted to be rotatably attached to the camera" is functional language, and the threaded shaft 9 is clearly capable of mounting the camera in various orientations relative to the long sides of the camera fixed part. Due to this potential movement, shaft 9 is seen as the first axis. Arms 3 and 4 are seen as the support frame, as each arm is rotatably attached to shaft 1 (which also pivotably supports camera fixed part 2). Because of this arrangement, shaft 1 forms the second axis of rotation relative to the support frame, with the first and second axes being perpendicular and the second axis substantially parallel to the first surface when the hinge member is supported on the object. As shown in figures 9 and 10, the arms can support the camera on either a planar surface or by contacting opposite surfaces of an object by changing the disposition of the arms relative to the second axis. As non-slip rings 12 are the parts of the frame which contact the surface, the device of Irifune is seen to have two rear support elements and two front support elements (the non-slip rings on each arm). When in the second disposition (with the arms contacting opposite surfaces of an object) the non-slip rings associated with large arm contact one surface, while the non-slip rings associated with the small arm contact the opposite surface which will prevent the frame from rotating.

In regard to claims 14 and 15, figure 9 shows the front and rear support elements (non-slip rubber rings 12) contacting the planar horizontal surface at a total of four locations, with the non-slip surfaces preventing rotation of the support frame.

In regard to claim 16, Irifune uses a small arm (3) and a large arm (4). Irifune does not specify which is the front arm, and in fact has figures showing both the small

arm in front (fig 11) and the large arm in front (fig 10). This is seen as evidence that

Irifune shows an embodiment with the rear support element further away from the edge

than the front support element. This is further seen as evidence of Irifune showing

multiple camera positions relative to the first axis.

In regard to claim 17, the camera attachment shaft 9, which provides a pivoting

support for the camera is above the central portion of shaft 1, and is thus seen as being

located in a proximal end of the body. Irifune states that the structure is "(a) structure in

which a camera fixed part (2) and arms (3) and (4) can be freely rotated about a central

shaft (1)". This is seen as the body (camera fixed part 2) being able to rotate about the

second axis (shaft 1) relative to the support frame (arms 3 and 4).

Claim 19 is seen as claiming the same structure as claim 1, with the claiming of

the specific use, "for supporting a camera on a laptop camera". This is seen as

intended use, which does not impart any structural elements to the claim. Irifune

discloses that the disclosed camera support is designed for use in a variety of positions,

including fastened to opposite surfaces of generally vertical opposing surfaces (as

shown in figure 10 and described on page 7, "the back of a chair,... a guard rail, a wall,

a fence". As claim 19 is an apparatus claim, and "for supporting a camera on a laptop

computer", is functional language which the structure of Irifune is capable of performing,

claim 19 is seen as anticipated by Irifune.

Claim 40 is similar to claim 1, but specifies "a hinge member adapted to be

rotatably bound to the camera, said camera, when the hinge member is so rotatably

bound, rotating, about a first axis of rotation, relative to said hinge member;". The

"adapted to be" makes the limitation functional.  The fixed part 2 and the associated

screw are clearly capable of being bound to the camera to permit rotation (about the

screw as an axis).

Claim 41 is substantially similar to claim 40, with "joined" replacing "bound" in the

functional language.  The fixed part 2 and the screw of Irifune are capable of being

joined to the camera, as that is their stated purpose.  When so attached, the camera is

capable of rotating about the screw.

In regard to claim 42, the hinge member is seen to comprise the screw, which is

inserted into the housing of the camera during use.


### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

Claim 7 is rejected under 35 U.S.C. 103(a) as being unpatentable over Irifune in

view of Ma.

As discussed above, Irifune shows a camera support device which can be placed

in different configurations to be supported where the user desires.  Figure 2 shows the

camera in a position in which the camera is supported by opposing generally vertical

planar surfaces.  Irifune does not explicitly state that the device can be used to support

function if the parts were integrated into a unitary body. The same reasoning applies to

claims 23-25. Claim 33 depends from claim 31, so it is allowable for at least the above

reason. Claims 44 and 45 contain allowable subject matter, as none of the cited

references show or fairly teach a hinge member with a lip for rotatable attachment to the

camera. In regard to claims 46 and 47, none of the cited reference show or fairly teach

a front support that engages the front surface, and the intersection of the edge with both

the first and second surfaces.

### Response to Patent Owner's Remarks

While the camera support of Irifune is capable of being locked in place by

attachment shaft 9, it is clearly possible to loosen the attachment screw, to enable the

pivoting of the camera relative to support (fixed part 2) while the camera is still attached

to the support. This (the axis of screw 9) represents a first axis of rotation relative to the

hinge member. Patent owner (PO) states that the partially tightened screw is not

attached. PO gives a dictionary definition for attached as "permanently fixed, joined

connected or bound." Dictionary.com's definition is the final three words of this given

definition. When the screw is slightly loosened, the camera is still joined or connected

to the fixed part of the support. Thus, Irifune is seen to show a camera attached to a

support, as claimed. To support their position, PO submitted a declaration of John

Vronay. This declaration states in part, "a rotatably attached connection describes a

joint in which two members are attached or fixed but the connection allows rotation of at

least one member relative to the other about at least one axis with control of a rotated

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/011,316 | 12/30/2010 | 5855343 | 76958.00001 | 5680 |

7590    08/30/2012

HIMANSHU AMIN, LLC
127 Public Square
57th Floor
Cleveland, OH  44114

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 08/30/2012

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

Application/Control Number: 90/011,316 and
90/011,366                                                                    Page 7
Art Unit: 3993

noted using the earlier amendment as a basis, instead of the patent, so a Notice of

Informal Amendment was mailed June 20, 2012.  A compliant amendment was received

July 20, 2012.


**Grounds of Rejection**
The following grounds of rejection are set forth:


### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in
public use or on sale in this country, more than one year prior to the date of application for patent in
the United States.


Claims 1,2,5,6,8,10,14-17 and 19 are rejected under 35 U.S.C. 102(b) as being

anticipated by Irifune.

Irifune discloses a camera support apparatus which is shown supporting a

camera on a horizontal planar surface in figure 9-2 and on an object having first and

second surfaces having an edge intersecting the first and second surfaces in figure 10-

2.  Irifune shows a hinge (around shaft 1) which is rotatably attached to the camera

using threaded camera attachment shaft 9.  Although Irifune does not explicitly state

that the camera can rotate about the threaded post, such rotation is seen as inherent to

such a connection, as the post is designed to rotate to fasten the camera and the

camera can be securely fastened in any position using shaft 9 as an axis while the

camera rests on the camera fixed part 2.   The large arm 3 and small arm 4 are seen as

a support frame which is rotatably attached to the hinge member and which, as shown

in figures 9-2 and 10-2, can support the camera on either a horizontal surface or

supported adjacent the edge between two inclined surfaces.  The central shaft 1,

around which the large arm, small arm and camera fixed part rotate is perpendicular to

the camera attachment shaft 9, around which the camera can be rotated for proper

positioning.

In regard to claim 2, arms 3 and 4 are seen as the first and second portion of the

support frame.  Figure 9-2 shows the arms in a first disposition with the distal

extremities of the arms engaging a generally horizontal planar surface.  Figure 10

shows the arms engaging opposing outer surfaces to maintain the camera at an edge

between the two surfaces.

In regard to claim 5, Irifune shows nonslip rubber rings 12 attached to arms 3 and

4, so that the arms engage a generally horizontal surface at four locations and

unwanted rotation of the frame is avoided.

In regard to claim 6, figures 10-1 and 10-2 show the large leg contacting the

surface further away from the edge than the short leg contacts the opposite surface.

In regard to claim 8, the camera attachment shaft 9, which provides a pivoting

support for the camera is above the central portion of shaft 1, and is thus seen as being

located in a proximal end of the body.  Irifune states that the structure is "(a) structure in

which a camera fixed part (2) and arms (3) and (4) can be freely rotated about a central

shaft (1)". This is seen as the body (camera fixed part 2) being able to rotate about the

second axis (shaft 1) relative to the support frame (arms 3 and 4).

In regard to claim 10, the camera supported by the Irifune device in figure 9-2 is

shown to have both a housing and a lens and the camera is shown supported on a

generally horizontal substantially planar surface. Figure 10 also shows the camera

housing and lens, but in this instance it is supported on an edge intersecting a first

surface and a second surface. The camera fixed part 2 is adapted to be rotatably

attached to the camera using shaft 9. While a pivotable connection between the

camera and the camera fixed part is not explicitly recited, "adapted to be rotatably

attached to the camera" is functional language, and the threaded shaft 9 is clearly

capable of mounting the camera in various orientations relative to the long sides of the

camera fixed part. Due to this potential movement, shaft 9 is seen as the first axis.

Arms 3 and 4 are seen as the support frame, as each arm is rotatably attached to shaft

1 (which also pivotably supports camera fixed part 2). Because of this arrangement,

shaft 1 forms the second axis of rotation relative to the support frame, with the first and

second axes being perpendicular and the second axis substantially parallel to the first

surface when the hinge member is supported on the object. As shown in figures 9 and

10, the arms can support the camera on either a planar surface or by contacting

opposite surfaces of an object by changing the disposition of the arms relative to the

second axis. As non-slip rings 12 are the parts of the frame which contact the surface,

the device of Irifune is seen to have two rear support elements and two front support

elements (the non-slip rings on each arm). When in the second disposition (with the

arms contacting opposite surfaces of an object) the non-slip rings associated with large

arm contact one surface, while the non-slip rings associated with the small arm contact

the opposite surface which will prevent the frame from rotating.

In regard to claims 14 and 15, figure 9 shows the front and rear support elements

(non-slip rubber rings 12) contacting the planar horizontal surface at a total of four

locations, with the non-slip surfaces preventing rotation of the support frame.

In regard to claim 16, Irifune uses a small arm (3) and a large arm (4). Irifune

does not specify which is the front arm, and in fact has figures showing both the small

arm in front (fig 11) and the large arm in front (fig 10). This is seen as evidence that

Irifune shows an embodiment with the rear support element further away from the edge

than the front support element. This is further seen as evidence of Irifune showing

multiple camera positions relative to the first axis.

In regard to claim 17, the camera attachment shaft 9, which provides a pivoting

support for the camera is above the central portion of shaft 1, and is thus seen as being

located in a proximal end of the body. Irifune states that the structure is "(a) structure in

which a camera fixed part (2) and arms (3) and (4) can be freely rotated about a central

shaft (1)". This is seen as the body (camera fixed part 2) being able to rotate about the

second axis (shaft 1) relative to the support frame (arms 3 and 4).

Claim 19 is seen as claiming the same structure as claim 1, with the claiming of

the specific use, "for supporting a camera on a laptop camera". This is seen as

intended use, which does not impart any structural elements to the claim. Irifune

discloses that the disclosed camera support is designed for use in a variety of positions,

Application/Control Number: 90/011,316 and
90/011,366                                                                          Page 11
Art Unit: 3993

including fastened to opposite surfaces of generally vertical opposing surfaces (as

shown in figure 10 and described on page 7, "the back of a chair,... a guard rail, a wall,

a fence". As claim 19 is an apparatus claim, and "for supporting a camera on a laptop

computer", is functional language which the structure of Irifune is capable of performing,

claim 19 is seen as anticipated by Irifune.


### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

Claim 7 is rejected under 35 U.S.C. 103(a) as being unpatentable over Irifune in

view of Ma.

As discussed above, Irifune shows a camera support device which can be placed

in different configurations to be supported where the user desires. Figure 2 shows the

camera in a position in which the camera is supported by opposing generally vertical

planar surfaces. Irifune does not explicitly state that the device can be used to support

a camera on a display screen for a laptop computer. Figure 3 of Ma shows the camera

supported by the screen of a laptop computer, with the circuit box 3 forming the rear leg

on the back of the display screen and the hook plate pivoted to its open position to

Application/Control Number: 90/011,316 and
90/011,366                                                    Page 13
Art Unit: 3993

above, such a connection is not shown in the cited art. Claim 43 requires the hinge

member to be capable of being inserted into a joint within a housing of the camera.

This is not shown by the cited prior art. Claims 44 and 45 are allowable, as none of the

cited references show or fairly teach a hinge member with a lip for rotatable attachment

to the camera. In regard to claims 46 and 47, none of the cited references show or

fairly teach a front support that engages the front surface, and the intersection of the

edge with both the first and second surfaces. In regard to claim 48, the cited references

fail to show or fairly teach the support frame having a front support element that can sit

atop a portion of the length of the edge between the first and second surfaces when

supporting the camera. The support of Irifune contacts only the first and second

surfaces and would not function if one of the legs was attached to the edge between

surfaces.


### Response to Patent Owner's Remarks

The amendments made by the patent owner have overcome the rejections under

35 USC 112 (both first and second paragraphs).

While the camera support of Irifune is capable of being locked in place by

attachment shaft 9, it is clearly possible to loosen the attachment screw, to enable the

pivoting of the camera relative to support (fixed part 2) while the camera is still attached

to the support. This (the axis of screw 9) represents a first axis of rotation relative to the

hinge member. Patent owner (PO) states that the partially tightened screw is not

attached. PO gives a dictionary definition for attached as "permanently fixed, joined,

connected or bound." Dictionary.com's definition is the final three words of this given

definition (not counting "or"). When the screw is slightly loosened, the camera is still

joined or connected to the fixed part of the support. Thus, Irifune is seen to show a

camera attached to a support, as claimed. To support their position, PO submitted a

declaration of John Vronay. This declaration states in part, "a rotatably attached

connection describes a joint in which two members are attached or fixed but the

connection allows rotation of at least one member relative to the other about at least

one axis with control of a rotated position without initiating disassembly of the

members." In the opinion of the examiner, this definition reads limitations into the

claims that are not found in the common definition of the terms, or having a definition in

the specification. If the screw of Irifune was slightly loosened, the camera would be

able to pivot and if the camera were picked up, the support would be picked up as well,

through the action of the screw. Loosening the screw does not require the

deconstruction of any component of the system.

Irifune's fixed part (2) is seen as the hinge member, as the camera can pivot

about one axis (screw 9) at one end (proximal) of the hinge member and a support

frame (legs 3 and 4) pivots about a perpendicular axis at the other (distal) end. This is

seen to meet the claimed limitations of claims 8 and 17. It is further noted that

independent claims 1 and 10 use the functional phrase "a hinge member adapted to be

rotatably attached". A reference that is capable of performing this function is seen to

meet the limitation. The hinge member (2) of Irifune is clearly capable of being attached

(connected or joined to the camera), while enabling rotation of the camera relative to the

Application/Control Number: 90/011,316 and
90/011,366                                                                                  Page 15
Art Unit: 3993

hinge member.  The examiner agrees that if the claims are amended to clearly claim

that the hinge is permanently, yet rotatably fastened to the camera, Irifune could be

overcome. The newly added claims clearly claim that the connection is permanent and

able to rotate (and have thus been indicated as allowable).  The original patent claims

which remain rejected use only functional language to establish a rotating connection

between parts, and Irifune is capable of performing this function.

PO states that figure 2 of Irifune shows an unthreaded hole through fixed part 2.

It is unclear how an unthreaded hole would overcome the rejection.  If the hole is

unthreaded, it is still possible (and easier than it would be if the hole were threaded) to

rotate fixed part 2, while the screw is still firmly attached to the camera.

PO states that Irifune does not show the camera rotating about a first axis of

rotation relative to the hinge member as claimed in claim 10.  The camera can pivot

about the screw, which provides an axis of rotation relative to the hinge member (2).


**All** correspondence relating to this *ex parte* reexamination proceeding should be
directed:

   By EFS:    Registered users may submit via the electronic filing system EFS-Web, at
                  https://efs.uspto.gov/efile/myportal/efs-registered.


  By Mail to:  Mail Stop *Ex Parte* Reexam
                Central Reexamination Unit
                Commissioner for Patents
                United States Patent & Trademark Office
                P.O. Box 1450
                Alexandria, VA 22313-1450

Attorney Docket No. GMGP101US

CERTIFICATE OF TRANSMISSION
I hereby certify that this correspondence (along with any paper referred to as being attached or enclosed) is
being submitted *via* the USPTO EFS Filing System on the date shown below to Mail Stop Ex Parte Reexam,
Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Date: September 20, 2012 _____        /Himanshu S. Amin/ _____
                                          Himanshu S. Amin

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| Application No(s). | : | 90/011,366 and 90/011,316 | Confirmation No. | 5680 |
|---|---|---|---|---|
| Patent No. | : | 5,855,343 | Patentee: | David E. Krekelberg |
| Assignee | : | Global Media Group LLC | | |
| Filed | : | March 7, 1997 | | |
| Art Unit | : | 3993 | | |
| Examiner | : | William C. Doerrler | | |
| Docket No. | : | GMGP101US | | |

Mail Stop Ex Parte Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

### REPLY TO FINAL OFFICE ACTION DATED AUGUST 30, 2012

Dear Sir,

This is in response to the Final Office Action dated August 30, 2012. Favorable reconsideration of the subject patent under reexamination is respectfully requested in view of the following amendments and comments. The Commissioner is authorized to charge any fees due in relation to this filing to Deposit Account No. 50-1063 [GMGP101US].

**A Marked-Up Version of All Pending Claims** begins on page 2 of this paper.

**Remarks/Arguments** begin on page 15 of this paper.

A1515

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

### Listing of Claims:

1. (Cancelled - Subject to Reexamination)

2. (Cancelled - Subject to Reexamination)

3. (Not Subject to Reexamination)   Apparatus according to claim 2 wherein the support frame includes a cover adapted to protect the camera lens when the camera is rotated about the second axis until the camera is between the first portion and the second portion.

4. (Not Subject to Reexamination)   Apparatus according to claim 3 wherein the first portion of the support frame further includes said cover, said cover being mounted at the distal end of the first portion and adapted the lens of the camera.

5. (Cancelled - Subject to Reexamination)

6. (Cancelled - Subject to Reexamination)

7. (Cancelled - Subject to Reexamination)

8. (Cancelled - Subject to Reexamination)

9. (Not Subject to Reexamination)   Apparatus according to claim 8 wherein the pivot element has a bore along the first axis of rotation to receive an electrical wiring harness and pass said wiring harness to the camera.

10. (Cancelled - Subject to Reexamination)

A1516

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

11. (Not Subject to Reexamination)  Apparatus according to claim 10 wherein the support frame adapted to protect the camera when the camera is rotated about the second axis towards the rear support element of the support frame until the camera is between the rear support element and the first and second front support elements, and is releasably held between the rear support element and the first and second front support elements.

12. (Not Subject to Reexamination)  Apparatus according to claim 11 wherein the first and second front support elements are spaced a distance apart, and wherein said distance is less than a diameter of the housing of the camera so that as the camera is being rotated about the second axis in the direction towards the rear support element, said housing passes between the first and second front support elements and the first and second front support elements resiliently flex outwardly to accommodate passage of said housing, said housing being releasably held once passing between the first and second front support elements by the rear support element engaging said housing at the lens.

13. (Not Subject to Reexamination)  Apparatus according to claim 11 wherein the first portion of the support frame further has a cover, said cover being mounted at a distal end of the rear support element and adapted to receive the lens of the camera when the camera is releasably held between the rear support element and the first and second front support elements.

14. (Cancelled - Subject to Reexamination)

15. (Cancelled - Subject to Reexamination)

16. (Cancelled - Subject to Reexamination)

17. (Cancelled - Subject to Reexamination)

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

18. (Not Subject to Reexamination)   Apparatus according to claim 17 wherein the pivot element
has a bore along the first axis of rotation to receive said electrical wiring harness and pass said
wiring harness to the camera.

19. (Cancelled - Subject to Reexamination)

20. (Not Subject to Reexamination)   Apparatus for supporting a camera having a lens on a
substantially level surface, comprising:

   a.   a hinge member adapted to be rotatably attached to the camera, the camera
rotating about a first axis of rotation relative to said hinge member; and

   b.   a support frame rotatably attached to said hinge member and configured to
support said hinge member on a generally horizontal, substantially planar surface, said hinge
member rotating about a second axis of rotation relative to said support frame, said first axis of
rotation being generally perpendicular to said second axis of rotation, said second axis of rotation
being substantially parallel to the generally horizontal, substantially planar surface when said
hinge member is supported on the generally horizontal, substantially planar surface, said support
frame having a first portion and a second portion wherein said support frame protects the camera
when said hinge member is not supported on the generally horizontal, substantially planar
surface, and when the camera is rotated around said second axis in a direction from said second
portion towards said first portion of said support frame until the camera is between said first
portion and said second portion and is releasably held between said first portion and said second
portion.

21. (Not Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on an
object having a first surface and a second surface, wherein a thickness measured between the
first surface and the second surface defines an edge therebetween, comprising:

Page 4 of 16

**A1518**

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so adapted, rotating about a first axis of rotation relative to said hinge member; and

b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported by said support frame on the object, said support frame supporting said hinge member on the object when said first surface is inclined from a substantially horizontal position, the camera being maintained adjacent the edge when an uppermost extremity of the object is the edge, rotation of said support frame being precluded about an axis substantially parallel to said second axis, said second axis being substantially parallel to said edge, said support frame having a first portion and a second portion wherein said support frame releasably holds and protects the camera when said hinge member is not supported by said support frame on the object and the camera is rotated around said second axis in a direction from said second portion towards said first portion of said support frame until the camera is between said first portion and said second portion and is releasably held between said first portion and said second portion.

22. (Pending - Subject to Reexamination) Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

a. a hinge member adapted to be rotatably and permanently attached to the camera, said camera, when the hinge member is so permanently attached, rotating, about a first axis of rotation, relative to said hinge member; and

A1519

tilted down, the angle at which the camera is tilted will change and the lens of the camera will be pointing up when the camera has been rotated 180 degrees.

    B.    Construed Claim Terms

    29.    In reviewing the claims of the '343 Patent and formulating my opinions in this case, I have followed the constructions determined by the Court and agreed to by the parties. Those constructions are summarized in the following chart:

| '343 Claim Term | Construction |
| --- | --- |
| Hinge Member | A structural element that joins to another for rotation |
| Rotatably attached / adapted to be rotatably attached / adapted to rotatably attached | No construction necessary, sufficiently defined in the claims; subject to the Court's resolution of the scope of the claims that "rotatably attached objects" are "limited to a single axis of rotation." |
| Support Frame | No construction necessary, sufficiently defined in the claims; subject to the Court's resolution of the scope of the claims |
| Disposition | A configuration or arrangement of the support frame |
| "Hingedly attached/hingedly attaching" | Connected or joined via a hinge joint |

## VII.   THE ACCUSED PRODUCTS

    30.    In his report, and more particularly in his corrected Supplemental Report, Dr. Muskivitch identifies the following accused webcams regarding Newegg, HP, Gear Head, and Sakar (collectively the "Accused Products"):

Accused Webcams identified with Newegg[1]:

| Supplier | Brand | Newegg/Rosewill SKU |
|---|---|---|
| Guillemot | HERCULES CLASSIC A/K/A DELUXE | 26-606-004__WEBCAM HERCULES 4780401 DELUXE RT<br>26-606-006__WEBCAM HERCULES 4780466 RT<br>26-606-007__WEBCAM HERCULES CLASSIC SILVER RT |
| Guillemot | HERCULES DUALPIX A/K/A Exchange, Emotion, Sunset, Infinite, HD | 26-606-005__WEBCAM HERCULES 4780463 RT<br>26-606-014__WEBCAM HERCULES 4780655 R<br>26-606-011__WEBCAM HERCULES 4780515 RT,<br>26-606-002__WEBCAM HERCULES DUALPIX HD RT |
| iMicro | iMICRO IMV6/ZB029 | 26-563-004__WEBCAM IMICRO IMV6 RTL<br>26-717-019__WEBCAM IMC \| ZB029 R |
| iMicro | IMICRO CH-8118 | 26-717-012__WEBCAM IMC CH-8118 R |
| Rosewill | Rosewill RCM-8163 | RCM-8163 |

Accused webcams identified with HP[2]:

| Supplier | Brand | HP SKU |
|---|---|---|
| HP | HP Elite/Elite Autofocus | HP GX607AA, aka AU927AA |
| HP | HP 2 Megapixel Webcam | HP RZ406AA, aka EW099AA, EW191AA, GS360AA |

---

[1] My analysis of the Hercules-brand webcams applies to other retailers in the suit, including Best Buy Co., Inc., Best Buy Stores, LP, BestBuy.com, LLC (collectively "Best Buy"), Wal-Mart Stores, Inc., and Office Depot, Inc.

[2] I have been informed that HP-branded webcams sourced from Chicony Global, Ltd have been licensed by AdjustaCam and are therefore not in issue. I understand that Dr. Muskivitch's report still includes one Chicony webcam, the QP896AT, but that this inclusion is in error. Therefore, my report addresses only those webcams identified with respect to HP that are not licensed.

In addition, I have been informed that AdjustaCam's damages report also included another HP branded webcam, corresponding to model number RD345AA. However, Dr. Muskivitch's report does not identify this webcam as being associated with HP at all nor does it provide any infringement-related analysis. Therefore, my report is limited only to those webcam models that Dr. Muskivitch's report has identified and analyzed as being infringing.

Accused webcams identified with Gear Head:

| Supplier | Brand | Gear Head SKU |
|----------|-------|---------------|
| Gear Head | Gear Head WC4500 | WC4500 |
| Gear Head | Gear Head WC3301 | WC3301 |
| Gear Head | Gear Head WC5351 | Gear Head WC5351 |
| Gear Head | Gear Head WC7351 | Gear Head WC7351 |

Accused webcams identified with Sakar and Fry's:

| Supplier | Brand | Sakar SKU |
|----------|-------|-----------|
| Sakar | A4 Tech PK-720MJ | |
| Sakar | Kodak W100 | |

31.    Many of the accused products have a ball-and-socket design. In these products, the camera rotates relative to the support frame via a ball-and-socket. The ball-and-socket of these designs enables rotation about more than a single axis. The following accused products have such a ball-and-socket design and are referred to throughout the remainder of my report as the ("Ball-and-Socket Accused Products"):

1. Hercules Classic/Deluxe webcams
2. Hercules DualPix/Exchange/Emotion/Sunset/Infinite/HD webcams
3. iMicro CH-8118 webcam
4. Rosewill RCM-8163 webcam
5. Gear Head WC4500 webcam
6. Gear Head WC330I webcam sold after April 19, 2011
7. Gear Head WC535I webcam sold after April 19, 2011
8. Gear Head WC735I webcam sold after April 19, 2011
9. A4 Tech PK-720MJ
10. Kodak W100

32.    One of the accused products (the iMicro IMV6/ZB029) has a traditional pan-and-tilt design.

- 12 -

**A1757**

EXHIBIT 3
NON-INFRINGEMENT OF ROSEWILL RCM-8163

| '343 Patent Claim | Rosewill RCM-8163 |
|---|---|
| 1. Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation.<br><br>Therefore, I shall focus my analysis of the Rosewill RCM-8163 product to the claim limitations recited below. |
| a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The Rosewill RCM-8163 does not include a hinge member rotatably attached to the camera such that the camera rotates about a first axis of rotation relative to the hinge member. Hinge member having been defined as a structural element that joins to another for rotation.<br><br>The structural element that the camera of the Rosewill RCM-8163 is mounted on rotates relative to the camera clip in multiple axes of rotation via a ball-and-socket joint. As Figure 1 illustrates, the ball- and-socket joint of the Rosewill RCM-8163 consists of a ball resting in a socket within the camera clip, and a stem connecting the camera to the ball:<br><br><br>*Figure 1 – Ball-and-socket joint of Rosewill RCM-8163*<br><br>The top of the stem is fixed to the camera, and the bottom of the stem is fixed to the ball. The stem does not rotate independent of, or relative to, the ball. The stem does not rotate independent of, or relative to, the camera.<br><br>Dr. Muskivitch identifies the camera clip of the Rosewill RCM-8163 as the "support frame" and the ball, socket, and stem of the Rosewill RCM-8163 as the "hinge member." |

Case: 13-1665   Document: 97-2   Page: 258   Filed: 12/11/2014

EXHIBIT 3
NON-INFRINGEMENT OF ROSEWILL RCM-8163

| '343 Patent Claim | Rosewill RCM-8163 |
|---|---|
|  | However, the camera is fixed to what he calls the hinge member and cannot rotate relative to said hinge member.  Because the hinge member is not rotatably attached, and cannot rotate relative to, the camera, the camera does not rotate "about a first axis of rotation relative to [the] hinge member." |
| b.  a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, | The Rosewill RCM-8163 does not include a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object.<br><br>The support frame of the Rosewill RCM-8163 is not "rotatably attached" to the hinge member, as the Court has construed that term.  This is because what Dr. Muskivitch identifies as the support frame of the Rosewill RCM-8163 attaches to what he identifies the hinge member in such a way that the support frame and hinge member rotate relative to one another about multiple axes.  Figure 2 shows a close-up of the ball and socket, illustrating the multiple axes of rotation:<br><br><br><br>*Figure 2 – Ball-and-socket joint of Rosewill RCM-8163* |
| said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when | The Rosewill RCM-8163 does not include a hinge member rotating about a second axis of rotation relative to a support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object. |

Case: 13-1665     Document: 97-2     Page: 259     Filed: 12/11/2014

EXHIBIT 3
NON-INFRINGEMENT OF ROSEWILL RCM-8163

| '343 Patent Claim | Rosewill RCM-8163 |
|---|---|
| said hinge member is supported on the object, | As described above, the Rosewill RCM-8163 does not include a hinge member rotatably attached to a camera and, therefore, does not include the claimed "first axis of rotation." Because the Rosewill RCM-8163 does not have the "first axis of rotation," it does not have the "second axis of rotation," let alone a second axis of rotation that is "generally perpendicular to" the first axis of rotation. |
| | In addition, and as described above, what Dr. Muskivitch identifies as the hinge member of the Rosewill RCM-8163 rotates relative to what he identifies as the support frame in a multiple axes of rotation. Therefore, the hinge member does not rotate in a single axis of rotation (the claimed "Second Axis of Rotation") relative to the support frame. |
| said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | As described above, the Rosewill RCM-8163 does not include a support frame rotatably attached to the hinge member or a support frame that rotates relative to the hinge member in the second axis of rotation. Because the Rosewill RCM-8163 does not include the claimed support frame, it does not include "*said support frame* having a first disposition positioned on said generally horizontal, substantially planar surface." |
| 7. Apparatus according to claim 1 wherein the object is a display screen for a laptop computer, and the second surface is the front of the display screen and the first surface is the back of the display screen. | See above analysis for claim 1 of the '343 Patent. |
| 19. A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation. |
| | Therefore, I shall focus my analysis of the Rosewill RCM-8163 product to the claim limitations recited below. |
| a.  a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | *See* above to corresponding element of claim 1 of the '343 Patent. |

EXHIBIT 3
NON-INFRINGEMENT OF ROSEWILL RCM-8163

| '343 Patent Claim | Rosewill RCM-8163 |
|---|---|
| b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | The Rosewill RCM-8163 does not include a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. |

What Dr. Muskivitch identifies as the support frame of the Rosewill RCM-8163 is not "hingedly attached" to what he identifies as the hinge member based on the parties' agreed construction of "hingedly attached." This is because the support frame attaches to the hinge member via a ball-and-socket joint, whereas claim 19 requires that the hinge member connect or join to the support frame via a hinge joint. The Rosewill RCM-8163 contains no such hinge joint.

Figure 3 shows a close-up of the ball and socket, illustrating the multiple axes of rotation of the support frame with respect to the rest of the apparatus:



*Figure 3 – Ball-and-socket joint of Rosewill RCM-8163*

The Rosewill RCM-8163 does not include a hinge member rotating about a second axis of rotation relative to a support frame for the same reasons described in connection with claim 1. See above.

EXHIBIT 4

NON-INFRINGEMENT OF HERCULES CLASSIC/DELUXE

| '343 Patent Claim | Hercules Classic/Deluxe[1] |
|---|---|
| 1. Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation.<br><br>Therefore, I shall focus my analysis of the Hercules Classic/Deluxe products to the claim limitations recited below. |
| a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The Hercules Classic/Deluxe Webcams do not include a hinge member rotatably attached to the camera such that the camera rotates about a first axis of rotation relative to the hinge member. Hinge member having been defined as a structural element that joins to another for rotation.<br><br>The structural element that the camera of the Hercules Classic/Deluxe Webcams is mounted on rotates relative to the camera clip in multiple axes of rotation via a ball-and-socket joint. As Figure 1 illustrates, the ball-and-socket joint of the Hercules Classic/Deluxe Webcams consists of a ball resting in a socket within the camera clip, and a stem connecting the camera to the ball: |

[1] My opinions concerning the Hercules Classic/Deluxe Webcams apply to all Hercules Classic/Deluxe webcams identified in Dr. Muskivitch's report, all of which include the same functionality for purposes of my analysis. These products include the Hercules Classic, Hercules Classic Link, Hercules RT, Hercules Deluxe RT, Hercules Deluxe Optical Glass, and Hercules Classic Silver RT.

EXHIBIT 4
NON-INFRINGEMENT OF HERCULES CLASSIC/DELUXE

| '343 Patent Claim | Hercules Classic/Deluxe[1] |
|---|---|
| |  *Figure 1 – Ball-and-socket joint of a Hercules Classic/Deluxe Webcam* The top of the stem is fixed to the camera, and the bottom of the stem is fixed to the ball. The stem does not rotate independent of, or relative to, the ball. The stem does not rotate independent of, or relative to, the camera. Dr. Muskivitch identifies the camera clip of the Hercules Classic/Deluxe Webcams as the "support frame" and the ball, socket, and stem of the Hercules Classic/Deluxe Webcams as the "hinge member." However, the camera is fixed to what he calls the hinge member and cannot rotate relative to said hinge member. Because the hinge member is not rotatably attached, and cannot rotate relative to, the camera, the camera does not rotate "about a first axis of rotation relative to [the] hinge member." |
| b.   a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, | The Hercules Classic/Deluxe Webcams do not include a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object. The support frame of the Hercules Classic/Deluxe Webcams is not "rotatably attached" to the hinge member, as the Court has construed that term. This is because what Dr. Muskivitch identifies as the support frame of the Hercules Classic/Deluxe Webcams |

EXHIBIT 4
NON-INFRINGEMENT OF HERCULES CLASSIC/DELUXE

| '343 Patent Claim | Hercules Classic/Deluxe[1] |
|---|---|
| | attaches to what he identifies the hinge member in such a way that the support frame and hinge member rotate relative to one another about multiple axes.  Figure 2 shows a close-up of the ball and socket, illustrating the multiple axes of rotation:<br><br><br><br>*Figure 2 –Hercules Classic/Deluxe Webcam Shown With Camera Detached from Clip* |
| said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The Hercules Classic/Deluxe Webcams do not include a hinge member rotating about a second axis of rotation relative to a support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object.<br><br>As described above, the Hercules Classic/Deluxe Webcams do not include a hinge member rotatably attached to a camera and, therefore, do not include the claimed "first axis of rotation."  Because the Hercules Classic/Deluxe Webcams do not have the "first axis of rotation," they do not have the "second axis of rotation," let alone a second axis of rotation |

EXHIBIT 4
NON-INFRINGEMENT OF HERCULES CLASSIC/DELUXE

| '343 Patent Claim | Hercules Classic/Deluxe[1] |
|---|---|
| | that is "generally perpendicular to" the first axis of rotation. In addition, and as described above, what Dr. Muskivitch identifies as the hinge member of the Hercules Classic/Deluxe Webcams (a ball and socket) rotates relative to what he identifies as the support frame in multiple axes of rotation. Therefore, the hinge member does not rotate in a single axis of rotation (the claimed "second axis of rotation") relative to the support frame. |
| said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | As described above, the Hercules Classic/Deluxe Webcams do not include a support frame rotatably attached to the hinge member or a support frame that rotates relative to the hinge member in the second axis of rotation. Because the Hercules Classic/Deluxe Webcams do not include the claimed support frame, they do not include "*said support frame* having a first disposition positioned on said generally horizontal, substantially planar surface. |
| 7. Apparatus according to claim 1 wherein the object is a display screen for a laptop computer, and the second surface is the front of the display screen and the first surface is the back of the display screen. | See above analysis for claim 1 of the '343 Patent. |
| 19. A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation. Therefore, I shall focus my analysis of the Hercules Classic/Deluxe products to the claim limitations recited below. |
| a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | *See* above to corresponding element of claim 1 of the '343 Patent. |
| b. a support frame hingedly attached to said hinge member to engagingly | The Hercules Classic/Deluxe Webcams do not include a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said |

EXHIBIT 4
NON-INFRINGEMENT OF HERCULES CLASSIC/DELUXE

| '343 Patent Claim | Hercules Classic/Deluxe[1] |
|---|---|
| support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. <br><br> What Dr. Muskivitch identifies as the support frame of the Hercules Classic/Deluxe Webcams is not "hingedly attached" to what he identifies as the hinge member based on the parties' agreed construction of "hingedly attached." This is because the support frame attaches to the hinge member via a ball-and-socket joint, whereas claim 19 requires that the hinge member connect or join to the support frame via a hinge joint. The Hercules Classic/Deluxe Webcams contain no such hinge joint. <br><br> Figure 3 shows a close-up of the ball-and-socket joint: <br><br>  <br><br> *Figure 3 – Ball-and-socket joint of Hercules Classic/Deluxe Webcam* <br><br> The Hercules Classic/Deluxe Webcams do not include a hinge member rotating about a second axis of rotation relative to a support frame for the same reasons described in connection with claim 1. See above. |

- 5 -

EXHIBIT 5
NON-INFRINGEMENT OF HERCULES DUALPIX PRODUCTS

| '343 Patent Claim | Hercules Dualpix[1] |
|---|---|
| 1. Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation.<br><br>Therefore, I shall focus my analysis of the Hercules Dualpix products to the claim limitations recited below. |
| a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The Hercules Dualpix Webcams do not include a hinge member rotatably attached to the camera such that the camera rotates about a first axis of rotation relative to the hinge member. Hinge member having been defined as a structural element that joins to another for rotation.<br><br>The structural element that the camera of the Hercules Dualpix Webcams is mounted on rotates relative to the camera clip in multiple axes of rotation via a ball-and-socket joint. As Figure 1 illustrates, the ball-and-socket of the Hercules Dualpix Webcams consists of a ball resting in a socket within the camera clip: |

---

[1] My opinions concerning the Hercules Dualpix Webcams apply to all Hercules Dualpix webcams identified in Dr. Muskivitch's report, all of which have the same functionality for purposes of my analysis. These products include the Hercules Dualpix, Dualpix Exchange, Dualpix Emotion, Dualpix Sunset, Dualpix Infinite, and Dualpix HD.

EXHIBIT 5
NON-INFRINGEMENT OF HERCULES DUALPIX PRODUCTS

| '343 Patent Claim | Hercules Dualpix[1] |
|---|---|
| |  *Figure 1 – Ball-and-socket joint of Hercules Dualpix Webcams* The top of the ball is fixed to the camera, and the bottom of the ball rotates in multiple axes of rotation relative to the camera clip. The camera does not rotate independent of, or relative to, the ball.<br><br>Dr. Muskivitch identifies the camera clip of the Hercules Dualpix Webcams as the "support frame" and the ball and socket as the "hinge member." However, the camera is fixed to what he calls the hinge member and cannot rotate relative to said hinge member. Because the hinge member is not rotatably attached, and cannot rotate relative to, the camera, the camera does not rotate "about a first axis of rotation relative to [the] hinge member." |
| b.  a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, | The Hercules Dualpix Webcams do not include a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object.<br><br>The support frame of the Hercules Dualpix Webcams is not "rotatably attached" to the hinge member, as the Court has construed that term. This is because what Dr. Muskivitch identifies as the support frame of the Hercules Dualpix Webcams attaches to what he identifies the hinge member in such a way that the support frame and hinge member rotate relative to one another about multiple axes. |

EXHIBIT 5
NON-INFRINGEMENT OF HERCULES DUALPIX PRODUCTS

| '343 Patent Claim | Hercules Dualpix[1] |
|---|---|
| said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The Hercules Dualpix Webcams do not include a hinge member rotating about a second axis of rotation relative to a support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object.<br><br>As described above, the Hercules Dualpix Webcams do not include a hinge member rotatably attached to a camera and, therefore, do not include the claimed "first axis of rotation." Because the Hercules Dualpix Webcams do not have the "first axis of rotation," they do not have the "second axis of rotation," let alone a second axis of rotation that is "generally perpendicular to" the first axis of rotation.<br><br>In addition, and as described above, what Dr. Muskivitch identifies as the hinge member of the Hercules Dualpix Webcams rotates relative to what he identifies as the support frame in multiple axes of rotation. Therefore, the hinge member does not rotate in a single axis of rotation (the claimed "Second Axis of Rotation") relative to the support frame. |
| said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | As described above, the Hercules Dualpix Webcams do not include a support frame rotatably attached to the hinge member or a support frame that rotates relative to the hinge member in the second axis of rotation. Because the Hercules Dualpix Webcams do not include the claimed support frame, they do not include "*said support frame* having a first disposition positioned on said generally horizontal, substantially planar surface. |
| 7. Apparatus according to claim 1 wherein the object is a display screen for a laptop computer, and the second surface is the front of the display screen and the first surface is the back of the display screen. | See above analysis for claim 1 of the '343 Patent. |
| 19. A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation.<br><br>Therefore, I shall focus my analysis of the Hercules Dualpix products to the claim limitations recited below. |

EXHIBIT 5
NON-INFRINGEMENT OF HERCULES DUALPIX PRODUCTS

| '343 Patent Claim | Hercules Dualpix[1] |
|---|---|
| comprising: | |
| a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | *See* above to corresponding element of claim 1 of the '343 Patent. |
| b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | The Hercules Dualpix Webcams do not include a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. <br><br> What Dr. Muskivitch identifies as the support frame of the Hercules Dualpix Webcams is not "hingedly attached" to what he identifies as the hinge member based on the parties' agreed construction of "hingedly attached." This is because the support frame attaches to the hinge member via a ball-and-socket joint, whereas claim 19 requires that the hinge member connect or join to the support frame via a hinge joint. The Hercules Dualpix Webcams contain no such hinge joint. <br><br> Figure 2 shows the ball-and-socket joint, illustrating the multiple axes of rotation of the support frame with respect to the hinge member: <br><br>  <br><br> *Figure 2 – Ball-and-socket joint of Hercules Dualpix Webcams* <br><br> The Hercules Dualpix Webcams do not include a hinge member rotating about a second axis of rotation relative to a support frame for the same reasons described in connection with claim 1. See above. |

EXHIBIT 6
NON-INFRINGEMENT of iMICRO CH-8118

| '343 Patent Claim | iMICRO CH-8118 |
|---|---|
| 1. Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation.<br><br>Therefore, I shall focus my analysis of the iMICRO CH-8118 product to the claim limitations recited below. |
| a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and | The iMICRO CH-8118 Webcam does not include a hinge member rotatably attached to the camera such that the camera rotates about a first axis of rotation relative to the hinge member.  Hinge member having been defined as a structural element that joins to another for rotation.<br><br>The structural element that the camera of the iMICRO CH-8118 Webcam is mounted on rotates relative to the camera clip in multiple axes of rotation via a ball-and-socket joint.  As the following figure illustrates, the ball-and-socket joint of the iMICRO CH-8118 Webcam consists of a ball resting in a socket within the camera clip, and a stem connecting the camera to the ball:<br><br><br><br>Ball-and-Socket Joint<br><br>*Figure 1 – Reproduction of Photograph of iMICRO CH-8118 from Expert Report of John C. Muskivitch, Showing Ball-and-Socket Joint (annotations added)* |

- 1 -

EXHIBIT 6
NON-INFRINGEMENT OF iMICRO CH-8118

| '343 Patent Claim | iMICRO CH-8118 |
|---|---|
| | The components that make up the ball-and-socket joint of the iMICRO CH-8118 are shown in Figure 2:<br><br><br><br>*Figure 2 – iMICRO CH-8118 Disassembled*<br><br>The top of the stem is fixed to the camera, and the bottom of the stem is fixed to the ball by a screw. The ball includes a square slot in which the square stem of the camera inserts to prevent rotation of the stem with respect to the ball. The stem does not rotate independent of, or relative to, the ball. The stem does not rotate independent of, or relative to, the camera.<br><br>Dr. Muskivitch identifies the camera clip of the iMICRO CH-8118 Webcam as the "support frame" and the ball, socket, and stem of the iMICRO CH-8118 Webcam as the "hinge member." However, the camera is fixed to what he calls the hinge member and cannot rotate relative to said hinge member. Because the hinge member is not rotatably attached, and cannot rotate relative to, the camera, the camera does not rotate "about a first axis of rotation relative to [the] hinge member." |

EXHIBIT 6
NON-INFRINGEMENT OF iMICRO CH-8118

| '343 Patent Claim | iMICRO CH-8118 |
|---|---|
| b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, | The iMICRO CH-8118 Webcam does not include a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object. |
| | The support frame of the iMICRO CH-8118 Webcam is not "rotatably attached" to the hinge member, as the Court has construed that term. This is because what Dr. Muskivitch identifies as the support frame of the iMICRO CH-8118 Webcam attaches to what he identifies as the hinge member in such a way that the support frame and hinge member rotate relative to one another about multiple axes. |
| said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, | The iMICRO CH-8118 Webcam does not include a hinge member rotating about a second axis of rotation relative to a support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object. |
| | As described above, the iMICRO CH-8118 Webcam does not include a hinge member rotatably attached to a camera and, therefore, does not include the claimed "first axis of rotation." Because the iMICRO CH-8118 Webcam does not have the "first axis of rotation," it does not have the "second axis of rotation," let alone a second axis of rotation that is "generally perpendicular to" the first axis of rotation. |
| | In addition, and as described above, what Dr. Muskivitch identifies as the hinge member of the iMICRO CH-8118 Webcam rotates relative to what he identifies as the support frame in multiple axes of rotation. Therefore, the hinge member does not rotate in a single axis of rotation (the claimed "Second Axis of Rotation") relative to the support frame. |
| said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame. | As described above, the iMICRO CH-8118 Webcam does not include a support frame rotatably attached to the hinge member or a support frame that rotates relative to the hinge member in the second axis of rotation. Because the iMICRO CH-8118 Webcam does not include the claimed support frame, it does not include "*said support frame* having a first disposition positioned on said generally horizontal, substantially planar surface." |
| 7. Apparatus according to claim 1 wherein the object is a display screen for a laptop computer, and the second surface is the | See above analysis for claim 1 of the '343 Patent. |

EXHIBIT 6
NON-INFRINGEMENT OF iMICRO CH-8118

| '343 Patent Claim | iMICRO CH-8118 |
|---|---|
| front of the display screen and the first surface is the back of the display screen. | |
| 19. A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising: | I understand that preambles of claims are not generally limitations on the claimed invention, and that in this case the parties have not contended that the preamble is a limitation.<br><br>Therefore, I shall focus my analysis of the iMICRO CH-8118 product to the claim limitations recited below. |
| a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and | See above to corresponding element of claim 1 of the '343 Patent. |
| b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge. | The iMICRO CH-8118 Webcam does not include a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge.<br><br>What Dr. Muskivitch identifies as the support frame of the iMICRO CH-8118 Webcam is not "hingedly attached" to what he identifies as the hinge member based on the parties' agreed construction of "hingedly attached." This is because the support frame attaches to the hinge member via a ball-and-socket joint, whereas claim 19 requires that the hinge member connect or join to the support frame via a hinge joint. The iMICRO CH-8118 Webcam contains no such hinge joint.<br><br>Figure 3 shows a close-up of the ball and socket, illustrating the multiple axes of rotation of the support frame with respect to the rest of the apparatus: |

EXHIBIT 6
NON-INFRINGEMENT OF iMICRO CH-8118

| '343 Patent Claim | iMICRO CH-8118 |
|---|---|
|  |  Figure 3 – Ball-and-socket joint of iMICRO CH-8118 Webcam <br><br> The iMICRO CH-8118 Webcam does not include a hinge member rotating about a second axis of rotation relative to a support frame for the same reasons described in connection with claim 1.  See above. |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC,

                    Plaintiff,                         Case No. 6:10-CV-329-LED

vs.
                                                       JURY TRIAL DEMANDED
AMAZON.COM, INC., ET AL.,

                    Defendants.

**NEWEGG INC., NEWEGG.COM INC. AND ROSEWILL INC.'S OPPOSED
MOTION FOR DECLARATION OF EXCEPTIONAL CASE AND AWARD OF FEES
AND NONTAXABLE EXPENSES**

**FILED UNDER SEAL**

## I.    INTRODUCTION

Very early in this litigation, this Court expressed concern over the possibility that plaintiff filed its Complaint with the purpose of exacerbating "cost-of-defense type settlements" divorced from the merits of the case.  As discussed below, the Court's expression of concern was entirely accurate.  Plaintiff AdjustaCam LLC ("Plaintiff" or "AdjustaCam") is a non-practicing entity and a wholly-owned subsidiary of Acacia Research Group LLC.  Plaintiff sued more than 30 defendants (including suppliers and retailers) for infringement of U.S. Patent 5,855,343 entitled "Camera Clip" (the '343 Patent).  Shortly after filing its Complaint, Plaintiff began its pattern of extorting nuisance-value settlements from defendants in amounts far below the costs of defense.  Plaintiff continued this pattern over the next two years, and by August 2012, Plaintiff had settled for nuisance value with nearly all of the defendants in this case.

This case was exceptional.  As described below, this lawsuit was objectively baseless and was brought for no other reason than to extract nuisance-value settlements for sums divorced from the merits and far below the costs of defense.  Plaintiff had no reasonable chance of success on its infringement claims against Newegg Inc., Newegg.com Inc. and Rosewill Inc. (collectively "Newegg"), particularly after the Court's Claim Construction Order.  Even so, Plaintiff continued to assert untenable infringement claims, to demand unjustified settlement sums, and to prolong this litigation in bad faith, all in the hopes of extorting money from Newegg.

Newegg refused to participate in the shakedown by simply buying their way out of this lawsuit, but instead vigorously defended this case on the merits, convicted by the fact that Plaintiff's infringement claims and validity defenses were baseless.  Eventually conceding the meritless nature of the claims asserted against Newegg in this case, Plaintiff was forced to extend a unilateral covenant not to sue and to dismiss its claims with prejudice.   But by the time Plaintiff finally

1

Here, as in *Eon-Net*, Plaintiff settled with dozens of defendants for substantially less than the costs to defend against Plaintiff's baseless infringement allegations.   Indeed, like the patent owner in *Eon-Net*, AdjustaCam offered to settle with Newegg and Rosewill for substantially less than the cost for Newegg and Rosewill to defend this lawsuit.  Ultimately, Plaintiff voluntarily dismissed Newegg and Rosewill when it became clear that they would not agree to a nuisance-value settlement.  These facts render this case exceptional.

1.   *AdjustaCam Extracted Nuisance-Value Settlements From Multiple Defendants Before Voluntarily Dismissing Newegg*

Just two months after filing this lawsuit, Plaintiff executed its first nuisance-value settlement with defendant ████████████ in the amount of $25,000.  (Zarian Decl. ¶ 9; Sullivan Rpt. ¶¶ 62-63, Attachment 7.)  On November 22, 2012, Plaintiff settled with defendants ████████ ████████████████████████ for $25,000, and in March 2011, Plaintiff settled with defendants ████████ and ████ for $15,000 and $18,000, respectively.  (*Id.*) By the time Plaintiff dismissed Newegg in 2012, Plaintiff settled with at least:

- Twelve defendants for $25,000 or less;
- Three defendants for an amount between $25,001 and $50,000;
- Five defendants for an amount between $50,001 and $100,000; and
- Two defendants for an amount between $100,001 and $225,000.

(*Id.*; Zarian Decl. ¶ 10).

AdjustaCam's settlements are consistent with the nuisance-value settlements in the range of $25,000 to $75,000 in *Eon-Net*.   Like the patent owner in *Eon-Net*, Plaintiff employed the strategy of exploiting the high cost of defending against Plaintiff's baseless claims, effectively ensuring that the frivolous nature of those claims was not exposed.  *Eon-Net LP,* 653 F.3d at 1327.

2.   *Plaintiff's Nuisance-Value Settlements and Settlement Demands Had No Relationship to Defendants' Exposure*

4

As further evidence that Plaintiff filed this litigation in bad faith and for an improper purpose, the amounts that defendants agreed to pay AdjustaCam under the 22 settlement agreements have no connection to the defendants' sales of accused products. To be sure, Plaintiff and its damages expert maintained that AdjustaCam's settlement agreements (and demands) were based on a minimum target royalty of $1.25/unit.[1] However, this assertion was objectively baseless. For example, the implied royalty[2] for 15 of the settlement agreements for which sales data was disclosed ranged from a minimum of $0.10/unit to a maximum of $161.29/unit. (Zarian Decl. ¶¶ 9, 10; Sullivan Rpt. Attachment 12.) Of those 15 settlement agreements, not a *single* agreement included an implied royalty of $1.25 per unit. (*Id.*)

Indeed, Plaintiff's own damages expert admitted that his opinion concerning the appropriate per-unit royalty was not calculated based on the number of units sold by any of the defendants that settled with AdjustaCam. (Zarian Decl. ¶ 12, Bratic Dep. at 97:6-98:17; 118:8-119:7; 146:6-24; 177:20-178:16; 231:16-234:3). He also admitted that his opinion was not influenced by the cost or sales price of the accused products or the cost of the patented feature (a clip) of the accused products on the grounds that the cost of the patented feature is "not relevant."[3] (*Id.* at 74:25-75:3; 77:8-15; 79:4-19.) Rather, his opinions were based on his understanding of what someone else viewed as a "target royalty" based (allegedly) on two settlement agreements executed in 2001 by the prior owner of the '343 Patent (PAR Technologies). (*Id.* at 36:23-39:22; 41:17-42:16; 229:1-4; 233:18-234:3; 235:24-236:15.) Of course, this clearly does not meet the requirements of Rule 702 of the Federal Rules of Evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

[1] Expert Report of Walt Bratic, dated June 25, 2012 at ¶ 107 (Zarian Decl. ¶ 3; Exh. 1.)
[2] "Implied Royalty" = (Settlement amount / units sold). For example, one defendant sold 6,584 accused units and settled for $40,000 for an implied royalty of $6.08/unit. (Zarian Decl. ¶ 9; Sullivan Rpt., Attachment 12.)
[3] Plaintiff's potential damages were limited to the value of the patented feature, absent a showing that the patented feature constitutes the basis for consumer demand. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). At no point did Plaintiff or its expert argue that the webcam clip was the basis of consumer demand for the accused products.

5

Similarly, Plaintiff was unable to point to any evidence to support the claim that the 22 settlement agreements were based on a "target" royalty of $1.25. In fact, Plaintiff's 30(b)(6) representative was unaware of the number of units that any defendant sold prior to settling with AdjustaCam and, therefore, was unable to verify whether any of the 22 defendants paid a minimum per-unit royalty of $1.25. (Zarian Decl. ¶ 13; Exh. 9, AdjustaCam 30(b)(6) Depo. at 69:6-70:21.)

More particularly, Plaintiff's nuisance-value settlement demands to Newegg were entirely divorced from Newegg's sales of the accused products. On November 9, 2011, several defendants (including Newegg and Rosewill) participated in mediation with Plaintiff in Dallas, Texas before Mr. James Knowles. At the time of the mediation, Rosewill had confirmed sales of 14,499 units of the accused products for total revenues of $63,760 and Newegg had confirmed sales of 5,904 units of the Newegg accused products—the majority of which were supplied to Newegg by other named defendants—for total revenues of $33,379. Despite claiming entitlement to a minimum per-unit royalty between $1.25 and $1.50, Plaintiff demanded $75,000 from Newegg and Rosewill at mediation. Plaintiff refused to explain the basis for demanding nearly *three times* its "target" per-unit royalty and more than 75% of Newegg and Rosewill's *total revenue* from sales of the accused products. (Zarian Decl. ¶ 15; Exh. 11.)

After mediation and before eventually dismissing Newegg, Plaintiff made two additional nuisance-value settlement demands. In March 2012, after many of the accused Newegg products had been the subject of settlements between Plaintiff and Newegg Inc.'s suppliers, Plaintiff demanded $65,000 from Newegg and Rosewill, refusing to provide an explanation as to how that figure was calculated. (Zarian Decl. ¶ 17.) Then, on July 11, 2012 - less than two weeks after serving a report from its damages expert[4] - AdjustaCam demanded $51,543 to settle this matter with

---

[4] In his June 28, 2012 Supplemental Report, Mr. Bratic opined that AdjustaCam was entitled to reasonable-royalty damages from Newegg and Rosewill in the amount of $17,928. Mr. Bratic calculated this figure by multiplying the total

6

Newegg and Rosewill—*a demand nearly three times the damages calculation performed by its own expert.* Again, Plaintiff offered no explanation for its demand, which equated to an implied per-unit royalty of $3.60, or nearly three times Plaintiff's alleged target royalty. (Zarian Decl. ¶ 18; Exh. 12.) Mr. Bratic testified that at no time did he form an opinion that a per-unit royalty of $3.00 or more would be reasonable. In fact, Mr. Bratic testified that such a royalty would be *unreasonable*. (Bratic Dep. at 242:11-22.)

### B. Plaintiff's Infringement Claims Were Brought in Bad Faith and Were Objectively Baseless

This lawsuit was frivolous from the very outset because, as explained below, Newegg simply could not infringe the Asserted Claims under any reasonable interpretation. Unlike the accused Newegg products, the '343 Patent claims a camera clip with two separate and distinct axes of rotation. The camera disclosed in the '343 Patent is "rotatably attached" to the "hinge member" of the claimed apparatus such that the camera rotates about a *single axis of rotation* (the "**first** axis of rotation"). The "support frame" of the apparatus is "rotatably attached" to the "hinge member" such that the support frame rotates relative to the hinge member about a separate, *single axis of rotation* (the "**second** axis of rotation"). (Zarian Decl. ¶ 19; Exh. 13, '343 Patent, col 6:57-57; col. 7:39-42; col 9:20-22 (emphasis added.)) Thus, as illustrated by Figures 1 and 2 of the '343 Patent, the claimed apparatus is aimed by rotating the camera in a left-to-right direction about the "first axis of rotation" (28) and in an up-and-down direction by rotating the support frame and hinge member about the "second axis of rotation" (32). (*Id*. at Figs. 1, 2.)

Unlike the camera disclosed in the '343 Patent, none of the accused Rosewill webcams rotate about a *single axis of rotation*, and the vast majority of the accused Newegg webcams do not rotate

---

number of accused Newegg and Rosewill products (14,342 units) by a per-unit royalty of $1.25. (Bratic Report ¶¶ 109-110.)

about a *single axis of rotation*, as the claims of the '343 Patent require. Instead, these products (the "Accused Ball-and-Socket Products") include a camera connected to a clip via a ball-and-socket joint, which facilitates rotation about **multiple axes**.[5] The substantial and material differences between the Accused Ball-and-Socket Products and the Asserted Claims are illustrated by the following photographs of the accused Rosewill RCM-8163 (below left) and Hercules Classic (below right) webcams, which are both representative of the Accused Ball-and-Socket Products:



Comparing the Accused Products to the claims and specification of the '343 Patent shows that Plaintiff's infringement allegations were spurious. Indeed, as the Court explained in its Claim Construction Order, "[e]very reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a *single axis of rotation*," and "[t]he claims plainly describe each 'rotatably attached' object as rotating about a single axis." (Claim Construction Order (Dkt. 627) at 9-10.) Accordingly, Plaintiff's infringement allegations against Newegg were objectively baseless.

## IV.  PLAINTIFF'S LITIGATION MISCONDUCT PROVIDES ADDITIONAL AND SUFFICIENT EVIDENCE TO ESTABLISH THIS CASE AS EXCEPTIONAL

### A.  Plaintiff Continued to Maintain Its Frivolous Infringement Claims Even After the Court's Claim Construction Order

Maintaining infringement claims after an unfavorable claim construction may constitute litigation misconduct and provide additional grounds for declaring a case exceptional. *MarcTec,* 664

---

[5] *See* Expert Report of John H. Hamilton Re Non-Infringement, Claim Charts, Exhs. 3-5 claim limitation 1(a), attached as Exhibit 31 to the Zarian Decl.

*Excerpts from Dr. Muskivitch's June 25 Report (left) and August 24 Report (right) identifying the "second axis of rotation" of the accused Rosewill RCM-8163 (yellow arrow) and "support frame" (red arrow) (Zarian Decl. at ¶¶ 5, 7; Exhs. 3, 5.)*



*Excerpts from Dr. Muskivitch's June 25 Report (left) and August 24 Report (right) identifying the "hinge member" of the accused Rosewill RCM-8163 (green arrow) and first axis of rotation" (blue arrow) (Zarian Decl. at ¶¶ 5, 7; Exhs. 3, 5.)*

Underscoring the significance of these changes, Dr. Muskivitch acknowledged that Newegg's expert (Mr. Hamilton) would not be able even to understand his infringement opinions absent the so-called "final" August 24 Report. (Muskivitch Dep. at 34:16-35:4.) Plaintiff has yet to provide any justification for serving the untimely report. Plaintiff has suggested an apparent "mistake," but this argument strains credulity. If Plaintiff's counsel truly served an earlier draft of Dr. Muskivitch's opinion on June 25, this error would have come to Plaintiff's attention when Mr. Hamilton served his rebuttal report on July 27, 2012 and certainly before Plaintiff's counsel examined Mr. Hamilton at his deposition on August 17, 2012.

## C.    Plaintiff Continued to Maintain Objectively Baseless Invalidity Defenses

On several occasions, including as early as August 12, 2011, Examiner Doerrler of the USPTO rejected the Asserted Claims as anticipated and/or obvious based on Japanese Utility Model Publication No. H2-19997 to Irifune (the "Irifune Publication") and U.S. Patent No. 5,880,783 to Ma entitled "Digital Camera for a Computer" (the "Ma Patent"). (Zarian Decl. at ¶ 22; Exh. 16, OA dated August 12, 2011). The patentee, Global Media Group LLC ("Global Media")[6], was able to prolong the reexamination until Examiner Doerrler issued a Final Office Action on August 30, 2012

---

[6] Plaintiff has represented that Global Media is the owner of the '343 Patent and AdjustaCam is the exclusive licensee of the '343 Patent.

11

reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation.".).)

2. *The Ma Patent*

Plaintiff and its expert also advanced and maintained frivolous arguments concerning the Ma Patent. As illustrated in the annotated figure from the Ma Patent (below left), and as the USPTO correctly concluded, the Ma Patent discloses a camera (1) rotatably attached to a hinge member (2), a support frame (3), and the claimed first and second axes of rotation. (Zarian Decl. at ¶ 21; Exh. 15.) As shown in the figure (below right) excerpted from Dr. Muskivitch's report, remarkably, Dr. Muskivitch opined that the Ma device does not disclose a camera and a support frame, but instead "a camera with moveable parts."[7] (Muskivitch Rebuttal Report at 28, 29 (showing alleged "camera" in red)).



FIG. 1

The '343 Patent does not ascribe a unique definition of a camera that would include structures used to *support* a camera.

### D. Plaintiff Fabricated a Per-Unit Royalty In An Attempt to Justify its Nuisance-Value Settlements

As described above, Plaintiff lacked a good faith basis for asserting that AdjustaCam's settlements were based on a minimum royalty of $1.25/unit. Neither Plaintiff, nor its damages expert, could identify any reliable evidence in support of such an alleged royalty. Indeed, Mr. Bratic

---

[7] Dr. Muskivitch maintained that the circuit box (3) of the Ma device was not a support frame because it was part of the camera, despite conceding that "circuit box (3) does support tubular shaft 21, which in turn supports adjustment block (2)." (*Id.* at 31).

ignored the obvious fact that the implied royalty rate for at least 15 of AdjustaCam's settlement agreements ranged from $0.10/unit to $161.29/unit.  In addition, Mr. Bratic did not even take into consideration the costs or profits associated with the accused feature of the webcam.  Evidently, Plaintiff simply had Mr. Bratic "proffer junk science" and "bogus theories" to justify its pattern of extracting nuisance-value settlements.  Such conduct makes this case exceptional and warrants reimbursement for Newegg's expert fees.  *See MarcTec*, 664 F.3d 907, 921-22 (affirming exceptional case finding and award of expert fees and expenses in excess of $800,000 where MarcTec offered unreliable and irrelevant expert testimony and "had its experts proffer junk science," which unnecessarily extended the litigation).

## V.    UNDER THE CIRCUMSTANCES, THE COURT SHOULD AWARD REASONABLE ATTORNEYS' FEES AND EXPENSES TO NEWEGG

By this motion, pursuant to 35 U.S.C. § 285, Newegg seeks to recover all reasonable attorneys' fees and expert witness fees incurred in this litigation.[8]  Specifically, Newegg respectfully requests that the Court enter an order requiring AdjustaCam to reimburse Newegg for attorneys' fees in the amount of $286,102.52 and expert witness fees, pursuant to the Court's inherent authority to award such fees, in the amount of $68,183.93.  The attorneys' fees for which Newegg seeks reimbursement were necessarily and reasonably incurred in the defense of this action. Furthermore, the billing rates for Newegg's attorneys are reasonable and below market rates for patent litigation counsel in Texas and nationally. (Zarian Decl. ¶¶ 49-54).  In addition, this case was handled with the appropriate level of diligence and concern for costs and efficiencies. The total fees and costs incurred on behalf of Newegg are in line with, and significantly below, the total fees and costs billed on average in patent infringement cases in Texas and nationally for cases of this size. (*Id.*)

---

[8] Newegg is also requesting reimbursement for taxable costs in a separate, itemized Bill of Costs.

**VI.    CONCLUSION**

Based on the foregoing, Newegg respectfully requests the Court to declare this case exceptional and to award it $354,286.45, which amount equals a reasonable portion of Newegg's attorney fees and expert witness fees incurred in the defense of this litigation.

DATED THIS 11th day of October, 2012.

PARSONS BEHLE & LATIMER

By */s/ Dana M. Herberholz*
John N. Zarian (*Admitted E.D. Texas*)
Dana M. Herberholz (*Admitted E.D. Texas*)
960 Broadway, Suite 250
Boise, Idaho 83706
Telephone:  (208) 562-4900
Facsimile:  (208) 562-4901
E-mail: jzarian@parsonsbehle.com
          dherberholz@parsonsbehle.com

YARBROUGH WILCOX GUNTER PLLC
Trey Yarbrough, State Bar No. 22133500
Debby E. Gunter, State Bar No. 24012752
100 E. Ferguson Street, Ste. 1015
Tyler, Texas 75702
Telephone:  (903) 595-3111
Facsimile:  (903) 595-0191
E-mail:trey@yw-lawfirm.com
          debby@yw-lawfirm.com

Attorneys For Defendants
Newegg Inc., Newegg.com Inc., and Rosewill, Inc.

16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| ADJUSTACAM LLC | |
| v. | NO. 6:10-cv-329-LED |
| AMAZON.COM, INC.;  ET AL. | JURY |

<u>**NOTICE OF SUPPLEMENTAL AUTHORITY FOR PLAINTIFF'S MOTION TO DISMISS ITS CLAIMS AGAINST SAKAR AND KOHL'S AND THEIR COUNTERCLAIMS AGAINST PLAINTIFF FOR LACK OF SUBJECT MATTER JURISDICTION**</u>

Plaintiff AdjustaCam, LLC ("AdjustaCam") respectfully submits this notice of supplemental authority in support of its opposed Motion to Dismiss (Doc. No. 721), as follows:

As noted in Plaintiff's Motion, the cancellation of the Asserted Claims in reexamination proceedings moots or near moots the issues remaining in this case – *e.g.*, infringement of the Asserted Claims, validity of the Asserted Claims and damages due for infringement of the Asserted Claims.  In fact, at this point, all Defendants except Sakar/Kohl's have been dismissed either by settlement or mutual agreement. *See, e.g.,* Orders of Dismissal at Doc Nos. 665, 671, 672, 673, 674, 675, 677 and 720.  Further, in order to overcome Sakar/Kohl's opposition to being dismissed with prejudice relative to the now-canceled Asserted Claims that are no longer in dispute, AdjustaCam has taken the further step of granting Sakar/Kohl's a covenant not to sue under the '343 patent. *See* Doc. No. 721, Exhibit 2.

As noted in Plaintiff's Motion to Dismiss, irrespective of the canceled claims and irrespective of Sakar/Kohl's opposition to being dismissed with prejudice, AdjustaCam's covenant not to sue under the '343 patent divests the Court of subject matter jurisdiction with respect to Sakar/Kohl's counterclaims for invalidity and non-infringement. *See, e.g., Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995).

**A1867**

As further support for its Motion to Dismiss, Plaintiff respectfully submits Exhibit A hereto, which is the Jury Verdict form that was submitted yesterday as part of the parties' Joint Pretrial submission. (Doc No. 723, Exhibit 6).  As can be seen, Plaintiff has not requested any jury questions since the parties' prior dispute over the Asserted Claims is now moot.  More importantly, Defendants' purported jury questions relate solely to their baseless allegation that that this is an exceptional case, which is an issue to be decided by the Court, not by the jury. *See, e.g., Eon–Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1323 (Fed. Cir. 2011).

Although Defendants are free to reserve or pursue their baseless exceptional case allegations with the Court, there are no triable issues left for jury, and the case should be dismissed without further burdening the parties and the Court with pretrial motions and submissions.

October 3, 2012

Respectfully submitted,

By: /s/ *John J. Edmonds*
John J. Edmonds – LEAD COUNSEL
Texas State Bar No. 789758
Michael J. Collins
Texas Bar No. 4614510
Stephen F. Schlather
Texas Bar No. 24007993
COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC
1616 S. Voss Rd., Suite 125
Houston, Texas 77057
Telephone: (713) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
mcollins@cepiplaw.com
sschlather@cepiplaw.com

Andrew W. Spangler
Texas Bar No. 24041960
Spangler & Fussell P.C.

208 N. Green Street, Suite 300
Longview, Texas 75601
(903) 753-9300
(903) 553-0403 (fax)
spangler@spanglerlawpc.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

October 3, 2012                    /s/ *John J. Edmonds*
                                   John J. Edmonds

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| **ADJUSTACAM LLC** | |
| **v.** | **NO. 6:10-cv-329-LED** |
| **AMAZON.COM, INC.; ET AL.** | **JURY** |

# JURY VERDICT FORM

**Question No. 1**[1]

Do you find that Adjustacam conducted an adequate pre-filing investigation before filing this lawsuit against the various defendants?

Yes _____

No _____

**Question No. 2**

Do you find that Adjustacam conducted this lawsuit in bad faith?

Yes _____

No _____

**Question No. 3**

Do you find that this is an exceptional case justifying the award of attorneys fees to Sakar and Kohl's?

Yes _____

No _____

**Question No. 4**

Do you find that defendants Sakar and Kohl's are entitled to attorneys fees in this case?

Yes _____

No _____

**Question No. 5**

If the answer to question no. 7 is yes, state the amount of attorneys fees that should be awarded to Sakar.

---

[1] Questions 1 - 5 are requested by Defendants.  Plaintiff objects to Questions 1 - 5 for, inter alia, lack of evidence and lack of relevance, and because they are not proper questions for a jury to answer.  Plaintiff has no jury questions to submit because come time of trial the Asserted Claims will have been officially canceled by the USPTO, and on account of Plaintiff's covenant not to sue Defendants on the '343 patent. *See* Plaintiff's pending Motion to Dismiss.

The foreperson is requested to initial and date this document in the spaces provided below as the unanimous verdict of the jury.

_____                    _____
DATE                                       FOREPERSON INITIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                        NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                                 JURY

## JOINT PRE-TRIAL ORDER

This cause came before the court at a pre-trial management conference held on December

18, 2012, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure.

## A.    COUNSEL FOR THE PARTIES

**Plaintiff:**                                   **Defendants:**

John Edmonds                                     Ezra Sutton
Stephen Schlather                                EZRA SUTTON, P. A.
Joshua Long
COLLINS, EDMONDS & POGORZELSKI,
SCHLATHER & TOWER, PLLC

Andrew W. Spangler
Spangler & Fussell P.C.

## B.    STATEMENT OF JURISDICTION

### Plaintiff:

Per plaintiff's pending motion to dismiss at Dkt No. 721, Plaintiff contends that subject

matter jurisdiction is lacking due to Plaintiff's covenant not to sue defendants.  Further, by the

time of the pretrial conference, the asserted claims will have been canceled in connection with

the issuance of a reexamination certificate, thus rendering moot the prior disputes over the

asserted claims.  Accordingly, this Court lacks subject matter jurisdiction to take what is left of

this case to trial.

**Defendants:**

This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1131, 1338(a), 2201, and 2202. Also, venue is proper in this district under 28 U.S.C. §§ 1391 (b) and (c).

By the time of the pretrial conference, the Re-examination Certificate will have issued with new independent claims 22, 31, 40, 41, 44, 45, 46 and 47 which have been allowed by the U.S.P.T.O.  The plaintiff's covenant not to sue defendants Sakar International, Inc. ("Sakar"), Kohl's Illinois, Inc., and Kohl's Corporation, Inc. ("Kohl's") (collectively "Sakar/Kohl's") does not include these new re-examined claims, and the plaintiff has refused to include them in the covenant.   Therefore, there is still a dispute and case or controversy between the parties regarding the `343 patent in suit.

Thus, this Court presently has subject matter jurisdiction, and will continue to have subject matter jurisdiction over the new re-examined claims of the `343 patent when the Re-examination Certificate issues.

**C.      NATURE OF ACTION**

**Plaintiff:**

In this case plaintiff originally contended that Defendants infringed claims 1, 7 and 19 (the "Asserted Claims") of U.S. Patent No. 5,855,343 (the "`343 patent").  However, on August 30, 2012, at the culmination of reexamination proceedings involving the '343 patent, the U.S.P.T.O. issued a Final Office Action rejecting the Asserted Claims as being unpatentable over prior art, but allowing additional new and amended claims. On September 20, 2012, in response to that Final Office Action, AdjustaCam canceled the Asserted Claims of the '343 patent so that

a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable.

By the time of the pretrial conference, the cancellation of the Asserted Claims in reexamination proceedings will have mooted the issues remaining in this case – *e.g*., infringement of the Asserted Claims, validity of the Asserted Claims and damages due for infringement of the Asserted Claims.  At this point, all Defendants except Sakar/Kohl's have been dismissed either by settlement or mutual agreement. *See, e.g.,* Orders of Dismissal at Doc Nos. 665, 671, 672, 673, 674, 675, 677 and 720.

Despite the foregoing, for reasons that perhaps it can explain to the Court, Sakar/Kohl's has to date opposed being dismissed from this case with prejudice.  In order to overcome Sakar/Kohl's opposition to being dismissed with prejudice relative to canceled asserted claims that are no longer in dispute, AdjustaCam has taken the further step of granting Sakar/Kohl's a covenant not to sue under the '343 patent. Dkt No. 721. Irrespective of the canceled claims and irrespective of Sakar/Kohl's opposition to being dismissed with prejudice, AdjustaCam's covenant not to sue under the '343 patent divests the Court of subject matter jurisdiction with respect to Sakar/Kohl's First and Second counterclaims in this matter, since they relate solely to Sakar/Kohl's claims that it does not infringe the '343 patent and that the '343 patent is invalid.

Accordingly, as of the date of this submission, pending before the Court is AdjustaCam's Motion (Dkt No. 721) for the Court issue an Order dismissing AdjustaCam's claims against Sakar/Kohl's for infringement of the '343 Patent as well as Sakar/Kohl's First and Second Counterclaims of its Amended Answer and Counterclaims.

3

**Defendants:**

As stated by Adjustacam, when the Certificate of Re-examination issues, the asserted claims (1, 7, and 19) will be cancelled, and the new and allowed re-examined claims will be issued (including independent claims 22, 31, 40, 41, 44, 45, 46 and 47).  Adjustacam has refused (during a meet and confer on September 29, 2012) to issue a covenant not to sue Sakar/Kohl's on these new re-examined claims of the `343 patent.  Thus, the controversy continues regarding the re-examined claims of the `343 patent.  That is, Adjustacam can continue to sue Sakar/Kohl's on the `343 patent as to the webcams in issue for infringement of these claims.  Thus, the Court has not been divested of subject matter jurisdiction.  In addition, Sakar/Kohl's reserves its right to file a motion for attorneys fees and costs.

This is a patent infringement case wherein Plaintiff AdjustaCam has asserted that Defendants Sakar International, Inc., Kohl's Illinois, Inc., and Kohl's Corporation, Inc., (collectively, "Defendants") directly infringe claims 1, 7 and/or 19 (the "asserted claims") of United States Patent No. 5,855,343 ("the `343 patent").  Defendants contend that none of their products infringe the asserted claims of the `343 patent and that the asserted claims are invalid because they fail to meet one or more of the requirements for patentability. Defendants also deny AdjustaCam's allegations of willful infringement and deny AdjustaCam's claim for damages.

**D.      CONTENTIONS OF THE PARTIES**

      **(1)      Plaintiff's Contentions.**

      a.      GlobalMedia Group LLC is, and at all relevant times as been, the assignee of the '343 patent.

      b.      Plaintiff is, and at all relevant times has been, the exclusive licensee of the '343 patent, with the right to sue for infringements thereof.

c.      By time of trial, Asserted Claims 1, 7 and 19 of the '343 patent will be canceled and moot.

d.      Prior to the cancelation of the Asserted Claims and Plaintiff granting a covenant not to sue to Defendants, Plaintiff contended that Defendants infringed the Asserted Claims by making, selling, offering for sale and importing the Kodak S101/W100 and T130, including as set forth in the Expert Report of John Muskivitch.

e.      Prior to the cancelation of the Asserted Claims and Plaintiff granting a covenant not to sue to Defendants, Plaintiff contended that Defendants owed Plaintiff reasonable royalties, prejudgment interest and post-judgment interest, including as set forth in the Expert Report of Walter Bratic.

f.      Defendants' defenses and counterclaims lack merit and are nonetheless moot.

g.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue will not be moot come time of trial, Defendants have not rebutted the presumption of validity accorded the patent-in-suit under 35 U.S.C. § 282.

h.      All claims of the '343 patent are entitled to priority no later than the March 7, 1997

i.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue will not be moot come time of trial, none of the Asserted Claims are invalid.

j.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to

the extent the issue will not be moot come time of trial, Defendants bear the burden of proving non-infringement of the Asserted Claims by a preponderance of the evidence.

k.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue will not be moot come time of trial, Defendants bear the burden of proving invalidity of the Asserted Claims by clear and convincing evidence.

l.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of damages will not be moot come time of trial, Defendants have no relevant or admissible proof concerning damages because they never designated a damages expert.

m.      Defendants are not entitled to any declaratory relief or any other relief, award, finding, verdict or judgment.

n.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of validity of the will not be moot come time of trial, AdjustaCam reserves the right to rely upon the validity opinions of its technical expert Dr. Muskivitch.  To the extent necessary, the validity report of Dr. Muskivitch is incorporated herein by reference for notice purposes.

n.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of infringement will not be moot come time of trial, AdjustaCam reserves the right to rely upon the infringement opinions of its technical expert Dr. Muskivitch.  To the extent

necessary, the infringement report of Dr. Muskivitch, at Exhibit 4 to the Muskivitch deposition, is incorporated herein by reference for notice purposes.

       n.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of damages will not be moot come time of trial, AdjustaCam reserves the right to rely upon the damages opinions of its damages expert Mr. Bratic.  To the extent necessary, the damages report of Mr. Bratic is incorporated herein by reference for notice purposes.  Further, to the extent that damages is still deemed to be relevant, AdjustaCam reserves the right to recover pre and post-judgment interest and costs.

       o.      Plaintiff reserves the right to include additional contentions and disputed issues of fact and law based on (i) the Court's rulings on pending motions that may arise between the date of the filing of the parties' joint pretrial order and (ii) the pre-trial conference and (iii) trial.

      **(2)**      **Defendants' Contentions.**

      By providing these contentions, Defendants do not concede that all of these issues are appropriate for trial. In particular, Defendants do not waive any of their motions in limine, motions for summary judgment, or *Daubert* motions, which, if granted, would render some or all of these issues moot. Defendants' contentions in this case are detailed in their answers, affirmative defenses and counterclaims to AdjustaCam's Third Amended Complaint, and Defendants' invalidity contentions, all of which are incorporated herein by reference. In sum, Defendants contend the following:

      a.  By the time of trial, new re-examined claims (including new independent claims 22, 31, 40, 41, 44, 45, 46 and 47)  will be granted by the Re-examination Certificate to AdjustaCam, and AdjustaCam has refused to agree not to assert these claims against Sakar/Kohl's.

b.  The re-examined `343 patent is still in dispute between the parties with regard to the webcams Sakar has been selling.

c.  AdjustaCam's refusal to provide Sakar/Kohl's with a covenant agreeing not to assert the allowed claims of the reexamined `343 patent against Sakar/Kohl's means that there is a continuing controversy between the parties regarding infringement of the `343 patent.

d.  Defendants' defenses and counterclaims have merit and are not moot.

### Non-Infringement

e.  Defendants do not directly infringe, and have not directly infringed, the asserted `343 patent claims.

f.  If Defendants are found to infringe any claim of the `343 patent, and those asserted claims of the `343 patent are found to be valid, then Defendants' infringement was not willful.

g.  Defendants are entitled to a declaratory judgment finding that Defendants are not directly or indirectly infringing, and have not directly or indirectly infringed, any claim of the `343 patent.

h.  All of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) comprise a ball and socket joint or hinge member that is fixedly attached to the bottom of the camera and is not "rotatably attached" to the camera.  Moreover, Sakar/Kohl's accused Kodak webcams (Kodak S101 and Kodak T130) with a ball and socket joint do not have a hinge member that is "rotatably attached" about a single axis of rotation relative to the camera (or an equivalent thereof), as required by all of the independent claims of the original and reexamined `343 patent.

i.  The accused ball and socket clips of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) rotate relative to the camera about multiple axes of rotation.

j.  AdjustaCam's own infringement expert, Dr. Muskivitch admitted that Sakar/Kohl's Kodak webcams with a ball and stem fixed to the camera do not rotate as required by claims.

k.  The support frame of Sakar/Kohl's Kodak webcams (Kodak S101 and Kodak T130) is not "rotatably attached" to the hinge member about a single axis either literally or under the doctrine of equivalence. Specifically, Sakar/Kohl's Kodak webcams have a ball-and-socket hinge member whereby the ball-and-socket hinge member rotates in multiple axes of rotation relative to the support frame (legs).  Moreover, because the ball and socket structure of the hinge member permits the "support frame" to rotate in multiple axes of rotation relative to the hinge member, the hinge member of Sakar/Kohl's Kodak webcams is not "rotatably attached" about a "single axis of rotation" relative to the support frame as specified by this Court.

l.  One half of the webcam clips of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) cannot support anything and does not have two "dispositions" as required by the claims of the `343 patent. Moreover, one half of a webcam clip clearly cannot support a webcam on a display (such as a laptop computer), as the claims require.

m.  Plaintiff's noninfringement expert, Dr. Muskivitch, improperly submitted a new and untimely expert report on August 24, 2012 that changed the identification of many claim limitations concerning defendants' accused products (including Sakar/Kohl's infringing products) from those first identified in his original June 25, 2012 infringement report. Dr. Muskivitch even admitted during his deposition that his June 25, 2012 was incorrect. Specifically, in his original June 25, 2012 report, Dr. Muskivitch identified the "ball-and-stick" portion of the accused Sakar/Kohl's Kodak webcams as the "hinge member," and the clip of those products as the "support frame." In his untimely August 24 Report, however, Dr. Muskivitch moved his identification of the "hinge member" from the "ball and stick" of the

accused products to the top half of the webcam clip.  In addition, in his untimely August 24

Report, Dr. Muskivitch also opines that the "support frame" is no longer the clip of the accused

products, but is only one half (the bottom half) of the clip.

n.  Under Rule 26(a)(2)(B), Dr. Muskivitch may not offer any opinion at trial which was

not disclosed in his June 25 Report, and any subsequent report should be stricken.

o.  Adjustacam did not conduct an adequate pre-filing investigation under Rule 11 for its

infringement claims against Sakar/Kohl's Kodak webcams.

### Invalidity

p.  There is no presumption of validity for reexamined asserted claims 1, 7, and 19 (as

well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent because the U.S.P.T.O. finally

rejected these claims.  *See Dow Jones v. Albaise, Ltd.*, 606 F.3d 1338, n. 3 (Fed. Cir. 2010).

q.  The asserted claims 1, 7, and 19 are invalid and AdjustaCam knew or should have

known that they were invalid.  During the last 2 years, the asserted claims were rejected 3 times

by the U.S. Patent Office over the Irifune and Ma prior art references under 35 U.S.C. § 102,

meaning the claims were fully anticipated by these prior art references.  However, Adjustacam

continued to prosecute these asserted invalid claims in bad faith against Sakar/Kohl's, and other

defendants in this case.

r.  Even before the U.S.P.T.O. finally rejected the asserted claims 1, 7, and 19 (as well as

claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent, Plaintiff's own infringement expert, Dr.

Muskivitch, admitted during his deposition that the Irifune publication anticipated asserted

claims 1, 7, and 19 of the `343 patent by testifying that the camera disclosed in Irifune is

rotatably attached to the hinge member, as claimed in the `343 patent.

s. Sakar/Kohl's are entitled to a declaratory judgment finding that the claims of the `343

patent are invalid under one or more sections of Title 35 of the United States Code,

including, without limitation, 35 U.S.C. §§ 102, 103, and/or 112.

### Damages

t.  If Defendants Sakar/Kohl's are found to infringe any of the claims of the `343 patent,
and those claims are found to be valid, AdjustaCam is entitled to no more than the amount set
forth in the Expert Report of Dr. Sullivan.  Also, AdjustaCam, through the report of its damages
expert, has no proof of a damage royalty of $1.25 per webcam.

u.  Plaintiff through its damages expert, Mr. Bratic, has failed to properly establish a
royalty calculation based on the Entire Market Value Rule.  Specifically, AdjustCam has failed
to provide any proof that the clip for Sakar/Kohl's Kodak webcams motivates consumers to buy
the webcams in the first place; and AdjustaCam has failed to conduct market studies or consumer
surveys to ascertain whether the demand for Sakar/Kohl's Kodak webcams in question is driven
by the clip patented technology, as required by the Federal Circuit.

v.  Plaintiff AdjustaCam's evidence of past settlement agreements from approximately 24
defendants in this case are not determinative of a reasonable royalty because they: (1) did not
include the quantities sold by respective defendants,  (2) did not show a discernible link to the
claimed technology, and (3) were extracted as nuisance value settlements.  This evidences
Plaintiff's bad faith strategy.

w.  AdjustaCam tried to extract a settlement from Sakar/Kohl's in the amount of
$550,000 and $250,000, as part of AdjustaCam's strategy, when AdjustaCam knew that their
asserted claims had been rejected twice by the U.S.P.T.O. and knew that their asserted claims
would be finally rejected by the U.S.P.T.O.  This strategy of Adjustacam was in bad faith.

x.  AdjustaCam delayed its prosecution of the re-examination of the `343 patent for as

long as it could until all but 2 or 3 defendants had settled.  Then, as part of its strategy to avoid a trial on the merits, AdjustaCam dismissed its claims against Newegg and Sakar/Kohl's.

y.  AdjustaCam is now trying to cover up its bad faith strategy by ending the case before trial with a dismissal of the case.

z.  Sakar will prove that Adjustacam had no proof of a damage royalty of $1.25 through the damage expert of Adjustacam.

aa.  Sakar will prove that Adjustacam caused Sakar to spend over $300,000 in legal fees, costs, and expenses to defend this case that was brought and conducted in bad faith.

bb.  Sakar reserves the right to include additional contentions and disputed issues of fact and law based on the Court's expected rulings on invalidity and non-infringement, and on motions set forth in Defendants' letter briefs.

**E.     STIPULATIONS AND UNCONTESTED FACTS**

**1.     Stipulations**

a.     Highlighted, underlined or enlarged exhibit pages, or portions of pages, shall not count as demonstratives unless the text has been changed but shall not be admitted as separate exhibits.

b.     The parties shall not object to the authenticity of any documents authored and produced by the other side.

c.     During trial, each Party shall provide notice by email no later than 8 pm each day of all witnesses and all exhibits associated with each witness that are intended to be used as direct evidence the following day at trial.

d.     Each Party shall provide by email no later than 9 pm each day a copy of all demonstratives that are intended to be presented the following day at trial.

2.      **Uncontested Facts**

a.      GlobalMedia Group LLC is the assignee of the '343 patent.

b.      AdjustaCam LLC is the exclusive licensee of the '343 patent.

c.      Sakar International, Inc. ("Sakar")  is a New York corporation with its principal place of business located in Edison, New Jersey.

d.      Kohl's Corporation d/b/a Kohl's has a place of business in Menomonee Falls, Wisconsin.

e.      Kohl's Illinois, Inc. has a place of business in Menomonee Falls, Wisconsin.

f.      The '343 patent was filed on March 7, 1997, and it issued on January 5, 1999.

g.      All claims of the '343 patent are entitled to priority from its March 7, 1997 filing date.

h.      During this litigation, Adjustacam obtained settlements from at least 15 defendants in this case.

F.      **CONTESTED ISSUES OF FACT AND LAW**

The Parties identify the following issues of fact that remain to be litigated. To the extent any issue of law discussed below is deemed to be an issue of fact, it is incorporated into this section. The Parties reserve the right to identify additional factual or legal issues as permitted by the Court.

(1)      **Plaintiff's List of Contested Issues of Fact and Law**

a.      Whether, at time of trial, Defendants' counterclaims, including issues involving the infringement, validity and damages relative to the Asserted Claims are moot due to the cancelation of those claims in reexamination proceedings.

b.      Whether Defendants are entitled to any declaratory relief or any other relief.

c.      Whether Defendants' inexplicable and vexatious conduct after being offered a dismissal (and in fact after a motion to dismiss was filed) – based upon the cancelation of the Asserted Claims during reexamination proceedings and the covenant not to sue under the '343 patent granted to Defendants -- renders this a exceptional case, including an award of attorney's fees and/or cost to Plaintiff.

(2)      **The Defendants' List of Contested Issues of Fact and Law.**

(To the extent any issue of law is deemed to be an issue of fact, it is incorporated into this section).

a.  Whether, at time of trial, Defendants' counterclaims, including issues involving the infringement, validity and damages relative to the Allowed Reexamined Claims are not moot as a result of the issuance of the reexamination certificate.

## Non-Infringement

b.  Whether AdjustaCam has proven by a preponderance of the evidence that each of Sakar/Kohl's accused Kodak webcam products literally and directly infringes any claim of the `343 patent.

c.  If Defendants are found to have infringed any claim of the `343 patent, and the claims are found to be valid, the amount Adjustacam has proven by a preponderance of the evidence that it is entitled to damages for that infringement.

d.  If Defendants are found to infringe any claim of the `343 patent, and those asserted claims of the `343 patent are found to be valid, whether Adjustacm has proven by clear and convincing evidence that Defendants' infringement was willful.

e.  Whether Defendants have proven that Defendants are entitled to a declaratory judgment finding that Defendants are not directly infringing, and have not directly

infringed, any claims of the `343 patent.

f.   Whether each accused product of the Defendants infringes any of the claims of the `343 patent.

g.   All of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) comprise a ball and socket joint or hinge member that is fixedly attached to the bottom of the camera and is not "rotatably attached" to the camera.  Moreover, Sakar/Kohl's accused Kodak webcams (Kodak S101 and Kodak T130) with a ball and socket joint do not have a hinge member that is "rotatably attached" about a single axis of rotation relative to the camera (or an equivalent thereof), as required by all of the independent claims of the original and reexamined `343 patent.

h.   The accused ball and socket clips of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) rotate relative to the camera about multiple axes of rotation.

i.   AdjustaCam's own infringement expert, Dr. Muskivitch admitted that Sakar/Kohl's Kodak webcams with a ball and stem fixed to the camera do not rotate as required by claims.

j.   The support frame of Sakar/Kohl's Kodak webcams (Kodak S101 and Kodak T130) is not "rotatably attached" to the hinge member about a single axis either literally or under the doctrine of equivalence. Specifically, Sakar/Kohl's Kodak webcams have a ball-and-socket hinge member whereby the ball-and-socket hinge member rotates in multiple axes of rotation relative to the support frame (legs).  Moreover, because the ball and socket structure of the hinge member permits the "support frame" to rotate in multiple axes of rotation relative to the hinge member, the hinge member of Sakar/Kohl's Kodak webcams is not "rotatably attached" about a "single axis of rotation" relative to the support frame as specified by this Court.

k.   One half of the webcam clips of Sakar/Kohl's accused Kodak webcams (Model Nos.

Kodak S101 and Kodak T130) cannot support anything and does not have two "dispositions" as required by the claims of the `343 patent. Moreover, one half of a webcam clip clearly cannot support a webcam on a display (such as a laptop computer), as the claims require.

l.  Plaintiff's noninfringement expert, Dr. Muskivitch, improperly submitted a new and untimely expert report on August 24, 2012 that changed the identification of many claim limitations concerning defendants' accused products (including Sakar/Kohl's infringing products) from those first identified in his original June 25, 2012 infringement report. Dr. Muskivitch even admitted during his deposition that his June 25, 2012 was incorrect. Specifically, in his original June 25, 2012 report, Dr. Muskivitch identified the "ball-and-stick" portion of the accused Sakar/Kohl's Kodak webcams as the "hinge member," and the clip of those products as the "support frame." In his untimely August 24 Report, however, Dr. Muskivitch moved his identification of the "hinge member" from the "ball and stick" of the accused products to the top half of the webcam clip.  In addition, in his untimely August 24 Report, Dr. Muskivitch also opines that the "support frame" is no longer the clip of the accused products, but is only one half (the bottom half) of the clip.

m.  Under Rule 26(a)(2)(B), Dr. Muskivitch may not offer any opinion at trial which was not disclosed in his June 25 Report, and any subsequent report should be stricken.

n.  Adjustacam did not conduct an adequate pre-filing investigation under Rule 11 for its infringement claims against Sakar/Kohl's Kodak webcams.

### Invalidity

o.   Whether Defendants have proven that Defendants are entitled to a declaratory judgment finding that the claims of the `343 patent are invalid under one or more sections of

Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 102, 103, and/or 112.

p.  Whether the asserted claims of the `343 Patent are valid.

q.  Whether there is no presumption of validity for reexamined asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent because of the U.S.P.T.O. finally rejected these claims.  *See Dow Jones v. Albaise, Ltd.*, 606 F.3d 1338, n. 3 (Fed. Cir. 2010).

r.  The asserted claims 1, 7, and 19 are invalid and AdjustaCam knew or should have known that they were invalid.  During the last 2 years, the asserted claims were rejected 3 times by the U.S. Patent Office over the Irifune and Ma prior art references under 35 U.S.C. § 102, meaning the claims were fully anticipated by these prior art references.  However, Adjustacam continued to prosecute these asserted invalid claims in bad faith against Sakar/Kohl's, and other defendants in this case.

s.  Even before the U.S.P.T.O. finally rejected the asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent, Plaintiff's own infringement expert, Dr. Muskivitch, admitted during his deposition that the Irifune publication anticipated asserted claims 1, 7, and 19 of the `343 patent by testifying that the camera disclosed in Irifune is rotatably attached to the hinge member, as claimed in the `343 patent.

t.  Sakar/Kohl's are entitled to a declaratory judgment finding that the claims of the `343 patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 102, 103, and/or 112.

Sakar states that Adjustacam and Sakar conducted a meet and confer with regard to the following statements u to z, and Adjustacam refused to include them in the Uncontested Fact

Section, on the grounds that they were not relevant, even though they are factually correct.

u.      U.S. Patent Nos. 5,880,783 to Ma; D383,475 to Yamauchi; 4,526,308 to Dovey; 5,808,672 to Wakabayashi; and 4,493,542 to Ohmurawere; and Japanese Unexamined Utility Model App. Pub. No. 11219997 to Irifune (referred to in this case as "the Irifune Publication") are all prior art to AdjustaCam's `343 patent.

v.      AdjustaCam did not inform Sakar/Kohl's of the `343 patent before filing this lawsuit.

w.      With regard to allowed reexamined claims 22 through 48 (including independent claims 22, 31, 40, 41, 44, 45, 46 and 47) of the `343 patent, Plaintiff has refused to grant a covenant not to sue on these claims against Sakar/Kohl's in the imminent future when the U.S.P.T.O. issues a reexamination certificate granting these claims.

x.      AdjustaCam's asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15, 16, 17) of the `343 patent were finally rejected by the U.S.P.T.O. on August 30, 2012.

y.      On September 20, 2012, AdjustaCam cancelled the asserted claims asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15, 16, 17) of the `343 patent.

z.      AdjustaCam knew of the Irifune prior art for over one year during this litigation.

**Damages**

u.  If Defendants are found to infringe any claim of the `343 patent, and those claims are found to be valid, AdjustaCam is entitled to no more than the amount set forth in the Expert Report of Dr. Sullivan.

v.  If Defendants are found to infringe any claim of the `343 patent, and those claims are found to be valid, Defendants' infringement was not willful and AdjustaCam is not entitled to enhanced damages of up to three times actual damages.

w.  If Defendants are found to infringe any claim of the `343 patent, and those claims are found to be valid, Adjustacam is not entitled to prejudgment interest and costs.

x.  Whether this is an exceptional case that entitles Defendants to attorneys' fees, costs and interest.

y.  If Defendants Sakar/Kohl's are found to infringe any of the claims of the `343 patent, and those claims are found to be valid, AdjustaCam is entitled to no more than the amount set forth in the Expert Report of Dr. Sullivan.  Also, AdjustaCam, through the report of its damages expert, has no proof of a damage royalty of $1.25 per webcam.

z.  Plaintiff through its damages expert, Mr. Bratic, has failed to properly establish a royalty calculation based on the Entire Market Value Rule.  Specifically, AdjustCam has failed to provide any proof that the clip for Sakar/Kohl's Kodak webcams motivates consumers to buy the webcams in the first place; and AdjustaCam has failed to conduct market studies or consumer surveys to ascertain whether the demand for Sakar/Kohl's Kodak webcams in question is driven by the clip patented technology, as required by the Federal Circuit.

aa.  Plaintiff AdjustaCam's evidence of past settlement agreements from approximately 24 defendants in this case are not determinative of a reasonable royalty because they: (1) did not include the quantities sold by respective defendants,  (2) did not show a discernible link to the claimed technology, and (3) were extracted as nuisance value settlements.   This evidences Plaintiff's bad faith strategy.

bb.  AdjustaCam tried to extract a settlement from Sakar/Kohl's in the amount of $550,000 and $250,000, as part of AdjustaCam's strategy, when AdjustaCam knew that their asserted claims had been rejected twice by the U.S.P.T.O. and knew that their asserted claims would be finally rejected by the U.S.P.T.O.  This strategy of Adjustacam was in bad faith.

cc.  AdjustaCam delayed its prosecution of the re-examination of the `343 patent for as long as it could until all but 2 or 3 defendants had settled.  Then, as part of its strategy to avoid a trial on the merits, AdjustaCam dismissed its claims against Newegg and Sakar/Kohl's.

dd.  AdjustaCam is now trying to cover up its bad faith strategy by ending the case before trial with a dismissal of the case.

ee.  Sakar will prove that Adjustacam had no proof of a damage royalty of $1.25 through the damage expert of Adjustacam.

ff.  Sakar will prove that Adjustacam caused Sakar to spend over $300,000 in legal fees, costs, and expenses to defend this case that was brought and conducted in bad faith.

gg.  Sakar reserves the right to include additional contentions and disputed issues of fact and law based on the Court's expected rulings on invalidity and non-infringement, and on motions set forth in Defendants' letter briefs.

**G.     WITNESS LISTS.**

Plaintiff's witness list is at Exhibit 1.  Defendants' witness list is at Exhibit 2.

**H.     EXHIBIT LISTS.**

Plaintiff's exhibit list is at Exhibit 3.  Defendants' exhibit list is at Exhibit 4.

**I.     LIST OF ANY PENDING MOTIONS.**

The following motions are pending:

| Docket No. | Pending Motion |
|---|---|
| 721 | Plaintiff's Motion to Dismiss the Claims and Counterclaims Involving Defendants |

Based upon Defendants' inputs into this joint submission, Plaintiff is preparing a motion to stay this case pending issuance of the reexamination certificate, at which time the Court can hold a status conference to determine the future, if any, of this case relative to newly issued

claims.  (Although Plaintiff would prefer just to have the case dismissed per its pending motion to dismiss based upon the cancelation of the Asserted Claims during reexamination proceedings and the covenant not to sue under the '343 patent granted to Defendants.).

Defendants are preparing to file motions for summary judgment on invalidity, and non-infringement; a motion to strike the expert report of Dr. Muskivitch; and a motion to strike portions of the expert report of Walter Bratic.  *See* Defendants Letter Briefs on file.  It is necessary for defendants to continue work on these motions because Adjustacam's covenant not to sue under the `343 patent granted to defendants fails to make it clear that Adjustacam will not sue Sakar in the future with regard to the Kodak webcam products that Sakar has been selling for the last 2 years.  In a final meet and confer on October 2, 2012, Adjustacam's counsel, Mr, Edmonds, refused to grant such a covenant not to sue.

In addition, Defendants are preparing to file a motion for attorney's fees, costs and interests.

**J.      PROBABLE LENGTH OF TRIAL.**

The parties estimate that the probable length of trial is three court days, with time split evenly between both sides.

**K.      MANAGEMENT CONFERENCE LIMITATIONS.**

None.

**L.      JURY CHARGE.**

The parties joint proposed jury charge is at Exhibit 5.  The parties proposed jury verdict form is at Exhibit 6.

**M.      MOTIONS IN LIMINE.**

The parties' will submit motions in limine in accordance with the procedure set forth in the Court's Docket Control Order.

**L.     CERTIFICATIONS.**

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

(1)     Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)     Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)     Each exhibit that is not specifically designated as a demonstrative in the List of Exhibits herein: a. is in existence; b. is numbered; and c. has been shown (or will be shown if requested) to opposing counsel.


Approved as to form and substance:

/s/ John J. Edmonds____
Attorney for Plaintiff

/s/ Ezra Sutton_____
Attorney for Defendants



This Joint Pre-Trial Order is hereby approved this _____ day of _____, 2012.


_____
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

October 2, 2012                                  /s/ *John J. Edmonds*
                                                 John J. Edmonds

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| ADJUSTACAM LLC | |
|---|---|
| v. | NO. 6:10-cv-329-LED |
| AMAZON.COM, INC.;  ET AL. | JURY |

**PLAINTIFF'S TRIAL WITNESS LIST[1]**

Pursuant to the Court's schedule and procedures, Plaintiff AdjustaCam LLC designates

the following witnesses, live and/or by deposition:

| | Witness | Employer | Topic(s) | WC[2] | MC | PWNC |
|---|---|---|---|---|---|---|
| 1. | Barthelemy, Joel | GlobalMedia | GlobalMedia; Kritter Cam; '343 patent; Rights to '343 patent | | X | |
| 2. | Bratic, Walter | Overmont | Damages; Royalties; See report and depo | | X | |
| 3. | Haynes, Clayton | Acacia Research Corp. and AdjustaCam LLC | AdjustaCam; Rights to '343 patent; See depo | X | | |
| 4. | Hermann, David | Kohl's | Infringement and damages | | | X |
| 5. | Krekelberg, David | Illunis | Inventorship; Kritter Cam | | X | |
| 6. | Muskivitch, John | Independent consultant | Infringement; Validity; See Muskivitch reports and depo; See Bratic report and depo | X | | |
| 7. | Sandhosh, George | Sakar | Infringement and damages | | | X |
| 8. | Sasson, Ralph | Sakar | Infringement and damages | | | X |

---

[1] Pending before the Court is AdjustaCam's motion to dismiss the remaining defendants, Sakar and Kohl's, with prejudice, which is based upon the cancelation of the Asserted Claims in reexamination proceedings and a covneant not to sue granted to Sakar/Kohl's. Sakar/Kohl's opposition to this case being dismissed at this point is ill-informed and mystifying.  Thus, subject to its pending motion to dismiss, in an abundance of caution AdjustaCam respectfully submits this Witness List, despite the fact that the issues in this litigation are moot or near moot at this point, and will clearly be moot come time of trial.

[2] "WC" means will call.  "MC" means may call.  "PWNC" means probably will not call.

| 9. | Wong, Steve | Acacia Research Group LLC | GlobalMedia; AdjustaCam; Rights to '343 patent; Royalties; See Bratic report and depo; See Haynes depo | | X | |
| 10. | Any Defendant employees/representatives/witnesses who attend the trial | Various | Infringement and damages | | X | |
| 11. | Anyone Designated by Defendants to testify. | Various | Infringement, validity and damages | | X | |

Plaintiff reserves the right to supplement, amend, or withdraw witnesses from this submission in accordance with the Court's schedule and procedures.


October 2, 2012                          Respectfully submitted,

                                         /s/ *John J. Edmonds*
                                         John J. Edmonds – LEAD COUNSEL
                                         Texas Bar No. 789758
                                         Stephen F. Schlather
                                         Texas Bar No. 24007993
                                         Michael J. Collins
                                         Texas Bar No. 4614510
                                         COLLINS, EDMONDS POGORZELSKI
                                         SCHLATHER & TOWER, PLLC
                                         1616 S. Voss Rd., Suite 125
                                         Houston, Texas 77057
                                         Telephone: (281) 501-3425
                                         Facsimile: (832) 415-2535
                                         jedmonds@cepiplaw.com
                                         sschlather@cepiplaw.com
                                         mcollins@cepiplaw.com

                                         Andrew W. Spangler
                                         State Bar No. 24041960
                                         Spangler & Fussell P.C.
                                         208 N. Green Street, Suite 300
                                         Longview, Texas 75601
                                         (903) 753-9300

(903) 553-0403 (fax)
spangler@sfipfirm.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC


**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

October 2, 2012                          /s/ *John J. Edmonds*
                                         John J. Edmonds

SAKAR 6.0-018

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| ADJUSTACAM, L.L.C.<br><br>                    Plaintiff,<br><br>vs.<br><br>SAKAR INTERNATIONAL, INC., et al<br><br>                    Defendants. | Civil Action No. 6:10-cv-00329 |

## EXHIBIT 2

## DESIGNATION OF TRIAL WITNESSES OF
## SAKAR INTERNATIONAL, INC., KOHL'S ILLINOIS, INC., AND
## KOHL'S CORPORATION

The parties hereby designate the following Trial Witnesses:

**Name**                                      **Testimony**

1) Ralph Sasson, Vice               Sakar's purchase and sales of accused Kodak
   President of Sakar                webcams, where purchased, the prices, who
   International, Inc., 195          developed the webcams, the customers, gross
   Carter Drive, Edison, NJ         profits, net profits, cost of the web cam clip and
                                     cost of camera, how the web cams operate, no
                                     notice prior to lawsuit, and related matters; the
                                     amount of legal fees, costs, and expenses
                                     incurred by Sakar in this case.

| 2) Santhosh George, Vice President of Sakar International, Inc., 195 Carter Drive, Edison, NJ | Sakar's purchase and sales of accused Kodak webcams, where purchased, the prices, who developed the webcams, the customers, gross profits, net profits, cost of the web cam clip and cost of camera, how the web cams operate, no notice prior to lawsuit, and related matters. |
|---|---|
| 3) David Krekelberg Minneapolis, MN | Inventor with regard to his knowledge of prior art and the relevance of the Irifune prior art and other references. |
| 4) Adjustacam's 30 (b)(6) witness – Clayton Haynes | His knowledge of Adjustacam's Rule 11 pre-filing investigation, and his knowledge of Settlement Agreements entered into by Adjustacam with regard to the patent in suit, and his knowledge of royalty payments and royalty calculations. |

| **Experts** | **Testimony** |
|---|---|
| 5) John Hamilton 3031 Tisch Way, Suite 1010, San Jose, CA | Topics sets forth in his Expert Report, including non-infringement, claim charts, rebutting the Report of Plaintiff's Expert on infringement and related matters. |
| 6) Richard Klopp 525 West Monroe Street, Suite 1050 Chicago, IL | Topics set forth in his Expert Report, including Invalidity, rebutting the Report of Plaintiff's Expert on validity, and related topics, the prosecution history in the U.S. Patent Office, the prior art, claim charts, the re-examination proceeding of the `343 patent in suit, the final rejection, and related topics. |
| 7) John Muskivitch San Francisco, CA | His testimony regarding his two Expert Reports on infringement and validity. |
| 8) Walter Bratic Houston, TX | His testimony regarding his Expert Report on settlements and damages. |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| ADJUSTACAM LLC | |
|---|---|
| v. | NO. 6:10-cv-329-LED |
| AMAZON.COM, INC.;  ET AL. | JURY |

**PLAINTIFF'S TRIAL EXHIBIT LIST**[1]

| PLT EXH. NO. | DESCRIPTION | EXPECT TO USE | MAY USE | MARKED | OFFERED | ADMITTED |
|---|---|---|---|---|---|---|
| 1. | U.S. Patent No. 5,855,343 | X | | | | |
| 2. | Assignment history for the '343 patent | X | | | | |
| 3. | Exclusive license to the '343 patent | X | | | | |
| 4. | Assignment of exclusive license to the '343 patent | X | | | | |
| 5. | Kodak S101/W100 webcam | X | | | | |
| 6. | Kodak T130 webcam | X | | | | |
| 7. | ADJCAM000133-147 | | X | | | |
| 8. | AdjustaCam and PAR's license agreements, including at ADJCAM-SETTLE000001-270 | | X | | | |

---

[1] Pending before the Court is AdjustaCam's motion to dismiss the remaining defendants, Sakar and Kohl's, with prejudice, which is based upon the cancelation of the Asserted Claims in reexamination proceedings and a covnenant not to sue granted to Sakar/Kohl's.  Sakar/Kohl's opposition to this case being dismissed at this point is ill-informed and mystifying.  Thus, subject to its pending motion to dismiss, in an abundance of caution AdjustaCam respectfully submits this Exhibit List, despite the fact that the issues in this litigation are moot or near moot at this point, and will clearly be moot come time of trial.

3

| | | | | | |
|---|---|---|---|---|---|
| 9. | Bratic CV | | X | | |
| 10. | Documents, namely HP and WalMart documents and prior license agreements, cited in the Bratic Report | | X | | |
| 11. | GLOBALMEDIA 2701-2714 | | X | | |
| 12. | GLOBALMEDIA 2715-2720 | | X | | |
| 13. | GLOBALMEDIA 2721-2760 | | X | | |
| 14. | GLOBALMEDIA 2761-66 | | X | | |
| 15. | GLOBALMEDIA0000013 – 34 | | X | | |
| 16. | HP000023 - 415; | | X | | |
| 17. | HP000201 – 214 | | X | | |
| 18. | HP000215 – 229 | | X | | |
| 19. | HP00023 – 57 | | X | | |
| 20. | HP000244 – 295 | | X | | |
| 21. | HP000296 – 370 | | X | | |
| 22. | HP000371 – 406 | | X | | |
| 23. | HP00230 - 243 | | X | | |

4

A1902

| | | | | | |
|---|---|---|---|---|---|
| 24. Invoices from Dr. Klopp | | X | | | |
| 25. Invoices from Dr. Sullivan | | X | | | |
| 26. Muskivitch CV | | X | | | |
| 27. Exhibit 4 to Muskivitch Deposition – Muskivitch Report (redacted to relate to Sakar/Kohl's only) | | X | | | |
| 28. Sales numbers produced by Kohl's | | X | | | |
| 29. Sales numbers produced by Sakar | | X | | | |
| 30. WMT-ACAM0001100 – 1200; | | X | | | |
| 31. WMT-ACAM0001128 – 1131 | | X | | | |
| 32. Updated sales numbers produced by Kohl's | | X | | | |
| 33. Updated sales numbers produced by Sakar | | X | | | |
| 34. AdjustaCam reserves the right to introduce one or more of the Exhibits listed on Defendants' Trial Exhibit List, to the extent it may be admissible | | X | | | |

Plaintiff reserves the right to supplement, amend, or withdraw exhibits from this submission in accordance with the Court's schedule and procedures.

October 2, 2012

Respectfully submitted,

/s/ *John J. Edmonds*
John J. Edmonds – LEAD COUNSEL
Texas Bar No. 789758

5

A1903

Stephen F. Schlather
Texas Bar No. 24007993
Michael J. Collins
Texas Bar No. 4614510
COLLINS, EDMONDS POGORZELSKI
SCHLATHER & TOWER, PLLC
1616 S. Voss Rd., Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
sschlather@cepiplaw.com
mcollins@cepiplaw.com

Andrew W. Spangler
State Bar No. 24041960
Spangler & Fussell P.C.
208 N. Green Street, Suite 300
Longview, Texas 75601
(903) 753-9300
(903) 553-0403 (fax)
spangler@sfipfirm.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being

served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

October 2, 2012                    /s/ *John J. Edmonds*_____
                                   John J. Edmonds

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **ADJUSTACAM, L.L.C.** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 6:10-cv-00329 (LED)** |
| | : | |
| **vs.** | : | **Jury Trial Demanded** |
| | : | |
| **AMAZON.COM, INC., et al** | : | |
| | : | |
| **Defendants.** | : | |

_____

**EXHIBIT 4**

**SAKAR/KOHL'S EXHIBIT LIST**

| Exhibit No. | Description |
|---|---|
| 1. | Expert Report of Ryan Sullivan, Ph. D., 7-26-12 (#2 – Sullivan) |
| 2. | Invoice 202893 (Highly Confidential) (#2 – Klopp) |
| 3. | Expert Report of Dr. Richard Klopp, P.E. (#3 – Klopp) |
| 4. | Expert Report of John Hamilton |
| 5. | Document entitled, "Expert Report of John C. Muskivitch Regarding Infringement of J.S. Patent No. 5,855,343," dated 6-25-12, 173 pages (Highly Confidential, Attorneys' Eyes Only (#4 – Muskivitch) |
| 6. | Document entitled "Unexamined Utility Model Application Publication H2-19997," "Japanese Unexamined Utility Model Publication," Bates numbers ADJDEFPA000093.1 through ADJDEFPA000093.40 (#13 – Muskivitch) |
| 7. | United States Patent No. 5,880,783 by Ma, dated 3-9-99, Bates numbers ADJDEF000001 through ADJDEFPA000005 (#14 – |

Muskivitch)

8.         United States Patent Number Des. 383,475 by Yamauchi et al., dated 9-9-97, Bates numbers ADJDEFPA000006 through ADJDEFPA000012 (#15 – Muskivitch)

9.         United States Patent Number 4,526,308 by Dovey, dated 7-2-85, Bates numbers ADJDEFPA000013 through ADJDEFPA000018 (#16 – Muskivitch)

10.      06-25-12 "Expert Report of Walt Bratic" (#3 – Bratic)

11.      06-28-12 "Supplement Expert Report of Walt Bratic" (#4 – Bratic)

12.      "Settlement and License Agreement" between PAR Technologies, Inc. and Philips Electronics North America Corporation, HIGHLY CONFIDENTIAL/ATTORNEY'S EYES ONLY, Bates ADJCAM-SETTLE000001 through 000015 (#5 – Bratic)

13.      "Settlement and Patent License Agreement" between Adjustacam LLC and Jasco Products Company, LLC, HIGHLY CONFIDENTIAL/ATTORNEY'S EYES ONLY, Bates ADJCAM-SETTLE000016 through 000026 (#6 – Bratic)

14.      "Settlement and Patent License Agreement" between Adjustacam LLC and jWIN Electronics Corp., HIGHLY CONFIDENTIAL/ATTORNEY'S EYES ONLY, Bates ADJCAM-SETTLE000027 through 000037 (#7 – Bratic)

15.      "Settlement and Patent License Agreement" between Adjustacam LLC and Tripp Manufacturing Company, LLC, HIGHLY CONFIDENTIAL/ATTORNEY'S EYES ONLY, Bates ADJCAM-SETTLE000060 through 000069 (#8 – Bratic)

16.      "Settlement and Patent License Agreement" between Adjustacam LLC and Creative Technology, Ltd., HIGHLY CONFIDENTIAL, Bates ADJCAM-SETTLE000142 through 000152 (#9 – Bratic)

17.      "Subject to FRE 408 and NDA Settlement and Patent License Agreement" between Adjustacam LLC and Intcomex, Inc., et al, HIGHLY CONFIDENTIAL/ATTORNEY'S EYES ONLY, Bates ADJCAM-SETTLE000038 through 000048 (#10 – Bratic)

18.      "Settlement and Patent License Agreement" between Adjustacam LLC and Phoebe Micro, Inc., HIGHLY

CONFIDENTIAL/ATTORNEY'S EYES ONLY, Bates
ADJCAM-SETTLE000049 through 000059 (#11 – Bratic)

19. "Settlement and Patent License Agreement" between Adjustacam
LLC and Dell, Inc., HIGHLY CONFIDENTIAL, Bates ADJCAM-
SETTLE000153 through 000163 (#12 – Bratic)

20. "Settlement and Patent License Agreement" between Adjustacam
LLC and J&R Electronics Inc., HIGHLY CONFIDENTIAL, Bates
ADJCAM-SETTLE000164 through 000175 (#13 – Bratic)

21. "Settlement and Patent License Agreement" between Adjustacam
LLC and Mace Group, Inc. and Macally Peripherals, Inc.,
HIGHLY CONFIDENTIAL, Bates ADJCAM-SETTLE000176
through 000190 (#14 – Bratic)

22. "Settlement and Patent License Agreement" between Adjustacam
LLC and Overstock.com, HIGHLY CONFIDENTIAL, Bates
ADJCAM-SETTLE000191 through 000201 (#15 – Bratic)

23. "Settlement and Patent License Agreement" between Adjustacam
LLC and, et al., HIGHLY CONFIDENTIAL, Bates
ADJCAM-SETTLE000202 through 000212 (#16 – Bratic)

24. "Settlement and Patent License Agreement" between Adjustacam
LLC and Amazon.com, Inc., HIGHLY CONFIDENTIAL, Bates
ADJCAM-SETTLE000213 through 000222 (#17 – Bratic)

25. "Settlement and Patent License Agreement" between Adjustacam
LLC and Auditek Corporation, HIGHLY CONFIDENTIAL, Bates
ADJCAM-SETTLE000235 through 000243 (#18 – Bratic)

26. "Settlement and Patent License Agreement" between Adjustacam
LLC and Digital Innovations, LLC, HIGHLY CONFIDENTIAL,
Bates ADJCAM-SETTLE000223 through 000234 (#19 – Bratic)

27. "Settlement and Patent License Agreement" between Adjustacam
LLC and KYE International Corporation, et al, HIGHLY
CONFIDENTIAL, Bates ADJCAM-SETTLE000244 through
000254 (#20 – Bratic)

28. "Settlement and Patent License Agreement" between Adjustacam
LLC and Trust International B.V., HIGHLY CONFIDENTIAL-
FOR COUNSEL ONLY, Bates ADJCAM000106 through 000116
(#21 – Bratic)

29.        "Settlement and Patent License Agreement" between Adjustacam
           LLC and Baltic Latvian Universal Electronics, LLC,  HIGHLY
           CONFIDENTIAL-FOR COUNSEL ONLY, Bates ADJCAM
           000127 through 000135 (#22 – Bratic)

30.        "Settlement Agreement" between Adjustacam LLC and Chicony
           Global, Inc., HIGHLY CONFIDENTIAL-FOR COUNSEL
           ONLY, Bates ADJCAM000097 through 000105 (#23 – Bratic)

31.        "Settlement and Patent License Agreement" between Adjustacam
           LLC and RadioShack Corporation,  HIGHLY CONFIDENTIAL-
           FOR COUNSEL ONLY, Bates ADJCAM 000117 through 000126
           (#24 – Bratic)

32.        "Settlement and Patent License Agreement" between Adjustacam
           LLC and PC Gear Head, LLC,  HIGHLY     CONFIDENTIAL-
           ATTORNEY'S EYES ONLY, Bates ADJCAM 000255 through
           000262 (#25 – Bratic)

33.        "Settlement and Patent License Agreement" between Adjustacam
           LLC and Hewlett-Packard Company,  HIGHLY
           CONFIDENTIAL-ATTORNEY'S EYES ONLY, Bates
           ADJCAM-SETTLE 000263 through 000271 (#26 – Bratic)

34.        Sakar's legal fees, costs, and expenses incurred in the litigations
           with Adjustacam.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.

**PROPOSED JURY INSTRUCTIONS**

**1.  INTRODUCTION[1]**

     **MEMBERS OF THE JURY:[2][3]**

     You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made during trial or make in these instructions as an indication that I have any opinion about the facts of this case. After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not instruction son the law. They are intended only to assist you in understanding and resolving the evidence and the parties' contentions. A verdict form has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your

---

[1] Jury charge in *CEATS v. Continental Airlines, et al.*, 6:10cv120, Doc No. 970.

[2] Defendants state that this jury instruction applies up until the time that the reexamination certificate for the `343 patent is granted.  Sakar does not wish to litigate the asserted claims or the re-examined claims.  However, Adjustacam has refused to provide Sakar, along with its Motion to Dismiss, a Covenant Not To Sue against Sakar's accused products that Sakar has been selling for 2 years, by asserting Adjustacam's new re-examined claims against Sakar's accused products.  In addition, these Jury Instructions and the Pre-Trial Order would not have been necessary if Adjustacam had agreed to postpone the Pre-Trial Order and Jury Instructions that Sakar had requested on September 24, 2012.  After 2 years of litigation with Adjustacam, Sakar does not want another lawsuit by Adjustacam asserting the new re-examined claims against the same products that Sakar has been selling for 2 years.

[3] Plaintiff states that it is at a loss as to why we need this jury instruction, or for that matter any jury instructions, in view of Plaintiff's Motion to Dismiss, which is based upon the cancelation of the Asserted Claims in reexamination proceedings (which will be final long before the scheduled trial of this matter) and the Covenant Not To Sue granted to Defendants.  Rather than wasting everyone's time, including most importantly the Court's on this jury charge, Defendants should withdraw their meritless opposition to the dismissal of this case.

Case 6:10-cv-00329-LED   Document 723-5   Filed 10/02/12   Page 2 of 20 PageID #:  6467

foreperson fill in, date, and sign the form. Answer each question from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers in your verdict must be unanimous. Unless otherwise instructed, in determining whether any fact has been proved in this case, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them, and any stipulations as to facts. In deciding the facts of this case, you must not be influenced by bias or prejudice or favor as to any party. Our system of law does not permit jurors to be governed by prejudice or sympathy or public opinion. The parties and the public expect that you will carefully and impartially consider all of the evidence in the case, follow the law as stated by the Court, and reach a just verdict regardless of the consequences.

## 1.1 CONSIDERING WITNESS TESTIMONY[4]

You the jurors are the sole judges of the credibility of all witnesses and the weight and effect of all evidence. By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence. When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if he or she had been permitted to answer the question. You must not consider the question or answer for any purpose. At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We met because often during a trial something comes up that does not involve the jury. You should not speculate on what may have been discussed during such times. In determining the weight to give to the testimony of a witness, you may ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some

---

[4] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.

important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial. You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you should consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

## 1.2 HOW TO EXAMINE THE EVIDENCE[5]

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, the witness testimony may be presented, under oath, in the form of a deposition. Some time before this trial, attorneys representing the parties in this case questioned this witness under oath. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weight and otherwise considered by you insofar as possible the same as if the witness had been present and had testified from the witness stand in court. While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of reason and common experience. In other words, in reaching your verdict, you may reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case. Unless you are instructed otherwise, the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the

---

[5] Jury charge in *CEATS v. Continental Airlines, et al.*, 6:10cv120, Doc No. 970.

contrary, if after considering all the other evidence you believe that single witness more than the other witnesses. There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence such as testimony of an eyewitness. The other is indirect or circumstantial evidence — the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence and simply requires that you find the facts after considering all the evidence, both direct and circumstantial.

## 1.3 DEMONSTRATIVE EXHIBITS[6]

Certain exhibits shown to you are illustrations of the evidence, but are not themselves evidence. We call these types of exhibits "demonstrative exhibits." Demonstrative exhibits are a party's description, picture, or model to describe something involved in this trial. If your recollection of the evidence differs from the exhibit, rely on your recollection.

## 1.4 EXPERT WITNESSES[7]

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field, called an expert witness, is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether and to what extent to rely upon it. In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying.

## 2. CONTENTIONS OF THE PARTIES[8]

---

[6] Jury charge in *CEATS v. Continental Airlines, et al.*, 6:10cv120, Doc No. 970.
[7] Jury charge in *CEATS v. Continental Airlines, et al.*, 6:10cv120, Doc No. 970.

Defendants contend that they do not infringe claims 1, 7 and 19 of the '343 patent.  I will sometimes refer to claims 1, 7 and 19 of the '343 patent as the "Disputed Claims."  Defendants contend that all of the Disputed Claims are invalid on one or more grounds. Your job is first to decide (1) whether the Disputed Claims have been infringed, and then decide (2) whether the Disputed Claims are invalid. Infringement and invalidity are separate questions and should be considered and answered separately.

## 2.1 BURDENS OF PROOF[9]

In any legal action, facts must be proved by a required amount of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. The first is the "preponderance of the evidence "standard and the second is the "clear and convincing" standard. The "preponderance of the evidence" standard means that the evidence persuades you that a claim is more likely true than not true. The "clear and convincing standard" means that the evidence produces in your mind a firm belief or conviction as to the matter at issue. The clear and convincing evidence standard requires greater proof than is necessary for the preponderance of the evidence standard.

**Plaintiff:**

Defendants bear the burden of proving non-infringement by a preponderance of the evidence. In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. If the proof establishes that all essential parts of the Defendants' non-

---

[8] Jury charge in *CEATS v. Continential Airlines, et al.,* 6:10cv120, Doc No. 970; *Medtronic Inc. v. Boston Scientific Corp.*, No. 11-1313 (Fed. Cir. Sept. 18, 2012) (party seeking declaratory relief has burden of proving non-infringement).
[9] Jury charge in *CEATS v. Continential Airlines, et al.,* 6:10cv120, Doc No. 970; *Medtronic Inc. v. Boston Scientific Corp.*, No. 11-1313 (Fed. Cir. Sept. 18, 2012) (party seeking declaratory relief has burden of proving non-infringement).

infringement of a claim are more likely true than not true, then you should find for Defendants as to that claim. As I told you during the preliminary instructions, each Defendant has the burden of individually proving non-infringement as to each Disputed Claim.

As an issued United States patent, the '343 patent is presumed to be valid. Defendants have the burden of overcoming that presumption and proving invalidity of the '343 patent by clear and convincing evidence. In determining whether any fact has been proved by clear and convincing evidence, you may, unless otherwise instructed, consider stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. Evidence of prior art which was not reviewed by the Patent Office may be more probative of meeting this standard than prior art which was reviewed by the Patent Office. The clear and convincing evidence standard requires a greater degree of proof than is necessary for the preponderance of the evidence standard. The proof must establish a firm belief or conviction in your mind that Defendants' invalidity claims are correct for you to find for them that the '343 patent is invalid.

**Defendants:**

Plaintiff bears the burden of proving infringement by a preponderance of the evidence. In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. If the proof establishes that all essential parts of the Plaintiff's claim for infringement of a claim are more likely true than not true, then you should find for Plaintiff as to that claim. As I told you during the preliminary instructions, Plaintiff has the burden of proving infringement as to each Disputed Claim.

The '343 patent is NOT presumed to be valid because the asserted claims have been finally rejected by the U.S. Patent Office. In determining whether any fact has been proved by clear and convincing evidence, you may, unless otherwise instructed, consider stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. Evidence of prior art which was not reviewed by the Patent Office may be more probative of meeting this standard than prior art which was reviewed by the Patent Office. The clear and convincing evidence standard requires a greater degree of proof than is necessary for the preponderance of the evidence standard. The proof must establish a firm belief or conviction in your mind that Defendants' invalidity claims are correct for you to find for them that the '343 patent is invalid.

## 3. THE CLAIMS OF THE PATENTS-IN-SUIT

## 3.1 PATENT CLAIMS[10]

The claims of a patent are the numbered sentences at the end of the patent. The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing. Claims may describe products, such as machines or chemical compounds, or processes for making or using a product. Claims are usually divided into parts or steps, called limitations or elements. For example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs on the tabletop. In this example, the tabletop, legs and glue are each a separate limitation of the claim.

---

[10] Jury charge in *CEATS v. Continental Airlines, et al.*, 6:10cv120, Doc No. 970.

## 3.2 CONSTRUCTION OF THE CLAIMS[11]

In deciding whether or not a patent is infringed, the first step is to understand the meaning of the words used in the patent claims. It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. You must accept the meanings I give you and use those meanings when you decide whether or not the patent claims are infringed, and whether or not they are invalid. I have interpreted the meaning of some of the language in the patent claims involved in this case. My interpretation of that claim language appears in Appendix A to this charge. The claim language I have not interpreted for you in Appendix A is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the art, which is to say, in the field of technology of the patent. The meaning of the words in the patent claims must be the same when deciding both infringement and validity.

## 3.3 OPEN-ENDED OR "COMPRISING" CLAIMS[12]

The beginning, or preamble, of certain claims uses the word "comprising.""Comprising" means "including" or "containing but not limited to." That is, acclaim that uses the word "comprising" is not limited to products or methods having only the requirements that are recited in the claim limitations: it also covers products or methods that have all of the requirements and add additional requirements without changing the required limitations. This means that if you decide that the Defendants' accused webcam clips include all of the requirements in a claim, the claim is infringed. This is true even if the accused webcam clip includes components in addition to those requirements.

## 3.4 INDEPENDENT AND DEPENDENT CLAIMS[13]

This case involves two types of patent claims: independent claims and dependent claims.

---

[11] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.
[12] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.
[13] Federal Circuit Bar Association, Model Pattern Jury Instructions, § 2.2a (Feb. 2012).

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, claims 1 and 19 of the '343 patent are each independent claims.

Claim 7 of the '343 patent is a "dependent claim." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim to which it refers. A product that meets all of the requirements of both the dependent claim and the claim to which it refers is covered by that dependent claim. You are tasked with determining whether there is infringement of these three claims.

## 4. INFRINGEMENT[14]

**Plaintiff:**

I will now instruct you as to the rules you must follow when deciding whether Defendants have proven that they have not infringed any of the Disputed Claims of the '343 patent. Patent law gives the owner of a valid patent the right to exclude others from making, using, offering to sell, selling, or importing, the patented invention within the United States during the term of the patent. Any business entity that has engaged in any of those acts without the patent owner's permission infringes the patent. Someone can infringe a patent without knowing that what they are doing is an infringement of the patent. They also may infringe a

---

[14] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.

patent even though they believe in good faith that what they are doing is not an infringement of any patent.

**Defendants:**

I will now instruct you as to the rules you must follow when deciding whether Plaintiff has proven that Defendants have infringed any of the Disputed Claims of the '343 patent. Patent law gives the owner of a valid patent the right to exclude others from making, using, offering to sell, selling, or importing, the patented invention within the United States during the term of the patent. Any business entity that has engaged in any of those acts without the patent owner's permission infringes the patent. Someone can infringe a patent without knowing that what they are doing is an infringement of the patent. They also may infringe a patent even though they believe in good faith that what they are doing is not an infringement of any patent.

You must decide whether any Defendant has made, used, sold, or offered for sale within the United States an apparatus covered by the Disputed Claims in the '343 patent. To decide infringement, you must compare the Defendants' disputed product to each Asserted Claim of the patent to determine whether every requirement or element of the Asserted Claim is included in the disputed product. To prove infringement, Plaintiff must prove that each disputed product meets all of the requirements or elements of an Asserted Claim. If the disputed product omits any requirement recited in an asserted patent claim, it does not infringe that claim.

## 5. INVALIDITY[15]

## 5.1 INVALIDITY—GENERALLY[16]

Patent invalidity is a defense to patent infringement. Even though the Patent Office examiner has allowed the claims of a patent, you have the ultimate responsibility for deciding

---

[15] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.
[16] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.

whether the claims of the patent are valid. I will now instruct you on the invalidity issues you should consider. As you consider these issues, remember that Defendants bear the burden of proving invalidity of each claim with facts supported by clear and convincing evidence. In making your determination as to invalidity, you should consider each claimseparately.

## 5.2 SCOPE AND CONTENT OF THE PRIOR ART[17]

Before explaining to you each of Defendants' grounds for invalidity in detail, I will discuss the concept of "prior art." Defendants must prove by clear and convincing evidence that the references on which they rely are, in fact, prior art. To do so, Defendants must prove that the references fall within one or more of the different categories of prior art recognized by the patent laws. The categories of relevance in this case are:

(1) Anything already patented or described in a printed publication, anywhere in the world before the March 7, 1997.

(2) Anything described in a published patent application filed by another in the United States or under the PCT system and designated the United States, which was published in English before March 7, 1997.

(3) Anything described in a patent granted on an application for patent by another filed in the United States or under the PCT system and designated the United States, which was published in English and the application was filed before March 7, 1997.

In order for a reference to be relevant prior art, the reference must be within the field of the inventor's endeavor, or if it is from another field of endeavor, the reference must be reasonably related to the particular problem or issue the inventor faced or addressed when making the inventions described in the Disputed Claims.

---

[17] Jury charge in *CEATS v. Continential Airlines, et al.,* 6:10cv120, Doc No. 970, and Federal Circuit Bar Association, Model Pattern Jury Instructions, § 4.3b (Feb. 2012).

Defendants must also prove that the prior art was complete enough to enable one of ordinary skill in the art to practice the claimed invention without undue experimentation. The disclosure in a prior art reference does not have to be in the same words as the claim. But all the elements of the claim must be there, either stated expressly or necessarily implied or inherent such that someone of ordinary skill in that field of technology looking at that one prior art reference would be able to make and use the claimed invention. Something is inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art, and if a skilled person would understand that to be the case. Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may coincidentally result from a given set of circumstances is not sufficient.

## 5.3 PERSON OF ORDINARY SKILL[18]

Several times in my instructions I have referred to a person of ordinary skill in the field of the invention. It is up to you to decide the level of ordinary skill in the field of the invention. You should consider all of the evidence introduced at trial in making this decision, including:

1. the levels of education and experience of persons working in the field;

2. the types of problems encountered in the field; and

3. the sophistication of the technology.

In this case, the parties have expressed their contentions of the level of ordinary skill in the art. Because it is your determination to make, you need not adopt the parties' contention of the level of ordinary skill in the art. I will now explain to you the Defendants' grounds for asserting invalidity of the Disputed Claims.

## 5.4 INVALIDITY—ANTICIPATION[19]

---

[18] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.
[19] Federal Circuit Bar Association, Model Pattern Jury Instructions, § 4.3b (Feb. 2012).

In order for someone to be entitled to a patent, the invention must actually be "new" and the inventor must not have lost her or his rights by delaying the filing of an application claiming the invention. In general, inventions are new when the identical product has not been made, used, or disclosed before. Anticipation must be determined on a claim-by-claim basis.

Defendants contend that claims 1, 7 and 9 of the '343 patent are invalid because the claimed inventions are anticipated. Defendants must convince you of this by clear and convincing evidence, i.e., that the evidence highly probably demonstrates that the claim(s) is/are invalid.

Here is a list of ways that Defendants can show that a patent claim was not new or that the patentee lost the right to patent the claim(s)

(1) An invention is not new if it was already patented or described in a printed publication, anywhere in the world before the March 7, 1997. A description is a "printed publication" only if it was publicly accessible.  An invention was patented by another if the other patent describes the same invention claimed by the Patentee to a person having ordinary skill in the technology.

(2) An invention is not new if it was described in a published patent application filed by another in the United States or under the PCT system and designated the United States, and was published in English before March 7, 1997.

(3) An invention is not new if the claimed invention was described in a patent granted on an application for patent by another filed in the United States or under the PCT system and designated the United States, and was published in English and the application was filed before March 7, 1997.

## 5.7 INVALIDITY—OBVIOUSNESS[20]

In this case, Defendants contend that all Disputed Claims are invalid as obvious. A patent claim is invalid if the claimed invention, as a whole, would have been obvious to a person of ordinary skill in the field of the invention at the time the application was filed. This means that even if all the requirements of the claim cannot be found in a single prior art reference that would anticipate the claim, a person of ordinary skill in the field of the invention who knew about all of the prior art would have come up with the claimed invention. But a patent claim composed of several requirements is not proved obvious merely by demonstrating that each of its requirements was independently known in the prior art. Although common sense directs one to look with care at a patent application that claims as innovation the combination of known requirements according to their established functions to produce a predictable result, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the requirements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. Accordingly, you may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention, as a whole, before the time of the claimed invention, although proof of this is not a requirement to prove obviousness. Teachings, suggestions, and motivations may also be found within the knowledge of a person with ordinary skill in the art including inferences and creative steps that a person of ordinary skill in the art would employ. Additionally, teachings, suggestions, and motivations may be found in the nature of the problem solved by the claimed invention, or any need or problem known in the field of the invention at the time of and addressed by the invention.

---

[20] Jury charge in *CEATS v. Continental Airlines, et al.*, 6:10cv120, Doc No. 970.

Therefore, in evaluating whether such a claim would have been obvious, you should consider a variety of factors:

1. Whether Defendants have identified a reason that would have prompted a person of ordinary skill in the field of the invention to combine the requirements or concepts from the prior art in the same way as in the claimed invention. There is no single way to define the line between true inventiveness on one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem on the other hand (which is not patentable). For example, market forces or other design incentives may be what produced a change, rather than true inventiveness.

2. Whether the claimed invention applies a known technique that had been used to improve a similar device or method in a similar way.

3. Whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art. But you must be careful not to determine obviousness using hindsight; many true inventions can seem obvious after the fact.

You should put yourself in the position of a person of ordinary skill in the field of the invention at the time the claimed inventions were made, and you should not consider what is known today or what is learned from the teaching of the patents.

The ultimate conclusion of whether a claim is obvious should be based on your determination of several factual issues:

1. You must decide the level of ordinary skill in the field of the invention that someone would have had at the time the claimed invention was made.

2. You must decide the scope and content of the prior art. In determining the scope and content of the prior art, you must decide whether a reference is pertinent, or analogous, to the claimed invention. Pertinent, or analogous, prior art includes prior art in the same field of endeavor as the claimed invention, regardless of the problems addressed by the reference, and prior art from different fields reasonably pertinent to the particular problem with which the claimed invention is concerned.

3. You should consider any difference or differences between the prior art and the claim requirements.

Finally, you should consider any of the following factors that you find have been shown by the evidence:

*Factors Tending to Show Non-obviousness*

1. commercial success of a product due to the merits of the claimed invention;

2. a long felt, but unresolved, need for the solution provided by the claimed invention;

3. unsuccessful attempts by others to find the solution provided by the claimed invention;

4. copying of the invention by others;

5. unexpected and superior results from the claimed invention;

6. acceptance by others of the claimed invention as shown by praise from others in the field of the invention or from the licensing of the claimed invention;

7. disclosures in the prior art that criticize, discredit, or otherwise discourage the claimed invention and would therefore tend to show that the invention was not obvious;

8. other evidence tending to show nonobviousness. To be relevant to your determination of obviousness, any of these additional considerations must have a connection to the claimed invention set forth in the patent claims. You may consider the presence of any of the list factors

1–8 as an indication that the claimed invention would not have been obvious at the time the claimed invention was made.

*Factors tending to show obviousness.*

1. independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it;

2. other evidence tending to show obviousness. Although you should consider any evidence of these factors, the relevance and importance of any of them to your decision on whether the claimed invention would have been obvious is up to you. Defendants must prove by clear and convincing evidence that a claimed invention was obvious. If you find that a claimed invention was obvious as explained above, you must find that claim invalid.

## 6. INSTRUCTIONS FOR DELIBERATIONS

## 6.1 INSTRUCTION REGARDING JUROR QUESTIONS[21]

As I explained at the beginning of the trial, during this trial I have allowed you, the jurors, to ask questions after each witness had presented their testimony. I hope you found it helpful to be able to ask questions. Also, as I explained at the beginning of trial, you should not draw any conclusions if I either decided not to ask one of your specific questions or if I rephrased some of your questions. Lastly, you should not draw any adverse inference against any party in this action if I decided not to ask your question.

## 6.2 GENERAL INSTRUCTION REGARDING DELIBERATIONS[22]

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider  all the evidence, follow the law as it is

---

[21] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.
[22] Jury charge in *CEATS v. Continental Airlines, et al.,* 6:10cv120, Doc No. 970.

now being given to you, and reach a just verdict, regardless of the consequences. It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However,  do not give up your honest beliefs solely because the others think differently, or merely to finish the case. Remember that in a very real way you are the judges—judges of the facts. Your only interest is to seek the truth from the evidence in the case. You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations and businesses such as AdjustaCam, the Sakar Defendants, and the Kohl's Defendants are entitled to the same fair trial as a private individual. All persons, including corporations, and other organizations stand equal before the law and are to be treated as equals. When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about your conduct during the trial. After you have reached your unanimous verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question. Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly

influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony. If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question. After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.

APPENDIX A

**Claim Term Court's Construction**

**Plaintiff:**

| Hinge member | a structural element that joins to another for  rotation |
|---|---|
| Disposition | a configuration or arrangement of the support frame |

**Defendants:**

| Hinge member | a structural element that joins to another for  rotation |
|---|---|
| Disposition | a configuration or arrangement of the support frame |
| Rotatably attached/adapted to be rotatably attached/adapted to rotatably attached | Rotating about a single axis of rotation or permitting motion over a single axis of rotation |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

**ADJUSTACAM LLC**

**v.**                                                    **NO. 6:10-cv-329-LED**

**AMAZON.COM, INC.; ET AL.**                              **JURY**

# Jury Verdict Form

**Question No. 1**[1]

       Do you find that Adjustacam conducted an adequate pre-filing investigation before filing this lawsuit against the various defendants?

       Yes _____

       No _____

**Question No. 2**

       Do you find that Adjustacam conducted this lawsuit in bad faith?

       Yes _____

       No _____

**Question No. 3**

       Do you find that this is an exceptional case justifying the award of attorneys fees to Sakar and Kohl's?

       Yes _____

       No _____

**Question No. 4**

       Do you find that defendants Sakar and Kohl's are entitled to attorneys fees in this case?

       Yes _____

       No _____

**Question No. 5**

       If the answer to question no. 7 is yes, state the amount of attorneys fees that should be awarded to Sakar.

---

[1] Questions 1 - 5 are requested by Defendants.  Plaintiff objects to Questions 1 - 5 for, inter alia, lack of evidence and lack of relevance, and because they are not proper questions for a jury to answer.  Plaintiff has no jury questions to submit because come time of trial the Asserted Claims will have been officially canceled by the USPTO, and on account of Plainitff's covenant not to sue Defendants on the '343 patent. *See* Plaintiff's pending Motion to Dismiss.

The foreperson is requested to initial and date this document in the spaces provided below as the unanimous verdict of the jury.


_____                    _____

DATE                                                        FOREPERSON INITIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                              JURY

## JOINT PRE-TRIAL ORDER

This cause came before the court at a pre-trial management conference held on December

18, 2012, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure.

## A.    COUNSEL FOR THE PARTIES

**Plaintiff:**                                  **Defendants:**

John Edmonds                                    Ezra Sutton
Stephen Schlather                               EZRA SUTTON, P. A.
Joshua Long
COLLINS, EDMONDS & POGORZELSKI,
SCHLATHER & TOWER, PLLC

Andrew W. Spangler
Spangler & Fussell P.C.

## B.    STATEMENT OF JURISDICTION

### Plaintiff:

Per plaintiff's pending motion to dismiss at Dkt No. 721, Plaintiff contends that subject

matter jurisdiction is lacking due to Plaintiff's covenant not to sue defendants.  Further, by the

time of the pretrial conference, the asserted claims will have been canceled in connection with

the issuance of a reexamination certificate, thus rendering moot the prior disputes over the

asserted claims.  Accordingly, this Court lacks subject matter jurisdiction to take what is left of

this case to trial.

**Defendants:**

This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1131, 1338(a), 2201, and 2202. Also, venue is proper in this district under 28 U.S.C. §§ 1391 (b) and (c).

By the time of the pretrial conference, the Re-examination Certificate will have issued with new independent claims 22, 31, 40, 41, 44, 45, 46 and 47 which have been allowed by the U.S.P.T.O.  The plaintiff's covenant not to sue defendants Sakar International, Inc. ("Sakar"), Kohl's Illinois, Inc., and Kohl's Corporation, Inc. ("Kohl's") (collectively "Sakar/Kohl's") does not include these new re-examined claims, and the plaintiff has refused to include them in the covenant.  Therefore, there is still a dispute and case or controversy between the parties regarding the `343 patent in suit.

Thus, this Court presently has subject matter jurisdiction, and will continue to have subject matter jurisdiction over the new re-examined claims of the `343 patent when the Re-examination Certificate issues.

C.    **NATURE OF ACTION**

**Plaintiff:**

In this case plaintiff originally contended that Defendants infringed claims 1, 7 and 19 (the "Asserted Claims") of U.S. Patent No. 5,855,343 (the "`343 patent").  However, on August 30, 2012, at the culmination of reexamination proceedings involving the `343 patent, the U.S.P.T.O. issued a Final Office Action rejecting the Asserted Claims as being unpatentable over prior art, but allowing additional new and amended claims. On September 20, 2012, in response to that Final Office Action, AdjustaCam canceled the Asserted Claims of the `343 patent so that

a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable.

By the time of the pretrial conference, the cancellation of the Asserted Claims in reexamination proceedings will have mooted the issues remaining in this case – *e.g*., infringement of the Asserted Claims, validity of the Asserted Claims and damages due for infringement of the Asserted Claims.  At this point, all Defendants except Sakar/Kohl's have been dismissed either by settlement or mutual agreement. *See, e.g.,* Orders of Dismissal at Doc Nos. 665, 671, 672, 673, 674, 675, 677 and 720.

Despite the foregoing, for reasons that perhaps it can explain to the Court, Sakar/Kohl's has to date opposed being dismissed from this case with prejudice.  In order to overcome Sakar/Kohl's opposition to being dismissed with prejudice relative to canceled asserted claims that are no longer in dispute, AdjustaCam has taken the further step of granting Sakar/Kohl's a covenant not to sue under the '343 patent. Dkt No. 721. Irrespective of the canceled claims and irrespective of Sakar/Kohl's opposition to being dismissed with prejudice, AdjustaCam's covenant not to sue under the '343 patent divests the Court of subject matter jurisdiction with respect to Sakar/Kohl's First and Second counterclaims in this matter, since they relate solely to Sakar/Kohl's claims that it does not infringe the '343 patent and that the '343 patent is invalid.

Accordingly, as of the date of this submission, pending before the Court is AdjustaCam's Motion (Dkt No. 721) for the Court issue an Order dismissing AdjustaCam's claims against Sakar/Kohl's for infringement of the '343 Patent as well as Sakar/Kohl's First and Second Counterclaims of its Amended Answer and Counterclaims.

**Defendants:**

As stated by Adjustacam, when the Certificate of Re-examination issues, the asserted claims (1, 7, and 19) will be cancelled, and the new and allowed re-examined claims will be issued (including independent claims 22, 31, 40, 41, 44, 45, 46 and 47).  Adjustacam has refused (during a meet and confer on September 29, 2012) to issue a covenant not to sue Sakar/Kohl's on these new re-examined claims of the `343 patent.  Thus, the controversy continues regarding the re-examined claims of the `343 patent.  That is, Adjustacam can continue to sue Sakar/Kohl's on the `343 patent as to the webcams in issue for infringement of these claims.  Thus, the Court has not been divested of subject matter jurisdiction.  In addition, Sakar/Kohl's reserves its right to file a motion for attorneys fees and costs.

This is a patent infringement case wherein Plaintiff AdjustaCam has asserted that Defendants Sakar International, Inc., Kohl's Illinois, Inc., and Kohl's Corporation, Inc., (collectively, "Defendants") directly infringe claims 1, 7 and/or 19 (the "asserted claims") of United States Patent No. 5,855,343 ("the `343 patent").  Defendants contend that none of their products infringe the asserted claims of the `343 patent and that the asserted claims are invalid because they fail to meet one or more of the requirements for patentability. Defendants also deny AdjustaCam's allegations of willful infringement and deny AdjustaCam's claim for damages.

**D.     CONTENTIONS OF THE PARTIES**

**(1)     Plaintiff's Contentions.**

a.     GlobalMedia Group LLC is, and at all relevant times as been, the assignee of the `343 patent.

b.     Plaintiff is, and at all relevant times has been, the exclusive licensee of the `343 patent, with the right to sue for infringements thereof.

c.      By time of trial, Asserted Claims 1, 7 and 19 of the '343 patent will be canceled and moot.

d.      Prior to the cancelation of the Asserted Claims and Plaintiff granting a covenant not to sue to Defendants, Plaintiff contended that Defendants infringed the Asserted Claims by making, selling, offering for sale and importing the Kodak S101/W100 and T130, including as set forth in the Expert Report of John Muskivitch.

e.      Prior to the cancelation of the Asserted Claims and Plaintiff granting a covenant not to sue to Defendants, Plaintiff contended that Defendants owed Plaintiff reasonable royalties, prejudgment interest and post-judgment interest, including as set forth in the Expert Report of Walter Bratic.

f.      Defendants' defenses and counterclaims lack merit and are nonetheless moot.

g.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue will not be moot come time of trial, Defendants have not rebutted the presumption of validity accorded the patent-in-suit under 35 U.S.C. § 282.

h.      All claims of the '343 patent are entitled to priority no later than the March 7, 1997

i.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue will not be moot come time of trial, none of the Asserted Claims are invalid.

j.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to

the extent the issue will not be moot come time of trial, Defendants bear the burden of proving non-infringement of the Asserted Claims by a preponderance of the evidence.

k.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue will not be moot come time of trial, Defendants bear the burden of proving invalidity of the Asserted Claims by clear and convincing evidence.

l.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of damages will not be moot come time of trial, Defendants have no relevant or admissible proof concerning damages because they never designated a damages expert.

m.      Defendants are not entitled to any declaratory relief or any other relief, award, finding, verdict or judgment.

n.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of validity of the will not be moot come time of trial, AdjustaCam reserves the right to rely upon the validity opinions of its technical expert Dr. Muskivitch.  To the extent necessary, the validity report of Dr. Muskivitch is incorporated herein by reference for notice purposes.

n.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of infringement will not be moot come time of trial, AdjustaCam reserves the right to rely upon the infringement opinions of its technical expert Dr. Muskivitch.  To the extent

necessary, the infringement report of Dr. Muskivitch, at Exhibit 4 to the Muskivitch deposition, is incorporated herein by reference for notice purposes.

n.      Notwithstanding Plaintiff's cancelation of the Asserted Claims that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable, to the extent the issue of damages will not be moot come time of trial, AdjustaCam reserves the right to rely upon the damages opinions of its damages expert Mr. Bratic.   To the extent necessary, the damages report of Mr. Bratic is incorporated herein by reference for notice purposes.  Further, to the extent that damages is still deemed to be relevant, AdjustaCam reserves the right to recover pre and post-judgment interest and costs.

o.      Plaintiff reserves the right to include additional contentions and disputed issues of fact and law based on (i) the Court's rulings on pending motions that may arise between the date of the filing of the parties' joint pretrial order and (ii) the pre-trial conference and (iii) trial.

**(2)      Defendants' Contentions.**

By providing these contentions, Defendants do not concede that all of these issues are appropriate for trial. In particular, Defendants do not waive any of their motions in limine, motions for summary judgment, or *Daubert* motions, which, if granted, would render some or all of these issues moot. Defendants' contentions in this case are detailed in their answers, affirmative defenses and counterclaims to AdjustaCam's Third Amended Complaint, and Defendants' invalidity contentions, all of which are incorporated herein by reference. In sum, Defendants contend the following:

a. By the time of trial, new re-examined claims (including new independent claims 22, 31, 40, 41, 44, 45, 46 and 47)  will be granted by the Re-examination Certificate to AdjustaCam, and AdjustaCam has refused to agree not to assert these claims against Sakar/Kohl's.

b.  The re-examined `343 patent is still in dispute between the parties with regard to the webcams Sakar has been selling.

c.  AdjustaCam's refusal to provide Sakar/Kohl's with a covenant agreeing not to assert the allowed claims of the reexamined `343 patent against Sakar/Kohl's means that there is a continuing controversy between the parties regarding infringement of the `343 patent.

d.  Defendants' defenses and counterclaims have merit and are not moot.

**<u>Non-Infringement</u>**

e.  Defendants do not directly infringe, and have not directly infringed, the asserted `343 patent claims.

f.  If Defendants are found to infringe any claim of the `343 patent, and those asserted claims of the `343 patent are found to be valid, then Defendants' infringement was not willful.

g.  Defendants are entitled to a declaratory judgment finding that Defendants are not directly or indirectly infringing, and have not directly or indirectly infringed, any claim of the `343 patent.

h.  All of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) comprise a ball and socket joint or hinge member that is fixedly attached to the bottom of the camera and is not "rotatably attached" to the camera.  Moreover, Sakar/Kohl's accused Kodak webcams (Kodak S101 and Kodak T130) with a ball and socket joint do not have a hinge member that is "rotatably attached" about a single axis of rotation relative to the camera (or an equivalent thereof), as required by all of the independent claims of the original and reexamined `343 patent.

i.  The accused ball and socket clips of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) rotate relative to the camera about multiple axes of rotation.

j.  AdjustaCam's own infringement expert, Dr. Muskivitch admitted that Sakar/Kohl's Kodak webcams with a ball and stem fixed to the camera do not rotate as required by claims.

k.  The support frame of Sakar/Kohl's Kodak webcams (Kodak S101 and Kodak T130) is not "rotatably attached" to the hinge member about a single axis either literally or under the doctrine of equivalence. Specifically, Sakar/Kohl's Kodak webcams have a ball-and-socket hinge member whereby the ball-and-socket hinge member rotates in multiple axes of rotation relative to the support frame (legs).  Moreover, because the ball and socket structure of the hinge member permits the "support frame" to rotate in multiple axes of rotation relative to the hinge member, the hinge member of Sakar/Kohl's Kodak webcams is not "rotatably attached" about a "single axis of rotation" relative to the support frame as specified by this Court.

l.  One half of the webcam clips of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) cannot support anything and does not have two "dispositions" as required by the claims of the `343 patent. Moreover, one half of a webcam clip clearly cannot support a webcam on a display (such as a laptop computer), as the claims require.

m.  Plaintiff's noninfringement expert, Dr. Muskivitch, improperly submitted a new and untimely expert report on August 24, 2012 that changed the identification of many claim limitations concerning defendants' accused products (including Sakar/Kohl's infringing products) from those first identified in his original June 25, 2012 infringement report. Dr. Muskivitch even admitted during his deposition that his June 25, 2012 was incorrect. Specifically, in his original June 25, 2012 report, Dr. Muskivitch identified the "ball-and-stick" portion of the accused Sakar/Kohl's Kodak webcams as the "hinge member," and the clip of those products as the "support frame." In his untimely August 24 Report, however, Dr. Muskivitch moved his identification of the "hinge member" from the "ball and stick" of the

accused products to the top half of the webcam clip.  In addition, in his untimely August 24 Report, Dr. Muskivitch also opines that the "support frame" is no longer the clip of the accused products, but is only one half (the bottom half) of the clip.

n.  Under Rule 26(a)(2)(B), Dr. Muskivitch may not offer any opinion at trial which was not disclosed in his June 25 Report, and any subsequent report should be stricken.

o.  Adjustacam did not conduct an adequate pre-filing investigation under Rule 11 for its infringement claims against Sakar/Kohl's Kodak webcams.

### Invalidity

p.  There is no presumption of validity for reexamined asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent because the U.S.P.T.O. finally rejected these claims.  *See Dow Jones v. Albaise, Ltd.*, 606 F.3d 1338, n. 3 (Fed. Cir. 2010).

q.  The asserted claims 1, 7, and 19 are invalid and AdjustaCam knew or should have known that they were invalid.  During the last 2 years, the asserted claims were rejected 3 times by the U.S. Patent Office over the Irifune and Ma prior art references under 35 U.S.C. § 102, meaning the claims were fully anticipated by these prior art references.  However, Adjustacam continued to prosecute these asserted invalid claims in bad faith against Sakar/Kohl's, and other defendants in this case.

r.  Even before the U.S.P.T.O. finally rejected the asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent, Plaintiff's own infringement expert, Dr. Muskivitch, admitted during his deposition that the Irifune publication anticipated asserted claims 1, 7, and 19 of the `343 patent by testifying that the camera disclosed in Irifune is rotatably attached to the hinge member, as claimed in the `343 patent.

s.  Sakar/Kohl's are entitled to a declaratory judgment finding that the claims of the `343

patent are invalid under one or more sections of Title 35 of the United States Code,

including, without limitation, 35 U.S.C. §§ 102, 103, and/or 112.

### Damages

t.  If Defendants Sakar/Kohl's are found to infringe any of the claims of the `343 patent, and those claims are found to be valid, AdjustaCam is entitled to no more than the amount set forth in the Expert Report of Dr. Sullivan.  Also, AdjustaCam, through the report of its damages expert, has no proof of a damage royalty of $1.25 per webcam.

u.  Plaintiff through its damages expert, Mr. Bratic, has failed to properly establish a royalty calculation based on the Entire Market Value Rule.  Specifically, AdjustCam has failed to provide any proof that the clip for Sakar/Kohl's Kodak webcams motivates consumers to buy the webcams in the first place; and AdjustaCam has failed to conduct market studies or consumer surveys to ascertain whether the demand for Sakar/Kohl's Kodak webcams in question is driven by the clip patented technology, as required by the Federal Circuit.

v.  Plaintiff AdjustaCam's evidence of past settlement agreements from approximately 24 defendants in this case are not determinative of a reasonable royalty because they: (1) did not include the quantities sold by respective defendants,  (2) did not show a discernible link to the claimed technology, and (3) were extracted as nuisance value settlements.  This evidences Plaintiff's bad faith strategy.

w.  AdjustaCam tried to extract a settlement from Sakar/Kohl's in the amount of $550,000 and $250,000, as part of AdjustaCam's strategy, when AdjustaCam knew that their asserted claims had been rejected twice by the U.S.P.T.O. and knew that their asserted claims would be finally rejected by the U.S.P.T.O.  This strategy of Adjustacam was in bad faith.

x.  AdjustaCam delayed its prosecution of the re-examination of the `343 patent for as

long as it could until all but 2 or 3 defendants had settled.  Then, as part of its strategy to avoid a

trial on the merits, AdjustaCam dismissed its claims against Newegg and Sakar/Kohl's.

y.  AdjustaCam is now trying to cover up its bad faith strategy by ending the case before

trial with a dismissal of the case.

z.  Sakar will prove that Adjustacam had no proof of a damage royalty of $1.25 through

the damage expert of Adjustacam.

aa.  Sakar will prove that Adjustacam caused Sakar to spend over $300,000 in legal fees,

costs, and expenses to defend this case that was brought and conducted in bad faith.

bb.  Sakar reserves the right to include additional contentions and disputed issues of fact

and law based on the Court's expected rulings on invalidity and non-infringement, and on

motions set forth in Defendants' letter briefs.

**E.     STIPULATIONS AND UNCONTESTED FACTS**

**1.     Stipulations**

a.     Highlighted, underlined or enlarged exhibit pages, or portions of pages, shall not

count as demonstratives unless the text has been changed but shall not be admitted as separate

exhibits.

b.     The parties shall not object to the authenticity of any documents authored and

produced by the other side.

c.     During trial, each Party shall provide notice by email no later than 8 pm each day

of all witnesses and all exhibits associated with each witness that are intended to be used as

direct evidence the following day at trial.

d.     Each Party shall provide by email no later than 9 pm each day a copy of all

demonstratives that are intended to be presented the following day at trial.

2.     **Uncontested Facts**

a.     GlobalMedia Group LLC is the assignee of the '343 patent.

b.     AdjustaCam LLC is the exclusive licensee of the '343 patent.

c.     Sakar International, Inc. ("Sakar")  is a New York corporation with its principal place of business located in Edison, New Jersey.

d.     Kohl's Corporation d/b/a Kohl's has a place of business in Menomonee Falls, Wisconsin.

e.     Kohl's Illinois, Inc. has a place of business in Menomonee Falls, Wisconsin.

f.     The '343 patent was filed on March 7, 1997, and it issued on January 5, 1999.

g.     All claims of the '343 patent are entitled to priority from its March 7, 1997 filing date.

h.     During this litigation, Adjustacam obtained settlements from at least 15 defendants in this case.

F.     **CONTESTED ISSUES OF FACT AND LAW**

The Parties identify the following issues of fact that remain to be litigated. To the extent any issue of law discussed below is deemed to be an issue of fact, it is incorporated into this section. The Parties reserve the right to identify additional factual or legal issues as permitted by the Court.

(1)     **Plaintiff's List of Contested Issues of Fact and Law**

a.     Whether, at time of trial, Defendants' counterclaims, including issues involving the infringement, validity and damages relative to the Asserted Claims are moot due to the cancelation of those claims in reexamination proceedings.

b.     Whether Defendants are entitled to any declaratory relief or any other relief.

c.      Whether Defendants' inexplicable and vexatious conduct after being offered a dismissal (and in fact after a motion to dismiss was filed) – based upon the cancelation of the Asserted Claims during reexamination proceedings and the covenant not to sue under the '343 patent granted to Defendants -- renders this a exceptional case, including an award of attorney's fees and/or cost to Plaintiff.

**(2)      The Defendants' List of Contested Issues of Fact and Law.**

(To the extent any issue of law is deemed to be an issue of fact, it is incorporated into this section).

a.  Whether, at time of trial, Defendants' counterclaims, including issues involving the infringement, validity and damages relative to the Allowed Reexamined Claims are not moot as a result of the issuance of the reexamination certificate.

**<u>Non-Infringement</u>**

b.  Whether AdjustaCam has proven by a preponderance of the evidence that each of Sakar/Kohl's accused Kodak webcam products literally and directly infringes any claim of the `343 patent.

c.  If Defendants are found to have infringed any claim of the `343 patent, and the claims are found to be valid, the amount Adjustacam has proven by a preponderance of the evidence that it is entitled to damages for that infringement.

d.  If Defendants are found to infringe any claim of the `343 patent, and those asserted claims of the `343 patent are found to be valid, whether Adjustacm has proven by clear and convincing evidence that Defendants' infringement was willful.

e.  Whether Defendants have proven that Defendants are entitled to a declaratory judgment finding that Defendants are not directly infringing, and have not directly

infringed, any claims of the `343 patent.

     f.  Whether each accused product of the Defendants infringes any of the claims of the `343 patent.

     g.  All of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) comprise a ball and socket joint or hinge member that is fixedly attached to the bottom of the camera and is not "rotatably attached" to the camera.  Moreover, Sakar/Kohl's accused Kodak webcams (Kodak S101 and Kodak T130) with a ball and socket joint do not have a hinge member that is "rotatably attached" about a single axis of rotation relative to the camera (or an equivalent thereof), as required by all of the independent claims of the original and reexamined `343 patent.

     h.  The accused ball and socket clips of Sakar/Kohl's accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130) rotate relative to the camera about multiple axes of rotation.

     i.  AdjustaCam's own infringement expert, Dr. Muskivitch admitted that Sakar/Kohl's Kodak webcams with a ball and stem fixed to the camera do not rotate as required by claims.

     j.  The support frame of Sakar/Kohl's Kodak webcams (Kodak S101 and Kodak T130) is not "rotatably attached" to the hinge member about a single axis either literally or under the doctrine of equivalence. Specifically, Sakar/Kohl's Kodak webcams have a ball-and-socket hinge member whereby the ball-and-socket hinge member rotates in multiple axes of rotation relative to the support frame (legs).  Moreover, because the ball and socket structure of the hinge member permits the "support frame" to rotate in multiple axes of rotation relative to the hinge member, the hinge member of Sakar/Kohl's Kodak webcams is not "rotatably attached" about a "single axis of rotation" relative to the support frame as specified by this Court.

     k.  One half of the webcam clips of Sakar/Kohl's accused Kodak webcams (Model Nos.

Kodak S101 and Kodak T130) cannot support anything and does not have two "dispositions" as required by the claims of the `343 patent. Moreover, one half of a webcam clip clearly cannot support a webcam on a display (such as a laptop computer), as the claims require.

l.  Plaintiff's noninfringement expert, Dr. Muskivitch, improperly submitted a new and untimely expert report on August 24, 2012 that changed the identification of many claim limitations concerning defendants' accused products (including Sakar/Kohl's infringing products) from those first identified in his original June 25, 2012 infringement report. Dr. Muskivitch even admitted during his deposition that his June 25, 2012 was incorrect. Specifically, in his original June 25, 2012 report, Dr. Muskivitch identified the "ball-and-stick" portion of the accused Sakar/Kohl's Kodak webcams as the "hinge member," and the clip of those products as the "support frame." In his untimely August 24 Report, however, Dr. Muskivitch moved his identification of the "hinge member" from the "ball and stick" of the accused products to the top half of the webcam clip.  In addition, in his untimely August 24 Report, Dr. Muskivitch also opines that the "support frame" is no longer the clip of the accused products, but is only one half (the bottom half) of the clip.

m.  Under Rule 26(a)(2)(B), Dr. Muskivitch may not offer any opinion at trial which was not disclosed in his June 25 Report, and any subsequent report should be stricken.

n.  Adjustacam did not conduct an adequate pre-filing investigation under Rule 11 for its infringement claims against Sakar/Kohl's Kodak webcams.

### **Invalidity**

o.   Whether Defendants have proven that Defendants are entitled to a declaratory judgment finding that the claims of the `343 patent are invalid under one or more sections of

Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 102, 103, and/or 112.

p.  Whether the asserted claims of the `343 Patent are valid.

q.  Whether there is no presumption of validity for reexamined asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent because of the U.S.P.T.O. finally rejected these claims.  *See Dow Jones v. Albaise, Ltd.*, 606 F.3d 1338, n. 3 (Fed. Cir. 2010).

r.  The asserted claims 1, 7, and 19 are invalid and AdjustaCam knew or should have known that they were invalid.  During the last 2 years, the asserted claims were rejected 3 times by the U.S. Patent Office over the Irifune and Ma prior art references under 35 U.S.C. § 102, meaning the claims were fully anticipated by these prior art references.  However, Adjustacam continued to prosecute these asserted invalid claims in bad faith against Sakar/Kohl's, and other defendants in this case.

s.  Even before the U.S.P.T.O. finally rejected the asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15 , 16, 17) of the `343 patent, Plaintiff's own infringement expert, Dr. Muskivitch, admitted during his deposition that the Irifune publication anticipated asserted claims 1, 7, and 19 of the `343 patent by testifying that the camera disclosed in Irifune is rotatably attached to the hinge member, as claimed in the `343 patent.

t.  Sakar/Kohl's are entitled to a declaratory judgment finding that the claims of the `343 patent are invalid under one or more sections of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 102, 103, and/or 112.

Sakar states that Adjustacam and Sakar conducted a meet and confer with regard to the following statements u to z, and Adjustacam refused to include them in the Uncontested Fact

Section, on the grounds that they were not relevant, even though they are factually correct.

u.      U.S. Patent Nos. 5,880,783 to Ma; D383,475 to Yamauchi; 4,526,308 to Dovey; 5,808,672 to Wakabayashi; and 4,493,542 to Ohmurawere; and Japanese Unexamined Utility Model App. Pub. No. 11219997 to Irifune (referred to in this case as "the Irifune Publication") are all prior art to AdjustaCam's `343 patent.

v.      AdjustaCam did not inform Sakar/Kohl's of the `343 patent before filing this lawsuit.

w.      With regard to allowed reexamined claims 22 through 48 (including independent claims 22, 31, 40, 41, 44, 45, 46 and 47) of the `343 patent, Plaintiff has refused to grant a covenant not to sue on these claims against Sakar/Kohl's in the imminent future when the U.S.P.T.O. issues a reexamination certificate granting these claims.

x.      AdjustaCam's asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15, 16, 17) of the `343 patent were finally rejected by the U.S.P.T.O. on August 30, 2012.

y.      On September 20, 2012, AdjustaCam cancelled the asserted claims asserted claims 1, 7, and 19 (as well as claims 2, 5, 6, 8, 10, 14, 15, 16, 17) of the `343 patent.

z.      AdjustaCam knew of the Irifune prior art for over one year during this litigation.

### Damages

u.  If Defendants are found to infringe any claim of the `343 patent, and those claims are found to be valid, AdjustaCam is entitled to no more than the amount set forth in the Expert Report of Dr. Sullivan.

v.  If Defendants are found to infringe any claim of the `343 patent, and those claims are found to be valid, Defendants' infringement was not willful and AdjustaCam is not entitled to enhanced damages of up to three times actual damages.

w.  If Defendants are found to infringe any claim of the `343 patent, and those claims are found to be valid, Adjustacam is not entitled to prejudgment interest and costs.

x.  Whether this is an exceptional case that entitles Defendants to attorneys' fees, costs and interest.

y.  If Defendants Sakar/Kohl's are found to infringe any of the claims of the `343 patent, and those claims are found to be valid, AdjustaCam is entitled to no more than the amount set forth in the Expert Report of Dr. Sullivan.  Also, AdjustaCam, through the report of its damages expert, has no proof of a damage royalty of $1.25 per webcam.

z.  Plaintiff through its damages expert, Mr. Bratic, has failed to properly establish a royalty calculation based on the Entire Market Value Rule.  Specifically, AdjustCam has failed to provide any proof that the clip for Sakar/Kohl's Kodak webcams motivates consumers to buy the webcams in the first place; and AdjustaCam has failed to conduct market studies or consumer surveys to ascertain whether the demand for Sakar/Kohl's Kodak webcams in question is driven by the clip patented technology, as required by the Federal Circuit.

aa.  Plaintiff AdjustaCam's evidence of past settlement agreements from approximately 24 defendants in this case are not determinative of a reasonable royalty because they: (1) did not include the quantities sold by respective defendants,  (2) did not show a discernible link to the claimed technology, and (3) were extracted as nuisance value settlements.  This evidences Plaintiff's bad faith strategy.

bb.  AdjustaCam tried to extract a settlement from Sakar/Kohl's in the amount of $550,000 and $250,000, as part of AdjustaCam's strategy, when AdjustaCam knew that their asserted claims had been rejected twice by the U.S.P.T.O. and knew that their asserted claims would be finally rejected by the U.S.P.T.O.  This strategy of Adjustacam was in bad faith.

cc.  AdjustaCam delayed its prosecution of the re-examination of the `343 patent for as long as it could until all but 2 or 3 defendants had settled.  Then, as part of its strategy to avoid a trial on the merits, AdjustaCam dismissed its claims against Newegg and Sakar/Kohl's.

dd.  AdjustaCam is now trying to cover up its bad faith strategy by ending the case before trial with a dismissal of the case.

ee.  Sakar will prove that Adjustacam had no proof of a damage royalty of $1.25 through the damage expert of Adjustacam.

ff.  Sakar will prove that Adjustacam caused Sakar to spend over $300,000 in legal fees, costs, and expenses to defend this case that was brought and conducted in bad faith.

gg.  Sakar reserves the right to include additional contentions and disputed issues of fact and law based on the Court's expected rulings on invalidity and non-infringement, and on motions set forth in Defendants' letter briefs.

## G.     WITNESS LISTS.

Plaintiff's witness list is at Exhibit 1.  Defendants' witness list is at Exhibit 2.

## H.     EXHIBIT LISTS.

Plaintiff's exhibit list is at Exhibit 3.  Defendants' exhibit list is at Exhibit 4.

## I.     LIST OF ANY PENDING MOTIONS.

The following motions are pending:

| Docket No. | Pending Motion |
| --- | --- |
| 721 | Plaintiff's Motion to Dismiss the Claims and Counterclaims Involving Defendants |

Based upon Defendants' inputs into this joint submission, Plaintiff is preparing a motion to stay this case pending issuance of the reexamination certificate, at which time the Court can hold a status conference to determine the future, if any, of this case relative to newly issued

claims.  (Although Plaintiff would prefer just to have the case dismissed per its pending motion to dismiss based upon the cancelation of the Asserted Claims during reexamination proceedings and the covenant not to sue under the '343 patent granted to Defendants.).

Defendants are preparing to file motions for summary judgment on invalidity, and non-infringement; a motion to strike the expert report of Dr. Muskivitch; and a motion to strike portions of the expert report of Walter Bratic.  *See* Defendants Letter Briefs on file.  It is necessary for defendants to continue work on these motions because Adjustacam's covenant not to sue under the `343 patent granted to defendants fails to make it clear that Adjustacam will not sue Sakar in the future with regard to the Kodak webcam products that Sakar has been selling for the last 2 years.  In a final meet and confer on October 2, 2012, Adjustacam's counsel, Mr, Edmonds, refused to grant such a covenant not to sue.

In addition, Defendants are preparing to file a motion for attorney's fees, costs and interests.

## J.     PROBABLE LENGTH OF TRIAL.

The parties estimate that the probable length of trial is three court days, with time split evenly between both sides.

## K.     MANAGEMENT CONFERENCE LIMITATIONS.

None.

## L.     JURY CHARGE.

The parties joint proposed jury charge is at Exhibit 5.  The parties proposed jury verdict form is at Exhibit 6.

## M.     MOTIONS IN LIMINE.

The parties' will submit motions in limine in accordance with the procedure set forth in the Court's Docket Control Order.

**L.     CERTIFICATIONS.**

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

(1)     Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)     Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)     Each exhibit that is not specifically designated as a demonstrative in the List of Exhibits herein: a. is in existence; b. is numbered; and c. has been shown (or will be shown if requested) to opposing counsel.


Approved as to form and substance:

/s/ John J. Edmonds____
Attorney for Plaintiff

/s/ Ezra Sutton_____
Attorney for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

October 2, 2012                          /s/ *John J. Edmonds*
                                         John J. Edmonds

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                              JURY

**PLAINTIFF'S MOTION TO DISMISS ITS CLAIMS AGAINST SAKAR AND KOHL'S
AND THEIR COUNTERCLAIMS AGAINST PLAINTIFF FOR LACK OF SUBJECT
MATTER JURISDICTION
AND
REQUEST FOR EXPEDITED BRIEFING SCHEDULE AND ORAL HEARING**

*FILED UNDER SEAL*

Plaintiff AdjustaCam, LLC ("AdjustaCam") respectfully submits this opposed Motion to

Dismiss, and request for expedited briefing schedule and oral hearing, as follows:

## I.    INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff AdjustaCam LLC ("AdjustaCam") hereby moves the Court to dismiss with

prejudice AdjustaCam's claims of infringement of U.S. Patent 5,855,343 ("the '343 Patent")

against Defendants Sakar International, Inc., Kohl's Illinois, Inc., and Kohl's Corporation, Inc.

(collectively "Sakar/Kohl's"),[1]. AdjustaCam also moves to dismiss without prejudice

Sakar/Kohl's counterclaims, which are directed to the infringement and validity of the '343

Patent,.

AdjustaCam filed this lawsuit on July 2, 2010, alleging that Sakar/Kohl's infringes the

'343 Patent. Dkt. No. 1. AdjustaCam's most recent Amended Complaint was filed on August 9,

2011 and also alleges infringement of the '343 Patent by Sakar/Kohl's. Dkt. No. 485.

Sakar/Kohl's answers and counterclaims are at Dkt. Nos. 231 and 520, respectively.

---

[1] Kohl's was sued in this case for re-selling Sakar's products, and Sakar and Kohl's are represented by the same
counsel.

CONFIDENTIAL

Sakar/Kohl's First and Second counterclaims are directed solely to non-infringement and invalidity of the '343 Patent. *Id.*

In this case, including in its expert reports, AdjustaCam has asserted claims 1, 7 and 19 (the "Asserted Claims") of the '343 patent.   On August 30, 2012, at the culmination of reexamination proceedings involving the '343 patent, the U.S.P.T.O. issued a Final Office Action rejecting the Asserted Claims as being unpatentable over prior art, but allowing additional new and amended claims. On September 20, 2012, in response to that Final Office Action, AdjustaCam canceled the Asserted Claims of the '343 patent, Exhibit 1, so that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable.

The cancellation of the Asserted Claims in reexamination proceedings moots or near moots the issues remaining in this case – *e.g.*, infringement of the Asserted Claims, validity of the Asserted Claims and damages due for infringement of the Asserted Claims.  At this point, all Defendants except Sakar/Kohl's have been dismissed either by settlement or mutual agreement. *See, e.g.,* Orders of Dismissal at Doc Nos. 665, 671, 672, 673, 674, 675, 677 and 720.  The most recent dismissal, which was also brought about by the cancelation of the Asserted Claims, occurred two days ago and was handled by agreement. *See* Doc Nos. 719 & 720.

Despite the foregoing, for reasons that perhaps it can explain to the Court, Sakar/Kohl's will not agree to being dismissed from this case with prejudice.

In order to overcome Sakar/Kohl's opposition to being dismissed with prejudice relative to canceled asserted claims that are no longer in dispute, AdjustaCam has taken the further step of granting Sakar/Kohl's a covenant not to sue under the '343 patent. Exhibit 2.  Irrespective of the canceled claims and irrespective of Sakar/Kohl's opposition to being dismissed with prejudice, AdjustaCam's covenant not to sue under the '343 patent divests the Court of subject

2

CONFIDENTIAL

matter jurisdiction with respect to Sakar/Kohl's First and Second counterclaims in this matter, since they relate solely to Sakar/Kohl's claims that it does not infringe the '343 patent and that the '343 patent is invalid. *See, e.g., Dow Jones & Co., Inc. v. Ablaise Ltd.,* 606 F.3d 1338, 1348 (Fed.Cir.2010); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995).   Accordingly, through this motion, AdjustaCam requests the Court issue an Order dismissing AdjustaCam's claims against Sakar/Kohl's for infringement of the '343 Patent as well as Sakar/Kohl's First and Second Counterclaims of its Amended Answer and Counterclaims.

## II.  **ARGUMENT**

Irrespective of the cancelation of the Asserted Claims, which renders moot or near moot the issues in this case, AdjustaCam's covenant not to sue along with AdjustaCam's motion to dismiss with prejudice terminates the Court's subject matter jurisdiction over the claims involving Sakar/Kohl's. *See, e.g., Dow Jones & Co., supra*; *Super Sack, supra*. Similarly, AdjustaCam's dismissal of its infringement claims relating to the '343 Patent and its covenant not to sue Sakar/Kohl's under the '343 Patent for all past, present, and future products also divests the Court of subject matter jurisdiction over Sakar/Kohl's First and Second counterclaims.  Therefore, they should be dismissed without prejudice.

"A declaratory judgment counterclaim, according to the relevant procedural provision, may be brought to resolve an 'actual controversy' between 'interested' parties." *Super Sack*, 57 F.3d at 1058; *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal, Inc.*, 248 F.3d 1333, 1340 (Fed. Cir. 2001); 28 U.S.C. § 2201(a). "The existence of a sufficiently concrete dispute between the parties remains, however, a jurisdictional predicate to the vitality of such an action." *Super Sack*, 57 F.3d at 1058 (internal citations omitted). In other words, an "actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007) (quoting *Steffel v. Thompson*, 415 U.S.

3

CONFIDENTIAL

452, 459 n. 10 (1974)) (internal citations omitted); *Intellectual Prop. Dev.*, 248 F.3d at 1340;

*Super Sack*, 57 F.3d at 1058. *See also Benitec*, 495 F.3d at 1344. Importantly, as is the case here,

a patentee can divest a court of jurisdiction over the case by filing a statement of non-liability for

the declaratory counterclaimant. *Benitec*, 495 F.3d at 1345; *Super Sack*, 57 F.3d at 1058.

**A.** **Sakar/Kohl's First and Second Counterclaims Should be Dismissed Because AdjustaCam's Covenant Not to Sue Divests the Court of Subject Matter Jurisdiction Over Those Declaratory Judgment Counterclaims.**

AdjustaCam seeks to dismiss its claims directed to '343 Patent with prejudice and has

granted Sakar/Kohl's a covenant not to sue under the '343 Patent that covers all of their products

as they exist today, in the past, or in the future, and extends to their customers and chain of

distribution, as follows:

> AdjustaCam LLC hereby unconditionally covenants not to sue Sakar International, Inc., Kohl's Illinois, Inc., Kohl's Corporation, Inc. and Kohl's Department Stores, Inc.[2] (collectively "Sakar/Kohl's") for infringement as to any claim of U.S. Patent No. 5,855,343 (the "'343 patent"). Further, AdjustaCam LLC hereby unconditionally covenants not to sue manufacturers, suppliers, wholesalers, sellers, offerors for sale, importers, and/or users for infringing the '343 patent relative to Sakar/Kohl's currently existing products. The foregoing unconditional covenant not to sue extends all the way up and down the distribution chain for Sakar/Kohl's currently existing products, from manufacture through distribution and end use.

Exhibit 2. A dismissal of AdjustaCam's claims with prejudice combined with the covenant not to

sue filed by AdjustaCam eliminates any "sufficient immediacy and reality to warrant declaratory

judgment jurisdiction over" Sakar/Kohl's First and Second counterclaims. *Benitec,* 495 F.3d at

1346; *see also Intellectual Prop. Dev., 248 F.3d at 1342; Super Sack,* 57 F.3d at 1059-60.

Therefore, this Court's subject matter jurisdiction over Sakar/Kohl's counterclaims has been

terminated, and the First and Second counterclaims must be dismissed without prejudice.

---

[2] Although AdjustaCam has sued Sakar International, Inc., Kohl's Illinois, Inc. and Kohl's Corporation, Inc., from time to time counsel for Sakar/Kohl's files papers under the name, Kohl's Department Stores, Inc. Thus, AdjustaCam has included Kohl's Department Stores, Inc. in its covenant not to sue, even though Kohl's Department Stores, Inc. is not understood to be a party to this lawsuit.

CONFIDENTIAL

*Benitec,* 495 F.3d at 1349; *Intellectual Prop. Dev.,* 248 F.3d at 1342; *Super Sack,* 57 F.3d at 1060.[3]

The language of AdjustaCam's covenant is consistent with  convenant not to sue language in other cases. *See e.g., Benitec,* 495 F.3d at 1343 ("[Patentee] covenants and promises not to sue [Defendant] for patent infringement arising from activities and/or products occurring on or before the date dismissal was entered in this action—September 29, 2005."); *Fujitsu Ltd. v. Tellabs Operations, Inc.,* 09-C-4530, 2010 WL 4627652 at *2 (N.D. Ill. Nov. 4, 2010). Thus, AdjustaCam's covenant is sufficiently broad to divest the Court of subject matter jurisdiction.

## III.   REQUEST FOR EXPEDITED BRIEFING SCHEDULE AND ORAL HEARING

Inexplicably, AdjustaCam and Sakar/Kohl's are still both expending large amounts of resources in this case, despite the fact that AdjustaCam is willing to dismiss Sakar/Kohl's with prejudice and grant a covenant not to sue.  Further, pending before the Court are Sakar/Kohl's multiple letter briefs, all of which are at this point moot or near moot, and a waste of the Court's time to decide.  Further, there are multiple significant deadlines approaching, namely: the joint pretrial order (10/2/12); pretrial disclosures (10/30/12); and others.  AdjustaCam's dismissal is reasonable, serves judicial efficiency and complies with the requirements of *Super Sack* and its progeny.  Sakar/Kohl's has no reason to further burden the Court and the parties with motion practice or pretrial submissions/disputes over moot or near moot issues.

For the foregoing reasons, namely avoidance of wasting the resources of the Court and the parties, AdjustaCam requests that the Court set an expedited briefing schedule and an oral hearing on this motion to dismiss.  Sakar/Kohl's has no legal or factual basis to oppose this

---

[3] The Federal Circuit has held that covenants not to sue signed by a party's counsel bind the party and are therefore sufficient. *Super Sack*, 57 F.3d at 1059.

CONFIDENTIAL

Motion, and if anything, despite its stubbornness, Sakar/Kohl's would also be a beneficiary of having itself dismissed from the lawsuit promptly.

IV.    **CONCLUSION**

Under *Super Sack* and subsequent Federal Circuit authority, AdjustaCam's covenant not to sue along with this motion to dismiss divests the Court of subject matter jurisdiction over AdjustaCam's claims against Sakar/Kohl's regarding infringement of the '343 Patent and Sakar/Kohl's First and Second counterclaims. Thus, the Court should grant AdjustaCam's Motion to Dismiss its claims of infringement of the '343 patent against Sakar/Kohl's with prejudice and should also dismiss Sakar/Kohl's First and Second Counterclaims without prejudice. Further, in order to conserve the resources of the Court and the parties, the Court should set an expedited briefing schedule on this matter, and set it for an oral hearing at the Court's earliest convenience, so that Sakar/Kohl's can explain why it refuses to accept a covenant not to sue and dismissal from this case.

September 30, 2012                              Respectfully submitted,

                                               By: /s/ *John J. Edmonds*
                                               John J. Edmonds – LEAD COUNSEL
                                               Texas State Bar No. 789758
                                               Michael J. Collins
                                               Texas Bar No. 4614510
                                               Stephen F. Schlather
                                               Texas Bar No. 24007993
                                               COLLINS,   EDMONDS,   POGORZELSKI,
                                               SCHLATHER & TOWER, PLLC
                                               1616 S. Voss Rd., Suite 125
                                               Houston, Texas 77057
                                               Telephone: (713) 501-3425
                                               Facsimile: (832) 415-2535
                                               jedmonds@cepiplaw.com
                                               mcollins@cepiplaw.com
                                               sschlather@cepiplaw.com

6

CONFIDENTIAL

Andrew W. Spangler
Texas Bar No. 24041960
Spangler & Fussell P.C.
208 N. Green Street, Suite 300
Longview, Texas 75601
(903) 753-9300
(903) 553-0403 (fax)
spangler@spanglerlawpc.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC

## CERTIFICATE OF CONFERENCE

The parties met and conferred in accordance with Local Rule CV-7 by telephone. Present on the call for AdjustaCam were local counsel Andrew Spangler, lead counsel John Edmonds, and Stephen Schlather.  Present on the call for Sakar/Kohl's was its sole counsel Ezra Sutton.  The parties have regrettably reached an impasse on these issues, and thus this motion is being filed over Sakar/Kohl's opposition.

September 30, 2012                    /s/ John J. Edmonds
                                      John J. Edmonds

## CERTIFICATE OF AUTHORITY TO FILE UNDER SEAL

I hereby certify that authority to file this document under seal is found in the protective order governing this case.

September 30, 2012                    /s/ John J. Edmonds
                                      John J. Edmonds

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

September 30, 2012                    /s/ John J. Edmonds
                                      John J. Edmonds

CONFIDENTIAL

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 13792139 |
| **Application Number:** | 90011316 |
| **International Application Number:** | |
| **Confirmation Number:** | 5680 |
| **Title of Invention:** | CAMERA CLIP |
| **First Named Inventor/Applicant Name:** | 5855343 |
| **Correspondence Address:** | HIMANSHU AMIN, LLC<br>-<br>127 Public Square<br>57th Floor<br>Cleveland                                    OH                    44114<br>US                    -<br>- |
| **Filer:** | Himanshu Amin/Heather Holmes |
| **Filer Authorized By:** | Himanshu Amin |
| **Attorney Docket Number:** | 76958.00001 |
| **Receipt Date:** | 20-SEP-2012 |
| **Filing Date:** | 30-DEC-2010 |
| **Time Stamp:** | 10:37:05 |
| **Application Type:** | Reexam (Third Party) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

Case 6:10-cv-00329-LED   Document 721-1   Filed 09/30/12   Page 2 of 19 PageID #: 6407

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment After Final | Reply_to_Final_OA.pdf | 749725<br>69b542b3ab-d791e6dc30568237e904441f1<br>b5d35 | no | 16 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Amendment After Final | Copy_of_Reply_to_Final_OA.pdf | 749725<br>69b542b3ab-d791e6dc30568237e904441f1<br>b5d35 | no | 16 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Reexam Certificate of Service | Certificate_of_Service.pdf | 816184<br>cd5995a74e2176305c8793dd060d1f56065<br>0185a | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Reexam Certificate of Service | Copy_of_Certificate_of_Service.pdf | 816184<br>cd5995a74e2176305c8793dd060d1f56065<br>0185a | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 3131818 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Attorney Docket No.  GMGP101US

**CERTIFICATE OF TRANSMISSION**

I hereby certify that this correspondence (along with any paper referred to as being attached or enclosed) is being submitted *via* the USPTO EFS Filing System on the date shown below to Mail Stop Ex Parte Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia  22313-1450.

Date: September 20, 2012            /Himanshu S. Amin/
                                                       Himanshu S. Amin

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | | |
|---|---|---|---|---|---|
| Application No(s). | : | 90/011,366 and 90/011,316 | Confirmation No. | | 5680 |
| Patent No. | : | 5,855,343 | Patentee: | | David E. Krekelberg |
| Assignee | : | Global Media Group LLC | | | |
| Filed | : | March 7, 1997 | | | |
| Art Unit | : | 3993 | | | |
| Examiner | : | William C. Doerrler | | | |
| Docket No. | : | GMGP101US | | | |

Mail Stop Ex Parte Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA  22313-1450

## REPLY TO FINAL OFFICE ACTION DATED AUGUST 30, 2012

Dear Sir,

This is in response to the Final Office Action dated August 30, 2012.  Favorable reconsideration of the subject patent under reexamination is respectfully requested in view of the following amendments and comments.  The Commissioner is authorized to charge any fees due in relation to this filing to Deposit Account No. 50-1063 [GMGP101US].

**A Marked-Up Version of All Pending Claims** begins on page 2 of this paper.

**Remarks/Arguments** begin on page 15 of this paper.

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

**Listing of Claims:**

1. (Cancelled - Subject to Reexamination)

2. (Cancelled - Subject to Reexamination)

3. (Not Subject to Reexamination)     Apparatus according to claim 2 wherein the support frame includes a cover adapted to protect the camera lens when the camera is rotated about the second axis until the camera is between the first portion and the second portion.

4. (Not Subject to Reexamination)     Apparatus according to claim 3 wherein the first portion of the support frame further includes said cover, said cover being mounted at the distal end of the first portion and adapted the lens of the camera.

5. (Cancelled - Subject to Reexamination)

6. (Cancelled - Subject to Reexamination)

7. (Cancelled - Subject to Reexamination)

8. (Cancelled - Subject to Reexamination)

9. (Not Subject to Reexamination)     Apparatus according to claim 8 wherein the pivot element has a bore along the first axis of rotation to receive an electrical wiring harness and pass said wiring harness to the camera.

10. (Cancelled - Subject to Reexamination)

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

11. (Not Subject to Reexamination)   Apparatus according to claim 10 wherein the support frame adapted to protect the camera when the camera is rotated about the second axis towards the rear support element of the support frame until the camera is between the rear support element and the first and second front support elements, and is releasably held between the rear support element and the first and second front support elements.

12. (Not Subject to Reexamination)   Apparatus according to claim 11 wherein the first and second front support elements are spaced a distance apart, and wherein said distance is less than a diameter of the housing of the camera so that as the camera is being rotated about the second axis in the direction towards the rear support element, said housing passes between the first and second front support elements and the first and second front support elements resiliently flex outwardly to accommodate passage of said housing, said housing being releasably held once passing between the first and second front support elements by the rear support element engaging said housing at the lens.

13. (Not Subject to Reexamination)   Apparatus according to claim 11 wherein the first portion of the support frame further has a cover, said cover being mounted at a distal end of the rear support element and adapted to receive the lens of the camera when the camera is releasably held between the rear support element and the first and second front support elements.

14. (Cancelled - Subject to Reexamination)

15. (Cancelled - Subject to Reexamination)

16. (Cancelled - Subject to Reexamination)

17. (Cancelled - Subject to Reexamination)

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

18. (Not Subject to Reexamination)   Apparatus according to claim 17 wherein the pivot element has a bore along the first axis of rotation to receive said electrical wiring harness and pass said wiring harness to the camera.

19. (Cancelled - Subject to Reexamination)

20. (Not Subject to Reexamination)   Apparatus for supporting a camera having a lens on a substantially level surface, comprising:

    a.    a hinge member adapted to be rotatably attached to the camera, the camera rotating about a first axis of rotation relative to said hinge member; and

    b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on a generally horizontal, substantially planar surface, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the generally horizontal, substantially planar surface when said hinge member is supported on the generally horizontal, substantially planar surface, said support frame having a first portion and a second portion wherein said support frame protects the camera when said hinge member is not supported on the generally horizontal, substantially planar surface, and when the camera is rotated around said second axis in a direction from said second portion towards said first portion of said support frame until the camera is between said first portion and said second portion and is releasably held between said first portion and said second portion.

21. (Not Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on an object having a first surface and a second surface, wherein a thickness measured between the first surface and the second surface defines an edge therebetween, comprising:

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

     a.    a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so adapted, rotating about a first axis of rotation relative to said hinge member; and

     b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported by said support frame on the object, said support frame supporting said hinge member on the object when said first surface is inclined from a substantially horizontal position, the camera being maintained adjacent the edge when an uppermost extremity of the object is the edge, rotation of said support frame being precluded about an axis substantially parallel to said second axis, said second axis being substantially parallel to said edge, said support frame having a first portion and a second portion wherein said support frame releasably holds and protects the camera when said hinge member is not supported by said support frame on the object and the camera is rotated around said second axis in a direction from said second portion towards said first portion of said support frame until the camera is between said first portion and said second portion and is releasably held between said first portion and said second portion.

22. (Pending - Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

     a.    a hinge member adapted to be rotatably and permanently attached to the camera, said camera, when the hinge member is so permanently attached, rotating, about a first axis of rotation, relative to said hinge member; and

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

23.    (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member consists of a single, unitary body.

24.    (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member consists of a single piece of material.

25.    (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member consists of a  unitary piece of material.

26.    (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member is adapted to be inserted inside a housing of said camera for rotatably attaching said hinge member to said camera.

27.    (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member comprises a lip adapted for rotatably attaching said hinge member to said camera.

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

28.     (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member comprises a neck having a lip, with said lip adapted for rotatably attaching said hinge member to said camera, wherein said lip has a wider circumference than said neck.

29.     (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member supports said camera from the bottom of said camera.

30.     (Pending - Subject to Reexamination)  The apparatus of claim 22, wherein said hinge member is rotatably attached to said camera at the bottom of said camera, and wherein said hinge member is rotatably attached to said support frame at the top of said support frame.

31.     (Pending - Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

        a.      a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member, wherein said hinge member consists of a single, unitary body; and

        b.      a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first

Page 7 of 16

A1970

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

32.     (Pending - Subject to Reexamination)  The apparatus of claim 30, wherein said hinge member is rotatably and permanently attached to the camera.

33.     (Pending - Subject to Reexamination)  The apparatus of claim 30, wherein said hinge member consists of a  single piece of material.

34.     (Pending - Subject to Reexamination)  The apparatus of claim 31, wherein said hinge member consists of a  unitary piece of material.

35.     (Pending - Subject to Reexamination)  The apparatus of claim 31, wherein said hinge member is adapted to be inserted inside a housing of said camera for rotatably attaching said hinge member to said camera.

36.     (Pending - Subject to Reexamination)  The apparatus of claim 31, wherein said hinge member comprises a lip adapted for rotatably attaching said hinge member to said camera.

37.     (Pending - Subject to Reexamination)  The apparatus of claim 31, wherein said hinge member comprises a neck having a lip, with said lip adapted for rotatably attaching said hinge member to said camera, wherein said lip has a wider circumference than said neck.

38.     (Pending - Subject to Reexamination)  The apparatus of claim 31, wherein said hinge member supports said camera from the bottom of said camera.

Page 8 of 16

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

39.    (Pending - Subject to Reexamination)  The apparatus of claim 31, wherein said hinge member is rotatably attached to said camera at the bottom of said camera, and wherein said hinge member is rotatably attached to said support frame at the top of said support frame.

40.    (Pending - Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

    a.    a hinge member adapted to be permanently rotatably attached to the camera, said camera, when the hinge member is so permanently rotatably attached, rotating, about a first axis of rotation, relative to said hinge member; and

    b.    a support frame permanently rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

41.    (Pending - Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

a.    a hinge member adapted to be permanently rotatably joined to the camera, said camera, when the hinge member is so permanently rotatably joined, rotating, about a first axis of rotation, relative to said hinge member; and

b.    a support frame permanently rotatably joined to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

42.    (Pending - Subject to Reexamination)  The apparatus of claim 1, wherein said hinge member is adapted to be inserted inside a housing of said camera for permanently rotatably attaching said hinge member to said camera.

43.    (Pending - Subject to Reexamination)  The apparatus of claim 1, wherein said hinge member is adapted to be inserted inside a joint within a housing of said camera for rotatably attaching said hinge member to said camera.

44.    (Pending - Subject to Reexamination)  Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

a.    a hinge member adapted to be rotatably attached to the camera, said camera, when

Page 10 of 16

A1973

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member, wherein said hinge member comprises a lip adapted for rotatably attaching said hinge member to said camera.; and

b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

45.    (Pending - Subject to Reexamination)  Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

a.    a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member, wherein said hinge member comprises a neck having a lip, with said lip adapted for rotatably attaching said hinge member to said camera, wherein said lip has a wider circumference than said neck; and

b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally

Page 11 of 16

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

46.     (Pending - Subject to Reexamination)   Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

      a.     a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and

      b.     a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, wherein the support frame has a front support element and rear support element, and wherein the front support element is configured to engage the object at the intersection of the first surface and the edge, and at the intersection of the second surface and the edge, when said first surface and said second surface are inclined from a generally horizontal orientation, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

47.    (Pending - Subject to Reexamination)  Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

        a.    a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and

        b.    a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, wherein the support frame has a front support element and rear support element, and wherein the front support element is configured to engage the object at the intersection of the first surface and the edge, at the intersection of the second surface and the edge, and at the second surface, when said first surface and said second surface are inclined from a generally horizontal orientation, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

48.    (Pending - Subject to Reexamination)  The hinge member of claim 1, wherein the support frame has a front support element and rear support element, wherein the front support element is

Page 13 of 16

Application No(s).  90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

configured to sit atop a portion of a  length of the edge between the first surface and the second surface when said first surface and said second surface are inclined from a generally horizontal orientation.

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

## REMARKS/ARGUMENTS

U.S. Patent No. 5,855,343 is subject to an order granting reexamination as a result of two reexamination requests under respective Control Nos. 90/011,366 and 90/011,316. These Control Nos. have been merged into the subject reexamination proceeding.

Claims 1, 2, 5-8, 10, 14-17, 19, and 22-48 are subject to reexamination. Claims 3, 4, 9, 11-13, 18, 20 and 21 are not subject to reexamination. A listing of all claims and status is provided at pages 2-14 of this paper. Please cancel claims 1, 2, 5-8, 10, 14-17, and 19. The Final Office Action notes that claims 22-48 are patentable.

A copy of Certificate of Service to Requestors is submitted concurrently herewith. Pursuant to 37 CFR 1.565(a), the Patent Owner notifies the Patent Office that the subject patent (U.S. 5,855,343) is part of the following litigation activity:

AdjustaCam LLC v. Amazon.com, Inc. et al., 6:10-cv-00329-LED, U.S. District Court for the Eastern District of Texas

AdjustaCam LLC v. Atlanta Network Technologies, Inc. d/b/a Antonline et al., 6:10-cv-00644-LED, U.S. District Court for the Eastern District of Texas

GlobalMedia Group LLC v. Logitech Inc., 5:11-cv-00778-EJD, U.S. District Court for the Northern District of California

Logitech Inc. v. GlobalMedia Group LLC, No. 12-16532, U.S. Court of Appeals for the Ninth Circuit

GlobalMedia Group LLC v. Logitech Inc., JAMS REF# 1100071120 (Arbitration proceedings)

A1978

Application No(s). 90/011,366 and 90/011,316
Reexam of U.S. Patent No. 5,855,343
Attorney Docket No. GMGP101US
Reply to Final Office Action dated August 30, 2012

## CONCLUSION

In view of the foregoing comments and amendments, Patent Owner's undersigned representative respectfully requests the Examiner to issue a Notice of Intent to Issue *Ex Parte* Reexamination Certificate" (NIRC). In the event additional amendments are necessary to cure informalities associated with the herein amendments, the Examiner is requested and authorized to make an Examiner's amendment to address such informalities.

If it is determined that fees are due in connection with the filing of this paper, the Commissioner is hereby authorized to charge payment of any fee(s) or any underpayment of fee(s) or credit any overpayment(s) to Deposit Account No. 50-1063 [GMGP101US].  If necessary, Patent Owner requests, under the provisions of 37 CFR 1.550(c) to extend the period for filing a reply in the above-identified application and to charge the fees for a small entity under 37 CFR 1.17(a).

Respectfully submitted,

Date:   September 20, 2012                  Himanshu S. Amin, Reg. No. 40,894

Himanshu S. Amin, LLC
127 Public Square
57th Floor
Cleveland, OH 44114

Email:        hamin@thepatentattorneys.com
Telephone:   216-535-7999
Mobile:       216-409-5303
Facsimile:    216-696-8731

Attorney Docket No.  GMGP101US

**CERTIFICATE OF TRANSMISSION**

I hereby certify that this correspondence (along with any paper referred to as being attached or enclosed) is being submitted *via* the USPTO EFS Filing System on the date shown below to Mail Stop Ex Parte Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia  22313-1450.

Date: September 20, 2012          /Himanshu S. Amin/
                                   Himanshu S. Amin

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| Application No(s). | : | 90/011,366 and 90/011,316 | Confirmation No. | 5680 |
| Patent No. | : | 5,855,343 | Patentee: | David E. Krekelberg |
| Assignee | : | Global Media Group LLC | | |
| Filed | : | March 7, 1997 | | |
| Art Unit | : | 3993 | | |
| Examiner | : | William C. Doerrler | | |
| Docket No. | : | GMGP101US | | |

## CERTIFICATE OF SERVICE REGARDING
## REPLY TO FINAL OFFICE ACTION DATED AUGUST 30, 2012

I hereby certify that on September 20, 2012, I served true and accurate duplicate copies of the herein Reply to Final Office Action by first class mail on below-noted Re-Exam Requestor Counsel.

Tracy W. Druce
Novak Druce & Quigg, LLP
1000 Louisiana St., 53rd Floor
Houston, TX 77002

Jay Chui
Paul Hastings Janofsky & Walker LLP
875 15th Street NW
Washington, DC 20005

Respectfully submitted,

Date:  September 20, 2012

Himanshu S. Amin, Reg. No. 40,894
Himanshu S. Amin, LLC
127 Public Square, 57th Floor
Cleveland, OH 44114

Email:       hamin@thepatentattorneys.com
Telephone:  216-535-7999
Mobile:      216-409-5303
Facsimile:   216-696-8731

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                           NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                     JURY

### DECLARATION OF JOHN J. EDMONDS

I, **JOHN J. EDMONDS**, declare under penalty of perjury as follows:

1.  My name is John J. Edmonds, I am over the age of twenty-one (21) years, am competent to testify on the matters stated herein, have personal knowledge of the facts and statements in this declaration and declare that each of the facts is true and correct.

2.  I am a shareholder at the law firm of Collins, Edmonds, Pogorzelski, Schlather & Tower, PLLC and am counsel of record for AdjustaCam, LLC in the above-referenced matter. I have personal knowledge of the facts set forth herein, and I could and would testify competently thereto if called as a witness.

3.  I am the lead counsel for the Plaintiff AdjustaCam LLC in the above-referenced matter.

4.  AdjustaCam LLC hereby unconditionally covenants not to sue Sakar International, Inc. Kohl's Illinois, Inc., Kohl's Corporation, Inc. and Kohl's Department Stores, Inc. (collectively "Sakar/Kohl's") for infringement as to any claim of U.S. Patent No. 5,855,343 (the "'343 patent"). Further, AdjustaCam LLC hereby unconditionally covenants not to sue manufacturers, suppliers, wholesalers, sellers, offerors for sale, importers, and/or users for infringing the '343 patent relative to Sakar/Kohl's currently existing products. The foregoing unconditional covenant not to sue extends all the way up and down the distribution chain for Sakar/Kohl's currently existing products, from manufacture through distribution and end use.

CONFIDENTIAL

A1981

5. I am fully authorized to make the covenant herein on behalf of my client AdjustaCam

LLC.

I declare under penalty of that the foregoing is true and correct.

Executed in Houston, TX on September 30, 2012

_____

John J. Edmonds

2

CONFIDENTIAL

Case 6:10-cv-00329-LED   Document 721-3   Filed 09/30/12   Page 1 of 1 PageID #:  6427

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                              JURY

## <u>ORDER</u>

CAME BEFORE THE COURT the Plaintiff's Motion to Dismiss Its Claims Against Sakar and

Kohl's and The Counterclaims Against Plaintiff and Request for Expedited Briefing Schedule and Oral

Hearing (the "Motion").

Plaintiff's request for an expedited briefing schedule and oral hearing is GRANTED.  Defendants

response to the Motion shall be due on _____, Plaintiff's Reply, if any, shall be due on

_____, and Defendants' Sur-Reply, if any, shall be due on _____.

Further, the Motion is hereby set for oral hearing before _____ at _____

a.m./p.m. on the _____ day of _____, 2012.

IT is so ORDERED.

Case 6:10-cv-00329-LED   Document 721-4   Filed 09/30/12   Page 1 of 1 PageID #:  6428

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                              JURY

## ORDER

CAME BEFORE THE COURT the Plaintiff's Motion to Dismiss its Claims against Sakar and Kohl's and Their Counterclaims Against Plaintiff (the "Motion").  The Motion is hereby GRANTED because Plaintiffs Motion to dismiss combined with its covenant not to sue Sakar International, Inc., Kohl's Illinois, Inc., Kohl's Corporation, Inc. (collectively "Sakar/Kohl's") under the '343 patent divests the Court of subject matter jurisdiction with respect to Plaintiff's claims against NewEgg/Rosewll and Sakar/Kohl'sSakar/Kohl's counterclaims against Plaintiff. *See, e.g., Dow Jones & Co., Inc. v. Ablaise Ltd.,* 606 F.3d 1338, 1348 (Fed.Cir.2010); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995).

It is therefore ORDERED that Plaintiff's claims against Sakar/Kohl's are hereby DISMISSED with prejudice, and Sakar/Kohl's counterclaims against Plaintiff are hereby DISMISSED without prejudice.

-IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

    v.                                          NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                    JURY

## UNOPPOSED MOTION TO DISMISS NEWEGG AND ROSEWILL

Plaintiff AdjustaCam LLC respectfully submits this unopposed motion to dismiss the claims and counterclaims involving Defendants/Counter-claimants Newegg Inc., Newegg.com Inc., and Rosewill, Inc. (collectively "NewEgg/Rosewill"), pursuant to Fed.R.Civ.P. 41(a)(2) as follows:

I.

This is a patent infringement case involving asserted claims 1, 7 and 19 (the "Asserted Claims") of U.S. Patent No. 5,855,343 (the "'343 patent").   On August 30, 2012, at the culmination of reexamination proceedings involving the '343 patent, the U.S.P.T.O. issued a Final Office Action rejecting the Asserted Claims for being unpatentable over prior art but allowing additional new and amended claims. Ex. 1.  On September 20, 2012, in response to that Final Office Action, Plaintiff canceled the Asserted Claims of the '343 patent, Ex. 2, so that a certificate of reexamination can issue concerning the multiple new and amended claims deemed allowable.

Moreover, on August 27, 2012, Plaintiff granted Newegg/Rosewill a covenant not to sue under the '343 Patent (Dkt. 678).

In view of the foregoing, the following issues in this case are now moot or near moot: (1) infringement of the Asserted Claims; (2) validity of the Asserted Claims; and (3) damages from infringement of the Asserted Claims.   Accordingly, Plaintiff hereby moves for an order

dismissing its claims against NewEgg/Rosewill **with prejudice**.  In addition, NewEgg/Rosewill does not oppose, and Plaintiff hereby moves for, an order dismissing NewEgg/Rosewill's counterclaims **without prejudice**.


## II.

NewEgg/Rosewill does not oppose dismissal of AdjustaCam's claims and Newegg/Rosewill's counterclaims as set forth herein, with the exception of Newegg/Rosewill's right to seek to obtain and recover costs and/or attorneys' fees pursuant to Fed.R.Civ.P. 54(d)(1) and/or (2) and 35 U.S.C. § 285..

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the foregoing relief.


September 27, 2012                     Respectfully submitted,

                                      By: /s/ *John J. Edmonds*
                                      John J. Edmonds – LEAD COUNSEL
                                      Texas State Bar No. 789758
                                      Michael J. Collins
                                      Texas Bar No. 4614510
                                      Stephen F. Schlather
                                      Texas Bar No. 24007993
                                      COLLINS, EDMONDS, POGORZELSKI,
                                      SCHLATHER & TOWER, PLLC
                                      1616 S. Voss Rd., Suite 125
                                      Houston, Texas 77057
                                      Telephone: (713) 501-3425
                                      Facsimile: (832) 415-2535
                                      jedmonds@cepiplaw.com
                                      mcollins@cepiplaw.com
                                      sschlather@cepiplaw.com

                                      Andrew W. Spangler
                                      Texas Bar No. 24041960
                                      Spangler & Fussell P.C.
                                      208 N. Green Street, Suite 300
                                      Longview, Texas 75601

(903) 753-9300
(903) 553-0403 (fax)
spangler@spanglerlawpc.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC


### CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Plaintiff have conferred with counsel for NewEgg/Rosewill in accordance with L.R. CV-7, and that NewEgg/Rosewill does not oppose this motion.

September 27, 2012                          /s/ *John J. Edmonds*
                                           John J. Edmonds


### CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

September 27, 2012                          /s/ *John J. Edmonds*
                                           John J. Edmonds

Case 6:10-cv-00329-LED   Document 719-1   Filed 09/27/12   Page 1 of 1 PageID #:  6397

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                              JURY

## ORDER

CAME BEFORE THE COURT the Unopposed Motion (the "Motion") of Plaintiff AdjustaCam LLC to dismiss the claims and counterclaims involving Defendants/Counter-claimants Newegg Inc., Newegg.com Inc., and Rosewill, Inc. (collectively "NewEgg/Rosewill"), and the Court being of the opinion that said motion should be GRANTED, it is hereby

ORDERED that Plaintiff's claims against NewEgg/Rosewill are DISMISSED WITH PREJUDICE.  It is further ORDERED that NewEgg/Rosewill's counterclaims are DISMISSED WITHOUT PREJUDICE.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| ADJUSTACAM LLC | |
| v. | NO. 6:10-cv-329-LED |
| AMAZON.COM, INC.;  ET AL. | JURY |

**PLAINTIFF'S MOTION TO DISMISS ITS CLAIMS AGAINST NEWEGG AND
ROSEWILL AND THEIR COUNTERCLAIMS AGAINST PLAINTIFF FOR LACK OF
SUBJECT MATTER JURISDICTION
AND
REQUEST FOR EXPEDITED BRIEFING SCHEDULE AND ORAL HEARING**

***FILED UNDER SEAL***

Plaintiff AdjustaCam, LLC ("AdjustaCam") respectfully submits this opposed Motion to Dismiss, and request for expedited briefing schedule and oral hearing, as follows:

I.    **INTRODUCTION**

Plaintiff AdjustaCam LLC ("AdjustaCam"), through counsel, hereby moves the Court to dismiss AdjustaCam's claims of infringement of U.S. Patent 5,855,343 ("the '343 Patent") against Defendants Newegg, Inc., Newegg.com, Inc, and Rosewill Inc. (collectively "NewEgg/Rosewill"),[1] with prejudice. AdjustaCam also moves to dismiss NewEgg/Rosewill's First and Second counterclaims, which are tied to the infringement and validity of the '343 Patent, with prejudice.

Concurrently with this motion, AdjustaCam has granted NewEgg/Rosewill a covenant not to sue under the '343 patent. Exhibit 1.  AdjustaCam's covenant not to sue under the '343 patent divests the Court of subject matter jurisdiction with respect to NewEgg/Rosewill's First and Second counterclaims in this matter, since they relate solely to NewEgg/Rosewill's claims that it does not infringe the '343 patent and that the '343 patent is invalid. *See, e.g., Dow Jones &*

---

[1] Rosewill is a subsidiary of NewEgg's.

CONFIDENTIAL

*Co., Inc. v. Ablaise Ltd.,* 606 F.3d 1338, 1348 (Fed.Cir.2010); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). Accordingly, through this motion, AdjustaCam requests the Court issue an Order dismissing AdjustaCam's claims against NewEgg/Rosewill for infringement of the '343 Patent as well as NewEgg/Rosewill's First and Second Counterclaims of its Amended Answer and Counterclaims.

## II.  STATEMENT OF FACTS

AdjustaCam filed this lawsuit on July 2, 2010, alleging that NewEgg/Rosewill infringes the '343 Patent. Dkt. No. 1. AdjustaCam's most recent Amended Complaint was filed on August 9, 2011. Dkt. No. 485. NewEgg/Rosewill filed its answer and counterclaims on September 19, 2011, denying all material allegations in the Complaint and alleging counterclaims of non-infringement and invalidity against all the patent-in-suit. Dkt. Nos. 495 and 496. NewEgg/Rosewill's First and Second counterclaims are directed solely to non-infringement and invalidity of the '343 Patent. *Id.*

AdjustaCam has recently resolved its claims against almost all of the remaining Defendants. *See, e.g.,* Orders of Dismissal at Doc Nos. 665, 671, 672, 673, 674, 675 and 677. AdjustaCam's original claims against NewEgg/Rosewill included claims relating to webcams from, *inter alia,* Creative, Lifeworks and Gear Head, all of which have now been resolved. Due to AdjustaCam's recent resolution of its claims against Gear Head, *see* Order of dismissal at Doc No. 665), NewEgg/Rosewill is no longer selling unlicensed webcams manufactured by any other Defendant.

In view of the foregoing, AdjustaCam desires to simplify this case by focusing its claims going forward solely upon Defendant Sakar and Defendant Kohl's, which is accused of infringement solely on account of Sakar manufactured products. NewEgg/Rosewill's remaining

CONFIDENTIAL

damages exposure, which is now unlinked to Gear Head's, is relatively *de minimis*, and is dwarfed by the damages exposure of Sakar.

In addition to focusing and simplifying the case, the foregoing would very likely help avoid unnecessary motion practice between AdjustaCam and NewEgg/Rosewill, who have managed to embroil themselves in multiple discovery and other disputes that so far have barely escaped motion practice.

## III.  <u>ARGUMENT</u>

AdjustaCam's covenant not to sue along with AdjustaCam's motion to dismiss with prejudice terminates the Court's subject matter jurisdiction over the claims involving NewEgg/Rosewill. *See, e.g., Dow Jones & Co., supra*; *Super Sack, supra*. Similarly, AdjustaCam's dismissal of its infringement claims relating to the '343 Patent and its covenant not to sue Newegg/Rosewill under the '343 Patent for all past, present, and future products also divests the Court of subject matter jurisdiction over NewEgg/Rosewill's First and Second counterclaims.  Therefore, they should also be dismissed.

"A declaratory judgment counterclaim, according to the relevant procedural provision, may be brought to resolve an 'actual controversy' between 'interested' parties." *Super Sack*, 57 F.3d at 1058; *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal, Inc.*, 248 F.3d 1333, 1340 (Fed. Cir. 2001); 28 U.S.C. § 2201(a). "The existence of a sufficiently concrete dispute between the parties remains, however, a jurisdictional predicate to the vitality of such an action." *Super Sack*, 57 F.3d at 1058 (internal citations omitted). In other words, an "actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974)) (internal citations omitted); *Intellectual Prop. Dev.*, 248 F.3d at 1340; *Super Sack*, 57 F.3d at 1058. *See also Benitec*, 495 F.3d at 1344. Importantly, as is the case here,

3

a patentee can divest a court of jurisdiction over the case by filing a statement of non-liability for the declaratory counterclaimant. *Benitec*, 495 F.3d at 1345; *Super Sack*, 57 F.3d at 1058.

**A. NewEgg/Rosewill's First and Second Counterclaims Should be Dismissed Because AdjustaCam's Covenant Not to Sue Divests the Court of Subject Matter Jurisdiction Over Those Declaratory Judgment Counterclaims.**

AdjustaCam seeks to dismiss its claims directed to '343 Patent with prejudice and has granted NewEgg/Rosewill a covenant not to sue under the '343 Patent that covers all of their products as they exist today, in the past, or in the future, and extends to their customers and chain of distribution, as follows:

> AdjustaCam LLC ("AdjustaCam") hereby unconditionally covenants not to sue Newegg, Inc., Newegg.com, Inc, and Rosewill Inc. (collectively "NewEgg/Rosewill") for infringement as to any claim of U.S. Patent No. 5,855,343, including any reexamination certificates that issue therefrom (the "343 patent"). Further, AdjustaCam LLC hereby unconditionally covenants not to sue manufacturers, suppliers, wholesalers, sellers, offerors for sale, importers and users for infringing the '343 patent relative to NewEgg/Rosewill's products. The foregoing unconditional covenants not to sue extend all the way up and down the distribution chain for NewEgg/Rosewill's products, from manufacture, through distribution and end use.

Exhibit 1. A dismissal with prejudice combined with the covenant not to sue filed by AdjustaCam eliminates any "sufficient immediacy and reality to warrant declaratory judgment jurisdiction over" NewEgg/Rosewill's First and Second counterclaims. *Benitec,* 495 F.3d at 1346; *see also Intellectual Prop. Dev.,* 248 F.3d at 1342; *Super Sack,* 57 F.3d at 1059-60. Therefore, this Court's subject matter jurisdiction over NewEgg/Rosewill's counterclaims has been terminated, and the First and Second counterclaims must be dismissed with prejudice. *Benitec,* 495 F.3d at 1349; *Intellectual Prop. Dev.,* 248 F.3d at 1342; *Super Sack,* 57 F.3d at 1060.[2]

---

[2] The Federal Circuit has held that covenants not to sue signed by a party's counsel bind the party and are therefore sufficient. *Super Sack,* 57 F.3d at 1059.

CONFIDENTIAL

The language of AdjustaCam's covenant is consistent with the language in other cases. *See e.g., Benitec,* 495 F.3d at 1343 ("[Patentee] covenants and promises not to sue [Defendant] for patent infringement arising from activities and/or products occurring on or before the date dismissal was entered in this action—September 29, 2005."); *Fujitsu Ltd. v. Tellabs Operations, Inc.*, 09-C-4530, 2010 WL 4627652 at *2 (N.D. Ill. Nov. 4, 2010). Thus, AdjustaCam's covenant is sufficiently broad to divest the Court of subject matter jurisdiction.

## IV.    REQUEST FOR EXPEDITED BRIEFING SCHEDULE AND ORAL HEARING

AdjustaCam and NewEgg/Rosewill are both expending large amounts of resources in this case, despite the fact that AdjustaCam is willing to dismiss NewEgg/Rosewill with prejudice and grant a covenant not to sue.  NewEgg/Rosewill apparently thinks this is an exceptional case. AdjustaCam has stated that NewEgg/Rosewill's pursuit of an exceptional case finding is baseless, but that nothing in the dismissal of the claim and counterclaims would preclude NewEgg/Rosewill from pursuing an exceptional case finding.  In view of the forgoing, NewEgg/Rosewill has no reason to continue to require AdjustaCam to expend large amounts of resources litigating infringement claims and invalidity counterclaims that are now moot relative to NewEgg/Rosewill.

Moreover, the parties have multiple disputes, many of which would almost certainly require motion practice as the case progresses towards a trial which, for all purposes, is now moot.  NewEgg/Rosewill has no reason to burden the Court with motion practice over moot claims.

For the foregoing reasons, namely avoidance of wasting the resources of the Court and the parties, AdjustaCam requests that the Court set an expedited briefing schedule and an oral hearing on this motion to dismiss.  NewEgg/Rosewill has no legal or factual basis to oppose this

CONFIDENTIAL

Motion, and if anything, despite its stubbornness, NewEgg/Rosewill would also be a beneficiary of having itself dismissed from the lawsuit promptly.

## V.   **CONCLUSION**

Under *Super Sack* and subsequent Federal Circuit authority, AdjustaCam's covenant not to sue along with this motion to dismiss divests the Court of subject matter jurisdiction over AdjustaCam's claims against NewEgg/Rosewill regarding infringement of the '343 Patent and NewEgg/Rosewill's First and Second counterclaims. Thus, the Court should grant AdjustaCam's Motion to Dismiss its claims of infringement of the '343 patent against NewEgg/Rosewill with prejudice and should also dismiss NewEgg/Rosewill's First and Second Counterclaims with prejudice. Further, in order to conserve the resources of the Court and the parties, the Court should set an expedited briefing schedule on this matter, and set it for an oral hearing at the Court's earliest convenience, so that NewEgg/Rosewill can explain why it refuses to accept a covenant not to sue and dismissal from this case.

August 27, 2012                         Respectfully submitted,

                                        By: /s/ *John J. Edmonds*
                                        John J. Edmonds – LEAD COUNSEL
                                        Texas State Bar No. 789758
                                        Michael J. Collins
                                        Texas Bar No. 4614510
                                        Stephen F. Schlather
                                        Texas Bar No. 24007993
                                        COLLINS,   EDMONDS,   POGORZELSKI,
                                        SCHLATHER & TOWER, PLLC
                                        1616 S. Voss Rd., Suite 125
                                        Houston, Texas 77057
                                        Telephone: (713) 501-3425
                                        Facsimile: (832) 415-2535
                                        jedmonds@cepiplaw.com
                                        mcollins@cepiplaw.com
                                        sschlather@cepiplaw.com

CONFIDENTIAL

Andrew W. Spangler
Texas Bar No. 24041960
Spangler & Fussell P.C.
208 N. Green Street, Suite 300
Longview, Texas 75601
(903) 753-9300
(903) 553-0403 (fax)
spangler@spanglerlawpc.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC


## CERTIFICATE OF CONFERENCE

The parties met and conferred in accordance with Local Rule CV-7 by telephone on August 23, 2012.  Prior to the call, AdjustaCam had sent NewEgg/Rosewill a copy of the proposed covenant not to sue.  Present on the call for AdjustaCam were local counsel Andrew Spangler, local counsel Charles VanCleef, lead counsel John Edmonds, and Stephen Schlather.  Present on the call for NewEgg/Rosewill were local counsel Trey Yarborough, lead counsel John Zarian and Dana M. Herberholz.  During the meet and confer, the parties discussed the issue of a covenant not to sue and dismissal.  Counsel for NewEgg/Rosewill were not in a position to agree or disagree with the proposed covenant and dismissal.  The parties, namely Mr. Edmonds and Mr. Yarborough, spoke again on August 24th, and NewEgg/Rosewill were still undecided.  And the parties, again Mr. Edmonds and Mr. Yarborough, spoke again today.  As of today, NewEgg/Rosewill are still undecided, and no time frame was provided for a decision to be made.  Thus, it was agreed that NewEgg/Rosewill could be put down as opposed to this Motion.


August 27, 2012                                   /s/ John J. Edmonds
                                                   John J. Edmonds

## CERTIFICATE OF AUTHORITY TO FILE UNDER SEAL

I hereby certify that authority to file this document under seal is found in the protective order governing this case.

August 27, 2012                                   /s/ John J. Edmonds
                                                   John J. Edmonds

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

August 27, 2012                                   /s/ John J. Edmonds
                                                   John J. Edmonds


7

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

    v.

AMAZON.COM, INC.;  ET AL.

NO. 6:10-cv-329-LED

JURY

### DECLARATION OF JOHN J. EDMONDS

    I, **JOHN J. EDMONDS**, declare under penalty of perjury as follows:

1.  My name is John J. Edmonds, I am over the age of twenty-one (21) years, am competent to testify on the matters stated herein, have personal knowledge of the facts and statements in this declaration and declare that each of the facts is true and correct.

2.  I am a shareholder at the law firm of Collins, Edmonds, Pogorzelski, Schlather & Tower, PLLC and am counsel of record for AdjustaCam, LLC in the above-referenced matter. I have personal knowledge of the facts set forth herein, and I could and would testify competently thereto if called as a witness.

3.  I am the lead counsel for the Plaintiff AdjustaCam LLC in the above-referenced matter.

4.  AdjustaCam LLC hereby unconditionally covenants not to sue Newegg, Inc., Newegg.com, Inc, and Rosewill Inc. (collectively "NewEgg/Rosewill") for infringement as to any claim of U.S. Patent No. 5,855,343, including any reexamination certificates that issue therefrom (the "343 patent"). Further, AdjustaCam LLC hereby unconditionally covenants not to sue manufacturers, suppliers, wholesalers, sellers, offerors for sale, importers and users for infringing the '343 patent relative to NewEgg/Rosewill's products. The foregoing unconditional covenants not to sue extend all the way up and down the distribution chain for NewEgg/Rosewill's products, from manufacture, through distribution and end use.

CONFIDENTIAL

5. I am fully authorized to make the covenant herein on behalf of my client AdjustaCam LLC.

I declare under penalty of that the foregoing is true and correct.

Executed in Houston, TX on August 27, 2012

John J. Edmonds

2

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                    NO. 6:10-cv-329-LED

AMAZON.COM, INC.;  ET AL.                              JURY

## <u>ORDER</u>

CAME BEFORE THE COURT the Plaintiff's Motion to Dismiss its Claims against NewEgg and Rosewill and Their Counterclaims Against Plaintiff (the "Motion").  The Motion is hereby GRANTED because Plaintiffs Motion to dismiss combined with its covenant not to sue Newegg, Inc., Newegg.com, Inc, and Rosewill Inc. (collectively "NewEgg/Rosewill") under the '343 patent divests the Court of subject matter jurisdiction with respect to Plaintiff's claims against NewEgg/Rosewll and Newegg/Rosewill's counterclaims against Plaintiff. *See, e.g., Dow Jones & Co., Inc. v. Ablaise Ltd.,* 606 F.3d 1338, 1348 (Fed.Cir.2010); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995).

It is therefore ORDERED that Plaintiff's claims against NewEgg/Rosewll and Newegg/Rosewill's counterclaims against Plaintiff are hereby DISMISSED with prejudice.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADJUSTACAM LLC

v.                                                       NO. 6:10-cv-329-LED

AMAZON.COM, INC., ET AL.                                 JURY

## PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE'S ORDER ON CLAIM CONSTRUCTION

Plaintiff AdjustaCam LLC ("AdjustaCam"), respectfully submits this Reply as follows:

Defendants argue that this Court can only overturn Magistrate Judge ("MJ") Love's claim construction ruling if clear error is shown. However, claim construction is a matter of law[1]; therefore, legal conclusions of MJ Love are subject to de novo review by this Court. *See Lahr v. Fulbright,* 164 F.R.D. 204, 209 (N.D. Tex. 1996). Likewise, the claim construction ruling governing this case will be subject to de novo review on appeal. *See Markman, supra.* Irrespective of the foregoing, this Court should sustain AdjustaCam's objections under either a de novo or clearly erroneous standard.

Defendants erroneously dispute that MJ Love imported a "single axis" limitation into the "rotatably attached terms" (hereinafter "rotatably attached"), because they contend he did not construe the term at all. However, MJ Love held that "rotatably attached" is "limited to a single-axis of rotation," and that "the parties may not contradict the Court's resolution of that dispute." Opinion at p. 8, 10, 11 & 15. This constitutes a claim construction under any reasonable view. AdjustaCam is entitled to object to MJ Love's ruling[2] and have this Court correct the error so that AdjustaCam would not be prevented from contradicting an erroneous claim construction in its expert reports or during the trial of this matter.

---

[1] *See Markman v. Westview,* 517 U.S. 370 (1996).
[2] The fact that MJ Love entitled his ruling a "Memorandum Opinion and Order" instead of a "Report and Recommendations" is immaterial. In this case the parties did not consent to having MJ Love adjudicate their dispute.

1

Defendants ignore the plain claim language when they deny that "rotatably attached" being limited to a single axis of rotation renders redundant the "axis of rotation" limitations also present in the claims. *See, e.g.,* Independent Claims 1, 10, 19, 20 & 21. It is plainly evident from the claim language that, if "rotatably attached" was limited to a single axis of rotation, then it would be redundant and unnecessary to include the limitation that the camera rotates about a "first axis of rotation" relative to the hinge member, and it would be redundant and unnecessary to include the limitation that the hinge member rotates about a "second axis of rotation" relative to the support frame. *See, e.g.,* Claims 1, 10, 19, 20 & 21.

The fact that one of the "rotatably attached terms" is "adapted to be rotatably attached" further illustrates the error in MJ Love's Opinion. According to the Opinion, if a member is "adapted to be rotatably attached," this means it is necessarily adapted to rotate in one and only one axis. However, plain English and simple physics dictate that a member adapted to be rotatably attached in one axis can also be adapted to be rotatably attached in other axes as well.

Defendants quote MJ Love in observing that "[e]very reference to 'rotatably attached' in the specification" involves an attachment that permits "motion over a single axis." Defendants' Opposition at Pg. 9. However, this quote from the Opinion only illustrates the error in limiting the plain language of "rotatably attached" to a preferred embodiment, which is the "cardinal sin" of claim construction. *Phillips v. AWH Corp*., 415 F.3d 1303, 1319-20 (Fed. Cir. 2005).

Defendants argue that limiting "rotatably attached" to a single axis of rotation does not limit it to "any particular" axis of rotation. Defendants' Opposition at Pg. 3. However, MJ Love's opinion, when understood relative to the claims, requires otherwise. Limiting "rotatably attached" to a single axis of rotation necessarily limits it to a particular axis of rotation. In particular, each claim requires that the first axis of rotation is "generally perpendicular," that the

second axis of rotation is "substantially parallel" to "generally horizontal," and that the first and second axis are "generally perpendicular" to each other. Thus, MJ Love's ruling unambiguously (and erroneously) requires that the straightforward term "rotatably attached" be limited to a single axis that is "generally perpendicular" as to the camera and to a single axis that is "substantially parallel" as to the surface. However, nothing in the term "rotatably attached," in its plain meaning or in context, should limit "rotatably attached" to a single axis, much less one that is "generally perpendicular" or "substantially horizontal."

Defendants also argue, erroneously, that MJ Love did not need to find limiting language in the specification or prosecution history to support his ruling because "the claim language already limits 'rotatably attached' to one direction." However, to make this argument, Defendants (and MJ Love) must point to the separate "first axis of rotation" and "second axis of rotation" limitations found in the claims. As noted above, the fact that the claims contain a "first axis of rotation" and "second axis of rotation" limitation illustrates why it is erroneous to render those limitations redundant by importing a "single axis of rotation" limitation into the plain term "rotatably attached."

Defendants defend MJ Love's error in failing to give adequate consideration to the term "comprising," which should mean that "rotatably attached" includes, but is not limited" to a single axis of rotation.[3] Here, Defendants argue that "comprising" cannot be used to remove claim limitations. However, AdjustaCam does not seek to remove any claim limitations. Simply put, the straight-forward and plain term "rotatably attached" is not, and should not be limited to a single axis of rotation. Separately in the claims, there are indeed limitations that there must be

_____

[3] Defendants argue that Plaintiff's "comprising" argument is "slightly modified" from the arguments made during the *Markman* process, yet they fail to explain why. This argument is baseless. *See* Doc No. 575, p. 7; Doc. No. 601, p. 5; and Exhibit 1, p. 81.

rotation along a "first axis of rotation" and along a "second axis of rotation." No claim limitations are removed by correcting MJ Love's erroneous construction of "rotatably attached."

As noted in AdjustaCam's Objections, a claim directed to a vehicle *comprising* a car which drives forward and reverse would be infringed by a car which drives forward, in reverse, and turns to the side, just as a claim directed to a chair *comprising* three straight legs would be infringed by a chair having three straight legs and one crooked leg. Likewise, an apparatus which *comprises* a member "rotatably attached" or "adapted to be rotatably attached" in "first axis of rotation" and in a "second axis of rotation," is infringed by a member which also rotates, or is adapted to rotate, also in a third, or even a fourth axis of rotation -- as long as the "first axis of rotation" and "second axis of rotation" limitations (which should stand on their own) are met.

Defendants argue that not limiting "rotatably attached" to a single axis of rotation would "render the claim language meaningless." Defendants' Opposition at Pg. 13.   AdjustaCam respectfully submits that giving a plain word its ordinary meaning, without importing other limitations therein, and without improperly limiting the claims to the preferred embodiment, does not render anything "meaningless."  Indeed the only "clarity" provided by MJ Love's opinion on this term is essentially a negative limitation that a straightforward term "rotatably" cannot include rotation in more than one axis.

Defendants argue that the "proper scope of ordinary meaning may be clarified" where a patentee "consistently used" a term in the specification. *Id.* at Pg. 5. However, their reading of *Nystrom* is distorted. In *Nystrom*, the ordinary meaning of "board" was "wood." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). In contrast, it is unreasonable and unsupported for the ordinary meaning of "rotatably attached" to be limited to a "single axis of rotation." It is self evident that bodies can rotate in any and all of 360 degrees. Moreover, MJ

Love did *not* base his Opinion upon the plain meaning of "rotatably attached." To the contrary, he opined that "rotatably attached" needed no construction except a negative limitation that it could not include rotation in more than a single axis.

Defendants argue that "the claimed clip is not comprised of 'rotatable attachments." This argument is simply at odds with the claim language. Plainly, "rotatably attached" requires an attachment which is rotatable. Defendants' Opposition at Pg. 11.

Respectfully, MJ Love erred in limiting the claimed invention to a preferred embodiment. This is the "cardinal sin" of claim construction. *Phillips, supra*.

Further, and respectfully, MJ Love erred in deciding that the "first axis of rotation" and "second axis of rotation" limitations in the claims somehow support or require that "rotatably attached" must be limited to a single axis of rotation. Contrary to the conclusion drawn by MJ Love, as noted above, the presence of the "first axis of rotation" and "second axis of rotation" limitations illustrate why it is erroneous to import those limitations into the plain term "rotatably attached" and limit it to a single axis of rotation. Indeed, all that is required to infringe the claims is rotation in a "first axis of rotation" and "second axis of rotation"; however, MJ Love's Opinion erroneously limits "rotatably attached" such that rotation cannot occur in *any* axis or rotation except the first or second. Respectfully, MJ Love's Opinion errs in failing to appreciate that an apparatus can infringe a claim even if it has more features or characteristics than those merely necessary to meet certain claim limitations as shown in the above examples regarding a vehicle and chair.

For the reasons stated in AdjustaCam's Objections and herein, this Court should sustain AdjustaCam's objections and construe the "rotatably attached" terms such that "rotatably attached" objects are <u>not</u> limited to a single axis of rotation.

May 17, 2012

Respectfully submitted,

By: /s/ *John J. Edmonds*
John J. Edmonds – LEAD COUNSEL
Texas State Bar No. 789758
Michael J. Collins
Texas Bar No. 4614510
Stephen F. Schlather
Texas Bar No. 24007993
COLLINS, EDMONDS &
POGORZELSKI, PLLC
1616 S. Voss Rd., Suite 125
Houston, Texas 77057
Telephone: (713) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
mcollins@cepiplaw.com
sschlather@cepiplaw.com

Andrew W. Spangler
Texas Bar No. 24041960
Spangler Law P.C.
208 N. Green Street, Suite 300
Longview, Texas 75601
(903) 753-9300
(903) 553-0403 (fax)
spangler@spanglerlawpc.com

ATTORNEYS FOR PLAINTIFF
ADJUSTACAM LLC

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with this filing via the Court's CM/ECF system and/or email per Local Rule CV-5(a)(3).

May 17, 2012

/s/ *John J. Edmonds*
John J. Edmonds

CLAIM CONSTRUCTION HEARING

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ADJUSTACAM, LLC | )( | |
| | )( | CIVIL DOCKET NO. |
| | )( | 6:10-CV-329 |
| VS. | )( | TYLER, TEXAS |
| | )( | |
| | )( | FEBRUARY 9, 2012 |
| AMAZON.COM, INC., ET AL. | )( | 9:00 A.M. |

CLAIM CONSTRUCTION HEARING

BEFORE THE HONORABLE JUDGE JOHN D. LOVE

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


FOR THE PLAINTIFF:    (See Attorney Sign-In Sheet)


FOR THE DEFENDANTS:   (See Attorney Sign-In Sheet)


COURT REPORTER:        SHELLY HOLMES, Texas CSR 7804
                       Expiration Date:  12/31/12
                       Sunbelt Reporting & Litigation
                       6575 West Loop South, Suite 580
                       Bellaire, Texas 77401
                       (903) 593-3213


(Proceedings recorded by mechanical stenography,
transcript produced on a CAT system.)

CLAIM CONSTRUCTION HEARING

1                          I N D E X

2

3

4   February 9, 2012

5                                          Page

6      Appearances                        1

7      Hearing                            3

8      Court Reporter's Certificate       98

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Shelly Holmes (601-132-921-6096)                     a5101796-2c83-4444-bd54-3e62930e0bb4

CLAIM CONSTRUCTION HEARING

Page 3

1            COURTROOM CLERK:  All rise.

2            THE COURT:  Please be seated.

3            All right.  Ms. Morris, you may call the

4   case.

5            COURTROOM CLERK:  The Court calls Case No.

6   6:10-CV-329, Adjustacam versus Amazon.com, et al.

7            THE COURT:  Announcements.

8            MR. SPANGLER:  Good morning.  Andrew

9   Spangler on behalf of the Plaintiff.  With me today is

10  Mr. John Edmonds and Mr. Johnathan --

11           MR. YAZDANI:  Yazdani.

12           MR. SPANGLER:  -- Yazdani, yes.  And we're

13  ready, Your Honor.

14           THE COURT:  All right.  And for the

15  Defendants?

16           MR. CRAFT:  Morning, Your Honor, Brian

17  Craft.  I'm here on behalf of Amazon.com with Jacqueline

18  Lu, Steve Daniels, here on behalf of Best Buy entities,

19  CDW, Fry's Electronics, Hewlett Packard Company, Micro

20  Electronics, and Office Depot.

21           THE COURT:  Okay.

22           MR. HAMMOND:  Herbert Hammond on behalf of

23  Gear Head.

24           MR. SMITH:  Michael Smith on behalf of

25  Wal-Mart.

CLAIM CONSTRUCTION HEARING

Page 79

1    to -- is the next thing to do is rotatably attached?

2              MR. ZARIAN:  We're prepared to address that,

3    Your Honor.

4              THE COURT:  Okay.  Mr. Edmonds, have you

5    addressed rotatably attached?

6              MR. EDMONDS:  I -- have I addressed theirs?

7    No, I was -- I was responding to hinge member.

8              THE COURT:  Go ahead and move to rotatably

9    attached, and that may raise some issues I might have

10   with regard to -- I think they're really, you know, kind

11   of arguing the same thing here, but if there's something

12   specific you want to present on rotatably attached, go

13   ahead.

14             MR. EDMONDS:  Yes, Your Honor.  I think that

15   the rotatably attached, the difference between the

16   parties is that they're saying it's limited to one axis

17   of rotation, and that's just simply not what the claims

18   say.

19             What the claims require to infringe the

20   claim, you have to have rotatable attachment in one

21   axis, you have to have rotatably attachment in a second

22   axis.  That's required to infringe the claim.

23             But what they're saying is that you -- you

24   can only have rotatable attachment in one axis.  And

25   there's nowhere that the patent says that.  There's

Electronically signed by Shelly Holmes (601-132-921-6096)                a5101796-2c83-4444-bd54-3e62930e0bb4

A2180

CLAIM CONSTRUCTION HEARING

Page 80

1    nowhere in the spec, there's nowhere in the claims that

2    say that.  So the question is are we going to limit

3    what's claimed here to the preferred embodiment?  The

4    preferred embodiment has a pivot joint.  The preferred

5    embodiment has a hinge joint on one end, a pivot joint

6    on the other end.  Both of those, fair enough, are --

7    are rotating in one axis.

8            But it's -- as Phillips says, you're not

9    limited to the preferred embodiment.  And the question

10   of whether somebody is limited to the preferred

11   embodiment, if somebody went around saying, the claimed

12   invention, the claimed invention, this is what the

13   claimed invention is, sometimes that happens, and the

14   Courts say, you know, you just -- you just said

15   that's the claimed invention.  That's all you're going

16   to get.

17           That's not how this patent was written.

18   They're referred to as the preferred embodiments, and

19   then, of course, at -- at the end, it made -- to the

20   extent it's not -- it wasn't clear at the end of the

21   patent, the specification says that we're not limited to

22   the preferred embodiment.  We're not intending to limit

23   this to the preferred embodiments.

24           And the case law we cited to the Court says

25   exactly that, that if the patentees are not limited to

Electronically signed by Shelly Holmes (601-132-921-6096)                a5101796-2c83-4444-bd54-3e62930e0bb4

CLAIM CONSTRUCTION HEARING

Page 81

1    the preferred embodiment, there has to be a special case
2    in which they be limited to the preferred embodiment.
3    Here they're not, and this is very much on point to the
4    case we cited to the Court.  It's very much on point to
5    Phillips for that matter.
6                But I think that's -- that's the issue,
7    and -- and with the webcam we have, I think it
8    illustrates the point.  This -- this webcam, as we can
9    see, it rotates in an axis.  So what -- what the
10   Plaintiff would say is you have an axis of rotation
11   here, you have another axis of rotation that is
12   perpendicular to it, and we say it infringes.
13               What the Defendants say is maybe it does
14   that, maybe it doesn't, but they say but it also moves
15   in other directions, and because it does more than what
16   the claim requires, it doesn't infringe.  The word
17   comprising is including but not limited to.
18               So the only way their argument works is if
19   the claim -- if the Court follows their admonition and
20   restricts the claim to mean that you can only do what --
21   what the claim absolutely requires.  You can't do
22   anything else.  So, for example, we have a car with head
23   lamps, they'd say, this claim is to a car.  If you put
24   head lamps on the car, it doesn't infringe because
25   you're limited to a car.

Electronically signed by Shelly Holmes (601-132-921-6096)                    a5101796-2c83-4444-bd54-3e62930e0bb4

A2182

CLAIM CONSTRUCTION HEARING

Page 82

1              THE COURT:  Okay.  All right.  Response?

2              MR. ZARIAN:  Thank you, Your Honor.  A

3    couple of quick points, then I'd like to move to the

4    presentation.  But just -- just to distinguish, Your

5    Honor, between the discussion we had about hinge member

6    and rotatably attached, our point with respect to hinge

7    member, and I think the fundamental difference between

8    parties, is that we -- we submit that whatever else the

9    hinge member does, it could have 20 attachments, it's

10   got to have a hinge.  There's got to be a hinge on the

11   hinge member, and if it doesn't, it's got to have a

12   hinge member.  That's -- that's our construction that

13   we've advanced.  It requires a hinge joint.  It's as if

14   the claim required head lamps on a car and there were no

15   head lamps.  That's where they're taking this claim in

16   terms of an attempt to broaden it.

17              The issue with respect to rotatable

18   attachment does turn on -- on the construction -- the

19   difference with the two constructions.  Defendants

20   submit that rotation about an axis means rotation about

21   an axis.  There must be a single axis.  That's all the

22   patent teaches, that's all that's disclosed, and there's

23   no teaching or any suggestion of any kind in terms of

24   these claims and this specification of this patent of

25   anything else.

Electronically signed by Shelly Holmes (601-132-921-6096)                    a5101796-2c83-4444-bd54-3e62930e0bb4

A2183

CLAIM CONSTRUCTION HEARING

```
 1                      CERTIFICATION

 2

 3          I HEREBY CERTIFY that the foregoing is a

 4   true and correct transcript from the stenographic notes

 5   of the proceedings in the above-entitled matter to the

 6   best of my ability.

 7

 8

 9   _____        March 2, 2012

10   SHELLY HOLMES                          Date
     Deputy Official Reporter
     State of Texas No.: 7804
11   Expiration Date: 12/31/12

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Job No. 98620
```

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| ADJUSTACAM LLC<br>*Plaintiff*<br><br>v.<br><br>AMAZON.COM, INC. *et al.*,<br>*Defendants* | Case No. 6:10-cv-329-LED<br><br>**JURY TRIAL DEMANDED** |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S MEMORANDUM OPINION AND ORDER REGARDING CLAIM CONSTRUCTION

Pursuant to Federal Rule of Civil Procedure 72(a), 28 USC § 636(b)(1)(A) and Local

Rule 72(b), Defendants Best Buy Co. Inc., Best Buy Stores, LP, Bestbuy.Com, LLC, CDW LLC,

Digital Innovations, LLC, Fry's Electronics, Inc., Gear Head, LLC, Hewlett-Packard Company,

Kohls Corporation, Kohl's Illinois, Inc., Micro Electronics, Inc. d/b/a Micro Center, Newegg,

Inc., Newegg.Com, Inc., Office Depot, Inc., Rosewill Inc., Sakar International, Inc., and Wal-

Mart Stores, Inc., (collectively, "Defendants") hereby submit the following Reply to Plaintiff

AdjustaCam, LLC's ("Plaintiff) Objections (Dkt. No. 629, hereinafter "Objections") to

Magistrate Judge Love's Memorandum Opinion and Order (Doc. No. 627; hereinafter "the

Opinion") regarding construction of the terms "rotatably attached" and "adapted to be rotatably

attached" in U.S. Patent No. 5,855,343.

Defendants respectfully request that the Court deny Plaintiff's objections to Judge Love's

construction of the "rotatably attached" terms.  Indeed, far from identifying *any* aspect of Judge

Love's analysis for the "rotatably attached" terms that could arguably constitute error under the

proper standard of review, Plaintiff's arguments merely highlight the fact that the Opinion is

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| ADJUSTACAM LLC | |
| v. | NO. 6:10-cv-329-LED |
| AMAZON.COM, INC., ET AL. | JURY |

**PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S MEMORANDUM OPINION AND
ORDER REGARDING CLAIM CONSTRUCTION (DOC NO. 627)**

Pursuant to Federal Rule of Civil Procedure 59, Plaintiff AdjustaCam LLC ("AdjustaCam"), respectfully objects to Magistrate Judge Love's Memorandum Opinion and Order Regarding Claim Construction, as follows:

**I.      INTRODUCTION**

Plaintiff is the owner of U.S. Patent No. 5,855,343 (the "'343 patent") entitled "Camera clip." Apparatuses which comprise camera clips are often referred to as webcams.

Magistrate Judge Love issued the Memorandum Opinion and Order Regarding Claim Construction (Doc. No. 627) (the "Opinion") on April 10, 2012.  A copy of the Memorandum Opinion is at Exhibit 1 for the Court's convenience.  AdjustaCam's opening Markman Brief is at Doc. No. 575, and AdjustaCam's Reply Markman Brief is at Doc. No. 601.   Both are respectfully incorporated herein to the extent the Court deems them helpful in resolving these objections.

The great majority of the Opinion correctly addressed the disputed claim terms. AdjustaCam is objecting to the Magistrate's findings and statements solely with respect to the term "rotatably attached" and the like terms, "adapted to be rotatably attached" and "adapted to rotatably attach," which the Opinion refers to collectively as the "'rotatably attached' terms."

AdjustaCam objects because, with all due respect, the Magistrate erred in holding that "'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation."

> In this regard, the Magistrate held as follows:

> The Court finds that the claims of the '343 patent describe "rotatably attached" objects as rotating over a single axis

> the Court finds that the "rotatably attached" terms do not require construction beyond what is contained in the claims. While the Court has not explicitly construed the "rotatably attached" terms, the Court has resolved the parties' dispute regarding the proper scope of the claims, i.e., "rotatably attached" objects in the patent-in-suit are limited to a single axis of rotation

> No construction necessary, sufficiently defined in the claims; subject to the Court's resolution of the scope of the claims

Opinion at pp 8, 10 & 15.

Although the Magistrate did not explicitly construe the "rotatably attached" terms, the Opinion states that "rotatably attached objects" are "limited to a single-axis of rotation," and that "the parties may not contradict the Court's resolution of that dispute," Opinion at p. 11. For the reasons stated herein, the District Judge should sustain AdjustaCam's objections and construe the "rotatably attached" terms such that "rotatably attached" objects are <u>not</u> limited to a single axis of rotation.

## II.     TECHNOLOGY AT ISSUE

The '343 patent generally relates to a novel adjustable camera clip comprising one disposition on a generally horizontal, planar surface (*e.g.*, a table top), and another disposition on an inclined object (*e.g.*, the screen of a laptop computer). Exemplary Fig. 2 shows a preferred embodiment webcam in a first disposition on a table top, and exemplary Fig. 4 shows the same webcam in a second disposition when attached to the laptop screen, as follows:





The independent claims of the '343 patent are claims 1, 10, 19, 20 and 21. Exemplary

claim 1 covers an apparatus comprising a hinge member rotatably attached to a camera, a support

frame rotatably attached to the hinge member, the support frame having a first disposition on a

surface and a second disposition on an inclined object.[1] To help the Court better envision claim

1, the following color-coded chart compares claim 1 to certain preferred embodiments disclosed

in the '343 patent:

---

[1] Exhibit 2 hereto is the '343 patent. Although the prosecution history of the '343 patent was not relied on with
regard to the subject matter of the present motion, in the interest of completeness it is included as Exhibit 3 hereto.

1. Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and

b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame,

said first axis of rotation being generally perpendicular to said second axis of rotation,

said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object,

said support frame having a first disposition positioned on said generally horizontal, substantially planar surface,

and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation,

the camera being maintained adjacent said edge in said second disposition of said support frame.



Independent claim 10 is similar to claim 1, except it comprises additional claim limitations related to the support frame being comprised of "a rear support element and a first and a second front support element."

Independent claim 20 is also similar to claim 1, except it comprises additional claim limitations related to "wherein said support frame protects the camera when said hinge member is not supported on the generally horizontal, substantially planar surface."

Independent claim 21 is similar to claim 1, except that it comprises additional claim limitations related to "wherein said support frame releasably holds and protects the camera when said hinge member is not supported by said support frame on the object."

Independent claim 19 covers a "camera clip for supporting a camera on a laptop computer ... comprising ... a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member; and a support frame

hingedly attached to said hinge." Thus, claims 1, 10, 20 and 21 each comprise a "support frame

rotatably attached to said hinge member ..." and claim 19 comprises a "support frame hingedly

attached to said hinge member."

## III.   APPLICABLE LEGAL PRINCIPLES

Claim construction is a matter of law.[2] The court "indulge[s] a heavy presumption that

claim terms carry their full ordinary and customary meaning unless the patentee unequivocally

imparted a novel meaning to those terms or expressly relinquished claim scope during

prosecution."[3] Claim terms are interpreted from the point of view of a person of ordinary skill in

the art who "is deemed to read the claim term not only in the context of the particular claim in

which the disputed term appears, but in the context of the entire patent, including the

specification."[4] However, "the ordinary meaning of claim language as understood by a person of

skill in the art may be readily apparent even to lay judges, and claim construction in such cases

involves little more than the application of the widely accepted meaning of commonly

understood words."[5]

Intrinsic evidence includes the claims, written description, drawings, and the prosecution

history."[6] A disputed term should be construed by first examining the intrinsic evidence of

record from the perspective of one skilled in the relevant art.[7] "The claims themselves provide

substantial guidance as to the meaning of particular claim terms."[8]

[2] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).
[3] *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).
[4] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).
[5] *Id.* at 1314.
[6] *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).
[7] *Phillips*, 415 F.3d at 1313-14.
[8] *Id.* at 1314.

Extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of the claim language.[9] Where the ordinary meaning can be ascertained from the intrinsic evidence, a court does not have to evaluate extrinsic evidence.[10]

Although the specification is relevant to interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.[11] As the Federal Circuit has held, "[o]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims."[12]

The Magistrate's Opinion is not dispositive of the parties' claims, and therefore, the question before the Court is whether it is "clearly erroneous or contrary to law." FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *see also Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Here, claim construction is a legal conclusion. The District Judge reviews the Magistrate Judge's legal conclusions de novo (reviews his factual findings for clear error). *See Lahr v. Fulbright & Jaworski*, 164 F.R.D. 204, 209 (N.D. Tex. 1996).

AdjustaCam respectfully submits that the Magistrate's Opinion is contrary to the law and that limiting of the "rotatably attached terms" to a single axis of rotation is a legal conclusion that must be reviewed de novo. To the extent that the Court deems the Magistrate's Opinion regarding the "rotatably attached terms" to be a factual finding, then AdjustaCam respectfully submits that it was clearly erroneous.

## IV.    THE CORRECT CONSTRUCTION OF ROTATABLY ATTACHED/ADAPTED TO BE ROTATABLY ATTACHED/ADAPTED TO ROTATABLY ATTACH.

During the Markman process, AdjustaCam advocated a construction for the "rotatably attached" terms of "connected such that the connected object is capable of being rotated." Doc.

---

[9] *Id.*
[10] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).
[11] *Comark Comms., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323.
[12] *Phillips*, 415 F.3d at 1319-20.

No. 601, p. 4.  In objecting to the Magistrate Judge's ruling regarding the "rotatably attached terms," AdjustaCam respectfully submits that its proposed construction should be adopted by the District Court, or alternatively, the District Court should adopt the Magistrate Judge's ruling that the "rotatably attached" terms do not require construction; while overruling and not adopting the Magistrate Judge's unwarranted limitation that rotatably attached objects are "limited to one axis of rotation."

To understand "rotatably attached" in the context of the patent and claims, one must also understand a "hinge member" and a "support frame."  The Magistrate Judge correctly construed hinge member as "a structural element that joins to another for construction." Opinion at p. 7. The Magistrate Judge also correctly construed "support frame" as having a plain meaning and requiring "no construction," subject to the Court's resolution of certain disputes over "support frame."

A hinge member, *i.e.*, a structural element that joins another for construction, is (1) for rotatable attachment to a camera (claims 1, 10, 19, 20 & 21); and (2) for rotatable attachment (claims 1, 10, 20 & 21) or hinged attachment (claim 19) to a support frame. Regarding rotatable attachment to a camera, the '343 patent teaches that in a preferred embodiment, "[h]inge member 16 is rotatably attached to camera 12." 4:17-19.[13] Further, each  independent claim comprises: "a hinge member adapted to be rotatably attached to the camera."[14]  Regarding rotatable attachment to a support frame, the '343 patent teaches and claims, "a support frame *rotatably attached* to said hinge member and configured to support said hinge member on the surface and the object." Claims 1, 10, 20 & 21. *See also* Figs. 2-4.

---

[13] *See also* rotatable attachment of the hinge member and camera in Figs. 2-4; 3:9-14 & 5:37-41. Note that "4:17-19" is shorthand for column 4, lns. 17-19 of the '343 patent.

[14] "The claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.

Regarding the first axis of rotation, the '343 patent teaches that, in a preferred embodiment, "[h]inge member 16 is rotatably attached to camera 12, where camera 12 rotates over a first axis 26 in a direction shown by arrow 28 relative to hinge member 16." 4:17-19. *See also* 2:12-14; 3:36-40 & 5:38-41. Further, independent claim 1 comprises, "said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member," and independent claims 10, 19, 20 and 21 each comprises: "a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation relative to said hinge member."

Regarding the second axis of rotation, the '343 patent teaches that, in a preferred embodiment, "[h]inge member 16 rotates over a second axis 32 in the direction shown by arrow 34 relative to support frame 18." 4:22-24. *See also* 2:14-18; 3:40-43 & 5:41-44. Further, claim 1 comprises: "a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object." Claims 10, 20 and 21 comprise: "said hinge member rotating about a second axis of rotation relative to said support frame." Claim 19 comprises: "said hinge member rotating over a second axis of rotation relative to said support frame."

With all due respect, the Magistrate Judge's limitation that the "rotatably attached" terms mean that an object is "limited to one axis of rotation" is erroneous.  First, nothing in the '343 patent or its prosecution history states that rotation is "limited to one axis of rotation."  To the contrary, in the summary of the invention, the patents states that "[t]he clip provides two axis of rotation to position the camera to any desired viewing angle. 1:66 – 2:1.  Further, although a preferred embodiment comprises "where camera 12 rotates over a first axis 26," the specification does <u>not</u> state that camera 12 cannot rotate over any axis besides first axis 26. Likewise, although

a preferred embodiment comprises where "Hinge member 16 rotates around a second axis 32," the specification does not state that hinge member 16 cannot rotate over any axis besides second axis 32.

More importantly, "[t]he claims themselves provide substantial guidance as to the meaning of particular claim terms."[15]  Claims 1 and 10 of the '343 patent, at element (a), each comprise "a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member."  If "rotatably attached" was "limited to one axis of rotation" as the Magistrate Judge has erroneously ruled, then it would be redundant to have a "first axis of rotation" limitation also present in element (a) of claims 1 and 10.[16]  The same issue exists with Claims 19 and 20, wherein element (a) of each is worded: "a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member."

Likewise, Claims 1, 10 and 21 of the '343 patent, at element (b), each comprises "a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame."  If "rotatably attached" was "limited to one axis of rotation" as the Magistrate Judge has erroneously ruled, then it would be redundant to have a "second axis of rotation" limitation also present in element (a) of claims 1, 10 and 21.  The same issue exists with Claim 20, wherein element (b) is worded: "a support frame rotatably attached to said hinge member and configured to support said hinge member on a generally horizontal, substantially

---

[15] *Phillips*, 415 F.3d at 1314.

[16] Claim 21 has almost the exact same language, except its element (a) is written in terms of "a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so adapted, rotating about a first axis of rotation relative to said hinge member."

planar surface, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation."

As the foregoing illustrates, it would be improper to import a "single axis of rotation" limitation into rotatably attached, including because it would make the "first axis of rotation" in element (a) redundant or superfluous, and it would make the "second axis of rotation" in element (b) redundant or superfluous.[17]

The Opinion "finds that the claims of the '343 patent describe 'rotatably attached' objects as rotating over a single axis." Opinion at p. 8. To the contrary, the applicable claims[18] *require* certain rotation over a first axis, and certain rotation over a second axis. This does not mean that "rotatably attached" objects that rotate over more than a single axis cannot meet the claim limitations, provided that they rotate over the required first and second axes.

The Opinion also states that the specification is "consistent in disclosing the camera and support frame rotating over a first and second axis of rotation." Opinion at p. 9. However, here the the Opinion is referring to what the specification specifically calls out as "preferred embodiments." Yet, the "cardinal sin" of claim construction is limiting the claims to a preferred embodiment.[19] Moreover, as noted above, while the preferred embodiment does involve certain rotation over a first axis of rotation and certain rotation over a second axis of rotation, it never states, or even implies, that "rotatable attachment" must be limited to a single axis of rotation, or that something that rotates in more than one axis of rotation cannot fall within the plain meaning of the broad "rotatable attachment" terms.

---

[17] *See, e.g., Blackboard, Inc. v. Desire2Learn, Inc., 574 F.3d 1371, 1376 (Fed. Cir. 2009); Rambus Inc. v. Infineon Techs. AG,* 318 F.3d 1081, 1096 (Fed.Cir.2003) (claim limitation for a multiplexed bus, a limitation that would be redundant if "bus" already meant "multiplexed bus"). *See also Clearstream Wastewater Sys., Inc. v. Hydro–Action, Inc.,* 206 F.3d 1440, 1446–47 (Fed.Cir.2000) (explaining that the doctrine "prevents the narrowing of broad claims by reading into them the limitations of narrower claims").

[18] Claim 19 involves hinged attachment at element (b),  so it is inapplicable to this issue.

[19] *Phillips*, 415 F.3d at 1319-20.

Further, while the Magistrate Judge correctly acknowledged that one preferred embodiment comprises a pivot joint for rotatable attachment, he erred in writing that "the specification explicitly describes the 'pivot element' as rotating around a single axis of rotation." Opinion at p. 10.   To the contrary, in the subject preferred embodiment, the specification describes that, "a pivot element 80 at proximal end 76 of body 74 rotatably attached camera 12 to body 74 so the camera may rotate about first axis 26. 5:38:41.  Rotating about a "first axis" does not mean that something is restricted to *only* a single axis.

Finally, the claims unequivocally refer to an apparatus "***comprising***" a "first axis of rotation" relative to the hinge member and camera and a "second axis of rotation" relative to the hinge member and support frame. The word "comprising," which in patent lexicography means "including, but not limited to" is "open-ended and does not exclude additional, unrecited elements."[20] While all that is required to infringe the claims is rotation in one axis per rotatable attachment, the claimed invention is not restricted to this embodiment.  Rather it ***comprises*** all types of "rotatable" attachments, including those which permit rotation in more than a single axis.

With all due respect, the Magistrate Judge erred in rejecting Plaintiff's "comprising" argument. *See* Opinion at p. 10.  First, the claims ***comprise*** all types of "rotatable" attachments, including those which permit rotation in more than a single axis.   This does not mean that "rotatably attached" is completely open ended; rather, it means that it is not limited to the specific rotatable attachments (*i.e.*, a hinge and a pivot joint) in the preferred embodiments. Second, the rotatable attachments ***comprise*** rotation over a first axis (as claimed), rotation over a second axis (as claimed), *and* rotation over a third axis, and so on.  This does not mean that

---

[20] *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1361 (Fed. Cir. 2007); *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1327-28 (Fed. Cir. 1999).

"rotatably attached" is completely open ended, it means that the claimed invention can involve rotatable attachment over multiple axes, provided that it meets the first axis and second axis limitations of the claims. For example, a claim directed to a vehicle comprising a car which drives forward and reverse would be infringed by a car which drives forward, in reverse, and turns to the side, and a claim directed to a chair comprising three straight legs would be infringed by a chair having three straight legs and one crooked leg.

## V.    CONCLUSION

For the reasons stated herein and in its prior *Markman* briefing, Plaintiff AdjustaCam respectfully submits that its proposed construction[21] of the "rotatably attached" terms should be adopted by the District Court, or alternatively, the District Court should adopt the Magistrate Judge's ruling that the "rotatably attached" terms do not require construction; while overruling the Magistrate Judge's unwarranted limitation that rotatably attached objects are "limited to one axis of rotation."  AdjustaCam also requests such other relief to which it may be justly entitled.

April 24, 2012                                    Respectfully submitted,

                                                  By: /s/ *John J. Edmonds*_____
                                                  John J. Edmonds – LEAD COUNSEL
                                                  Texas State Bar No. 789758
                                                  Michael J. Collins
                                                  Texas Bar No. 4614510
                                                  Stephen F. Schlather
                                                  Texas Bar No. 24007993
                                                  COLLINS, EDMONDS &
                                                  POGORZELSKI, PLLC
                                                  1616 S. Voss Rd., Suite 125
                                                  Houston, Texas 77057
                                                  Telephone: (713) 501-3425
                                                  Facsimile: (832) 415-2535
                                                  jedmonds@cepiplaw.com
                                                  mcollins@cepiplaw.com
                                                  sschlather@cepiplaw.com

---

[21] *i.e.* "connected such that the connected object is capable of being rotated."

> Andrew W. Spangler
> Texas Bar No. 24041960
> Spangler Law P.C.
> 208 N. Green Street, Suite 300
> Longview, Texas 75601
> (903) 753-9300
> (903) 553-0403 (fax)
> spangler@spanglerlawpc.com
>
> ATTORNEYS FOR PLAINTIFF
> ADJUSTACAM LLC

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with this filing via the Court's CM/ECF system and/or email per Local Rule CV-5(a)(3).

April 24, 2012                     /s/ *John J. Edmonds*
                                   John J. Edmonds

## <u>CERTIFICATE OF SERVICE</u>

I, John J. Edmonds, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On December 11, 2014, a copy of the foregoing **CORRECTED NON-CONFIDENTIAL JOINT APPENDIX – VOLUME II OF III (A0631 – A2448)** was filed electronically with the Clerk of the Court using the CM/ECF System, which will serve via electronic mail notice of such filing to all counsel registered as CM/ECF users.

Upon acceptance by the Court of the electronically filed document, six paper copies will be filed with the Court via courier within the time provided by the Court's rules.

Dated: December 11, 2014

/s/ *John J. Edmonds*
John J. Edmonds

COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC